ANIMAL SCIENCE PRODUCTS,
INC., et al., Plaintiffs,

v.

CHINA NATIONAL METALS & MIN-
ERALS IMPORT & EXPORT COR-
PORATION, et al., Defendants.

No. Civ. 05–4376(GEB).

United States District Court,
D. New Jersey.

April 1, 2010.

Robert A. Magnanini, Esq., Stone and Magnanini, LLP, Richard E. Donovan, Esq., Kelley Drye & Warren LLP, William A. Isaacson and Jennifer Milici, Esqs., Boies, Schiller & Flexner, LLP, for Plaintiffs Animal Science Products, Inc., Resco Products, Inc. and a class of similarly situated.[1]

Robert J. Del Tufo, Shepard Goldfein, Michael L. Weiner, Thomas Pak and Sean M. Tepe, Esqs., Skadden, Arps, Slate, Meagher & Flom, LLP, for Defendants China Minmetals Corp. and China National Minerals Co., Ltd.

Donald A. Robinson and Leda Dunn Wettre, Esqs., Robinson, Wettre & Miller LLC, Nicholas L. Coch, Jonathan S. Kaplan, Timothy J. Helwick and Mark A. Baghdassarian, Esqs., Kramer Levin Naftalis & Frankel LLP, for Defendants Sinosteel Corp., Sinosteel Trading Co. and Liaoning Jiayi Metals & Minerals Co., Ltd.

### OPINION

GARRETT E. BROWN, Jr., Chief Judge.

### TABLE OF CONTENTS

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 327

II. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 327

III. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

IV. Distinction Between the Relevant Tests and Burdens . . . . . . . . . . . . . . . . . . . . . . . . 330
 A. Standard and Burden Associated with Jurisdictional Inquiry . . . . . . . . . . . . . . . 330
 B. Standard Associated with Pleading Underlying Claims . . . . . . . . . . . . . . . . . . . . 332
 C. Burden Associated with Asserting Abstention . . . . . . . . . . . . . . . . . . . . . . . . . 334

V. Aspects Related to the FTAIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335
 A. Subject Matter Jurisdiction under the Export Exception to the FTAIA
 Bar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335
 1. Interplay Between the Sherman Act, FTAIA and Hartford Fire . . . . . . . . . 335
 2. Plaintiffs Fail to Provide Factual Proof Meeting the FTAIA
 Exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339

---

1. The instant matter is a putative class action.

| | | a. | Paragraph One ........................................... | 339 |
| | | b. | Paragraph Three ........................................ | 341 |
| | | c. | Paragraph Twenty–Nine................................ | 341 |
| | | d. | Paragraph Forty–Seven ............................... | 341 |
| | | e. | Paragraph Forty–Eight ............................... | 344 |
| | | f. | Paragraph Forty–Nine ................................ | 345 |
| | | g. | Paragraph Fifty ....................................... | 346 |
| | | h. | Paragraph Fifty–One ................................. | 346 |
| | | i. | Paragraph Fifty–Five ................................. | 347 |
| | | j. | Paragraph Sixty–Five ................................. | 349 |
| | | k. | Paragraph Seventy–Two............................... | 361 |
| | | l. | Paragraph Seventy–Five .............................. | 362 |
| | | m. | Amended Complaint Fails to Meet the FTAIA Exception ......... | 362 |

B. Subject Matter Jurisdiction Under the Introductory Clause of the FTAIA ............................................. 362

 1. Plaintiffs' Allegations ................................... 363

 2. Claim That Defendants Effectively Acted as Importers ............... 364

 a. Plaintiffs' Legal Position ..................................... 365

 b. Coors Does Not Lend Support to Plaintiffs' Legal Position ......... 367

 c. Plaintiffs' Position Contradicts the Gist of the Third Circuit Law .............................................. 369

 d. Sales to an American Intermediary or American End–Consumer....................................... 374

 3. Plaintiffs' Factual Proof as to Defendants' Importer Status ............. 375

 a. Plaintiffs' Own Exhibits ................................. 375

 b. Discrepancies in Defendants' Statements ....................... 376

 c. Defendants' Exhibits ..................................... 377

VI. Leave to Amend ...................................................... 378

 A. General Rule...................................................... 378

 B. Implications of Twombly, Iqbal and Factual Review Under Turicentro..... 380

 C. Limited Leave to Amend Is in the Interests of Justice ................... 382

 D. Prudential Considerations .......................................... 384

VII. The FSIA and Abstention Aspects ..................................... 384

 A. Standard of Review ............................................... 385

 B. Applicable Legal Tests ............................................ 385

 1. The FSIA ..................................................... 385

 2. The Act of State Doctrine ...................................... 388

 3. The Concept of Comity ........................................ 389

 4. Government Compulsion ........................................ 391

 C. Parties' Relevant Exhibits and Factual Assertions ..................... 394

 1. Defendants' Moving Papers ..................................... 394

 2. Plaintiffs' Opposition .......................................... 397

 3. Defendants' Reply.............................................. 400

 D. Relevant Legal Proceedings and Evidence Submitted Therein .............. 401

 1. Judicial Notice and the Concept of Stare Decisis ..................... 401

 2. Antidumping and Countervailing Proceedings......................... 403

 a. European Union Proceedings ................................. 405

 b. Proceedings Before the International Trade Administration ........ 409

 3. Antitrust Proceedings .......................................... 410

 a. Proceedings in the Western District of Pennsylvania .............. 410

 b. Vitamin C Proceedings ..................................... 413

 E. The FSIA Appears Relevant as to Some Defendants ..................... 418

 F. The Act of State Doctrine Does Not Warrant Abstention.................. 420

 G. Doctrine of Government Compulsion Appears Relevant ................... 421

 1. Preliminary Considerations...................................... 421

 a. Concept of Compulsion through the Prism of Common Law ........ 421

 b. Concept of Compulsion through the Prism of Foreign Regimes..... 422

 c. Deference to Statements Made by an Arm of a Foreign
 Sovereign............................................425
 2. The CCCMC Is a Government Entity for the Purposes of the
 Doctrine ...............................................429
 3. Presence of Compulsory Processes ................................437
 a. Source of Compulsion .........................................437
 b. Theoretical Severity..........................................439
 c. Actual Existence of Prescripts.................................441
 d. Composite Effect .............................................448
 e. Miscellaneous Considerations ................................452
 4. Compulsion Established and Asserted ..............................462

VIII. Conclusion ........................................................464

## I. INTRODUCTION

This matter comes before the Court upon Plaintiffs' filing of an amended complaint ("Amended Complaint" or "Am. Compl."), *see* Docket Entry No. 77, and upon submission of two motions to dismiss the Amended Complaint; these submissions were made by two groups of Defendants, *i.e.*, by: (1) China Minmetals Corp. and China National Minerals Co., Ltd. (collectively, "Minmetals Defendants"); and (2) Sinosteel Corp., Sinosteel Trading Co. and Liaoning Jiayi Metals & Minerals Co., Ltd. (collectively, "Sinosteel Defendants"). *See* Docket Entry No. 98 ("Sinosteel's Motion" or "S/Mot.") and Docket Entry No. 99 ("Minmetals' Motion" or "M/Mot."). Plaintiffs duly filed their opposition to Sinosteel and Minmetals' Motions, *see* Docket Entry No. 105 ("Plaintiffs' Opposition" or "Opp."), to which the aforesaid two groups of Defendants duly replied. *See* Docket Entry No. 109 ("Minmetals' Reply" or "M/Reply") and Docket Entry No. 110 ("Sinosteel's Reply" or "S/Reply"). For the reasons stated below, Sinosteel and Minmetals' Motions will be granted, and the Amended Complaint will be dismissed as to the Minmetals and Sinosteel Defendants.[2] This dismissal, however, will be, in part, without prejudice, and Plaintiffs will be allowed to amend their pleadings and to provide the Court with factual proof establishing that Defendants were acting as "importers" during the putative Class Period.

## II. PROCEDURAL BACKGROUND

Being initiated almost half a decade ago, this matter has accrued a rather substantial procedural history. However, the bulk of these developments is largely irrelevant to the issues at hand and, hence, it should suffice to merely note that, on September 7, 2005, Plaintiffs Animal Science Products, Inc. ("Animal Science") and Resco Products, Inc. ("Resco") filed a civil complaint ("Original Complaint") on behalf of a putative class and named seventeen Chinese business entities as Defendants.

The issues related to service of process dominated the next two years of litigation. *See, e.g.,* Docket Entries Nos. 3–50; *see also* Docket Entry No. 73 ("December Opinion" or "Dec. Op."), at 3–4 (detailing these procedural developments). Eventually, Plaintiffs moved for a default judg-

**2.** The instant decision shall not be construed as having any direct, that is, immediately dispositive, effect on Plaintiffs' claims raised against all Defendants that did *not* file the Motions at bar ("Residual Defendants"). The Court, however, reserves any determination as to indirect applicability of the instant decision to Plaintiffs' claims against the Residual Defendants; for instance, the Court reserves its decision as to whether Plaintiffs' claims against the Residual Defendants—or certain aspects of such Plaintiffs' claims—might be barred from enforcement by the operation of the doctrine of collateral estoppel.

ment, which triggered Defendants' motion for dismissal of the Original Complaint. *See* Sep. Op. at 3–4. These key revolutions were accompanied by: (a) an extensive litigation on the issue of whether this matter should be resolved by arbitration instead of being litigated; and (b) a panoply of peripheral claims and challenges based on a multitude of substantive and procedural issues. *See id.*; *see also* Docket Entries Nos. 3–63.

On September 15, 2008, this matter was reassigned to the undersigned and, on October 6, 2008, this Court held oral arguments as to the constellation of the then-pending motions. On December 30, 2008, this Court issued its December Opinion and accompanying order. *See* Docket Entries Nos. 73 and 74. The order dismissed the Original Complaint without prejudice, and disposed of the then-pending Plaintiffs and Defendants' motions on various grounds.

The accompanying December Opinion ended with a guidance as to motion practice:

> Thus far, the Court has been presented with a multitude of motions (in addition to those addressed in [the December] Opinion). Since these motions, as well as peripheral challenge[s] embedded in the [m]otions [to dismiss] resolved by this discussion, raise a panoply of issues, the Court finds it prudent to provide the parties with a roadmap to the future litigation in the event: (a) Plaintiffs' elect to take advantage of the leave to file an amended complaint; and (b) Defendants elect to renew some or all of the challenges extended in Defendants' motions and/or scattered in Defendants' oppositions to Plaintiffs' [m]otion [for default judgment]. Hence, in the event Plaintiffs file an amended complaint, Plaintiffs must incorporate in their submission evidentiary proof allowing the

Court to conduct a factual determination (in contrast with the facial analysis conducted herein) and to conclusively satisfy itself as to presence of lack of subject matter jurisdiction over this action. In the event Defendants wish to extend challenges to the Court's subject matter jurisdiction and/or to assert that the Court shall abstain from resolving the instant matter on the grounds involving any provision, judicially-create[d] doctrine or public policy related to a foreign sovereign's action or to Chinese regulatory or legal regime, Defendants should do so at their first opportunity to respond to the amended complaint. If, and only if, the Court: (a) determines that it has proper subject matter jurisdiction over this action; and (b) finds that it shall not abstain from resolving it, Defendants may, if they so desire, renew their currently extended challenges in the following order:

> (1) Defendants shall first raise their challenges based on the alleged lack of personal jurisdiction, insufficient service of process and improper venue;

> (2) only in the event Defendants elect not to raise such challenges, of if the Court determines that in personam jurisdiction was duly obtained and, in addition, establishes that the instant matter is properly before the Court, Defendants may, if they wish, re-raise their argument that the Court shall compel arbitration of this action; and

> (3) if, and only if, Defendants elect not to raise such challenge or the Court denies Defendants' request to compel arbitration, Defendants may, if they so desire, renew their challenges asserting Plaintiffs' lack of

standing and failure to state a claim upon which relief can be granted. Dec. Op. at 59–60.

The parties duly complied with the aforesaid guidance. Plaintiffs filed their Amended Complaint naming, in addition to the Minmetals and Sinosteel Defendants, the following entities as Defendants in this matter: Xiyang Group; Xiyang (Pacific) Import & Export Ltd. Co.; Xiyang Refractory Materials Ltd. Co.; Xiyang Fireproof Material Co. Ltd.; Liaoning Foreign Trade General Co.; Dalian Golden Sun Import & Export Co.; Haicheng Houying Co. Ltd.; Haicheng Huayu Group Import & Export Co. Ltd. (Huaziyu); Haicheng Pailou Magnesite Ore Co. Ltd. and Yingkou Huachen Co. Ltd. *See* Docket Entry No. 77, at 1–3. In response, Defendants filed the Motions at hand, challenging the Amended Complaint on the grounds of subject matter jurisdiction and failure to meet the pleading requirements and, in addition, setting forth numerous arguments advocating abstention.

## III. *FACTUAL BACKGROUND*

Since the allegations raised in the Amended Complaint—and corresponding challenges raised in the Minmetals and Sinosteel's Motions—fall into two broad categories, one addressing a multitude of aspects related to abstention and/or Defendants' immunity from suit, and another related to this Court's subject matter jurisdiction and Plaintiffs' compliance with the pleading requirements—a detailed recital of all allegations and challenges currently before the Court might be unnecessarily overwhelming, while a short summary of the same could cause the parties an undue concern that the Court's omission of certain aspects from such summary might be a sign that these aspects have escaped the Court's attention. Consequently, it appears useful to detail the relevant assertions and challenges in connection with discussion of each individual group of legal issues and, at the instant juncture, it should be sufficient to simply outline the key background points.

Here, Plaintiffs are United States enterprises that consume, for the purpose of conducting their respective businesses, magnesite-based products. *See* Am. Compl. §§ 10, 11. All Defendants named in the Amended Complaint are Chinese business entities involved in the sale of magnesite-based products. *See id.* §§ 12–27. Plaintiffs assert that each of the named Defendants either "directly sold magnesite products to the U.S. companies and shipped magnesite products to the United States" or "engage[d] in metal and minerals trading among other things, including export of magnesite to the United States." *Id.* Plaintiffs further assert that the overall prices charged for Chinese magnesite were artificially inflated because: (a) "[e]ach of these Defendants and its co-conspirators has colluded with each other to restrain competition by, among other things, setting artificial prices pursuant to illegal horizontal agreements among [themselves]," *id.* § 29; and (b) "[t]hese horizontal practices were designed to, and in fact did, have a substantial and adverse impact in the United States." *Id.* § 30. In light of the foregoing, Plaintiffs claim that Defendants' actions violated Section 1 of the Sherman Act, 15 U.S.C. § 1.[3]

---

**3.** No allegations made in the Amended Complaint suggest that Plaintiffs made any effort to buy, specifically, magnesite of Chinese origin (or to avoid buying Chinese magnesite); rather, it appears that Plaintiffs were: (a) buying magnesite regardless of the product's origin: and (b) driven only by their interest in obtaining the particular magnesite-based products Plaintiffs needed at the cheapest price these products were available. *See gen-*

Defendants challenge the Amended Complaint asserting that: (1) Plaintiffs' allegations fail to meet the applicable pleading requirements; (2) Plaintiffs' allegations depict a picture which—under the Foreign Trade Antitrust Improvements Act ("FTAIA") and the Foreign Sovereign Immunities Act ("FSIA")—strips this Court of subject matter jurisdiction over this matter; and/or (3) considerations of comity and the tenets of the "act of state" and "government compulsion" doctrines warrant abstention. *See generally,* M/Mot, S/Mot, M/Reply and S/Reply. To the degree this panoply of issues allows, the Court will address these challenges *seriatim.*

## IV. *DISTINCTION BETWEEN THE RELEVANT TESTS AND BURDENS*

Since there appears to be confusion among the parties as to the applicable tests, the allocation of burdens and the procedural propriety of related inquiries, the Court finds it prudent to clarify these matters at the outset of this discussion.

For instance, Plaintiffs seem to assert that they need not address factual subject matter jurisdictional challenges since the Minmetals' Motion raises only facial jurisdictional challenges, and the Sinosteel's Motion "purports to raise factual challenges but the majority of its arguments concern purported deficiencies in Plaintiffs['] allegations." Opp., at 26. In addition, Plaintiffs maintain that the resolution of the subject matter jurisdictional aspect "should be postponed until summary judgment or a trial on the merits" because a decision as to subject matter jurisdiction

would have a dispositive effect on the merits of Plaintiffs' Sherman Act claims. *See id.*

Defendants, on their part, make no distinction between the facial and factual standards and paraphrase their arguments with regard to the Court's subject matter jurisdiction in terms applicable to a facial review. *See, e.g.,* M/Mot., at 10–11 (discussing Rule 8 *facial* pleading requirements for the purposes of Defendants' *factual* analysis of the Court's subject matter jurisdiction). Moreover, Defendants seem to maintain that the Court must abstain from resolving this matter because *Plaintiffs* make insufficient assertions as to why this Court should not abstain from resolving it. *See, generally, id.* at 11–19, S/Reply at 19–23.

### A. *Standard and Burden Associated with Jurisdictional Inquiry*

Contrary to what appears to be Plaintiffs' impression, the subject matter jurisdiction inquiry initiated in this case was not a result of the challenges raised by the Minmetals Defendants or by the Sinosteel Defendants (or by any other Defendant); rather, the issue was raised by this Court *sua sponte* in light of the jurisdictional uncertainties presented by the case at bar. The Court's decision to look into the jurisdictional aspect ensued from the Court of Appeals' guidance that each "[c]ourt has a continuing obligation to *sua sponte* raise the issue of subject matter jurisdiction." *Bracken v. Matgouranis,* 296 F.3d 160, 162 (3d Cir.2002); *see also Morel v. INS,* 144 F.3d 248, 251 n. 3 (3d Cir.1998) (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie*

---

*erally,* Am. Compl. The voluminous attachments to Plaintiffs' Amended Complaint indicate that Chinese magnesite-based products were indeed the cheapest in the world market, and Plaintiffs never asserted otherwise. *See* Docket Entry No. 77. Rather, the finan-

cial point of Plaintiffs' legal claims could be reduced to the statement that the Chinese magnesite-base products were not as cheap as they could have been had Defendants not entered into the alleged collusive agreement(s). *See id.* § 29.

*des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), as to the observation that "[a] federal court . . . will raise lack of subject-matter jurisdiction on its own motion").

Next, the burden to establish subject matter jurisdiction falls squarely on Plaintiffs since Plaintiffs invoked the Court's jurisdiction by bringing this action. *See Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (clarifying that a federal court shall presume lack of jurisdiction, and the party seeking to invoke the court's jurisdiction bears the burden of proving that subject matter jurisdiction exists). Consequently, any potential shortcomings of—or any potential errors in—Defendants' subject matter jurisdictional challenges cannot have any effect on Plaintiffs' burden, except with regard to the issues discussed in "The FSIA" section of this Opinion, *infra.*

■■■ As this Court already pointed out in its December Opinion, deficiencies as to the "subject matter jurisdiction may be either 'facial' or 'factual.'" *Turicentro, S.A. v. Am. Airlines, Inc.,* 303 F.3d 293, 300, n. 4 (3d Cir.2002). The distinction between factual and facial assessments is rather dramatic. In a facial attack (that is, addressing a challenge based on the assertions made in the plaintiff's pleadings), the trial court must accept the complaint's allegations as true, *i.e.,* the court merely requires the plaintiff to articulate the factual premise of his/her contentions, without providing the court with any actual evidence underlying the plaintiff's factual assertions. "In contrast, a trial court considering a factual attack accords plaintiff's allegations no presumption of truth," and requires production of actual evidence upon which the plaintiff bases his/her factual contentions. *Turicentro,* 303 F.3d at 299, n. 4. Consequently, when assessing a factual—rather than facial—deficiency, the court "can look beyond the pleadings to decide factual matters relating to jurisdiction." *Cestonaro v. United States,* 211 F.3d 749, 752 (3d Cir.2000); *see also Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977) (a factual inquiry into the district court's jurisdiction under Federal Rule of Civil Procedure 12(b)(1) is not confined to the allegations in the complaint).

Furthermore, there is no procedural limitation as to the point in litigation in which a factual inquiry as to the subject matter jurisdiction may be undertaken. While it is true that, "in the Sherman Act context, jurisdictional facts are often closely intertwined with the merits of the claim," *Carpet Group Int'l v. Oriental Rug Importers Ass'n,* 227 F.3d 62, 73 (3d Cir.2000), the court in *CNA v. United States,* 535 F.3d 132, 145 (3d Cir.2008), which is the case relied upon by Plaintiffs, never held that the subject matter jurisdictional inquiry must be postponed until summary judgment, or until trial. Rather, the *CNA* court merely directed the district courts to "ensure that defendants [were] not allowed to use Rule 12(b)(1) to resolve the *merits* [of plaintiffs' claim] too early in litigation." *Id.* (emphasis supplied).

■■■ Here, the threshold subject matter jurisdictional inquiry is whether the FTAIA applies to this matter, thereby removing this Court's jurisdiction to address the merits of Plaintiffs' Sherman Act claims. While the intricacies of the FTAIA are discussed *infra* (and the Sherman Act test would be addressed only if subject matter jurisdiction over this matter is established), the Court presumes the parties' familiarity with the basic proposition that, "[t]o establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets;

(3) that the concerted action [was] illegal; and (4) that [the plaintiff was actually] injured as a proximate result of the concerted action."[4] *Gordon v. Lewistown Hosp.,* 423 F.3d 184, 207 (3d Cir.2005) (citations omitted), *cert. denied,* 547 U.S. 1092, 126 S.Ct. 1777, 164 L.Ed.2d 557 (2006). In contrast, to avoid the FTAIA jurisdictional bar, the plaintiff must show either that: (a) the defendants are importers of goods/services in the United States, *see* 15 U.S.C. § 6a (stating the notoriously inelegant introduction that "[the Sherman Act] shall not apply to conduct involving trade or commerce [ ] other than import trade or import commerce [ ]"); *accord Carpet Group,* 227 F.3d 62 at 72; *Turicentro,* 303 F.3d at 302; or, in alternative, (b) show that the defendants are exporters whose conduct "[had/]has a direct, substantial and reasonably foreseeable effect" on the United States domestic trade or commerce. *See* 15 U.S.C. § 6a(1); *accord Turicentro,* 303 F.3d at 302; *Kruman v. Christie's Intern. PLC,* 284 F.3d 384, 395 (2d Cir.2002), *overruled on other grounds, F. Hoffmann–LaRoche, Ltd. v. Empagran, S.A.,* 542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004).

Even a purely mechanical comparison of the elements comprising the Sherman Act standard with the elements of the FTAIA test reveals that these two tests, while perhaps peripherally related, have so little in common that a resolution of the threshold FTAIA aspect cannot be deemed substantively dispositive for purposes of the merits of the underlying Sherman Act claims. Therefore, the caution articulated by the *CNA* court appears virtually inapplicable to a FTAIA-based scenario, since—without engaging in undue over-

reaching—a judicial decision disposing of a FTAIA challenge does not prematurely resolve the merits of the underlying Sherman Act claims.

### B. *Standard Associated with Pleading Underlying Claims*

Since Plaintiffs' Original Complaint asserted fraudulent conduct by Defendants, Plaintiffs' prior pleadings were examined under the requirements of Rule 9. However, the Amended Complaint no longer makes these assertions. Therefore, for the purposes of their Sherman Act claims, Plaintiffs' new set of allegations is subject to review under Rule 8.

It is long established that a court should "accept as true all of the [factual] allegations in the complaint and reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Morse v. Lower Merion School Dist.,* 132 F.3d 902, 906 (3d Cir. 1997). Nonetheless, the Third Circuit has noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint. *See Burlington Coat Fact. Sec. Litig.,* 114 F.3d 1410, 1429 (3d Cir.1997). Therefore, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. *See Nice Sys., Ltd. Sec. Litig.,* 135 F.Supp.2d 551, 565 (D.N.J.2001).

Addressing the clarifications as to the litigant's pleading requirement stated by the United States Supreme Court in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Court of Appeals for the Third Circuit

---

**4.** Notably, if a restraint is *per se* illegal, no examination of the practice's impact on the market is necessary for finding of anti-competitive effects within relevant product and geographic markets, *see Pace Elecs., Inc. v.* *Canon Computer Sys., Inc.,* 213 F.3d 118, 123 (3d Cir.2000), which means, in turn, that no aspect even vaguely resembling the "direct, substantial and reasonably foreseeable effect" of the FTAIA can possibly arise.

provided the district courts with guidance as to what pleadings are sufficient to pass muster under Rule 8. *See Phillips v. County of Allegheny,* 515 F.3d 224, 230–34 (3d Cir.2008). Specifically, the Court of Appeals observed as follows:

> "While a complaint ... does not need detailed factual allegations, a plaintiff's obligation [is] to provide the 'grounds' of his 'entitle[ment] to relief' ...." *Twombly,* 127 S.Ct. at 1964–65 ... "[T]he threshold requirement of Rule 8(a)(2) [is] that the 'plain statement [must] possess enough heft to 'sho[w] that the pleader is entitled to relief.''" *Id.* at 1966. [Hence] "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965 & n. 3.

*Id.* at 230–34 (original brackets removed). This pleading standard was further refined by the United States Supreme Court in its recent decision *Ashcroft v. Iqbal,* — U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), where the Supreme Court clarified as follows:

> [In any civil action, t]he pleading standard ... demands more than an unadorned ["]the-defendant-unlawfully-harmed-me["] accusation. [*Twombly,* 550 U.S.] at 555, 127 S.Ct. 1955 .... A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [*Id.*] at 555, 127 S.Ct. 1955. [Moreover,] the plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* [Indeed, even w]here a complaint pleads facts that are "merely consistent with" a defendant's liability, [the so-al-

leging complaint still] "stops short of [showing] plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S.Ct. 1955 (brackets omitted). [*A fortiori,*] the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [or to t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements [, *i.e.,* by] legal conclusion[s] couched as a factual allegation [e.g.,] the plaintiffs' assertion of an unlawful agreement [or] that [defendants] adopted a policy " 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." .... [W]e do not reject these bald allegations on the ground that they are unrealistic or non-sensical.... It is the conclusory nature of [these] allegations ... that disentitles them to the presumption of truth.... [Finally,] the question [of sufficiency of] pleadings does not turn [on] the discovery process. [*Twombly,* 550 U.S.] at 559, 127 S.Ct. 1955 .... [The plaintiff] is not entitled to discovery [where the complaint asserts some wrongs] "generally," [*i.e.,* as] a conclusory allegation [since] Rule 8 does not [allow] pleading the bare elements of [the] cause of action [and] affix[ing] the label "general allegation" [in hope of developing actual facts through discovery].

*Iqbal,* 129 S.Ct. at 1949–54.

The Third Circuit observed that *Iqbal* hammered the "final nail-in-the-coffin" for the "no set of facts" standard set forth in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957),[5] which was applied to federal complaints before

---

5. The *Conley* court held that a district court was permitted to dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gib-*

son, 355 U.S. at 45–46, 78 S.Ct. 99. Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

*Twombly. See Fowler v. UPMC Shadyside,* 578 F.3d 203 (3d Cir.2009). Since *Iqbal,* the Third Circuit has instructed district courts to conduct, with regard to Rule 8 allegations, a two-part analysis when the district courts are presented with a Rule 12(b)(6) motion to dismiss:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [*See Iqbal,* 129 S.Ct. at 1949–50]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief" [in light of the definition of "plausibility" provided in *Iqbal.*] In other words, a complaint must do *more than allege the plaintiff's entitlement to relief.* A complaint has to "show" such an entitlement with its facts. *See Phillips,* 515 F.3d at 234–35. As the Supreme Court instructed in *Iqbal,* "[w]here the well-pleaded facts do not permit the court to infer more than the *mere possibility of misconduct, the complaint has alleged-but it has not 'show* [*n* ]*'-'that the pleader is entitled to relief.'*" *Iqbal,* [129 S.Ct. at 1949–50 (emphasis supplied) ]. This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

*Fowler,* 578 F.3d at 210–11 (emphasis supplied).[6]

## C. *Burden Associated with Asserting Abstention*

The Supreme Court has long rejected the rigid proposition that abstention is a technical rule of equity procedure. *See Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 718, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). Rather, the Court held that "the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief." *Id.* at 718, 116 S.Ct. 1712. However, as the parties seeking abstention, Defendants bear the burden of showing that abstention is the appropriate course. *Cf. Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ("The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it"); *Sheerbonnet v. American Express Bank, Ltd.,* 17 F.3d 46, 49 (2d Cir.1994) (given "the virtually unflagging obligation of the federal courts" to exercise jurisdiction where warranted, a defendant seeking abstention

---

**6.** This Court is not aware of any legal decision addressing the effect of *Iqbal* on the standard applicable to the *factual* Rule 12 challenges, as they are defined in *Turicentro.* However, it appears logical for the Supreme Court's guidance in *Iqbal* to have at least a ripple effect on the standard applicable to factual challenges. Since the Supreme Court in *Iqbal* expressly guided that a plaintiff cannot obtain discovery with regard to his/her claims unless the plaintiff actually spells out the facts underlying these claims, the same guidance—if applied to factual rather than facial review—must yield the rule that a plaintiff cannot obtain discovery with regard to evidence verifying jurisdiction. Indeed, concluding otherwise invites a scenario where the plaintiff, being charged with the duty to actually produce jurisdictional evidence, is nonetheless permitted to flatly admit that (s)he has no such evidence and that all (s)he can do is to speculate in his/her pleadings that such evidence might be discovered. In other words, allowing the plaintiff to conduct discovery for the purposes of factual challenge would result in an anomalous rule granting the plaintiff a broader pleading latitude for the purposes of the test under which the plaintiff's pleadings are not even granted presumption of truth.

faces a heavy burden). Consequently, any potential shortcomings of—or any potential errors in—Plaintiffs' position advocating against abstention cannot reduce or otherwise affect Defendants' burden of establishing that this Court should refrain from resolving this matter.

## V. THE FTAIA ASPECT

### A. Subject Matter Jurisdiction under the Export Exception to the FTAIA Bar

#### 1. Interplay Between the Sherman Act, FTAIA and Hartford Fire

As with the above-discussed issues of applicable standards and burdens, there appears to be a certain confusion among the parties as to the relationship between the governing statutory provision and relevant common law precedents addressing the issue of federal jurisdiction over the claims alleging collusive agreements within the context of international trade. *See, e.g.,* S/Mot., at 7 (suggesting the presence of *two different* tests by stating: "Plaintiffs' ... allegations are insufficient to establish that Defendants' alleged conspiracy involved United States "import commerce" or had a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce, as required by the ... FTAIA ... *or* that [Defendants' conduct] involved 'import commerce' or trade that had 'substantial effect[s]' on U.S. domestic commerce, as required by *Hartford Fire Ins[.] Co. v. California* ").

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Federal courts have struggled for decades to determine their jurisdiction over allegations of foreign restraints of trade. *See, e.g.,* Areeda & Hovenkamp, Antitrust Law, ¶ 272 (2d ed. 2000); *see also Den*

*Norske Stats Oljeselskap As v. Heere-Mac v.o.f.,* 241 F.3d 420, 423–24 (5th Cir.2001) ("The history of this body of case law is confusing and unsettled").

Prior to the passage of the FTAIA, the courts applied various tests in order to determine when foreign conduct fell within the purview of the Sherman Act. The most widely used standard was the "effects test," which was developed by the Second Circuit in *United States v. Aluminum Co. of Am.* ("*Alcoa*"), 148 F.2d 416, 444 (2d Cir.1945). The *Alcoa* court considered whether Congress intended the Sherman Act to impose liability for conduct outside the United States and under which circumstances the Constitution allowed Congress to do so. *See id.* Judge Hand rejected the idea that Congress meant "to punish all whom [United States] courts can catch." *Id.* at 443. Instead, the *Alcoa* court held that the Sherman Act was meant to reach foreign conduct only if that conduct was *intended to affect* (and did, in fact, affect) United States commerce. *See id.* Accordingly, in *Hartford Fire Ins. Co. v. California,* the Supreme Court focused on the "intent-to-affect" language of *Alcoa* and summarized the effects test by stating that "it is well established by now that the Sherman Act applies to foreign conduct that was *meant to produce* and did in fact produce some substantial effect in the United States." 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (citing *Alcoa,* emphasis supplied).

Application of the *Alcoa* effects test, however, proved difficult, causing the precise extraterritorial reach of the Sherman Act to remain less than crystal clear. In response to that difficulty, Congress enacted the FTAIA in 1982—because the "courts differ[ed] in their expression of the proper test for determining whether United States antitrust jurisdiction over international transactions exists," H.R.Rep. No.

97–686 (1982), *reprinted in,* U.S.C.C.A.N. 2487, 2487 (1982)—the statute, hence, built on the common law principle established in *Alcoa* and embraced in *Hartford Fire.* In no ambiguous terms, the FTAIA "clarif[ied] the Sherman Act [by] mak[ing it] explicit [that, in foreign trade cases, the Sherman Act had] application only to conduct having a 'direct, substantial and reasonably foreseeable effect' on domestic commerce." *Id.* Specifically, the FTAIA provided that:

[The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a *direct, substantial, and reasonably foreseeable effect*—

(A) ... on [United States] import trade or import commerce with foreign nations ...

and

(2) such effect gives rise to a claim under the [Sherman Act].

15 U.S.C. § 6a (emphasis supplied).

Although subsection (1) created an exception to the FTAIA's jurisdictional bar with regard to those claims that were raised against foreign *exporters,* the language of this exception did not clarify the meaning of the phrase "direct, substantial, and reasonably foreseeable effect," and federal courts' lack of interest in the FTAIA for the first decade after its enactment created an interpretative void opening the door to a debate as to whether the FTAIA established a new jurisdictional

standard or merely codified the very same test that was articulated in *Alcoa* and *Hartford Fire.*[7] The gap was filled by the Ninth Circuit, which reasoned as follows:

Our task when interpreting legislation is to give meaning to the words used by Congress; we strive to avoid constructions that render words meaningless. *See United States v. Fiorillo,* 186 F.3d 1136, 1153 (9th Cir.1999). The FTAIA states that the Sherman Act shall not apply to foreign conduct unless it has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce. [*See* ] 15 U.S.C. § 6a(1). [In contrast,] the Supreme Court [explained that] the *Alcoa* test ... confer[s] jurisdiction so long as the conduct creates "some substantial effect in the United States." *Hartford Fire,* 509 U.S. at 796, 113 S.Ct. 2891. Unlike the FTAIA, the *Alcoa* test does not require the effect to be "direct." [Hence, a]dopting the [reading of the FTAIA equivalent to that of] applying the *Alcoa* test would render meaningless the word "direct" in the FTAIA. We are not willing to rewrite a statute under the pretense of interpreting it. Moreover, applying *Alcoa* instead of the FTAIA would contravene the FTAIA's purpose. The FTAIA created its jurisdictional test because the "enactment of a single, objective test—the 'direct, substantial, and reasonably foreseeable effect' test—will serve as a simple and straightforward clarification of existing American law." [H.R.] at 2487–88. The [H.R.] goes on to state: "The specific

---

**7.** Several courts noted this question without answering it, e.g., the Supreme Court did so in *Hartford Fire,* noting that the effects test is well established, *see,* 509 U.S. at 796, 113 S.Ct. 2891, and observing—in a footnote—that the facts of *Hartford Fire* did not require the Court to address the question of "whether the [FTAIA's] 'direct, substantial, and reasonably foreseeable effect' standard amends ex-

isting law or merely codifies it." *Id.* at 796 n. 23, 113 S.Ct. 2891. After so concluding, the Court quickly turned to the issue of whether principles of international comity should have prevented the exercise of jurisdiction, *see id.* at 797, 113 S.Ct. 2891; the swiftness of the Court's transition perhaps made the value of *Hartford Fire* less obvious for the purposes of the FTAIA.

purpose of the Sherman Act modification is: to more clearly establish when antitrust liability attaches to international business activities." *Id.* at 2492. It would be a serious departure from the goal of achieving clarity for us to conclude that Congress meant only "some substantial effect," *Hartford Fire*, 509 U.S. at 796, 113 S.Ct. 2891, when it said "direct, substantial, and reasonably foreseeable effect." Clarity is not achieved by employing three modifiers ("direct," "substantial," and "reasonably foreseeable") as the standard for the required effect of the challenged conduct and then telling businesses that only one modifier ( [e.g.,] "substantial") is relevant to Sherman Act liability.[8]

. . .

[W]e [now] must consider what Congress meant by "direct." A dictionary published contemporaneously with the enactment of the FTAIA defined "direct" as "proceeding from one point to another in time or space without deviation or interruption." *Webster's Third New Int'l Dict.* 640 (1982). Further, our efforts at understanding the meaning of "direct" are aided by the Supreme Court's interpretation of a nearly identical term in the ... FSIA. The FSIA states that immunity does not extend to

commercial conduct "outside the territory of the United States ... that [ ] causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). After the lower federal courts struggled for years to define "direct effect," the Supreme Court unanimously declared that an effect is "direct" if it follows as an immediate consequence of the defendant's activity. [*See* ] *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).

*United States v. LSL Biotechnologies*, 379 F.3d 672, 679 (9th Cir.2004).[9]

■ This Court finds the reasoning in *Biotechnologies* well founded and persuasive. Thus, Sherman Act claims (if they are based on defendants' *export* practices but fail to state facts showing that these practices caused a direct, substantial, and reasonably foreseeable effect on United States commerce) effectively plead the plaintiff out of court or—to put it another way—in order to survive dismissal under the FTAIA jurisdictional bar, the plaintiff must show that:

(i) defendants' export practices were "direct" (in the sense that defendants' conduct actually caused such immediate consequence) with regard to United States domestic commerce, *see id.;*

---

**8.** The FTAIA test neither reversed nor even diluted the "intent-to-affect-and-effect-in-fact" common law principle established in *Alcoa/Hartford Fire*. Cf. *United States v. Texas*, 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993) ("[S]tatutes which invade the common law [are] to be read with a presumption favoring the retention of long-established and familiar principles, except when the statutory purpose to the contrary is evident"). Rather, the FTAIA spelled out additional—perhaps already implied but not articulated in *Alcoa*—elements. *See Biotechnologies*, 379 F.3d at 680, n. 6 ("the dissent does not argue that the effects need not be direct, but rather that the 'meant to affect' requirement has always been part of the 'effects test'

[of *Alcoa* ]. Thus, the panel agrees on the standard; we merely disagree about its source. We say it is the FTAIA, while the dissent says the common law. We all recognize that conduct related to international trade is exempt from the Sherman Act unless it has a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce").

**9.** The *Biotechnologies* court also observed that the process of "[a]pplying *Alcoa* [in lieu of the FTAIA] might also ignore the words 'reasonably foreseeable,' although we recognize that foreseeability might be a concept inherent in any scheme that seeks to impose liability." *Biotechnologies*, 379 F.3d at 679, n. 4.

(ii) defendants' conduct actually was "substantial" (in the sense that defendants' conduct was actually "intended/consciously meant") to produce a consequence in the United States;[10] *see Hartford Fire*, 509 U.S. at 796 [113 S.Ct. 2891]; *Alcoa*, 148 F.2d at 444;

(iii) that consequence was a foreseeable result of defendants' action rather than a mere incidental occurrence. *See id.*

Being mindful of the *cumulative* effect created by all three qualifiers of the FTAIA exception (*i.e.*, by the "direct, substantial, and reasonably foreseeable" elements, as they are read in light of guidance provided in *Alcoa/Hartford Fire*), the Court followed, in its December Opinion, the case law which—while addressing various "through out-the-world-with-the-United-States-included" foreign trade scenarios—found allegations asserting indiscriminating world-wide trade activities lacking focus on the United States commerce insufficient to invoke the FTAIA exception. *See* Docket Entry No. 73, at 28–34.

Specifically, this Court:

(i) relied on the observation made in *Dee–K Enters. v. Heveafil Sdn. Bhd.*, 299 F.3d 281, 294–96 (4th Cir.2002), and *Dee–K*'s utilization of *Hartford Fire*, which noted that

a court should consider whether the [defendants'] *acts, targets, and effects* ... are *primarily* foreign or *primarily* domestic. This inquiry will best accommodate the cases with mixed fact patterns, defying ready categorization as "foreign" or "domestic" conduct, which our increasingly global economy will undoubtedly produce. We cannot begin to foresee the scope or complexity of future transactions. To adopt simplistic rules ... might well yield unintended and unfortunate results.... We note that this approach echoes that of the Third Circuit in *Carpet Group* and finds support in several of the treatises[11];

and

(ii) observed that the FTAIA plaintiff challenging foreign exportation practices must show that defendant-exporters' conduct was, in some way, "focused" on the United States domestic market (since no defendant can unknowingly intend or mean to affect the American market), and a mere showing that defendants' exportation practices indiscriminately targeted "a global market, [and the] links to the United States [were] mere drops in the sea of conduct that occurred... around the world" would fail to establish that the defendants' activities resulted in the "direct, substantial and reasonably foreseeable effect" on the United States trade needed to remove the FTAIA jurisdictional bar. Docket Entry No. 73, at 33–34 (quoting *Dee–K Enters.*, 299 F.3d at 295, which cited *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1254 (7th Cir.1980), the case relying, in turn, on *Alcoa* ).

---

**10.** The Court is mindful that the "intended/meant-to-affect" aspect retained by the FTAIA from *Alcoa/Hartford Fire* does not have immediate lingual correspondence to the word "substantial," which is an element of the exception language provided in subsection (1)(A). Indeed, it appears that the word "direct" might be of better use to convey the sense of intent to affect. However, the Court finds it improper to switch the meanings of the terms "direct" and "substantial" as they were articulated by the Supreme Court in *Alcoa/Hartford Fire* and in *Republic of Argentina v. Weltover*. Therefore, the Court retains the Supreme Court's meaning of these terms and, with an eye on clarity of its decisions, utilizes the words "substantiality" and "directness" as references to the tests offered by the Supreme Court.

**11.** *See infra* note 57 for a detailed discussion of *Dee–K Enters.* and its particular relevance to certain aspects of the claims at bar.

## 2. Plaintiffs Fail to Provide Factual Proof Meeting the FTAIA Exception

Seemingly relying on § 6a(1)(A), Plaintiffs summarize their factual proof as follows:

Defendants' conspiracy ha[d] "the purpose and effect of fixing prices of magnesite ... products exported to and purchased in the United States." [Am. Compl.] ¶ 1. Defendants' [trading activities] ha[d] "affected hundreds of millions of dollars of commerce in products that are used in American manufacturing facilities" and "severely burdened consumers in the United States." *Id.* ¶ 3; *see also* [*i* ]*d.* ¶ 29.... Defendants' ... pricing ha[d] directly affected U.S. commerce by increasing the price of Chinese magnesite purchased ... for use in the United States. [*See* Am. Compl.] ¶¶ 1, 51, 55, 65, 72 and 75. This effect has been substantial, leading to average overcharges of more than 21% on each sale of magnesite made ... during the four year period from 2004 to 2008. [*See* Am. Compl.] ¶ 65.... In 2007, Defendants and [entities associated with Defendants] had an 83% share of [a certain type of magnesite product that was exported from all over the world] to the United States and 87% share of [another type of magnesite product that was exported from all over the world] to the United States. [*See* ] *id.* ¶ 47. The value of the ... magnesite from China [that was brought to the United States] exceeded $160 million in 2008. [*See* ] *id.* ¶ 49. Accordingly, Defendants' [trade] activities have affected ... U.S. commerce ....

Opp. at 17–18.[12] Each of the paragraphs cited in the Opposition, *i.e.*, Paragraphs 1, 3, 29, 47–51, 55, 65, 72 and 75 of the Amended Complaint, warrants an individual discussion.[13]

### a. *Paragraph One*

Paragraph One alleges as follows:

This case arises out of a conspiracy among all Defendants and their [unspec-

---

12. Since Plaintiffs in this matter are not *pro se* litigants but rather are represented by counsel, the Court need not examine the Amended Complaint for statements vaguely indicating assertions of facts, *compare Royce v. Hahn,* 151 F.3d 116, 118 (3d Cir.1998) (guiding that *pro se* pleadings "must be construed liberally and with a measure of tolerance"), and presumes that Plaintiffs' Opposition correctly directed the Court's attention to the statements in the Amended Complaint which Plaintiffs deem support their position under subsection (1)(A).

13. Granted that Plaintiffs' Amended Complaint systemically utilizes the term "Cartel" and, moreover, keeps referring to such "Cartel" as a single and continuously existing entity, the Court finds it useful to trace the history of this "Cartel," as painted by Plaintiffs. The following discussion, however, shall not be construed as expressing the Court's position that an actual—or a single and continuing cartel (or even a numbers of cartels)—existed; this issue is expressly reserved to be resolved in the event the Court has to address Plaintiffs' Sherman Act claims. First, relying on certain sources, Plaintiffs assert that, on April 9, 2000, Xiyang Refractory Materials, Yingkou Huachen, Dalian Golden Sun and Liaoning Foreign Trade, plus nine unspecified entities, established first "sub-Cartel" named "Jiyuan Magnesite Group," while Defendants Liaoning Liayi and Haicheng Huayu, plus non-defendant Shenyang Metals, established another "sub-Cartel" named "Huaxia Magnesite Group." *See* Am. Compl. ¶¶ 52–53. Then, without stating their factual source, Plaintiffs assert that "[o]n February 19, 2001, the Jiyuan and Huaxia Magnesite Groups formally established a single, unified group under the name 'Chinese Magnesite Export Association' ('Cartel').... The [resulting joint] Cartel comprised 23 exporting companies, including [eighteen unspecified entities and] Haicheng Pailou [not listed as a member of either "sub-Cartel"], Yingkou Huachen, Xiyang Group [not listed in either "sub-Cartel"], Haicheng Houying [not listed in either "sub-Cartel"] and Haicheng Huayu." *Id.* ¶ 57. Then Plain-

ified] co-conspirators [14] that has the purpose and effect of fixing prices of magnesite and magnesite products exported to and purchased in the United States. Defendants have also committed other unlawful practices designed to inflate the prices of magnesite and magnesite products sold to Plaintiffs and other purchasers in the United States and elsewhere.

Am. Compl. ¶ 1.

■ This Paragraph provides the Court with no factual proof of any kind, prevent-

tiffs allege, without specifying their source, that "[o]n March 22, 2003, at least 19 exporting companies [that is, the amount of companies less than the 23 companies comprising the alleged unified Cartel], including Liaoning Jiayi [resurrected from the second 'sub-Cartel'], Haycheng Houyin[g], Yingkou Huachen[ ], Dailan Golden Sun [resurrected from the first 'sub-Cartel'], China Minmetals [not included in the previous versions of 'Cartel' or in any 'sub-Cartel'], China Minerals [not included in the previous versions of 'Cartel' or in any 'sub-Cartel'], Sinosteel Trading [not included in the previous versions of 'Cartel' or in any 'sub-Cartel'], Xiyang Pacific [not included in the previous versions of 'Cartel' or in any 'sub-Cartel'] and Haicheng Huayu met in Shenyang, China[,] to discuss and forecast price trend for the year 2003." *Id.* ¶ 59. Plaintiffs then allege that "[t]he members of the [presumably, this "discussion/forecasting group"] agreed ... to have [a new version of] the Cartel establish[ed] ... under the name the 'China Magnetic Forum."' *Id.* Next, citing certain sources, Plaintiffs maintain that, "[o]n February 1, 2004, [unspecified] members of the [presumably, the latest version of] the Cartel [that] includ[ed] Defendants Sinosteel Trading, Xiyang Group [resurrected from the original version of the Cartel], Haicheng Huaya, Haicheng Houying [resurrected from the original version of the Cartel] and Jiachen Group [not included in either version of the Cartel or in any 'sub-Cartel'] met under yet another name calling themselves the 'China Magnesite Self–Disciplined Association." *Id.* ¶ 62. After so stating, Plaintiffs claim that unspecified members of an unspecified transformation of this ever-changing Cartel "reached [an agreement sometime] in November 2006, to increase the price of exported [magnesite-based products]." *Id.* ¶ 63. Finally, citing no sources, Plaintiffs state that, "[o]ver the weekend of December 9–10, 2006, [unspecified number of the members of this ever-changing] Cartel, including Xiyang Group, Haicheng Huaya, Haicheng Houying and Jiachen Group met and agreed to increase prices" on *magnesite-based products*.

*Id.* Citing an Internet article, Plaintiffs conclude the foregoing discussion with the statement that, sometime "[i]n February 2007, [unspecified] members of [this ever-changing] Cartel met to discuss a possible agreement to increase the export price." *Id.* ¶ 64. Although Plaintiffs assert that the "Cartel" is still operative, *see id.,* ¶ 3, they do not describe any post–February–2007 memberships, meetings or activities of the "Cartel." *See also* note 146, *infra.*

14. While the Amended Complaint states that "Defendants' co-conspirators include[d] Rongyuan Magnesite Corporation of China, subsequently renamed Shangawa Rongyuan Refractories Co., Ltd, Yingkou Sanhua Refractory Material Co., Ltd., subsequently renamed Yingkou Wonjin Refractory Material Co., Ltd., Shenyang Metals and Minerals, and CITIC Trading," the Amended Complaint does not explain why these entities are not named as Defendants, same as it does not clarify whether any other entity exporting Chinese magnesite might be included in the list of such non-liable "co-conspirators." *See* Am. Compl. ¶ 28. On the contrary, the Amended Complaint makes *passim* reference to unspecified "co-conspirators" (hence suggesting that such references are unrelated to the entities listed in Paragraph Twenty Eight). Plaintiffs' systemic reference to unspecified co-conspirators of Defendants, especially if assessed in light of the ever-changing composition of the alleged "Cartel," leaves the list of "co-conspirators" to the Court's imagination and necessarily invites a possibility that *all* Chinese exporters of magnesite products—regardless of whether or not they were identified in the Amended Complaint—could be such "co-conspirators"; this possibility, in turn, lends support to Defendants' assertion that *all* Chinese exporters of magnesite-based products were subject to compulsory price regulations governing export of Chinese magnesite-based products, as discussed *infra*, note 139 of this Opinion.

ing the Court from utilizing this Paragraph for its factual analysis, as defined in *Turicentro*. Moreover, being comprised of conclusory, self-serving sentences, this Paragraph fails to assert facts even in accordance with the lenient pleading requirements articulated in *Twombly* and *Iqbal*. Consequently, the content of this Paragraph will be disregarded for failure to support Plaintiffs' position that the Court has jurisdiction to hear their claims under 15 U.S.C. § 6a(1)(A).

### b. *Paragraph Three*

Paragraph Three asserts:

> The conspiracy has existed from at least April 2000 to date, and increased its effectiveness through new agreements to fix prices and limit supply entered in 2003. Defendants' illegal cartel [at an unspecified stage of its existence and, hence, of unspecified composition] has deliberately targeted and severely burdened consumers in the United States. Th[is unspecified in its stage-of-existence and composition] cartel has affected hundreds of millions of dollars of commerce in products that are used in American manufacturing facilities and households.

*Id.* ¶ 3.

The three sentences comprising this Paragraph suffer of the deficiencies identical to those plaguing Paragraph One, *i.e.*, the statements made in Paragraph Three are not cognizable even for the purposes of facial review, as defined in *Twombly* and *Iqbal*. *A fortiori*, these statements cannot qualify as factual proof for the purposes of factual review, as defined in *Turicentro*. Therefore, the content of Paragraph Three will similarly be disregarded by the Court without reaching the issue of whether this Paragraph could even be relevant to the "direct, substantial, and reasonably fore-

seeable" elements of the FTAIA exception stated in subsection (1)(A).

### c. *Paragraph Twenty–Nine*

The following paragraph in Plaintiffs' list, *i.e.*, Paragraph Twenty–Nine, states:

> Each of these Defendants and its [unspecified] co-conspirators has colluded with each other to restrain competition by, among other things, setting artificial prices pursuant to illegal horizontal agreements among these competitors. These horizontal practices were designed to, and in fact did, have a substantial and adverse impact in the United States.

*Id.* ¶ 29.

The shortcomings of this Paragraph are similar to those plaguing Paragraphs One and Three, discussed *supra*, *i.e.*, Plaintiffs offer the Court not a single factual proof, but only a "fusion" of: (a) legal conclusions applicable to any garden-variety Sherman Act scenario; and (b) a FTAIA/Sherman Act element. Therefore, the Court will analogously disregard the factless content of this Paragraph without reaching the issue of whether it might even be relevant to the "direct, substantial, and reasonably foreseeable" elements of the FTAIA exception.

### d. *Paragraph Forty–Seven*

The next paragraph referred to by Plaintiffs, that is, Paragraph Forty–Seven, alleges:

> During the period described in this [Amended] Complaint, the international market for magnesite and magnesite products was dominated by Defendants and their [unspecified] co-conspirators, including producers of magnesite and magnesite products and trading companies in China exporting magnesite and magnesite products. China is the most significant foreign supplier of magnesite to the United States with an 83 percent

share of ... magnesite imports [in one type of magnesite product] and an 87 percent share of ... magnesia imports [in another type of magnesite product] in 2007.

*Id.* ¶ 47. The Court gathers that this Paragraph aims to provide the Court with a showing that Defendants' export activities fell within the meaning of the exception in subsection (1)(A).

■ The Paragraph refers the Court, through footnote 5, to "2007 Yearbook Table 6," that is, to a table in the document attached to the Amended Complaint as Plaintiffs' Exhibit 4. The table, produced by the United States Census Bureau, shows that, in comparison with results of the year 2006, United States importation of Chinese magnesite-based products in the year 2007 slightly decreased in quantity and in value with regard to a certain magnesium oxide product but slightly increased in quantity and in value with regard to another magnesium oxide product. *See* Docket Entry No. 77–1, at 27; *see also infra* note 17 of this Opinion (explaining the distinction between crude magnesite and types of magnesium oxide). With regard to the first product, the table shows that United States import of this product was comprised of 85.4% (rather than 87% asserted by Plaintiffs) volume of goods of Chinese origin, and it's relevant value was 74.1% of United States overall 2007 importation of that product. *See id.* With regard to the second product, the table shows 83.3% volume and 67.3% value as to the relevant United States importation in 2007. *See id.* The table—presenting, by definition, a snapshot of United States importation only in 2007 (and also verifying that Chinese magnesite products were the cheapest among all other goods of these types imported by the United States)—is entirely silent as to *Defendants'* individual (or even collective) share, be it volume-

wise and/or value-wise, thus leaving it to the Court's imagination whether Defendants' goods comprised the entire batch of Chinese magnesium oxide imported by the United States in 2007, or none of it, or any amount in between. *See id.*

Since, without resolving this ambiguity, the Court cannot assess the validity of Plaintiffs' claims made against *Defendants* (rather than against the entire Chinese magnesite industry), the Court examined the Amended Complaint for any statement that may shed light on the relation between individual Defendants and the entire Chinese industry producing magnesite-based goods. The detected statements in the Amended Complaint (that appear relevant to the Court's inquiry) do not assist Plaintiffs' position; on the contrary, they render Plaintiffs' claims unwarranted. For instance, Paragraph Fifty–Four of the Amended Complaint states: "[t]he members of the two Jiyuan and Huaxia Magnesite Groups [*i.e.*, the two initial 'sub-Cartels'] collectively represented more than 70 percent of the export volume of magnesite in China" during unspecified year(s). Am. Compl. ¶ 54. (Notably, Paragraph Fifty–Four does not provide the Court with any source of Plaintiffs' conclusion as to this percentile, hence rendering it of no use for the purposes of factual analysis, as defined in *Turicentro.* The Court, however, ignores this shortcoming, for the purposes of this Opinion only, to address Plaintiffs' claim as a whole.)

If the Court were to entertain this 70% figure and, also, to take a leap of logic in Plaintiffs' favor by presuming that the ever-changing "Cartel" and the sum of Jiyuan and Huaxia Magnesite "sub-Cartels" were, somehow, the same thing, *but see supra* note 13 of this Opinion (prompting a conclusion otherwise), Plaintiffs' allegations would merely suggest that Defen-

dants (perhaps, jointly with their specified and unspecified co-conspirators) had a 70 percent share of Chinese magnesite-based export.[15] Further examining Plaintiffs' Amended Complaint, the Court finds this 70% figure relevant to Plaintiffs' claim that "[t]he United States consumes about 25 percent of China's magnesite exports." *Id.* ¶ 50. In support of that proposition, Plaintiffs rely on their Exhibit 2. *See id.* at 12, n. 7. However, Plaintiffs' Exhibit 2 states:

About 2.0 million metric tons of magnesium oxide were exported from China in 2006 .... In 2006, 590 thousand metric tons, 500 thousand metric tons, 300 thousand metric tons, and 640 thousand metric tons of magnesium oxide were exported from China to Japan, Europe, the United States, and Other Asia, respectively.[16]

Docket Entry No. 77–1, at 9.[17]

Read jointly with Exhibit 2, Plaintiffs' Paragraph Forty–Seven stands for the propositions that the alleged "Cartel" a/k/a the sum of "Jiyuan and Huaxia Magnesite Groups" was the source of a mere 10.5% (*i.e.,* 70% of these 15%) of the Chinese-origined magnesium oxide destined for export, and that is only if the Court generously presumes a pro-rate spread of export destinations among all Chinese exporters (since a non-pro-rata hypothesis would allow to presume that no Defendants' goods whatsoever—or mere droplets of Defendants' export—ended in the United States, and that these 15% of all Chinese magnesium oxide that ended in the United States

15. The Court is mindful of a possibility that this factlessly asserted 70 percent, if real, might be a "high-tide" scenario, since Plaintiffs concede that Chinese world-wide export of magnesite-based products differed rather significantly over the years relevant to Plaintiffs' claims. *See* Am. Compl. ¶ 46 (relying on United States surveys for assertion that "China's share of annual world production has increased from 32 percent in 2001 to 45 percent in 2007," *i.e.,* grew 13%). If the overall volume of Chinese magnesite-based export varied by more than 50%, the Court has no reason to presume that the exportation share of Defendants (and their specified and unspecified co-conspirators, if any) did not fluctuate in the same fashion or even more dramatically.

16. Defendants correctly point out the mathematical error in Plaintiffs' calculation of what share of 2 million tons of Chinese overall exportation in 2006 was represented by 300 thousand tons imported during that year by the United States: while Plaintiffs assert that 300,000 is a quarter of 2 million, Defendants correctly observe that it is only 15%.

17. The Court reads Plaintiffs' reliance on their Exhibit 2 as an assertion that Defendants were exporters not of crude magnesite but rather of magnesium oxide. Magnesium oxide is a product qualitatively different from magnesite; this is so because "*magne site* " is a layperson's term for magnesium *carbonate,* the composition having chemical symbol "$MgCO_3$," while the layperson's term "*magne sia* " designates what is technically known as "*magnes ium oxide,*" the composition having chemical formula "$MgO$." Magnesium oxide can be obtained from magnesium carbonate by heating magnesite to 700°C to 1000°C, which causes decomposition of magnesite into magnesium oxide and carbon dioxide (alternatively, magnesium oxide can be obtained, upon introduction of calcined dolime and heat, through a chain of chemical reactions processing seawater and brine containing magnesium chloride.) *See, e.g.,* <<http://www.magnesia specialties.com/students.htm>>. The report of Plaintiffs' expert, *see* Docket Entry No. 28–6, relied upon by Plaintiffs in Paragraph Sixty–Five, discussed *infra,* similarly suggests that Defendants were exporters of magnesium oxide rather than of crude magnesite, since the report takes pains to inform the Court that "[h]eating magnesite to a temperature between 700°C and 1000°C [produces] caustic calcined magnesia," while "[f]urther heating [to] temperatures between 1500°C and 2000°C produces ... [so-]called dead-burned magnesia," and "electro-fused magnesia ... is created by heating magnesite [to] about 2,800°C for several continuous hours." Docket Entry No. 28–6, at 5.

came from the 30% share of goods exported by Chinese entities that were not members of the alleged "Cartel"). This 10.5% figure cannot possibly be read as factual proof showing that Defendants intended/meant to affect *United States* commerce: if anything, it suggests that Defendants' focus was domestic Chinese sale and exportation to countries other than the United States. Consequently, the content of Paragraph Forty–Seven (asserting the percentile of United States importation of Chinese-originated magnesite in 2007) fails to meet the requirements of factual review, as defined in *Turicentro,* and—even under the standard of facial review—fails to indicate that the Court has jurisdiction to hear Plaintiffs' Sherman Act claims. If anything, this Paragraph merely verifies the interest of United States importers in buying Chinese magnesite-based products, perhaps because these products have consistently been the cheapest on the global market.

### e. Paragraph Forty–Eight

The following paragraph, *i.e.,* Paragraph Forty–Eight, alleges as follows:

> During the period relevant to this Complaint, the conduct of Defendants and their [unspecified] co-conspirators has taken place in and affected the interstate commerce of the United States. Hundreds of thousands of metric tons of magnesite are imported into the United States each year from China. Data from the U.S. International Trade Commission confirms that imports from China into the U.S. of magnesite exceeded 500,000 metric tons in each year from 2000 to 2006.

Am. Compl. ¶ 48. The Paragraph also includes the following table:

| Year | Fused and Dead-Burned Magnesia | | Caustic Calcined Magnesite | | Natural and Other Magnesite | | Total | |
|---|---|---|---|---|---|---|---|---|
| | China | All Countries | China | All Countries | China | All Countries | China | All Countries |
| 2000 | 345,016 | 500,873 | 83,488 | 136,241 | 8,282 | 33,476 | 436,796 | 670,590 |
| 2001 | 244,957 | 383,000 | 77,390 | 129,469 | 5,098 | 28,631 | 327,455 | 521,260 |
| 2002 | 286,349 | 394,322 | 93,797 | 147,510 | 5,915 | 29,190 | 384,000 | 571,012 |
| 2003 | 310,651 | 379,170 | 92,670 | 150,026 | 17,257 | 35,552 | 419,978 | 564,778 |
| 2004 | 340,593 | 418,013 | 95,432 | 157,299 | 9,269 | 31,864 | 446,658 | 606,970 |
| 2005 | 389,328 | 427,836 | 96,342 | 152,193 | 7,968 | 33,282 | 494,198 | 693,119 |
| 2006 | 360,777 | 439,151 | 127,540 | 162,786 | 9,813 | 34,193 | 498,680 | 630,106 |
| Total | 2,276,909 | 2,846,107 | 667,598 | 1,035,112 | 64,972 | 226,712 | 3,030,821 | 4,227,931 |

Although the Amended Complaint provides the Court with no citation allowing the Court to verify the authenticity of the table, the Court presumes, for the purposes of this Opinion only, that the table is true and correct.[18] Since the above-replicated table indicates that China was the origin of the lion's share of magnesite-based products imported by the United States during the period from 2000 to 2006, the prices on Chinese-originated magnesite-based goods could have a "direct" effect on the prices charged in the United States.

However, the table—providing, again, data only as to magnesite-based goods of any given year from 2000 to 2006 *never reached,* and certainly *never exceeded,* 500,000 metric tons. It appears that Plaintiffs failed to distinguish between the columns titled "All Countries" and "China."

---

18. Contrary to the claim asserted in Paragraph Forty–Eight, the table verifies that the share of Chinese magnesite (even if assessed collectively with regard to all types of magnesite-based products) in the magnesite-based goods imported by the United States during

Chinese origin imported by the United States—is wholly silent as to the share of magnesium oxide exported by *Defendants*, rather than by China as a country, same as the table sheds no light on Defendants' domestic Chinese sales and export to countries other than the United States. *See id.* In other words, it appears that Plaintiffs invite the Court to equate *all* Chinese magnesite-based export with Defendants' magnesium oxide export. This the Court cannot do,[19] since Plaintiffs' facts just as comfortably allow for an inference that *Defendants'* share in Chinese exportation of magnesium oxide caused no effect whatsoever. *Cf. Fowler*, 578 F.3d at 210–11 ("[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief'") (quoting *Iqbal*, 129 S.Ct. at 1949–50). If Plaintiffs' allegations fail even facial review, these allegations cannot operate as a proof for the purposes of the Court's factual review, as it is defined in *Turicentro*. Consequently, the content of Paragraph Forty–Eight will be disregarded for failure to provide factual proof as to the Court's subject matter jurisdiction over Plaintiffs' claims.

#### f. *Paragraph Forty–Nine*

The next paragraph relied upon by Plaintiffs, *i.e.*, Paragraph Forty–Nine, states as follows:

The value of U.S. imports of magnesite and magnesite products from China exceeded $50 million in 2000 and exceeded $160 million in 2008.

*See id.* ¶ 49 (referring the Court to footnote 6 which, in turn, directs the Court's attention to: (a) a table in Plaintiffs' Exhibit 5; and (b) a reference to a web page <<http://dataweb.usitc.gov/>>).

 The table included in Plaintiffs' Exhibit 5 shows that, during the year 2000, various magnesite-based products of Chinese origin were imported by the United States in the amount of $553,116,000. *See* Docket Entry No. 77–1, at 37. The web reference to <<http://dataweb.usitc.gov>> brings the Court to the homepage of the United States International Trade Commission, where no drop-down menu, no direct link, no search directory and no advance search of terms "China Chinese Magnesite 2008" allowed the Court to locate a particular statement with regard to United States importation of Chinese magnesite-based products in 2000 or 2008; in other words, this piece of Plaintiffs' "factual proof" was effectively nothing but Plaintiffs' directive to the Court to find evidence supporting Plaintiffs' claim. *See* <<http://dataweb.usitc.gov>>. Such "proof," by definition, fails to support Plaintiffs' position: "[d]istrict judges have no obligation to act as counsel or paralegal [even] to *pro se* litigants," *Pliler v. Ford*, 542 U.S. 225, 231–32, 124 S.Ct. 2441, 159 L.Ed.2d 338 (2004), and, *a fortiori*, have no obligation

---

19. The Court notes the practical anomaly of the legal position advocated by Plaintiffs. The bulk of evidence submitted in this matter suggests, rather unambiguously, that magnesite-based products of Chinese origin have been consistently the cheapest on the global market. This fact, apparently, has been prompting United States importers to buy predominantly the goods of Chinese origin. That predominant purchasing election, in turn, caused the predominance of Chinese goods in United States overall importation of magnesite-based products, even though it occurred with what seems to be complete neutrality of Chinese exporters who, it appears, were willing to sell their magnesite-based product to any buyer, regardless of whether such buyer was domestic or foreign, or of a particular foreign origin. Yet, Plaintiffs invite this Court to find that the *purchasing elections made by United States importers* somehow show that *Chinese sellers meant to affect* United States commerce.

seek out evidence supporting the claims asserted by a represented litigant.

However, the crucial error with Plaintiffs' Paragraph Forty–Nine is not the dead-end result of Plaintiffs' citations. Rather, the shortcomings of Plaintiffs' statement and Exhibit 5 are substantively identical to those plaguing the above-discussed Paragraph Forty–Eight, i.e., Plaintiffs try to equate the *entire Chinese export* of magnesite-based products with *Defendants'* export of magnesium oxide. As explained in the preceding subsection of this Opinion, the Court declines Plaintiffs' invitation to so equate since Plaintiffs' data, even if true, fails to establish proof that Defendants were meaning/intending to affect United States commerce. Therefore, the Court will disregard the content of Paragraph Forty–Nine for failure to provide factual proof.

### g. *Paragraph Fifty*

The following paragraph referred to by Plaintiffs, *i.e.*, Paragraph Fifty, asserts:

> The United States consumes about 25 percent of China's magnesite exports. The steel industry in the United States is the primary consumer of magnesite products, with 390 thousand metric tons consumed by steel refractories in the United States during 2006. Cement refractories are the second leading consumer of magnesia in the United States.

Am. Compl. ¶ 50 (referring the Court to footnotes 7 and 8, which—in turn—refer the Court to Plaintiffs' Exhibit 2 already examined by the Court in the subsection "Paragraph Forty–Seven," *supra* ).

The content of this Paragraph warrants little discussion, since the issue of which particular industry among United States industries is the leading—or second leading—consumer of magnesite-based products is wholly irrelevant to the subject matter jurisdictional inquiry at bar. That leaves the Court only with Plaintiffs' erroneously calculated claim that the United States consumes 25% of Chinese magnesite. *See supra* note 16 of this Opinion (pointing out the error in Plaintiffs' mathematics as to 25%, which should actually be 15%). As the Court already explained in its discussion of the shortcomings of Plaintiffs' Paragraph Forty–Seven, this 15% reference lends no support to Plaintiffs' claim that Defendants' activities fall within the language of subsection (1)(A): Defendants' export of, presumably, 10.5% of Defendants' goods to the United States cannot show that Defendants intended/meant to affect American domestic commerce. Therefore, the content of Paragraph Fifty will similarly be disregarded for the purposes of the Court's review, since it fails to provide factual proof of Plaintiffs' position.

### h. *Paragraph Fifty–One*

Plaintiffs' next paragraph, that is, Paragraph Fifty–One, alleges:

> The conduct of Defendants and their [unspecified] co-conspirators has directly, substantially and foreseeably restrained trade and commerce in the United States. Members of the conspiracy, including Defendants Sinosteel Trading, Liaoning Jiayi, Haicheng Houying, Haicheng Huayu, Yongkou Huachen, China Minerals, and Minmetals directly have sold and continue to sell magnesite and magnesite products to U.S. companies and in U.S. commerce at prices artificially increased by the Cartels [in unexplained plural].

Am. Compl. ¶ 51.

The deficiencies of this Paragraph are identical to those of Paragraphs One, Three and Twenty–Nine, *i.e.*, the content of this Paragraph fails to present any evidential support for Plaintiffs' position for purposes of factual review, as it is defined in *Turicentro*. Moreover, this Paragraph expressly includes the error disqualifying its content even for the purposes of facial review, since it "asserts" a mere mechanical repetition of the elements of the

FTAIA exception. *See Iqbal,* 129 S.Ct. at 1949–51 ("[*A fortiori,*] the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [or to t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements [, *i.e.,* by] legal conclusion[s] couched as a factual allegation [e.g.,] the plaintiffs' assertion of an unlawful agreement [or] that [defendants] adopted a policy " 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group" ") (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, and *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)). Therefore, the Court will disregard Plaintiffs' self-serving assertions set forth in Paragraph Fifty–One.[20]

### i. *Paragraph Fifty–Five*

The following paragraph, that is, Paragraph Fifty–Five, maintains:

As a result of these agreements, despite slumping demand, the price of magnesite products imported from China to the United States increased during 2000. According to statistics available from the United States International Trade Commission, the customs value of [dead-burned magnesium oxide] imported from China into the United States rose from $104 per metric ton in the fourth quarter of 1999 to $158 per metric ton by the fourth quarter of 2000.

Am. Compl. ¶ 55.

The Paragraph is referring the Court to footnote 11, which—in turn—refers the Court to the discussed *supra* homepage of the United States International Trade Commission, where, as stated *supra,* no drop-down menu, no direct link, no search directory and no advance search of terms allowed the Court to locate the statement referred to by Plaintiffs, *i.e.,* Plaintiffs' "factual proof," once again, is nothing but Plaintiffs' directive to the Court to find evidence supporting Plaintiffs' claim. *See* <<http://dataweb.usitc.gov>>. Moreover, Plaintiffs' first sentence, *i.e.,* "[a]s a result of [Defendants' collusive] agreements, despite slumping demand, the price of magnesite products imported from China to the United States increased during 2000" appears factually questionable [21] and, even if factually correct, merely paraphrases Plaintiffs' self-serving economic conclusion (that a drop in demand for certain goods must necessarily result in a drop or stagnation of price charged for these goods) [22] into a factless statement

---

**20.** The Court also notes, in passing, that an alleged fact of sale of goods to an importer who might bring the goods into the United States in no way shows the seller's intent to affect the United States commerce unless there are facts showing that the seller actually sought to sell to (*i.e.,* discriminated in favor of sales to) the buyers bringing the goods into the United States. *See Fowler,* 578 F.3d at 210–11 ("[w]here the well-pleaded facts do not permit the court to infer more than the *mere possibility of misconduct, the complaint has alleged-but it has not 'show [n ]-'that the pleader is entitled to relief'* ") (quoting *Iqbal,* 129 S.Ct. at 1949–50) (emphasis supplied).

**21.** *See* December Opinion at 50 (quoting a United States government survey, *see* <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcmyb2001.pdf>>,

showing that the decline of 2001 followed *the spike in importation that took place in 2000,* and explaining the reasons for a significant *increase* in United States demand for imported magnesite-based goods in 2000).

**22.** The Court already addressed this issue in its December Opinion detailing to Plaintiffs the operation of economic functions as follows:

The "supply and demand" economic model describes the operations of market mechanism. It is graphically represented through two curved functions which, if read jointly, reflect the understanding that, in a competitive market, price will function to equalize supply and demand. The model neither requires all producers to sell comparable goods at the same price nor implies that a

sounding like a fact. *See Iqbal*, 129 S.Ct. at 1953 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions ... couched as a factual allegation").

The second sentence of Plaintiffs' Paragraph Fifty–Five similarly fails to support Plaintiffs' position. That sentence cites the homepage of the United States International Trade Commission in order to assert that "the customs value of [dead-burned magnesium oxide] imported from China into the United States rose from $104 per metric ton in the fourth quarter of 1999 to $158 per metric ton by the

fourth quarter of 2000." Am. Compl. ¶ 55. This statement appears also factually questionable, since a United States Government Survey indicates that the per-metric-ton price on Chinese dead-burned magnesium oxide was $126.90 in 1999, and $129.27 in 2000. *See* < <http://minerals. usgs.gov/minerals/pubs/commodity/ magnesium/401400.pdf> >, at 8. If so, a simple mathematical calculation reveals that the per-ton price rose by $2.37, that is, by less than 2% (rather than by $54.00 per ton asserted by Plaintiffs in Paragraph Fifty–Five); such rise in price is so trivial in comparison with the base price of $126.90–per–ton that it would be unlikely to signify any non-nominal effect on United States commerce.[23]

decline in demand would force all producers to lower their prices: the leeway available to sellers depends on price elasticity of their goods. Thus, if demand for certain goods begins to decline, the sellers offering their goods at the upper-bracket prices would be forced to lower them (or go out of business if competitive prices become so low to render their businesses unprofitable), while the sellers offering their goods at lower-bracket prices do not have to change their pricing policies—and may even legitimately increase their prices—until the demand drops to such a point that there is not enough market even for the goods they sell. To illustrate, if tomato growers who previously sold their crop for $ 1.00 to $ 2.00 per pound are faced with a market decline, the growers who were selling at $ 2.00 per pound would have to lower their prices in order to compete for the shrunk market (or to leave the business if they cannot afford reduction in price), while the growers who were selling at $ 1.00 per pound would still be in the position to keep increasing their prices until the decline in demand becomes such that even these growers cannot sell their entire crop (at which point, these growers would have to either compete with each other by lowering their sale prices or reduce their production). Hence, Plaintiffs' argument that the gradual increase in the prices of Processed Magnesite imported from China during the Relevant Period was in contradiction to the rules of supply and demand is

based on an incorrect reading of economic theories. Docket Entry No. 73, at 49–50. In addition to the foregoing, the hike in price might be unavoidable to a seller that finds itself suddenly burdened with rising cost of overhead, soaring fixed costs and variable costs unrelated to payroll (e.g., rise in utilities charges), higher taxes, etc.—such developments might cause the seller to shift the increase in cost of operation to the buyer regardless of demand, since the seller's failure to so shift the burden might simply result in a speedy bankruptcy. *Accord id.* at 42–46 (detailing to Plaintiffs the interplay between relevant economics and accounting concepts, and providing data showing dramatic increase in the labor-related, fixed and variable costs in Chinese magnesite industry).

23. The Court notes that Plaintiffs attached to their Opposition an exhibit containing a copy of the document upon which Plaintiffs seemed to rely for the purposes of their $158 figure. The document contains a table showing that, basing their numbers on tariff and trade data from the United States Department of Commerce and the United States International Trade Commission, the unidentified-by-the-document entity compiling the table determined that prices of Chinese magnesium oxide were $0.1 per kilogram during the first quarter of 2000, $0.111 per kilogram during the second quarter, $0.136 during the third, and $0.158 during the fourth quarter. *See* Docket Entry No. 105–36, at 2. Since Plaintiffs assert that the price at the end of 1999

However, the key shortcoming of Plaintiffs' position is not rooted in the uncertainty of Plaintiffs' figures. Rather, it ensues from the fact that these figures show only the price trend with regard to all Chinese dead-burned magnesium oxide imported into the United States during 2000. Even if the Court were to ignore the "snap-shot" quality of this figure (since it cannot be imported into Plaintiffs' allegations with regard to 2001, 2002, 2003, 2004, 2005, 2006, 2007 and thereafter, apparently), the overall rise in Chinese prices charged with regard to United States import cannot show an "intent-to-affect" even by the entire Chinese magnesite industry unless Plaintiffs provide facts showing that Chinese domestic purchases and all foreign non-American purchasers were charged lower prices. Plaintiffs, however, do not even assert these facts and certainly offer no proof of them. Since Plaintiffs' figures do not establish that the entire Chinese magnesite industry was intending to affect United States commerce, the Court has no reason to deduce from this stark absence of facts that *Defendants* undertook actions that were meant to affect United States commerce. In light of the foregoing, the Court will disregard the content of Paragraph Fifty–Five, since it fails to provides the Court with any relevant factual proof.

### j. *Paragraph Sixty–Five*

Next paragraph, *i.e.*, Paragraph Sixty–Five, provides the Court with the following statement:

> Due to the efforts to increase prices at the end of 2003, the Cartel achieved significant price increases in the U.S., stabilized U.S. prices, and avoided major price cutting despite low levels of demand. An overcharge analysis from a regression model by Plaintiffs' expert economist Dr. Russell Lamb of Econ One shows that, between 2000 and 2003, the Cartel overcharged U.S. buyers of magnesite by an average of 4 percent,

was $104 per ton, the Court gathers that Plaintiffs' position is that the price dropped from $0.104 to $0.1 during the first quarter of 2000 but then began climbing. Plaintiffs' Opposition addresses this climb as follows: "The Government Survey provided *yearly* total import volumes and *yearly average* prices[, while the United States International Trade Commission's] quarterly data demonstrates [a price increase] consistent with Plaintiffs' allegation that the initial two export cartels were formed in April of 2000 and succeeded in raising the price of magnesite exported to the United States." Docket Entry No. 105. Plaintiffs' figures, if averaged, appear to be similar to the Survey's figure of $129.27 per ton (since the average of Plaintiffs' numbers results in $126.25 per ton, and the $3.02 difference might be a result of a heavier export during the third and fourth quarters, although the Court cannot determine the same with any degree of certainty since Plaintiffs' exhibit does not provide quarterly import volume). However, the Court is not entirely clear as to Plaintiffs' point that the rise in the price of Chinese magnesium oxide in 2000 must be viewed as a proof of the "Cartel's" formation and initial activities. According to Plaintiffs' version of the "Cartel's" history, the initial "sub-Cartels" solidified into a unified "Cartel" in February of 2001, muscling the largest membership during the entire "Cartel's" history, *see supra* note 13, which—pursuant to Plaintiffs' logic—should have resulted in further intensification of "Cartel's" activities and further increase in import prices of Chinese magnesium oxide, but the United States Government Survey indicates that the 2001 price for Chinese magnesium oxide was $148.75 per metric ton (if calculated on the grounds of the total tonnage and total value stated in the Survey). *See* <<http://minerals.usgs.gov/minerals/pubs/commodity/magnesium/mgcmyb2001.pdf>>. Thus—if the Court were to adopt Plaintiffs' position that this $148.75 price is not the year-end price but merely a yearly average—the increase of the alleged "Cartel" in size and in collusive activities should not have resulted in a progressive *drop* of prices during 2001 (since, if the price at the end of 2000's fourth quarter was $158 per ton, as Plaintiffs' exhibit alleges, than the price had to drop by the end of 2001 by 12.34%, *i.e.*, down to $*139.50* per ton, in order to yield the yearly average of $148.75 reflected in the Survey).

while between 2004 and 2008, as a direct result of the Cartel's activities, U.S. magnesite purchasers were overcharged more than 21 percent.

Am. Compl. ¶ 65.

■ This Paragraph refers the Court to footnote 20, reading, "Expert Report of Dr. Russell Lamb [ ("Lamb") ], dated September 27, 2007, filed in Support of Plaintiffs' Motion for a Default Judgment" ("Report"). *See id.* at 20. Although this reference states no docket entry number, the Court, given the above-designated date of execution, the authorship and the purpose of submission of the report, presumes that Plaintiffs' footnote 20 was intended to make a reference to Docket Entry No. 28–6.

■ Plaintiffs' reliance on the conclusions drawn by Plaintiffs' expert—rather than on facts and evidentiary proof of such facts—is necessarily concerning for the purposes of factual review for two reasons. First, Federal Rule of Evidence 702, amended to codify the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *GE v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), is unambiguous in the sense that it provides that an expert should base the expert's opinion on the litigant-provided facts rather than providing the expert's opinion as a "fact" supporting litigant's claim. *See* Fed.R.Evid. 702; *accord Daubert*, 509 U.S. 579, 113 S.Ct. 2786. Second, since the factual review at hand is a process qualitatively different in its premises and goals from a default judgment process, the Report—even if it were, hypothetically, proper for the purposes of Plaintiffs' then-pending-and-since-dismissed motion for default judgment—appears questionably relevant to the Rule 12 inquiry currently conducted.[24]

However, in light of the Court of Appeals' guidance as to the breadth of proof the district court should consider while conducting its factual review under Rule 12, *see Turicentro*, 303 F.3d at 300, n. 4 (explaining that, in its assessment of a factual deficiency, the district court "must weigh [all available] evidence relating to jurisdiction, with discretion to allow affidavits, documents, and even limited evidentiary hearings," and citing *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1260–61 (11th Cir.1997); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990); and *Oaxaca v. Roscoe*, 641 F.2d 386, 391 (5th Cir.1981)), this Court concludes that it would be an error to disregard the content of the Report merely on the grounds that it is an expert opinion and, thus, will assess the content of the Report on its merits.

That content of the Report is as follows:

---

**24.** "[T]he plaintiff may seek the Court's entry of default judgment under either [subpart of] Rule 55(b)." *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J.2008) (citing *Nationwide Mutual Ins. Co. v. Starlight Ballroom Dance Club, Inc.*, 175 Fed.Appx. 519, 521, n. 1 (3d Cir. 2006)). However, default judgment necessarily ensues from a party's failure "to plead or otherwise defend" against the allegations of his/her opponent. *Id.* at 177 (detailing the first step of default procedure under Fed. R.Civ.P. 55(a)). Although the second step of default allows the court to exercise its discretion in order to "establish the truth of any allegation by evidence," *see* Fed.R.Civ.P. 55(b)(2)(C), an entry of default does not obligate the court to conduct a facial—moreover factual—review. Hence, while for the purposes of a litigant's default application, the litigant's expert may be warranted in his/her submission of the expert's opinion based on facts as they are pled by the litigant seeking default, it is indeed questionable at best whether the same is warranted for the purposes of a factual review under Rule 12.

(i) The Report opens with Lamb's statement detailing his employ and studies. *See* Docket Entry No. 28–6, at 3.

(ii) Then, in no ambiguous terms, Lamb states that he "assume[d] that the allegations contained in the [Original] Complaint [were] in fact true."[25] *Id.* at 3–4.

(iii) Following this introduction, the Report proceeds to an observation that various forms of magnesium oxide are obtained, *inter alia* from extensive heating of magnesite. *See id.* at 5 (relying on a document designated as Stefan Schlag, Jim Glauser and Kenji Fujita, *Magnesium Oxide and Other Magnesium Chemicals*, Chemical Economics Handbook, SRI Consulting, 2007" ("CEH")).[26] The Report then informs the Court that "[t]he steel industry is a primary source of magnesia demand" and "[c]ement refractories are the second leading consumer of magnesia." Docket Entry No. 28–6, at 6 (relying on CEH and referring, seemingly, to American industrial landscape).

(iv) Then, switching to Chinese production of magnesium oxide, the Report informs the Court that "[a]bundant magnesite deposits and inexpensive processing have provided Chinese producers with a competitive price advantage relative to other exporters of magnesite products." *Id.* at 7 (relying exclusively on CEH for this sweeping economic conclusion). This statement is followed by a conclusion that "[d]emand for Chinese magnesia has been driven by China's domestic steel manufacturing industry." *Id.*

(v) With that, the Report repeats, in a purely conclusory fashion, that "the injury to [P]laintiffs arises because they purchased Chinese magnesite at prices higher than they would have paid but for the [D]efendants' misconduct," and proceeds to "[t]he calculation of [Plaintiffs'] damages arising from [Defendants'] conspiracy to fix prices." *Id.* at 8.

(vi) Lamb begins such calculation by stating that the base damages (that is, prior to trebling) are equal to "[t]he difference between the actual ... prices [paid to unspecified Chinese sellers of magnesium oxide by unspecified buyers of the same] and the prices that would have prevailed [presumably, in the entire market of Chinese domestic and ex-

---

**25.** This statement renders the applicability of the Report to the *Amended* Complaint questionable at best not only because Lamb fails to base his Report on *independent* facts but also because the Report unambiguously declares that it takes, as true, the facts stated in the *Original* Complaint, that is, in the set of pleadings which: (a) was dismissed by the Court for insufficiency of these very pleadings; and, even more importantly, (b) differed, and rather dramatically, from the Amended Complaint as to the factual assertions made therein. However, the Court ignores the anomaly of Plaintiffs' reliance on the Report based on different and dismissed facts in order to focus on the even more troubling deficiencies of Plaintiffs' utilization of Lamb's Report.

**26.** CEH appears to be the key basis for Lamb's deducements. *See* Docket Entry No. 28–6 (citing CEH in 18 out of Report's 34 footnotes). However, no reproduction of CEH is attached to the Report, and the Court's efforts to locate CEH in a printed version yielded no success. The Court, however, located a website stating that it is a "product review" titled "Magnesium Oxide and Other Magnesium Chemicals"; it is, apparently, authored by "Stefan Schlag and Kenji Fujita and James Glauser" of SRI Consulting. *See* <<http://www.sriconsulting. com/CEH/Public/Reports/747.2000/>>. The Court, therefore, presumes that Lamb referred to this online source as CEH. The CEH located by the Court online has the table of contents which, while listing 237 sections and subsections, omits such features as "list of sources" and/or "bibliography," thus leaving the Court to wonder whether CEH was based on data that could be deemed reliable for the purposes of legal proceedings.

352

ported magnesium oxide] but for [Defendants'] misconduct"; he calls such difference "overcharge." *Id.*

(vii) Then, the Report states that, "[t]o calculate the overcharge in this matter, [Lamb] use[d] the method known as a benchmark." [27] *Id.* at 9. Specifically, Lamb asserted that he used data related to sale of Chinese magnesite (which, the Court trusts, was data reflecting Chinese sales of magnesium oxide rather than crude magnesite) during the period from 1995 to 2000 in order to compare that data to—presumably corresponding—data as to the sale of Chinese magnesium oxide during the period from 2000 to the date of execution of the Report (that is, September 27, 2007).[28] *See id.* at 9, 18.

(viii) Next, the Report acknowledges that "[p]rices on [magnesium oxide] depend on many factors [and,] if any of these market factors also vary between the [after–2000] and the [1995–to–2000] period[s], then movements of these other factors should be taken into account when determining the overcharge," *id.* at 10, *i.e.*, that data must be adjusted.

(ix) Lamb states that, in order to perform such adjustment, he "employed a statistical technique known as multiple regression analysis." [29] *Id.* at 10. Since Lamb's conclusions are based on multiple regression analysis, his Report cannot be intelligibly discussed without at least a brief clarification as to the gist of the statistical tool he employed.[30] The

**27.** Although Lamb's reference to "a benchmark" does not provide the Court with any clarification as to the actual methodology intended to be employed by Lamb (*i.e.*, the Report only asserts that "[t]he benchmark methodology is an accepted method for calculating damages in the field of antitrust economies" and cites a 1967 article by Robert B. Bergstrom titled "The Role of the Expert in Proving and Disproving Damages in Antitrust Claims"), the Court presumes that the Report intended to use econometric benchmark analysis, a tool common in business management which is effectively a comparison of two or more sets of corresponding data. *See, e.g.,* Robert C. Camp, *Benchmarking: The Search for Industry Best Practices That Lead to Superior Performance* (2006) (detailing the methodology and applications of the tool).

**28.** Lamb, apparently, used the year 2000 as a breakpoint because—relying on the Original Complaint—he took it as a fact that pre–2000 sales of Chinese magnesium oxide were necessarily unaffected by Defendants' collusive activities but these sales became necessarily affected by Defendants' alleged conspiracy in 2000.

**29.** Usually, benchmark analysis is used as an alternative to—rather than in conjunction—with regression analysis. *See, e.g., In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 313 (3d Cir.2008) ("[Plaintiffs' expert] identified two 'potential approaches' to estimating damages, [either]: (1) benchmark analysis,

which would compare actual prices during the alleged conspiracy with prices that existed before the [alleged conspiracy]; and [the second option is] (2) regression analysis, through which it 'may be possible . . . to estimate the relationship between price of [the product allegedly affected by collusive activities] and the various market forces that influence prices, including demand and supply variables.' [Either one of] these methods, according to [Plaintiffs' expert], could be used to estimate the prices plaintiffs would have faced but for the conspiracy"). However, since a benchmark analysis suggested by Lamb seemingly envisioned a comparison of the overall trends in Chinese sales of magnesium oxide during the pre-alleged-conspiracy and the during-alleged-conspiracy periods, and regression analysis was seemingly meant only to adjust the during-alleged-conspiracy trend by removing effects of all conspiracy-unrelated developments that were absent during the pre-alleged-conspiracy period, the Court finds the possibility of joint utilization of these two methods not unreasonable, although the Court is left to wonder how these *generic* Chinese trends show intent of *Defendants.*

**30.** The Court's overview of regression analysis is based on Larry Wasserman, *All of Statistics: A Concise Course in Statistical Inference* (Springer 2004) ("*All Statistics* "); *Statistics, Super Review* (Research and Educ. Assoc., M. Fogiel, Chief Editor 2004); Douglas Downing, Jeffrey Clark, *Business Statistics* (Barron's 4th

premise underlying regression analysis is a recognition that there are many situations in life where one quantity (called the "independent variable") might have an effect on another quantity (called the "dependent variable"); to illustrate, there might be a relation between disposable personal income and consumption spending.[31] If the relationship between these two variables is figured out, then the changes of the dependent variable can be predicted if the changes of the independent variable are known or can be predicted. In order to start the analysis, pools of known observations of the quantities at issue have to be collected: in the aforesaid example, it would be the population's disposable income and its spending, e.g., for each year during the period 1989–2009. Once these pools of data are collected, they are usually presented in a visually meaningful form on an $xy$ diagram (so presented, the data looks like a cloud of scattered points in $xy$ axes, called a "scatterplot"), where all dependant variable data (in this example, spending) is $y$ values, and all independent variable data (disposable income) is $x$ values: so each year is reflected on the diagram by a point having its own $x$ and $y$ values. The overall "trend" of the scatterplot is the trend in the income/spending relationship during 1989–2009; this "trend" can be expressed by a straight line which best represents all the points in the graph. This line, in turn, is called the "regression line," and this type of analysis is called regression analysis. Since, geometrically, the regression line can be defined in terms of its slope "m" and its vertical intercept "b" (where the line crosses the $y$ axis), the mathematical equation of the line can be written as $y = mx + b$,[32] although both "m" and "b" typically carry caret symbol ("^") and, thus, are referred to as "m-hat" and "b-hat." The caret symbol stresses that both "m" and "b" are merely estimated, and that any regression model comes with an important warning that "the mere fact that there is a strong association between two variables does not indicate there is a cause and effect relationship between them." *Easy Statistics* at 270–72 (providing detailed examples, diagrams and calculations illustrating the same). These principles equally apply to simple regression (dealing with just two variables, as $y$ and $x$ ) and to multiple regression; indeed, "multiple regression" merely means that there is more than just one independent variable "$x$," for example, a multiple regression equation could be $y_i = b_1 x_{i1} + b_2 x_{i2} + b_3 + e_i$ . If the constants are expressed in numbers, such model might look, for instance, as:

$$y = 1.8016x_1 + 6.0658x_2 + 7.5546$$
$$(.2202) \quad (.1422) \quad (3.2556)$$

where 1.8016 is the coefficient for $x_1$, 6.0658 is the coefficient for $x_2$, 7.5546 is the coefficient for the constant term, and the parenthetical numbers underneath

ed. 2003) (*"Business Statistics"*); Douglas Downing, Jeffrey Clark, *Statistics The Easy Way* (Barron's 3rd ed., 1997) (*"Easy Statistics"*).

31. Such relationship between *two* variables give base to so-called "simple regression."

32. Not all simple relationships could be reduced to $y = mx + b$. For instance, if the true relationship between $x$ and $y$ is defined by equation $y = cd^x$, where both $c$ and $d$ are two unknown constants, the solution is obtained through the concept of logarithm. (An explanation of what is logarithm is best given by the question, "to what power should we raise 2 to get 128?" and its answer "7," because $2^7 = 128$, so the logarithm, *i.e.*, $\log_2 128$, is "7"). Applying common logarithms to the equation $y = cd^x$, we can rewrite it as $\log y = \log d * x + \log c$, *i.e.*, as a formula resembling the familiar $y = mx + b$. Thus, logarithms are frequently used in regression analysis.

represent corresponding standard errors. A division of each coefficient value by its corresponding standard error results in a measure called "$t$-statistic," it is used to test hypotheses about the value of the coefficient.[33]

Having so reviewed the very basic points of regression analysis, the Court now returns to its discussion of Lamb's regression-related statements.

(x) Lamb begins by explaining the meanings of the terms "dependant variable" and "independent variables"; he uses alternative terms for the latter (*i.e.*, "explanatory variables" or "regressors"). *See* Docket Entry No. 28–6, at 10. Lamb also clarifies that, for the purposes of his analysis, "the price of Chinese magnesite is the dependent variable" (that is, *y)*, but does not state whether his observations included prices charged only with regard to Chinese exportation or with regard to domestic Chinese prices, or United States importation (which leads to Court to conclude that these prices were the same, and all buyers were treated equally regardless of their origin). *See id.* Moreover, the Report does not provide the Court with *any* observations utilized by Lamb for his calculations: the Report simply invites the Court to trust Lamb that these pools of data were properly collected, by stating as follows:

[In order to obtain a pool of observations as to the this "price," Lamb utilized] prices obtained from Industrial Minerals, a market research firm.[34] The data [Lamb] used include[d] monthly prices for three common grades of Chinese dead-burned magnesia from July 1994 through July 2007.[[35]] Lamb] used these three price series to measure the dependent variable [$y$] in [his] regression model[.[36] Lamb] believe[d that] these price data provide[d] reliable measures of magnesite prices [because] Industrial Minerals is cited as a source of industry information by numerous[, although unspecified] experts on magnesite, [and in] citations in Deborah A. Kramer, "Magnesium Compounds" review in 2006 Minerals Yearbook, published by United States Geological Survey in June 2007. In addition, [Lamb] compared the prices [he used as his pool of $y$ observations] to other publicly available sources[37] and found them to be consistent [in an unspecified fashion] with prices for Chinese magnesite products sold in the United States (which Lamb, presumably, obtained from Industrial Minerals, "a market research firm"].

**33.** A calculation of multiple regression output also gives an $R^2$ value which is called the coefficient of multiple determination. The value of $R^2$ is always between 0 and 1, it measures the percent variation in the dependent variable $y$ that can be explained by the regression. The higher $R^2$, the more it means that the regression does a good job accounting for the variation in $y$ through variations in $x_1$ and $x_2$.

**34.** The Court's own efforts to locate "Industrial Minerals, a market research firm" did not yield any success; the Court was merely able to locate a British-based online magazine titled "Industrial Minerals" at <<http://www.mineralnet.co.uk/>>.

**35.** *I.e.*, Lamb, seemingly, took observations corresponding to 156 periods, since the 13 years (from 1994 to 2007), multiplied by 12 months per year, yield 156 monthly intervals.

**36.** *See infra* sub-paragraph (xiii) of this subsection for a discussion of the problems associated with the "three panels," the phrase which, it seems, might have been used by Lamb to refer to the very same data that Lamb alternatively designated as his "three price series."

**37.** However, the sole "other publicly available" source named by Lamb is the very same CEH, *see* Docket Entry No. 28–6, at 11, n. 30, the reliability of which the Court cannot determine. *See supra* note 26 of this Opinion.

*Id.* at 11 and n. 29 (footnoted text incorporated).

(xi) With that, Lamb states that he selected the total of six independent variables, namely:

(a) two variables that Lamb believed affected the demand factor as to magnesite-based products (these variables are "growth of Chinese steel production" and "growth in Chinese cement production");

(b) two variables that Lamb associated with Chinese export-related "price" advantage (these variables are: (a) the exchange rate between United States Dollar and Chinese Yuan; and (b) an assessment of the value of Yuan against the basket of international currencies Lamb titled "World Foreign Exchange Rate");[38] and

(c) two variables that Lamb associated with the costs of production and supply. These variables included: (1) cost of crude oil (since—for the reasons not entirely clear to this Court—Lamb presumed that the process of heating magnesite into magnesium oxide necessarily requires oil rather than natural gas, coal or other sources of energy[39]); and (2) Chinese domestic inflation (since Lamb

**38.** The Court is not familiar with the concept of "World Foreign Exchange Rate," and the Report does not enlighten the Court as to the nature of this tool. However, in light of Lamb's mentioning of the International Monetary Fund ("IMF") in connection with this tool, the Court presumes that Lamb aimed to refer to the Special Drawing Rights ("SDRs"). An SDR (which is a unit of account created by the IMF) is a weighted sum of contributions of four major currencies, and it is adjusted every five years (for instance, for the period of 2006–2010, one SDR is the sum of 0.632 U.S. dollars, 0.41 euro, 18.4 Japanese yen and 0.0903 pound sterling, while for the period 2001–2005 it was 0.577 U.S. dollars, 0.426 euro, 21 Japanese yen and 0.0984 pound sterling). *See* <<http://www.imf.org/external/fin. htm>> (IMF–Finances website, left column, SDR-rate section). Since the Dollar is already included in the SDR, utilization of both Yuan–Dollar and Yuan–SDR comparisons invited "double counting" into Lamb's assessment of his model's reliability. And, since the model subdivided data by 2000–2003 and 2003–2007 sub-periods, *see* Docket Entry No. 28–6, at 15, the Court is unclear as to how the 2005 change in SDR value and de-pegging of the Yuan from the Dollar were factored in the 2003–2007 sub-period.

**39.** *Compare* <<http://www.springerlink.com/ content/h13p454817437337/fulltext.pdf? page=1>> (reproducing an article showing that the USSR magnesium oxide production switched from oil to natural gas thirty years ago, *i.e.*, in 1969, finding natural gas a more viable and efficient source of energy for the purposes of magnesium oxide production). In view of: (a) apparent viability of non-oil heating of magnesite into magnesium oxide; (b) relative scarcity of Chinese oil in comparison with its coal, *see, e.g.,* <<http://www.eia. doe.gov/emeu/cabs/China/Background. html>> and <<http://www.eia.doe.gov/ emeu/cabs/China/Oil.html>> (showing that, during the period at issue, China has become the third largest world *im*porter of oil due to the lag between her domestic production and domestic consumption, while—at the same time, China remained the world's largest producer and consumer of coal); and (c) substantial difference in price increases experienced by oil, coal and natural gas during the first decade of the XXI century, that is, the period at issue, *see* <<http://tonto.eia.doe. gov/cfapps/STEO_Query/steotables.cfm?table Number=8&periodType=Annual&start Year=2000&endYear=2009&starthMonth Changed=false&startQuarterChanged= false&endMontChanged=false&endQuarter Changed=false&noScroll=true&load Action=Apply+Changes>> (showing that power generation fuel costs, in dollars per million Btu, rose from 2000 to 2009 by $2.22 as to coal, by $4.57 as to natural gas, and by at least $9.37 as to oil), Lamb's utilization of oil prices as a regressor is unclear. *Compare* Docket Entry No. 77–1, at 70, and Docket Entry No. 77–3, at 11 (Plaintiffs' exhibits attached to the Amended Complaint; the exhibit suggests that coal was the source of heating involved in all relevant technical processes, and the price of coal kept soaring).

believed that the overall increase in Chinese consumer prices would drive up prices charged for exported natural resources). *See id.* at 11–13, 15.[40]

(xii) The Report does not share with the Court Lamb's regression equation. Rather, short-cutting through all stages of his regression analysis, Lamb simply informs the Court that he reached certain results and organized some of these results into a table ("Lamb's Regression Result"), where: (1) estimates of variables were converted to their natural logarithms; (2) $R^2$ statistics show that Lamb's regression model "explains 87 percent of the variation in the dependent variable" (hence, leaving 13% unexplained); and (3) *t*-statistics is provided as a measure of what is "statistically significant."[41] *Id.* at 14–15.

Specifically, Lamb's Regression Result table is as follows:

### Chinese Magnesite Regression Model Results

| Observations | 429 | Wald Statistic | | 991.39 |
| Panels | 3 | Prob. > [Wald] | | 0.00 |
| Time Periods | 143 | OLS R-Squared | | 0.50 |

| Explanatory Variables[1] | Coefficient Estimate | Standard Error | t-Statistic | Statistical Significance[2] |
| --- | --- | --- | --- | --- |
| (1) Growth in Chinese Steel Production | 0.109 | 0.050 | 3.300 | *** |
| (2) Growth in Chinese Cement Production | 0.052 | 0.024 | 2.150 | ** |
| (3) Chinese Consumer Price Inflation | 0.587 | 0.224 | 2.590 | *** |
| (4) Crude Oil Price | | | | |
| Contemporaneous | 0.037 | 0.022 | 1.650 | ** |
| 1 Month Lag | 0.007 | 0.027 | 0.330 | |
| Sum of Coefficients | 0.044 | 0.027 | 2.550 | ** |
| (5) Chinese Yuan / USD Foreign Exchange Rate | -1.075 | 0.448 | -2.400 | *** |
| (6) Chinese Yuan World Foreign Exchange Rate | | | | |
| Contemporaneous | -0.192 | 0.163 | -1.180 | |
| 1 Month Lag | 0.258 | 0.175 | 1.460 | * |
| 2 Month Lag | -0.250 | 0.165 | -1.520 | * |
| 3 Month Lag | 0.066 | 0.158 | 0.360 | |
| 4 Month Lag | -0.155 | 0.158 | -0.970 | |
| 5 Month Lag | -0.040 | 0.157 | -0.270 | |
| 6 Month Lag | -0.515 | 0.144 | -3.570 | *** |
| Sum of Coefficients | -0.844 | 0.208 | -4.110 | *** |
| (7) Collusion Overcharges[3] | | | | |
| 2000 - 2003 | 0.040 | 0.017 | 2.330 | *** |
| 2004 - 2007 | 0.188 | 0.025 | 7.540 | *** |

Notes:
1. Fixed effects and quarterly seasonal indicator variables are incorporated in the model but not reported.
2. Singled Tailed Statistical Significance Levels: *** < 1% significance level, ** < 5% significance level, * < 10% significance level.
3. Collusion ended is April 2000 to Present.

*Id.* at 14–15.

(xiii) Even a superficial review of the table reveals that Lamb's Regression Result and the body of the Report are incongruent. For instance, while Lamb stated that his observations involved 156 periods, *see supra,* note 35 of this Opinion, the table somehow states that there

**40.** Although, presumably, Lamb should have collected pools of monthly observations for each of these six variables, the Report neither provides the Court with actual pools of these observations nor even states where the Court could locate them on its own.

**41.** *"Significance"* is a statistical term informing the reader about how certain is the analyst that a relationship between the variable actually exists, *i.e.,* that the result is unlikely to occur by chance. *See Business Statistics* at 287. However, "unfortunate stereotypes often arise from the use of the word *significant* in statistical studies. For example, studies often find statistically significant differences in certain abilities between men and women, but the variation in ability within each sex is much greater than the variation between the means of the two sexes. It would be wrong to use the result of such a study to prejudge the ability of any particular individual." *Id.* at 288.

were only 143 periods. And while there appears to be a correlation between these 143 periods, three "panels" and 439 "observations" (since $143 \times 3 = 429$), the Court is left to guess which "panels" Lamb had in mind, since he allegedly studied *six* independent variables and should have, at least theoretically, obtained six price series.[42] Similarly, the Court is left to guess a number of other aspects of Lamb's model and calculations.[43]

(xiv) The main problem with Lamb's Regression Result, however, seems to be not the string of the aforesaid incongruences and ambiguities, but the inexplicable appearance of two new regressors, called "Collusion Overcharges" ("CO"). Indeed, while the Report asserts—although without providing the Court with either actual data or citations to the sources of such data—that Lamb took observations of magnesite prices, steel production, cement production, oil prices, inflation of the Yuan and fluctua-

tions in its exchange rate, the Report at no point asserts that Lamb took—or even could have taken—any actual observations of these Collusion Overcharges. Rather, Lamb asserts that,

[because] Plaintiffs allege that the operation of the cartel resulted in higher prices for magnesite products in the U.S.... [Lamb] include[d two] variables [that he deemed to be] "indicator variables" for the period April 2000 through 2003 and for the period from 2004 forward ... to account for the possibility that the alleged ["C]artel["] may have become more effective over time.

Docket Entry No. 28–6, at 13–14.

(xv) The statement that a certain variable is binary (also referred to as "dummy variable" or by the term preferred by Lamb, *i.e.*, "indicator variable") merely establishes that this dummy variable is presumed to be "1" if a certain condition is true and "0" if that condition is false. *See Business Statistics* at 394–95; *accord* Docket Entry No. 28–6, at 14

---

**42.** Since Lamb also referred to "three price series," *see* Docket Entry No. 28–6, at 11, the Court cannot exclude the possibility that Lamb's "three panels" and "three time series" are the same, that they have nothing to do with sets of data collected with regard to Lamb's six independent variables, and that they were intended, for instance, to refer to three spans of time: 1995–2000, 2000–2003 and 2004–2007. However: (a) lack of any statements with regard to 1995–2000 span in Lamb's Regression Result renders this possibility unlikely; and (b) the 1995–2000 span would yield 48 monthly observations, hence raising the Court-calculated 156 monthly periods, *see supra* note 35 of this Opinion, to 204 (*i.e.*, the sum of 156 and 48), thus rendering the statement included in Lamb's Regression Result that Lamb collected observations with regard to 143 periods even more incomprehensible.

**43.** E.g., the table does not explain how $R^2$ of 0.87 asserted in the Report became $R^2$ of 0.86 in the table, leaving another percent of price variation unexplained. Analogously, no rea-

son is provided as to the relevance or even need for "Wald Statistic," which the Court presumes to be "Wald test," a parametric test typically substituted by the likelihood-ratio test (since the Wald test can give different answers to the same question, depending on how the question is phrased). *See All Statistics* at 153–54. In the same vein, the Court is left to guess why the Report stresses that *t*-statistics is used to determine statistical significance, if Lamb's Regression Result provides a totally different column, titled "Statistical Significance," which seemingly aims to provide the same assessment but on the grounds of what seems to be the so-called one-tailed test (applicable only if all studied relationships fell entirely within one tail of the distribution, which is unclear if it were actually true in this matter). Simply put, since Lamb did not provide the Court with his regression equation and pools of data, the Court has no opportunity to determine the validity of Lamb's calculative decisions, e.g., his resort to logarithms, or his results, or his end conclusions.

(seemingly trying to express the same by stating that "[s]uch indicator variables take the value of one during the period in question and zero elsewhere"). "Dummy variables," however, are *artificially created* variables utilized with a realization that, sometimes, a certain set of factors that affects the dependent variable might not be not quantitative (*i.e.*, while being known as present during the events statistically analyzed, it cannot be given by numbers); the coefficient of such dummy variable indicates how much effect this particular set of unquantifiable factors that the variable expresses had on the constant terms in the regression. *See Business Statistics* at 394–95.[44]

(xvi) Since—unlike in the World War II example provided in note 44 of this Opinion—there is no information establishing either the fact or the span of any

Chinese collusive agreements (among Defendant or all Chinese magnesite exporters, or other entities), the Court construes Lamb's resort to dummy variables as Lamb's presumption that a "certain" factor (or a certain combination of certain factors) fluctuated with 0.04 coefficient to Chinese prices on magnesite-based products during the years 2000–2003, and with 0.195 coefficient during the 2004–2007 period. However, the Court has no reason to presume that this "certain" factor was Chinese collusive agreements rather than a collusion-unrelated economic factor other than the six independent variables selected by Lamb (that is, other than growth in Chinese steel production, growth in Chinese cement production, domestic inflation of the Yuan and fluctuation of the Yuan versus the United States Dollar and SDR).[45] Yet, in a

---

**44.** The concept could be illustrated as follows: "For example, suppose you are investigating [United States] consumption behavior with time series data for the period 1930 to 1950. You would expect that consumption behavior would have been significantly different during the years of World War II than it was before and after the war. To take this effect into account, you can create an artificial variable that will take the value 1 during each of the war years and the value 0 during each of the other years." *Business Statistics* at 394. In such example, the usage of a dummy variable based on the WWII during the years affected by the WWII is warranted since the fact of the WWII occurrence has been unquestionably established, the same as the years during which the United States were engaged in the WWII.

**45.** The developments that could have had an influence on the prices of Chinese magnesium oxide (and, thus, might be dummy variables, that is, if the Court is to presume that these developments were, somehow, not quantitative) include: increases in Chinese domestic and export taxation, increases in cost of capital ensuing from borrowing (or issuance of debt), needs for repairs and/or new constructions caused by depreciation of equipment/other fixed assets, rising cost of labor,

etc. Indeed, the increase in wages appears to be the most probable factor—as this Court already pointed out in its December Opinion:

the cost of labor in Chinese mining and mining-related industries more than doubled from 2000 to 2005. 29 See <<http://www.stats.gov.cn/tjsj/ndsj/2006/html/E0520 E.HTM>>; <<http://www.stats.gov.cn/english/statisticaldata/yearlydata/yb2004–e/html/E0526ae.htm>>; <<http://www.stats.gov.cn/english/statisticaldata/yearlydata/YB2002e/html/e0526ae.htm>>; <<http://www.stats.gov.cn/english/statisticaldata/yearlydata/YB2001e/html/e0526ae.htm>> (information provided by the National Bureau of Statistics of China, indicating that the wages of employees in state-owned facilities increased, between 1999 and 2005, from 8,283 yuan to 20,992 yuan per annum, that is 254%; while the wages in collectively-owned units increased from 4,857 to 11,268 (231%), and in all other units went from 9,842 to 21,207, that is, 215%).

Docket Entry No. 73, at 45–46. It appears rather evident that the "Chinese Consumer Price Inflation" variable factored in the Lamb's Regression Result could not have accounted for these dramatic rise in labor costs, since: (a) the concept of "consumer price

purely conclusory fashion, the Report deduces from Lamb's Regression Result the following statement:

> The [dummy] variables included in the model measure the extent by which prices were higher as a result of the *alleged conspiracy* in this matter. These variables are both statistically significant. This result means that class members were all harmed in that they paid a higher price for magnesite products *as a result of the alleged conspiracy.*

Docket Entry No. 28–6, at 16 (emphasis supplied).

(xvii) Moreover, the Report not only declares, in conclusory fashion, that Lamb's artificially created dummy variables must be collusive activities of Defendants, the Report also omits to inform the Court of any results of the benchmark comparison of post–2000 data and 1995–2000 data that was promised by Lamb at the outset of his Report. *See id.* at 10–11 (promising such comparison by stating that "[r]egression is an appropriate technique in this context because it controls for the impact of each explanatory variable upon the dependent variable, while allowing me to quantify the difference between prices during the alleged conspiracy and the benchmark period, e.g. the overcharge"). Instead, the Report merely states:

> Table 3 [ ("Table 3"), replicated below,] shows the estimated overcharges from the regression model. These results show the percentage by which prices for magnesite were higher as a result of the alleged conspiracy. In order to obtain the percentage overcharge from the estimated coefficient it is necessary to make a technical adjustment. The conspiracy had greater impact in the period after 2004, since the estimated overcharge on magnesite prices was higher during that time period.

**Table 3**

**Estimated Overcharge Percentages**

| Collusion Period[1] | Estimated Overcharge Percentage |
|---|---|
| 2000 – 2003 | 4.83% |
| 2004 – 2007 | 21.83% |

1. Collusion period is April 2005 to Present.

*Id.* at 16 and n. 35.

In other words, the Report seems to substitute the promised benchmark analy-

inflation" is qualitatively different from that of "labor costs"; (b) the coefficient of 0.587 detected by Lamb as an assessor of the effect the increases in inflation had on the increases in magnesium oxide prices fails to correspond to the above-quoted over–200% increase in labor costs; and (c) rising cost of Chinese labor was virtually certain to be higher than domestic inflation of the Yuan (causing consumer price inflation) because an increase in wages *exceeding* the increase in inflation is a feature necessary for an increase in the population's purchasing power (and its standard of living) which, seems, was unquestionably achieved in China during the first decade of the XXI century. *See, e.g., Yangtze China Inv. Interim Results,* London Stock Exchange Aggregated Regulatory News Service (Dec. 4, 2009); *Form 8–k; Cn Dragon Announces Determination to Change Direction of Current Business Operations,* U.S. State News (Dec. 4, 2009); *Low-carbon Urbanization Is Way Forward for China,* Chinadaily.com (Nov. 30.2009).

sis by a percentile conversion of the coefficients of arbitrarily labeled dummy variable with the goal of restating the very same inexplicable conclusion, *i.e.*, that Chinese magnesite prices during 2000–2007 had to be affected by certain "Chinese" collusive activities.

> (xviii) Re-repeating the same once again, the Report concludes with Lamb's assertion that, "[b]ased on [his] analysis of the market for Chinese magnesite[, Lamb] ha[s] determined that all class members were injured as a result of the alleged conspiracy." *Id.* at 18. However, in light of the above-discussed chain of deficiencies (e.g., the unwarranted assumption that the facts borrowed from dismissed Original Complaint were true; the failure to provide the Court with Lamb's pools of data, the sources of this data, as well as with Lamb's regression equations; the discrepancies between the figures and statements made in the Report and Lamb's Regression Results; the discrepancies between the figures and statements made in the Report and the statements made in the Amended Complaint; the inexplicable deducement that Lamb's dummy variables were necessarily representative of collusive activities; failure to perform the benchmark analysis originally presented as the key analytical step; etc.), the Court cannot

accept the Report as proof that "Chinese" collusive activities actually took place and/or that these activities were the source of increase in magnesite prices. *A fortiori*, the Court cannot apply Lamb's conclusions specifically to Defendants.[46]

With that, the Court now returns to the second sentence composing Plaintiffs' Paragraph Sixty–Five (asserting that "[a]n overcharge analysis from a regression model by ... Lamb ... shows that, between 2000 and 2003, the Cartel overcharged U.S. buyers of magnesite by an average of 4 percent, while between 2004 and 2008, as a direct result of the Cartel's activities, U.S. magnesite purchasers were overcharged more than 21 percent"). Am. Compl. ¶ 65. This statement is incorrect even regardless of above-discussed shortcomings of the Report, since the Report neither speaks in terms of "Cartel's activities" (rather, it asserts "overall Chinese" activities) nor covers the year 2008 and any time thereafter (rather, it covers only the period from July 2000 to July 2007). Moreover, the Report merely suggests that the increases in Chinese prices might have been related to intensification of certain factor(s), some of which were assessed through, allegedly, actual pools of data.

---

**46.** The Court, having a mere layperson's familiarity and no expert command of statistics, is certainly mindful of the possibility that the Court misconstrued either Lamb's deducements and/or his regression model, and/or the correlation Lamb envisioned between the benchmarking and regression analyses, etc. However, the possibility of the Court's misconstruction of the Report transforms the Report into a document even less suitable to operate as a factual proof: it is axiomatic that Rule 702 admits expert testimony "if it will assist the trier of fact to *understand* the evidence or a fact in issue," *Moses v. Payne,* 543 F.3d 1090, 1101 (9th Cir.2008) (quoting *State v. Farr–Lenzini,* 93 Wash.App. 453, 970 P.2d 313, 318 (1999)); *see also Kannankeril v. Ter-*

*minix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir. 1997), and the Court has no obligation to decipher an expert's cryptic message. Moreover, since—under Rule 702—expert testimony *cannot be misleading, see Moses,* 543 F.3d at 1101 (citing *Farr–Lenzini,* 970 P.2d at 319), an expert's report must be amenable to understanding by a layperson not only with respect to the words composing the end-conclusion but also with regard to the rationale and the steps of the processes employed. Indeed, construing Rule 702 otherwise would invite experts to "create" facts by simply ushering floods of technical terminology on the judiciary stripped of an actual opportunity to analyze the testimony.

The Report, however, clearly states that the "collusion factor" was merely hypothesized by Lamb into a dummy variable as a result of Lamb's taking Plaintiffs' allegations in the Original Complaint as true facts. Simply put, Lamb's Report can be reduced to a sophistic statement, "if Plaintiffs' factual assertions are true, then Lamb's calculations of Plaintiffs' factual assertions shows that these assertions are true." Such statement establishes neither *Defendants'* intent nor even anyone's intent to affect United States commerce; moreover, it does not even establish the "directness" of these "someone's" actions (since, according to Lamb's results, the collusive activities, even during the "high-tide" period, caused only a price increase of $2.16 per metric ton).[47] Consequently, Plaintiffs' second sentence in Paragraph Sixty–Five appears to be nothing but Plaintiffs' unwarranted distortion of the already insufficient Report. In light of the foregoing, the Court will disregard the content of this Paragraph for failure to provide any relevant factual proof of Plaintiffs' position.

### k. *Paragraph Seventy–Two*

Next paragraph, *i.e.*, Paragraph Seventy–Two, alleges as follows:

> During the conspiracy, prices of magnesite and magnesite products exported to the United States from China have not followed the laws of supply and demand [which, in Plaintiffs' opinion, should] exist in a competitive market. Instead, prices have been set and maintained at artificially high levels by De-

fendants and their [unspecified] co-conspirators.

Am. Compl. ¶ 72.

Both of these statements fail to provide the Court with any proof necessary for the factual review, as defined in *Turicentro* (moreover, these statements fail to meet even the pleading requirements, as construed by *Twombly* and *Iqbal*). Indeed, the first sentence offers the Court only Plaintiffs' self-serving simplistic construction of economic models, virtually repeating the error of the above-discussed Paragraph Fifty–Five. *See supra*, note 22 of this Opinion (explaining the fallacy of Plaintiffs' overly simplified position). The second sentence does not even aim to state a fact: rather, it offers the Court a recital of a Sherman Act requirement, but attempts to disguise that recital as a fact. However, such pleading is insufficient even for the purposes of facial review. *See Iqbal*, 129 S.Ct. at 1949–54 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [or to t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[, *i.e.*, by] legal conclusion[s] couched as a factual allegation [e.g.,] the plaintiffs' assertion of an unlawful agreement [or] that [defendants] adopted a policy 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group") (citation omitted). Needless to say, such recital of legal elements fails to provide any proof for the purposes of factual review. Therefore, the Court will disregard the content of Para-

---

**47.** Since, according to Plaintiffs, the export price rose during 2000 from $104 per metric ton to $158 per metric ton (*i.e.*, by $54 per ton per year), *see* Am. Compl. ¶ 55, then the deduced-by-Lamb 4.03% effect, *see* Table 3, of such $54 increase would amount to the yearly price rise of $2.16 per metric ton (4.03% of

$54), *i.e.*, it yields Lamb's conclusion that "Chinese" collusive agreements caused only a $2.16 rise in price of magnesium oxide, and the remaining $51.84 ($54—$2.16) rise in price was attributed to factors unrelated to these "Chinese" collusive agreements.

graph Sixty–Three for the purposes of its jurisdictional assessment.

### l. *Paragraph Seventy–Five*

Finally, Paragraph Seventy–Five asserts:

> Defendants' combination and conspiracy have had the following effects, among others: (a) [t]he price of magnesite and magnesite products purchased by Plaintiffs ... has been fixed, raised, maintained and stabilized at artificial and non-competitive levels; (b) [c]ompetition in the sale of magnesite and magnesite products has been restrained.

Am. Compl. ¶ 75.

The shortcomings of this Paragraph are identical to those of Paragraph Seventy–Two, *i.e.,* Plaintiffs state nothing but a set of legal conclusions depicting "a" Sherman Act scenario and merely paste Defendants' name and the product's name into the picture in an effort to repackage their self-serving legal conclusions into a statement sounding like an assertion of fact. Since the Supreme Court expressly cautioned against such pleading practices even for the purposes of facial review, *see Iqbal,* 129 S.Ct. at 1949–54, the Court certainly cannot accept Plaintiffs' bare legal conclusions as proof for the purposes of factual review, as defined in *Turicentro.* Therefore, this final set of allegations made by Plaintiffs in an attempt to establish that this Court has subject matter jurisdiction over this case under the FTAIA exception will also be disregarded.

### m. *Amended Complaint Fails to Meet the FTAIA Exception*

As the foregoing discussion illustrates, not a single Paragraph of the Amended Complaint among those advertized in the Opposition as providing the Court with factual proof as to the Court's subject matter jurisdiction under 15 U.S.C. § 6a(1)(A) lives up to its promise. The bulk of Plaintiffs' pleadings related to the FTAIA exception fail to assert any facts (offering,

instead, a kaleidoscope of self-serving conclusions and/or recitals of legal elements) and the remainder of Plaintiffs' statements assert facts that either negate Plaintiffs' claims or are self-contradicting, or inapposite to Plaintiffs' position, or unwarranted in light of Plaintiffs' own evidence, or based on deficient assumptions and inexplicable conclusions. Since Plaintiffs failed to offer the Court even a single factual proof meeting the Rule 12 review, as articulated in *Turicentro,* the Court is constrained to conclude that Plaintiffs' Amended Complaint asserts Sherman Act claims (based on Defendants' status as exporters of Chinese magnesium oxide) that fall outside the Court's subject matter jurisdiction, and these claims should be dismissed.

Such conclusion, however, does not dispose of another reading of the Amended Complaint, which seems to suggest that Plaintiffs might be suing Defendants not in Defendants' capacity as exporters of Chinese goods but as importers of goods into the United States. The Court, therefore, now turns to such reading of the Amended Complaint.

### B. *Subject Matter Jurisdiction Under the Introductory Clause of the FTAIA*

As noted *supra,* the FTAIA, in its introductory clause provides that:

> [The Sherman Act] shall not apply to conduct involving trade or commerce (*other than import trade or import commerce* ) with foreign nations.

15 U.S.C. § 6a (emphasis supplied). Hence, in perhaps ineloquent but nonetheless unambiguous terms, Section 6a provides that the FTAIA-based jurisdictional bar is wholly inapplicable to pleadings alleging that the wrongful conduct was undertaken by defendants as *im* porters (rather than as *ex* porters). The Court's

December Opinion already reviewed the Court of Appeals' guidance as to the issue of whether the defendants are importers or exporters:

[T]he FTAIA asks whether [the] defendants were "involve[d in] `import trade or import commerce." *See Carpet Group*, 227 F.3d at 69, 72. If all that defendants were doing was actually bringing goods or services into the United States, then the FTAIA … is not even triggered, *i.e.*, the claim [against the defendants] squarely falls within the scope of the Sherman Act. *See Turicentro*, 303 F.3d at 302 ("[While the FTAIA] does not define the term 'import,' … the term generally denotes a product (or perhaps a service) has been brought into the United States from abroad") (citing Webster's Third New Int'l Dictionary (1986); Black's Law Dictionary (6th ed. 1990)). However, if "[d]efendants did not directly bring items or services into the United States …, they cannot be labeled 'importers,' [nor could it be said that defendants] have they engaged in 'import trade or commerce.'" *Id.* In other words, even if a certain importer purchased or otherwise obtained the defendants' product in a foreign market (be it the defendants' national market or any other market) and brought the defendants' product into the United States, the fact that the product eventually found its way into the United States does not transform the defendant into an "importer" and, hence, an antitrust claim against the defendants must pass muster under the FTAIA['s "substantial, direct and reasonably foreseeable" exception] before the Sherman Act claim can be entertained. *See id.* at 304 (The fact "[t]hat 'some of the goods purchased in [a foreign market] may ultimately have been imported by individuals into the United States' [is] immaterial to determining if defendants [are] involved in 'import

trade or import commerce' [since the defendants' own] actions did not directly increase or reduce imports into the United States") (quoting *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir.2002)).

Docket Entry No. 73, at 26–27 (emphases removed).

### 1. Plaintiffs' Allegations

The allegations stated in the Amended Complaint are less than clear as to whether Plaintiffs are suing Defendants as *ex* porters or as *im* porters.

Specifically, some Plaintiffs' claims use the term "import" and the phrase "sale of magnesite products to customers *in* the United States" (rather than "sale *to* United States customers," which could have been taking place *outside* the United States). *See* Am. Compl. ¶¶ 1–2 (asserting that "[t]his action seeks no damages or relief with respect to non-import foreign commerce," "Defendants have directly sold and delivered magnesite and magnesite products to customers in the United States"). However, while some Defendants are named as entities that "directly sold … and *shipped magnesite products to the United States* during the period described in the [Amended] Complaint," *id.* ¶ 12–13, 15, 19–20, 22–25 and 27 (emphasis supplied), hence suggesting that Defendants were *im* porters, other Defendants are described as "producer[s] and *ex* porter[s] of magnesite," suggesting that Defendants were not importers at all. *Id.* ¶¶ 17, 26 (emphases supplied). To add to the uncertainty, Plaintiffs' Paragraph Fifty–One outright merges the "substantial, direct and reasonably foreseeable effect on United States commerce" language of the FTAIA exception from 15 U.S.C. § 6a(1)(A) (applicable to *ex* porters of goods that are brought into the United States by others) with an assertion that

Defendants, on their own, brought these goods into the United States. *See id.* ¶ 55 ("The conduct of Defendants . . . has directly, substantially and foreseeably restrained trade and commerce in the United States. [They] directly sold [their goods] in United States commerce"). Finally, to make Plaintiffs' allegations even more confusing, the Amended Complaint opens with the sentence asserting that Defendants ha[d] "the purpose and effect of fixing prices of magnesite . . . products *exported* to . . . the United States," *id.* ¶ 1 (emphasis supplied), but then immediately proceeds to state that "Defendants have directly sold and *delivered* magnesite . . . to customers *in* the United States." *Id.* ¶ 2 (emphasis supplied). These inconsistent allegations necessarily allows for two readings of the Amended Complaint: (1) one, where Plaintiffs seem to assert inapplicability of the FTAIA jurisdictional bar on the grounds of the § 6a(1)(A) exporter exception ( addressed in the prior section of this Opinion); and (2) another, where Plaintiffs seem to assert an "altogether" inapplicability of the FTAIA on the grounds that Defendants were *im* porters (*i.e.*, relying on the FTAIA's introductory clause). Plaintiffs' statements to the latter effect could be roughly subdivided into three categories: (1) Plaintiffs' conclusory references to certain Defendants as entities that "directly . . . shipped magnesite products to the United States during the period described in the [Amended] Complaint," *id.* ¶ 12–13, 15, 19–20, 22–25 and 27; (2) Plaintiffs' legal position that Defendants were importers because American entities either purchased Defendants' goods or consumed/resold these goods in the United States; and (3) Plaintiffs' assertion that Defendants were importers in light of the evidence contained in certain Plaintiffs and Defendants' exhibits.

The first category, consisting of numerously repeated factless self-serving assertions, cannot support Plaintiffs' position even for the purposes of facial review under the standard articulated in *Iqbal and Twombly* and, a *fortiori*, is insufficient for the purposes of factual review, as defined in *Turicentro.* Hence, this category of conclusory statements will be disregarded without further discussion. However, Plaintiffs' position based on alleged Defendants' sales to "American" entities, as well as Plaintiffs' reliance on certain exhibits, warrants a detailed review.

## 2. Claim That Defendants Effectively Acted as Importers

 The Amended Complaint is void of any factual statements or references to exhibits related to Defendants' alleged importation of goods into the United States. *See, generally,* Am. Compl. However, Plaintiffs' included in their amended pleadings a statement seemingly aiming to assert purchases of Defendants' goods by an entity which, upon bringing these goods to the United States, resold them to Plaintiffs (and, hence, introduced these goods in United States stream of domestic commerce). *See id.* ¶ 11.

Specifically, Plaintiffs' Paragraph Eleven reads:

> Possehl, Inc. [ ("Possehl") ] has assigned to [Plaintiffs all Possehl's] rights, title and interest in and to all causes of action it may have relating to magnesite or magnesite products brokered by Possehl, Inc. and subsequently delivered to [Plaintiffs] during the relevant period. Possehl, Inc. purchased magnesite and magnesite products directly from [D]efendants during the [relevant] period and shipped those products to [Plaintiffs].

*Id.* All other relevant statements made in the Amended Complaint are entirely factless, *i.e.,* they present mere conclusory assertions lacking even verbal specificity, let alone actual factual proof. *See* Am. Compl. ¶¶ 12–13, 15, 19–20, 22–25 and 27.

Yet, Plaintiffs' factual assertions currently before the Court are not limited to the above-quoted two sentences in Paragraph Eleven. Rather, these statements and evidentiary material are contained in Plaintiffs' Opposition and exhibits attached thereto. *See* Docket Entry No. 105. Plaintiffs' inclusion of these statements (and exhibits) in their Opposition rather than in their Amended Complaint is a procedural oversight, since a litigant cannot plead claims, state and/or support facts by any non-pleading document, be it moving papers, an opposition to adversaries' motion, the litigant's traverse, etc. *See, e.g., Bell v. City of Phila.*, 275 Fed.Appx. 157, 160 (3d Cir.2008); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir.2004); *Veggian v. Camden Bd. of Educ.*, 600 F.Supp.2d 615, 628 (D.N.J. 2009). However, for the purposes of this Opinion only, the Court will consider Plaintiffs' Opposition statements and exhibits attached thereto as if they were included in the Amended Complaint by reference, via the above-quoted statement made in Paragraph Eleven.

### a. *Plaintiffs' Legal Position*

Plaintiffs' legal position is not entirely clear, granted that Plaintiffs assert:

> Defendants ... directly sold magnesite to U.S. customers for delivery in the United States during the relevant time period.... Contracts previously submitted to the Court establish that [Defendants] sold magnesite to U.S. companies pursuant to contracts requiring delivery to the United States. Publicly available import records confirm that ... Defendants ... sold magnesite directly to customers in the United States for delivery in the United States.
>
> . . .
>
> Courts have uniformly concluded that the FTAIA exception for conduct involving import trade applies to claims by domestic importers arising from direct

purchases of price-fixed goods. *See, e.g., The 'In' Porters, S.A. v. Hones-Printables [Hanes Printables ], Inc.*, 663 F.Supp. 494, 499 (M.D.N.C.1987) (applying FTAIA to claims of antitrust plaintiffs "other than [ ] domestic importers]"); *Coors Brewing Co. v. Miller Brewing Co.*, 889 F.Supp. 1394, 1398 (D.Colo.1995) (stating that the FTAIA applies to antitrust plaintiffs' claims "with the exception of claims brought by domestic importers"); *see also Caribbean Broad Sys. Ltd. v. Cable and Wireless PLC*, 1995 U.S. Dist. LEXIS 19225, C.A. No. 93–2050, 1995 WL 767164, at *2 (D.D.C. Dec. 21, 1995), *rev'd on other grounds*, 148 F.3d 1080 (B.C. [D.C.] Cir. 1998) (noting that the FTAIA "makes clear that the concern of the antitrust laws is protection of American consumers and American exporters, not foreign consumers or producers").

. . .

In *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 398 (2d Cir.2002)[,] the defendant auction houses were accused by plaintiffs that had purchased goods at auctions outside of the United States of conspiring to fix commissions on foreign auctions. In concluding that the import trade exception did not apply, the Second Circuit noted that, although "some of the goods purchased in those auctions may ultimately have been imported by individuals in the United States," "the commerce that is the focus of this case is the charging of fixed commissions on the purchase and sale of goods at foreign auctions, not the trade in and subsequent movement of the goods that were purchased and sold." *Id.* at 395–96.

Opp. at 14–15, 27–28.

Plaintiffs' invocation of *The 'In' Porters* does not seem to raise any legal point worthy of discussion, since it merely reiterates the Court's reading of the FTAIA

as wholly inapplicable to claims against importers that bring goods in the United States. Similarly, Plaintiffs' reliance on *Kruman* does not seem to add any wrinkle, since the Court of Appeals for the Third Circuit already adopted the *Kruman* point highlighted by Plaintiffs in the Court of Appeal's *Turicentro* decision. *See* 303 F.3d at 302. That adoption of *Kruman* by the Court of Appeals was already duly noted by this Court in its December Opinion, when the Court states:

"[while the FTAIA] does not define the term 'import,' ... the term generally denotes a product (or perhaps a service) has been brought into the United States from abroad." [*Turicentro,* 303 F.3d at 302.] However, if "[d]efendants did not directly bring items or services into the United States ..., they cannot be labeled 'importers,' [nor it could be said that defendants] have they engaged in 'import trade or commerce.'" *Id.* In other words, even if a certain importer purchased or otherwise obtained the defendants' product in a foreign market (be it the defendants' national market or any other market) and brought the defendants' product into the United States, the fact that the product eventually found its way into the United States does not transform the defendant into an "importer" and, hence, an antitrust claim against the defendants must pass muster under the FTAIA['s "substantial, direct and reasonably foreseeable" exception] before the Sherman Act claim can be entertained. *See id.* at 304 (The fact "[t]hat 'some of the goods purchased in [a foreign market] may ultimately have been imported by individuals into the United States' [is] immaterial to determining if defendants [are] involved in 'import trade or import commerce' [since the defendants' own] actions did not directly increase or reduce imports

into the United States") (quoting *Kruman,* 284 F.3d [at] 395).
Docket Entry No. 73, at 26–27.

Hence, the excerpt from Plaintiffs' Opposition quoted at the outset of this subsection leaves the Court with only two Plaintiffs' quotations, one from *Carribean* and another from *Coors.* However, *Carribean* is wholly inapposite to the case at hand since it deals with the issue of whether a purchaser in a foreign country can bring a Sherman Act claim based on foreign harm; this question was answered in the negative by the Supreme Court in *Empagran S.A.,* 542 U.S. 155, 124 S.Ct. 2359. One court explained and illustrated the issues associated with the *Carribean* language quoted by Plaintiffs as follows:

In asserting [that they have standing to sue], Plaintiffs rely on the FTAIA's introductory language, which states that the FTAIA's requirement of a "direct, substantial, and reasonably foreseeable effect" on domestic commerce applies to claims "involving trade or commerce (other than import trade or import commerce) with foreign nations." ... Based on this language, Plaintiffs assert that the parenthetical exclusion of "import trade or import commerce" means that a foreign antitrust claim need never satisfy the FTAIA as long as it involves products that might be shipped to the United States.... The court determines that Plaintiffs' position is not a correct statement of the law. The "main significance" of the FTAIA is to "make[ ] clear that the concern of the antitrust laws is protection of American consumers and American exporters, not foreign consumers or producers" .... Phillip Areeda & Herbert Hovenkamp, Antitrust Law P 272h2, at 362–63 (1997) .... The antitrust laws' goal of protecting American consumers and producers cannot realistically be served by Plaintiffs' version of the FTAIA, which would permit for-

eign plaintiffs to bring treble damages suits based on conduct that has only indirect, insubstantial, and unforeseeable effects on commerce in this country.

*United Phosphorus, Ltd. v. Angus Chem. Co.,* 131 F.Supp.2d 1003, 1022 (N.D.Ill. 2001).

Since Plaintiffs' reference to *Carribean* is inapposite to the matter at hand, the Court is left to distill Plaintiffs' position from: (a) Plaintiffs' mentioning of Possehl in Paragraph Eleven of the Amended Complaint, *see* Am. Compl. ¶ 11; (b) Plaintiffs' thrice paraphrased assertion that Defendants "sold magnesite to U.S. customers for delivery in the United States," "sold magnesite to U.S. companies pursuant to contracts requiring delivery to the United States," and "sold magnesite directly to customers in the United States for delivery in the United States," Opp. at 14–15; and (c) Plaintiffs' quotation from *Coors* that suggests Plaintiffs' reading of *Coors* as a case standing for the proposition the FTAIA jurisdictional bar is inapplicable to the claims brought *by* plaintiffs who are *United States importers. See id.* at 27. Read jointly, these statements seems to express Plaintiffs' position that a foreign *ex* porter automatically becomes a *de facto im* porter of goods in the United States (and, hence, automatically loses his/ her ability to invoke the FTAIA jurisdic-

tional bar) if: (a) that *ex* porter sells his/ her goods to an *im* porter that is/labels/deems itself an American entity; and (b) that importer brings the goods purchased from that exporter into the United States, either for the importer's consumption or for the importer's further re-sale of these goods to other American end-users. *Accord* Opp. at 27 (titling this section of the Opposition as "The Sale of ... Products *to U.S. Companies for Delivery in the United States* is 'Conduct Involving' '... Import Trade or Import Commerce' ") (emphasis supplied).[48] Presuming that the Court correctly distilled Plaintiffs' legal position, such position—as explained below—is without merit and, hence, Plaintiffs cannot reclassify Defendants-*ex* porters into *im* porting entities prevented from invoking the FTAIA jurisdictional bar.[49]

**b. *Coors* Does Not Lend Support to Plaintiffs' Legal Position**

Writing one of the very few pilot FTAIA decisions, the court in *Coors* grappled with a question completely different, both factually and legally, from the issue of what circumstances could reclassify an *ex* porter defendant into an *im* porter. *See Coors Brewing Co. v. Miller Brewing Co.,* 889 F.Supp. 1394. With finesse of sub-agreements addressed in *Coors* being factored out, the circumstances in *Coors* were as follows: Coors Brewing Company (a Colo-

---

**48.** In other words, Plaintiffs seem to invite the Court to find that the process of "importation" begins right at the loading docks of an exporter if the exporter sells to an American end-user or to a broker who informs the exporter of the broker's intent to resell the goods directly to American end-user once the goods enter the United States. Such reading divorces United States actual geographic borders from Plaintiffs-created "virtual borders" which become drawn at any point where an American end-user or catering-to-Americans broker gets the good.

**49.** The Court notes, in passing, that it is not entirely clear as to any rights, title or interests

in any cause of action that Possehl might have in this matter, since: (a) Possehl is a German entity, situated in Lübeck (Schleswig–Holstein land of Germany), *see* <<http://www.possehl. de/en/index.html>>; (b) Possehl is an importer of all kinds of goods and is operating world-wide, *see id.;* (c) here, Possehl seemingly has been purchasing Chinese goods for further world-wide importation, which bars Possehl's claims under the holding of *Empagran S.A.,* 542 U.S. 155, 124 S.Ct. 2359; and (d) the only injury Possehl might have suffered as a result of the alleged collusive activity is a wholly speculative Possehl's inability to make "more" profit on resale of Chinese goods.

368

rado corporation engaged in the business of brewing, marketing, and distributing beer) entered into a licensing agreement with Molson Breweries of Canada (a Canadian corporation, also in the beer industry), pursuant to which Molson would brew and distribute Coors products in Canada. *See Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1512–13 (10th Cir.1995). Thereafter, Miller Brewing Company (a Wisconsin corporation also in the business of brewing and marketing beer) entered into a partnership with Molson; under that agreement, Miller became the exclusive distributor of Molson's products in the United States, and Molson became the exclusive distributor of Miller's products in Canada. *See id.* At no point in the *Coors* litigation did Molson and/or Miller deny the existence of the Miller–Molson alliance, pursuant to which Molson and Miller jointly targeted United States and Canadian markets through coordination of their marketing and pricing. *See id.*; *see also Coors*, 889 F.Supp. 1394. In light of this Miller–Molson agreement, Coors initiated a legal action asserting that the Miller–Molson alliance limited Coors' ability to *ex*port its beer to Canada and, in addition, "somewhat restrained" trade in the United States. *See Coors*, 889 F.Supp. at 1397. In response, Miller and Molson asserted that Coors' claim was jurisdictionally barred by the FTAIA, and that the FTAIA's "direct, substantial, and reasonably foreseeable effect" exception (restoring jurisdiction) did not apply. *See id.* at 1397. Presented with such contentions, the District of Colorado ruled that the

Molson–Miller alliance "satisfie[d] both subsections ... of the FTAIA [exception] because it ha[d] a direct, substantial, and reasonably foreseeable effect not only on Coors' export trade with Canada, but also, albeit less directly, on the United States beer market." In other words, the *Coors* court made its finding primarily under subsection (1)(B) of the FTAIA, which: (a) removes the jurisdictional bar with regard to claims asserting "direct, substantial, and reasonably foreseeable [effect] on *export* trade [of American entities selling *to* ] foreign nations," *see id.* (emphasis supplied); and (b) is entirely inapplicable to the matter at hand, since—here—Plaintiffs are not suing in Plaintiffs' capacity as exporters of goods to China or to any other nation.[50]

At no point did the *Coors* court deal with the question of whether Molson, an *ex*porter, could be re-characterized into an *im*porter of Canadian beer to the United States on the grounds that Miller was "directly" bringing Molson's goods into the United States for sale to American consumers: the *importer/exporter* roles in *Coors* were firmly allocated and never contested by the parties.[51] With that observation, the Court now turns to the *Coors* sentence quoted by Plaintiffs; the paragraph from which Plaintiffs extracted that sentence reads, in its entirety, as follows:

Although cases applying the FTAIA are few, its "inelegant" language has been interpreted to mean that *with the exception of claims brought by domestic importers*, the Sherman Act will not apply to conduct affecting foreign markets, consumers or producers unless there is

**50.** This Court does not endorse the *Coors* court's choice of words suggesting that an antitrust plaintiff might establish a direct effect necessary for subsection (1)(A) by pleadings asserting that the defendants' actions affected United States "less directly."

**51.** Hence, even if the *Coors* court were to make a finding that Molson was a quasi-

*im*porter of its Canadian beer to the United States as a result of engaging Miller, such finding would be necessarily a *dictum* having no precedential value even in the *Coors* court jurisdiction, and certainly in no other jurisdiction, such as this District. However, it does not seem that the *Coors* court made such a finding even in *dicta*.

also a direct, substantial, and reasonably foreseeable effect on the domestic market (subsection (1)(A)) or on opportunities to export from the United States ((1)(B)). [*See* ] P. Areeda & H. Hovenkamp, Antitrust Law ¶ 236'a at pp. 306–07 (1993 Supp.); *see McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 813 (9th Cir.1988) (allegations of a refusal to deal in foreign markets injuring only foreign customers and plaintiff insufficient to confer antitrust jurisdiction under FTAIA); *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494, 498–99 (M.D.N.C.1987) (French garment distributor had no cause of action under federal antitrust laws absent evidence of injury within the United States); *Liamuiga Tours v. Travel Impressions, Ltd.*, 617 F.Supp. 920, 922–23 (E.D.N.Y. 1985) (court lacked jurisdictional nexus under the FTAIA where restraint of trade and conspiracy claims involved exclusively lost business and anti[-]competitive effects in St. Kitts).

*Id.* at 1397–98 (language quoted in Plaintiffs' Opposition italicized).

In light of the *Coors* court's references to Areeda & Hovenkamp, *McGlinchy, The 'In' Porters* and *Liamuiga Tours,* none of which suggests, even remotely, that an *ex* porter could be "re-characterized" into an *im* porter if a catering-to-Americans importer or an American end-user purchases the exporter's goods in a foreign market, this Court cannot exclude the possibility that the *Coors* court's phrase "with the exception of claims brought *by* domestic importers" (which, it seems, merely made a generic reference to the introductory clause of the FTAIA) was meant to read "with the exception of claims brought *against* domestic importers," *i.e.,* that the *Coors* court merely summarized the introductory language of the FTAIA stating the statute's inapplicability to claims against importers of goods into the United States. So read, the *Coors* decision certainly cannot support Plaintiffs' position, while—read otherwise—it would be mere *dicta.*

### c. *Plaintiffs' Position Contradicts the Gist of the Third Circuit Law*

As noted *supra,* the Court of Appeals for the Third Circuit provided some guidance as to what entity qualifies as an "importer" for the purposes of the FTAIA analysis, stating that, while the FTAIA "does not define the term 'import,' . . . the term generally denotes a product [that] has been brought into the United States from abroad. [If d]efendants did not directly bring items or services into the United States . . ., they cannot be labeled 'importers.' "[52] *Turicentro,* 303 F.3d at

---

**52.** The Court takes note of Plaintiffs' position that, in order to avoid the FTAIA jurisdictional bar under the introductory language "[the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless . . ." 15 U.S.C. § 6a, Plaintiffs need not show that Defendants were actually "importers" of goods to the United States but could make a "diluted" showing that Defendants were just "involved" in import to the United States. *See* Opp. at 29–30 ("the FTAIA exception is not limited to claims against *importers* but extends to claims alleging illegal conduct that *involves* import trade or import commerce," emphasis in original, quoting *Carpet Group,* 227 F.3d at 71, state-

ment that "[t]he proper inquiry [is] whether the alleged conduct by the defendants 'involved' import trade or commerce," and *In re Air Cargo Shipping Servs. Antitrust Litig.,* 2008 WL 5958061, at *12–13, 2008 U.S. Dist. LEXIS 107882, at *99 (E.D.N.Y. Sept. 26, 2008), *rejected in part,* 2009 WL 3443405, 2009 U.S. Dist. LEXIS 97365 (E.D.N.Y. Aug. 21, 2009), for the proposition that "language makes clear that not only import commerce, but conduct *involving* import commerce, is never removed from the reach of the Sherman Act," retaining the emphasis of Magistrate Judge Victor V. Pohorelsky). Plaintiffs misconstrue the meaning the word "involved," as utilized by the Court of Appeals in *Carpet Group* and even by Judge Pohorelsky in *Air Cargo.* The

302. This definition, while undoubtedly helpful, does not, however, provide a bright-line test as to what process qualifies as "bringing" a product into the United States. True, such inquiry is easy in a scenario where the buyer "X" goes to country "Y" and—upon purchasing goods from the selling entity "Z"—brings these goods into the United States and consumes the goods or resells them within the United States: in such case, "X" is undoubtedly the "importer" of Z's goods. (Alternatively, if Z brings Z's goods into the United States and then sells them to X, then Z is both an exporter from Z's country and, also, an importer for the purposes of the United States. However, modern trade is a process infinitely more complicated than the above-described simple scenarios. For instance: (a) seller Z typically receives a pro-forma offer from an intermediary "A" who, in turn, is interested in Z's goods because he either already has a pro-forma offer to buy from a purchaser X or anticipates such offer from X and/or from other X-like buyers; (b) in response to or in anticipation of X's offer, A obtains price quotes from Z and then quotes to X and X-like buyers A's price list (which, typically, factors in A's surcharge); (c) if X contacts A (or already contacted A), accepts A's quotes and

---

paragraph of the *Carpet Group* opinion, from which Plaintiffs extracted their quotation, reads, in its entirety, as follows:

> The Magistrate Judge held that this case did not fall into the FTAIA's parenthetical exclusion, *i.e.*, did not "involve" import trade or commerce, because the plaintiffs in this case were not importers .... [T]his is plainly an inaccurate reading of the FTAIA. It is an incorrect focus on the plaintiffs' function rather than the defendants' conduct. [The] FTAIA's exemption from the Sherman Act focuses on the latter's application to "conduct involving trade or commerce (other than import trade or import commerce) with foreign nations." ... The implication that the Sherman Act provisions "apply to import trade and import commerce is unmistakable." *Eskofot A/S v. E.I. DuPont De Nemours & Co.*, 872 F.Supp. 81, 85 (S.D.N.Y.1995). The proper inquiry was therefore whether the alleged conduct by the defendants "involved" import trade or commerce, not on whether the plaintiff's conduct, which is not being challenged as violative of the Sherman Act, "involved" import trade or commerce.

*Carpet Group*, 227 F.3d at 71. Hence, the word "involved" was utilized by the Court of Appeals in order to denote which party (*i.e.*, the plaintiff or the defendants) has to be importer(s) in order to render the FTAIA's jurisdictional bar wholly inapplicable to the plaintiff's claims; the word was not used in order to set forth a "diluted" or "relaxed" meaning of the term "import." This is especially obvious in light of the Court of Appeals' unaltered quotation from *Eskofot*: had the Court of Appeals wished to relax the *Eskofot* language, it would change it to "the Sherman Act provisions 'apply to [acts somehow involving] import trade and import commerce.' " Magistrate Judge Pohorelsky's focus on the word "involving" is, too, different from Plaintiffs' position. While his end-conclusion does not persuade this Court (and was indeed rejected, in part, by the Eastern District of New York), his "Analysis" section following the quotation extracted by Plaintiffs indicates that Judge Pohorelsky utilized the word in response to defendants' assertion that the act of price fixing outside the United States must be divorced, for the purposes of the FTAIA analysis, from any importation activities, and only the foreign situs of the price fixing could be assessed. *See Air Cargo Shipping Servs.*, 2008 WL 5958061, at *12–13, 2008 U.S. Dist. LEXIS 107882, at *99–100. In light of the foregoing, the Court finds Plaintiffs' reliance on *Carpet Group* and *Air Cargo* without merit. Simply put, the FTAIA is wholly inapplicable to Plaintiffs' claims if—and only if—Defendants were, in fact, *im*porters: so read, the introductory language of the FTAIA yields the result comparable, policy-wise, to the "meant/intended to affect" test of *Alcoa/Hartford Fire* adopted in the subsection (1)(A)'s requirement for "direct, substantial and reasonably foreseeable effect," since an entity which is the "main force" behind the transaction bringing the goods on United States soil is expected to "mean/intend to affect" United States commerce.

places X's order, then A agrees with both Z and X on the terms of getting the goods from Z and payments to Z, as well as on getting the goods to X and payments from X (that is, unless A already had some arrangement in place with either X or Z, or both); (d) then, typically on agreement or at least in consultation with either X or Z, or both, A arranges for freight forwarder "B" to deliver the goods (that is, unless X or Z already have certain exclusive or preferred freight forwarding arrangements in place); and (e) upon issuance of a stream of negotiable instruments and a chain of payment instruments, *e.g.,* letters of credit, bill of lading, etc., the goods (accompanied by negotiable instruments) begin their voyage from Y to their first port of destination, while the payment instruments start *en route* from X to A and then from A to Z. *See, e.g.,* Ralph H. Folsom et al., *International Business Transactions* 28–299 (West 3rd ed. 1995) (taking almost 300 pages to sketch just the

basic financial and legal steps associated with international trade in goods). And, since the above-outlined chain of transactions is still a very simplistic way to define the actual intricacies of the trade process, the answer to the question of which entity or entities "bring(s)" Z's goods into the United States, *see Turicentro,* 303 F.3d at 302, might be less than obvious.

Defendants seem to suggest that this question should be decided on the basis of the particular Incoterms governing Defendants' sale of goods contracts.[53] *See, e.g.,* S/Reply at 11. Plaintiffs, in turn, move the Court to wholly ignore the Incoterms used in Defendants' sales contracts and, instead, determine Defendants' importer/exporter status on the basis of the country of the first official port of destination where the goods were shipped from the seller's country. *See* Opp. at 28–29 (citing contract law cases assessing transfer of title and risk of loss associated with injury

---

**53.** "Where the goods are to be carried from one location to another as part of the sale transaction, the parties will often adopt a commercial term to state the delivery obligation of the seller.... These terms are defined in the UCC [] §§ 2–319, 2–320[], but the UCC definitions are seldom used intentionally in international trade ... because *the abbreviations used are now associated primarily with water-borne traffic,* and the statutory terms do not include the new terminology associated with air freight, containerization, or multi-modal transportation practices. In international commerce, the dominant source of definitions for commercial delivery terms is 'Incoterms,' published by the International Chamber of Commerce (I.C.C.) .... Incoterms is an acronym for International Commercial Terms, and provides rules for determining the obligations of both seller and buyer when different commercial terms ... are used. They state what acts the seller must do to deliver, what acts buyer must do to accommodate delivery, what costs each party must bear, and at what point in the delivery process the risk of loss passes from seller to buyer. Each of

these obligations may be different for different commercial terms..... There are other sources of such definitions, in addition to the UCC and Incoterms, such as the American Revised Foreign Trade Definitions .... widely used in Pacific Ocean trade .... Since the I.C.C. is a non-governmental entity, Incoterms is neither a national legislation nor an *international treaty* [and] it cannot be 'the governing law' of any contract. Instead, it is a written form of custom and usage in the trade, which can be, and often is expressly incorporated by ... the parties to an international contract for the sale of goods.... Although the [the line of aforesaid sources] has definitions for [Incoterms], these definitions are expressly subject to 'agreement otherwise' [and] United States courts have so held.... Incoterms gives the parties a menu of thirteen different commercial terms to describe the ... obligations of the seller and ... the buyer ...: (1) EXW; (2) FCA; (3) FAS; (4) FOB; (5) CFR; (6) CIF; (7) CPT; (8) CIP; (9) DAF; (10) DES; (11) DEQ; (12) DDU; (13) DDP." Ralph H. Folsom et al., *International Business Transactions in a Nutshell* 93–96 (West 5th ed., 1996).

to or destruction of goods). The Court finds both positions equally unpersuasive.

Defendants' hard-and-fast rule based on the Incoterms ignores: (a) the fact that the meaning of any Incoterm is subject to alteration upon agreement between parties (and such alteration might even be a result of a condoned conduct), *see supra* note 53 of this Opinion; and (b) the axiomatic proposition that form shall not be elevated over substance, and thus the actual content of the contract—rather than its title/caption/headings—governs the actions of contracting parties. *See, e.g.* Farnsworth, *Contracts* § 6.3 (1982) (the determination of the nature of a transaction "is a question of substance rather than form"); *In re Underwood,* 2004 WL 5607954, 2004 Bankr.LEXIS 1461 (Bankr.E.D.Wash. Apr. 9, 2004) ("A classic maxim of contract construction dictates that [the] substance of the parties' transaction governs how their relationship is defined rather than the label or form used"); *In re Associated Bicycle Serv.,* 128 B.R. 436, 458 (Bankr. N.D.Ind.1990) ("The substance of the agreement, rather than its form, is the material issue").

Plaintiffs' mechanical position focusing on the "first port of destination" fares even worse, not just because it aims to import a string of largely irrelevant considerations of contract law into the predominantly policy-driven FTAIA regime, but because adoption of Plaintiffs' simplistic model would automatically transform any foreign seller into a United States importer if the sellers' goods reach the United States without a detour; that would be so regardless of whether or not the seller even cared about where the buyer of the seller's goods would take them. Since, as Judge Hand aptly noted, the idea that Congress meant to mechanically "punish all whom [United States] courts can catch" is incompatible with both the spirit of American antitrust law and constitutional mandate, *Alcoa,* 148 F.2d at 443–44, Plaintiffs' "first destination port" model would result in an impermissible overreaching and undue "exportation of American law."

Consequently, the Court rejects both sides' invitations to adopt a perfunctory rule and turns to the Court of Appeals' observation that importation is, effectively, a process of "bringing" goods into the United States from abroad. *See Turicentro,* 303 F.3d at 302. A dictionary meaning of the verb "bring" is to "cause to come along with one toward [a certain] place" or "to cause to move in a special way." <<http://www.merriam-webster.com/dictionary/BRING>>. While, indeed, this definition is moderately precise at best, it establishes the presence of at least one indelible attribute, *i.e.,* the harbinger's act of pioneering a certain cause, which—upon a chain of later developments—eventually results in physical transition of the seller's goods to the buyer's country. Translated in terms of international trade, such attribute necessarily begs the question "was it mainly the seller who engaged his/her agents and/or independently contracted third parties in order to physically tender the seller's goods for sale on the buyer's soil, or was it mainly the buyer who engaged the seller and/or independent third parties in order to have the seller's goods materialize on the soil of the buyer's country?" *Accord U.S. v. Berkos,* 543 F.3d 392, 396–97 (7th Cir.2008) ("We assume that the legislative purpose [of the statute] is expressed by the ordinary meaning of the words used"). Such question seems to be warranted since it: (a) corresponds to the FTAIA's general objective of limiting the extraterritorial reach of American antitrust law while preserving protections for American consumers; and (b) does not render any portion of the statute "redundant or meaningless." *See id.* In light of the foregoing, it appears that the term "importer" employed in the introductory language of the FTAIA would be best read

as referring to the "main force" behind the physical movement of goods to the United States; such inquiry is, by definition, unamenable to any hard-and-fast rule and must be resolved on a case-by-case basis.[54] The only aspect appearing certain is that a plaintiff (who is asserting that a purely foreign seller is, effectively, not a "real" exporter but a *de facto* importer "bringing" the goods into the United States within the meaning of the introductory clause of the FTAIA) has to show that the seller's activities were "direct" in a degree higher

that required under 15 U.S.C. § 6a(1)(A), with regard to exporters: the "directness" under the introductory clause should yield such substantial contacts between the seller and the United States that it establishes a nexus roughly corresponding, in its magnitude, to the nexus needed to show the "directness" sufficient to remove the FSIA-based presumptive immunity under the "commercial activity" exception set forth in 28 U.S.C. § 1605(a)(2): a conclusion otherwise would invite the danger of putting form over substance.[55] *Accord in-*

---

**54.** The Court recognizes that such "main force" inquiry is, perhaps, just as open to an academic debate as the "who brings the goods into the United States?" question in *Turicentro*. However, it appears rather certain that such entity as a freight forwarder, that is, a retained shipper, would not qualify as the "main force" behind the transaction, even though the freight forwarder is actually charged with an obligation to physically "bring" the goods into the United States. Similarly, since no meeting of minds can be reached and, hence, no sale of goods can take place, unless the seller is interested in selling and the buyer is interested in buying, the fact that the seller is seeking to increase his/her export quotas or is engaged in generic advertisement of his/her goods, or that the intermediary is advertising his/her services, or that the buyer is making generic inquiries with sellers or intermediaries, cannot be reflective of their responsibility for "bringing" the goods into the United States for the purposes of a *particular* transaction. In contrast, if an intermediary buys a certain batch of the seller's goods because the intermediary has an actual or potential United States purchaser, or if the seller retains an intermediary to bring the goods into the United States and hold them for sale to the seller's potential buyers, or if the buyer approaches an intermediary with a request to obtain a specified amount of certain goods within a certain period of time and at the price the maximum of which is set within a certain bracket, then such actions might be indicative of being the "main force" behind the particular sale of goods. And, since these types of actions are likely to require the "main force" entity to comply with United States customs clearance procedures (or to retain a freight forwarder

or customs agent to perform such clearance) and to post a bond to cover customs duties or to deposit estimated customs duties upon filing the entry summary, the entity performing such clearance and liable for import duties within the meaning of United States customs law is likely to be the "importer" for the purposes of the particular transactions in goods if these transactions are examined with an eye on the FTAIA jurisdictional bar. *See* <<http://www.customs.gov/linkhandler/cgov/newsroom/publications/trade/iius.ctt/iius.pdf>> at 11 (defining the features of "importer of record"); <<http://www.census.gov/foreign-trade/regulations/ftsrletters/ftsr174.html>> (same); *see also* 19 U.S.C. § 1484 (same) and 19 U.S.C. § 1641 (providing relevant clarifications as to customs brokers).

**55.** Analogously, the "directness" of the seller's contacts with the United States required under the introductory clause of the FTAIA should roughly correspond, in the magnitude of the nexus it produces between the seller and the United States, to the cumulative nexus produced by the "direct, substantial and reasonably foreseeable" elements of § 6a(1)(A): then, the defendant (whom, as here, the plaintiff seeks to re-qualify from an exporter into a *de facto* importer) would be subject to the jurisdiction of United States courts regardless of the plaintiff's or defendant's exercises in semantics, *i.e.*, the mere terms "exporter" and "importer" (being products more of the discipline of economics than of law which tends to operate in such basic terms as "seller" and "buyer") would not invite a risk of inconsistent legal results as to the very same set of facts.

*fra,* section "The FSIA Appears Relevant to Some Defendants" of this Opinion.

### d. *Sales to an "American" Intermediary or End– Consumer*

■ With this conclusion in mind, the Court now turns to Plaintiffs' alternative position inviting the Court to qualify Defendants as *im* porters of magnesite-based products to the United States because Defendants sold their goods to, *inter alia:* (a) intermediaries alleging that they were planning an immediate resale in the United States; or/and (b) alleged "American" end-consumers. *See* Opp. at 14–15 and ("Defendant ... conspired ... with other Defendants and co-conspirators that sold magnesite directly to customers located in the United States for delivery in the United States"; "[p]ublicly available import records confirm that ... Defendants and their co-conspirators sold ... directly to customers in the United States for delivery in the United States"; "[Defendants] were the 'exporters' of record for at least 67 direct sales of magnesite to U.S. companies delivered to ports in the United States"; [Defendants] sold magnesite directly to end-users located in the United States, including LWB Refractories in York, Pennsylvania"); *see also* Opp. at 15 and Am. Compl. ¶ 11 (asserting that Plain-

tiffs acquired the legal rights of Possehl, and that "Possehl [sold] the magnesite to others, including the end-user[s in the United States]").[56]

The Court rejects Plaintiffs' argument that the seller's "importer" status may be deduced from the alleged "nationality" or reselling intentions of the buyer that purchases the seller's goods. First, the practical implications of such deducement would invite a wholly anomalous scenario where the seller might be able to ensure against legal liability in the United States only if the seller, in each and every transaction: (a) first conducts a full-fledge due diligence investigation of the purchaser's actual "nationality" or actual reselling intentions; and (b) then delegates a "agent" to follow each particular shipment to ensure that the buyer, in fact, consumes the goods in the United States or actually resells the goods to an American end-user instead of "unduly" diverting the goods to another country, either prior to or after clearance at the United States customs.[57] Consequently, the Court declines to adopt this wholly anomalous position differentiating between sales to American and non-American end-consumers and intermediaries catering to American and non-American end-users, or between direct and indirect shipments from the country of export

56. Possehl appears to be either an Aktiengesellschaft, or KGaA, or GmbH (*i.e.*, a typical business entity chartered under the German law), *see supra* note 49 of this Opinion; Possehl seems to have no articles of incorporation registered in one of the United States' states and no such features as an American nerve-center or main production facility (which might give rise to "local" corporate situs under state law). Therefore, the Court is not entirely clear as to the logic of Plaintiffs' reference to Possehl as an "American" importer.

57. The Court fails to fancy what such "agent" is to do in the event the alleged American intermediary or alleged American end-user

attempts to "divert" the goods to a non-United States market. Moreover, the economic implications of a ruling tying the seller's importer status to the buyer's contractually irrelevant promise would invite a self-imposed quasi-embargo (preventing import to the United States), since foreign sellers, worried about liability in the United States, might start selling their goods only to those intermediaries or end-consumers that promise to ship/consume the goods only to non-United States ports, which means that American buyers or a second tier of intermediaries would have then to re-import the goods into the United States, raising the cost of these goods for the purposes of United States domestic trade by dual broker's commissions and additional freight.

to the United States: the issue whether the seller is an "importer" can neither legally nor logically depend on those acts or intentions of the buyer which the seller cannot control or verify.[58]

### 3. Plaintiffs' Factual Proof as to Defendants' Importer Status

In addition to suggesting the above-discussed two models re-characterizing *ex* porters as *im* porters, Plaintiffs also support their claim that Defendants were importers through three means: (a) Plaintiffs' own exhibits; (b) certain Defendants' exhibits; and (c) Plaintiffs' assertions that Defendants' statements are self-contradicting. The Court addresses each category in turn.

#### a. *Plaintiffs' Own Exhibits*

Plaintiffs' own exhibits are attached to the declaration of Robert A. Magnanini, Esq. (submitted jointly with Plaintiffs' Opposition); out of the thirty-four such exhibits, Exhibits Five to Nine (docketed as Docket Entries Nos. 105–7 to 105–11) appear relevant to the issue of Defendants' status as importers of goods to the United States. Each of these Exhibits, in turn, contains numerous print-outs of public records of sales of magnesium oxide; each record has the following information:

(i) a line naming the "manifest commodity" as "dead burned magnesite" and stating the applicable tariff code;

(ii) a line naming the "exporter"; such entry is followed by one of the names of Defendants, with some Defendants being named on numerous occasions, others being named only a few times, and yet others not being named at all;

(iii) a line naming the "importer," *e.g.*, Possehl (some of these entries are followed by the importer's address, while others are not);

(iv) a triplet of lines reading "port," "origination" and "destination," with each "origination" entry being followed by the name of some port, usually Chinese (*e.g.*, Bayuquan or Derien (former Dalian), or Hsinkang, etc., or simply by the word "China"), and each "destination" entry being followed by the name of some United States port or an approximated area in the United States (e.g., Gramercy, Takoma, New Orleans or just "S[outhern] Louisiana");

(v) a line indicating "unit of measure"; such entry is followed by a specific figure and a phrase "big bags" or the word "bulk";

(vi) a line indicating the "weight" of shipment, typically in thousands of pounds;

(vii) a line stating the "ship[ment]-date," these dates are all post–1999;

---

**58.** To illustrate, it would be anomalous to declare a French vineyard or Spanish tannery "importers" of goods to the United States simply because American tourists keep purchasing wine and hides while visiting the vineyard and tannery and bringing these goods to the United States, where they consume the wine and use the hides to decorate their living rooms. Moreover, a position somewhat similar to that suggested by Plaintiffs was rejected in *Dee–K Enters.*, 299 F.3d 281. *Dee–K Enters.* involved a price-fixing action by two American companies against Southeast Asian producers. *See id.* at 283. On appeal, plaintiffs: (a) challenged the dis-

trict court's adherence to the *Hartford Fire* standard asserting that *Hartford Fire* applied only to cases involving "wholly foreign" commerce; and (b) maintained that the sale of price-fixed goods by foreign sellers to an American buyer must be deemed as involving, by definition, United States commerce. The Court of Appeals for the Fourth Circuit characterized plaintiffs' latter argument as "perilously close to clear conflict with *Hartford Fire*," *id.* at 291, and pointed out that such "single-factor test" proposed by plaintiffs would open United States courts to a flood of claims involving "a great variety of foreign conduct." *Id.* at 292.

(viii) a line indicating the language, presumably of the print-out, reading "English"; and

(ix) a line stating the "load[ing]-date," usually sometime in 2004 and 2008; it, presumably, reflects the date of Plaintiffs' research of the database and downloading of the results.

*See* Docket Entries Nos. 105–7 to 105–11.

Organized by: (a) alphabetized names of the entities designated as "importers"; (b) the number of such print-out records per each "importer"; and (c) the number of the particular Plaintiffs' Exhibit where copies of such print-outs can be found, these Docket Entries Nos. 105–7 to 105–11 could be reduced to the table ("Importers Table"):

| Name of Importer | Number of Transactions | Exhibit(s) |
|---|---|---|
| ACC Resources | 6 | 8, 9 |
| Allied Mineral Products | 8 | 5 |
| American Minerals | 1 | 7 |
| Ami Trdg | 18 | 6, 7, 9 |
| Baymag | 1 | 6 |
| CMC Cometals | 5 | 5, 8, 9 |
| Comsource | 14 | 9 |
| Epoch Resources | 1 | 6 |
| George William Rueff | 6 | 8, 9 |
| Global Minerals | 8 | 8, 9 |
| Golden Resources Intl | 3 | 8, 9 |
| Lake Resources | 13 | 6, 7 |
| LWB Refractories | 10 | 8, 9 |
| Possehl | 46 | 5, 8, 9 |
| Resco Products | 1 | 6 |
| S & S Intersource | 5 | 9 |
| Schenkers Intl Fwdrs | 7 | 8 |
| Valudor Products | 11 | 8 |
| Vesuvius | 2 | 9 |
| Wide Go US | 2 | 5, 9 |
| Worldwide Refractories | 1 | 9 |
| Yas | 4 | 5 |
| Order of Shipper | 1 | 6 |

Short of identifying the "importer," none of these print-outs sheds any light on the nature of the underlying transaction. However, even a cursory examination of the Importers Table unambiguously establishes that none of the importers named in the print-outs is a Defendant in this action.[59] In other words, Plaintiffs' own Exhibits tend to establish that Defendants were *not* importers of goods in the United States; rather, various intermediaries and end-consumers, including Resco itself, were the actual importers of the goods. If this conclusion is true, then the FTAIA would necessarily apply to Plaintiffs' claims, and the Court would necessarily lack subject matter jurisdiction over this action and would be constrained to dismiss it.

**b. *Discrepancies in Defendants' Statements***

As noted *supra*, Plaintiffs also seek to establish Defendants' importer status by pointing out that statements made by Defendants are incoherent. Although the incoherence of Defendants' statements, even

---

**59.** The sole suspect print-out appears to be the one where the "importer" is identified as "Order of Shipper," since the Court is left to wonder about the form of notice to—and the identity of—the consignee (and the consignee's relation to the shipper, who is likely to be the exporter retaining the consignee as its United States sales agent for the purposes of that particular transaction). *See* Docket Entry No. 105–8, at 2. However, the nature of the transaction reflected by this print-out appears questionably relevant to the case at bar, since: (a) the "port [of] origination" designated in that particular print-out is "PT ALFRED," that is, a seemingly non-Chinese port having code number "14069," *compare* Docket Entry No. 105–11, at 54 (suggesting that the codes for all Chinese ports falls within 57000's); *see also* Docket Entries Nos. 105–7 to 105–11 (identifying all Chinese ports under 57000's numbers); and (b) the only "port Alfred" the Court is aware of is in South Africa rather than in China. *See* <<http://www.portalfred.co.za>>.

if shown, does not assist Plaintiffs (since the burden to establish jurisdiction in this matter is on Plaintiffs, and Defendants have no obligation to disprove a negative), the Court finds a brief discussion of Plaintiffs' points warranted. Specifically:

(i) Plaintiffs point to one of Defendants' previously submitted declarations (which asserted that this Defendant "d[id] not export magnesite from China and d[id] not import magnesite into the United States [but, rather] delivered [it] to the customer, whether a broker ... or an end[-]user, at some location in China [and was] unaware of the ultimate location where the magnesite may be delivered or used," Opp. at 15 (quoting Docket Entries Nos. 98–16 and 98–17), and argue that this statement contradicts one of Defendants' previously submitted exhibits (attached to Plaintiffs' Opposition as Exhibits 3 and 10) which shows Defendants' awareness of the destination of their goods; Plaintiffs, somehow, deduce from this alleged inconsistency that Defendants must have been "importers" of goods to the United States. *See id.* at 15–16.[60] Plaintiffs' make an identical deducement from the inconsistency between: (i) Defendants' previously submitted declarations asserting that Defendants "s[old] magnesite to brokers ..., which then s[old] the magnesite to others, including the end-user"; and (ii) one of the print-outs reflected in the Importers Table which designated LWB Refractories, *i.e.*, an end-user rather than an intermediary, as "importer."

*See id.* at 16. Finally, pointing out the inconsistency between: (i) Defendants' previously submitted declarations asserting that Defendants "d[id] not export magnesite from China"; and (ii) bids for export quotas and award of export quotas to Defendants, Plaintiffs, again, somehow deduce that Defendants must have been importers of goods to the United States; and

(ii) Plaintiffs also point out that the Sinosteel Defendants are listed as exporters in 67 print-outs reflected in the Importers Table, *see* Opp. at 16, and that the Sinosteel Defendants' affiants averred that, as a result of their employ, they obtained personal knowledge of Chinese exportation practices. *See id.* at 16–17. Reading, once again, these statements and facts against Defendants' previously submitted declarations asserting that they "d[id] not export magnesite from China," Plaintiffs similarly translate such incoherence into the fact that Defendants must have been importers of goods to the United States. *See id.*

The Court disagrees. While the choice of words in Defendants' declarations may be ambiguous, this language does not state anything but Defendants' pure exporter status.[61]

### c. *Defendants' Exhibits*

Finally, the Court turns to Defendants' exhibits (rather than declarations) re-submitted by Plaintiffs' in support of Plain-

---

**60.** Plaintiffs' Exhibit 3 does not support Plaintiffs' point; rather, it shows a transaction by the Defendant that does not assert importation. Plaintiffs' Exhibit 10 contains a blank boilerplate contract shedding no light on this matter, plus one contract between one of the Sinosteel Defendants and Possehl. *See* Docket Entry No. 105–12, at 10–11. That contract suggests that Possehl was likely the importer of goods (since Possehl purchased the goods in Dalian, China, and insured the goods, and

arranged for their transportation to New Orleans).

**61.** The "incongruent" language—upon which Plaintiffs try to capitalize—is a product of the Sinosteel Defendants' affiants, both of whom are Chinese nationals; the overall content of their declaration suggest limited fluency in English. *See* Docket Entries Nos. 98–16 and 98–17.

tiffs' position that Defendants were importers of goods to the United States. *See* Docket Entry No. 105–5, at 7–8 ("Contract/Exhibit 3"); and Docket Entry No. 105–6, at 6–7 ("Contract/Exhibit 4").

Unlike Plaintiffs' print-outs reflected in the Importers Table, both the Contract/Exhibit 3 and the Contract/Exhibit 4 are actual agreements for sale of goods shedding some light on the nature of particular transactions. The Contract/Exhibit 4 was executed between one of the Minmetals Defendants and an entity named "American Minerals, Inc.," which advertises itself as an intermediary facilitating sales and purchases world-wide. *See* <<http://www.infornine.com/index/ suppliers/American_Minerals,_Inc.html>> (stating on its homepage that it is "Connecting Mining Suppliers & Buyers World-wide"). The sale in this Contract/Exhibit 4 was executed F.O.B., *see* Docket Entry No. 105–6, at 6, with a clarification that the goods would be leaving Chinese port Bayu-quan *en route* to New Orleans, that "the carrying vessel [would] be provided by the Buyer[, and] partial shipments and trans-shipments [would] not [be] allowed," *i.e.*, that the Buyer was interested in delivering the entire purchase to the United States in one "chunk" and in one "shot," that is without breaking bulk and without switching from one mode of transportation to another. *Id.* at 6–7. The combination of these statements strongly suggests that American Minerals, Inc., the buyer, was the actual importer in that transaction, and the Minmetals Defendant was acting solely as an exporter seller. In other words, the content of the Contract/Exhibit 4 gives the Court no reason to presume that the FTAIA jurisdictional bar might be inapplicable to Plaintiffs' claim.

However, the same cannot be said about the Contract/Exhibit 3, which suggests the opposite. *See* Docket Entry no. 105–5, at 7–8. That contract was executed between a seller named "China Metallurgical Import & Export Corporation" (which, according to the Amended Complaint, is a former name of one of the Sinosteel Defendants) and a buyer named "Allied Mineral Products, Inc.," resident in Columbus, Ohio. *See id.* at 7. The contract arranged for sale of magnesium oxide and for delivery of the goods from Xingang, China, to Columbus. *See id.* at 7. Moreover, the contract specified that: (a) the sale would be C.I.F., that is, with freight and insurance arranged by the seller; and (b) "the carrying vessel [would also] be provided by the Seller[, plus] partial adjustments, transshipment [ (*i.e.*, that change in the means of transportation) ] and container transportation [would be] allowed," *id.* at 8, which is hardly surprising since Columbus (being situated on the Scioto River, which is too small for modern commercial shipping) is the place where goods are delivered by air or motor transportation, rather than by ocean vessels. The combination of these statements allows for an inference that Sinosteel, the seller, was the actual importer in that transaction, since it seems that Sinosteel retained a chain of freight-forwarders to transfer the goods to the American soil, clear the goods through the United States Customs onto the American soil, pay the duties, reload the goods and bring them to Columbus. In other words, the Contract/Exhibit 3 strongly suggests the possibility that at least in this transaction one of Defendants might have been an actual importer of magnesium oxide to the United States.

## VI. *LEAVE TO AMEND*

Ordinarily, the plaintiff may be granted "leave [to amend,] ... when justice so requires." *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir.1993). Indeed, "[t]he Federal Rules reject the approach that pleading is

a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Foman*, 371 U.S. at 182–83, 83 S.Ct. 227. However, "[a]llowing leave to amend where 'there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings …,' would frustrate Congress's objective in enacting this statute of 'provid[ing] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.'" *California Public Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126, 164 (3d Cir.2004) (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 246 (3d Cir.2004)). For instance, where the plaintiff had already amended plaintiff's complaint and yet failed to allege sufficient facts, the courts may find that "[the previous number of] bites at the apple is enough," and conclude that it is proper to deny leave to replead. *Salinger v. Projectavision, Inc.*, 972 F.Supp. 222, 236 (S.D.N.Y.1997) (citing *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir.1996)); *Career Educ. II*, 2007 WL 1029092, at *10, 2007 U.S. Dist. LEXIS 23635, at *36 (where "plaintiffs have had ample opportunities to research and plead their claims," but failed to compose a sufficient pleading, the complaint is dismissed with prejudice).

The foregoing, however, shall be read in light of the Federal Rule of Civil Procedure 15(a), which provides that, where "a party may amend [its] pleading only by leave of court[, such] leave shall be freely given when justice so requires." Correspondingly, the Supreme Court has identified several factors to be considered when applying Rule 15(a):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman*, 371 U.S. at 182, 83 S.Ct. 227; *see also Heyl & Patterson Int'l. Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir.1981), *cert. denied*, 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).

Thus, while "Rule 15(a) gives the court extensive discretion to decide whether to grant leave to amend after the time for amendment as of [right] has passed," 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1486 (2d ed. 1990), the Rule 15(a) "generous standard is tempered by the necessary power of a district court to manage a case" in light of the factors listed in *Foman*. *See Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 891 (5th Cir.1987). The *Foman* list of factors, however, appears to be non-exhaustive, *i.e.*, leaving it for the district court to consider, on a case-by-case basis, whether consideration of additional factors would be appropriate in order to assure that plaintiff is granted leave "when justice so requires." Fed.R.Civ.P. 15(a).

Here, two groups of considerations drive the Court's analysis. The first one consists of the Court's realization that: (a) since Plaintiffs' filing of the Original Complaint, the Supreme Court provided guidance in *Twombly* and *Iqbal* as to the construction of Rule 8, archiving the *Conley v. Gibson* standard operable during filing of

the Original Complaint; and (b) the Court's order accompanying its December Opinion directed Plaintiffs to submit proof for the purposes of factual review, as defined in *Turicentro,* rather than facial review under *Iqbal* and *Twombly.*

### A. *Implications of Twombly, Iqbal and Factual Review Under Turicentro*

Since, as noted *supra,* the Supreme Court issued its *Iqbal* and *Twombly* decisions after the filing of the Original Complaint and the Court's December Opinion and accompanying order, the Court finds it proper to examine the issue of whether leave to amend should be granted on the grounds of these factors (rather than those expressly listed in *Foman* ). The Court believes that the gist of such inquiry is sufficiently analogous to that conducted pursuant to Rule 59(e) and, hence, allows a parallel test.

"Rule 59(e) permits motions to amend or alter a judgment and may be granted to submit new, previously undiscovered evidence or to correct a clear error of law or prevent manifest injustice." *Gutierrez v. Gonzales,* 125 Fed.Appx. 406, 416 (3d Cir. 2005) (citing *North River Ins. Co. v. CIG-NA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir.1995), and *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985)). Relief under Rule 59(e) is also appropriate when there has been an intervening change in the controlling law. *See Buffa v. N.J. State Dep't of Judiciary,* 56 Fed. Appx. 571, 574 (3d Cir.2003) (citing Rule 59(e) and New Jersey Local Rule of Civil Procedure 7.1(i)). This Court turns for guidance to a decision the Court finds most pertinent to the circumstances at hand, *Schiller v. Physicians Res. Group, Inc.* ("*Schiller–Appellate* "), 342 F.3d 563 (5th Cir.2003).

The opinion of the Court of Appeals for the Fifth Circuit in *Schiller–Appellate* was entered in response to an appeal taken by plaintiffs from the decision entered by the District Court for the Northern District of Texas in *Schiller v. Physicians Res. Group, Inc.* ("*Schiller–District* "), 2002 WL 318441, 2002 U.S. Dist. LEXIS 3240 (N.D.Tex. Feb. 26, 2002). In *Schiller–District,* the plaintiffs claimed that the defendants made false and misleading statements to investors concerning the issuer's integration of practices that it had acquired across the nation and other issuer's business operations in order to inflate stock prices. *See Schiller–Appellate,* 342 F.3d at 565. The *Schiller* plaintiffs filed their complaint in December 1997 and amended their complaint numerous times from July 1998 to December 2000. *See id.* On February 5, 2001, the defendants moved to dismiss the then-pending third amended complaint under Rule 12(b)(6). *See id.* In response—and instead of requesting to amend their then-pending third amended complaint for the fourth time in order to correct the deficiencies—the plaintiffs stood by their third amended complaint and requested the court to grant a further amendment only if the third amended complaint failed to state a claim. *See id.* The district court, in response, found that the plaintiffs' pleadings failed to state a claim and granted the defendants' motion to dismiss, but refused to give the plaintiffs "four bites at the apple." *See id.* at 565–66.

> On appeal, the plaintiffs argue[d] that leave to amend [was] warranted because [the] decision [issued by the Fifth Circuit, that is, the court whose decisions are binding upon the District Court] in *Nathenson v. Zonagen, Inc.,* 267 F.3d 400 (5th Cir.2001) represents an intervening change in the law. [The Fifth Circuit] reject[ed the plaintiffs'] argument for two reasons. First, *Nathenson* was decided on September 25, 2001, approximately five

months before the district court granted the motions to dismiss, and thus cannot constitute an intervening change in the law. Second, [the Fifth Circuit] conclude[d] that *Nathenson* did not change the law with respect to the pleading requirements .... The Court in *Nathenson* merely confirmed that [a certain element] remained a valid basis for liability under [the applicable law]. [The Fifth Circuit] likewise reject[ed the plaintiffs'] argument that [other binding decision entered in conjunction with *Nathenson* and reflecting on the pleading requirements], represent[ed] an intervening change in the law. [The plaintiffs were] well aware of the pleading standards, but simply failed to meet them.

*Schiller–Appellate*, 342 F.3d at 568, n. 3; *see also Capstead Mortg. Corp. Secs. Litig.*, 2003 WL 22221320, 2003 U.S. Dist. LEXIS 16525 (N.D.Tex. Sept. 19, 2003) (conducting the same inquiry).

 Therefore, under *Schiller–Appellate*, an entry of a binding precedent, which: (a) is issued while the matter is still pending, and (b) clarifies—rather than alters the existing legal regime—cannot qualify as an intervening change in the law. If so, the Supreme Court's decisions in *Twombly* and *Iqbal* do not provide this Court with grounds to grant Plaintiffs yet another leave to amend, since both Supreme Court's decisions clarified—rather than altered—Rule 8 pleading standard, which existed at the time of Plaintiffs' filing of both the Original and Amended Complaints. In other words, the fact that Plaintiffs—at the time of drafting the Original Complaint—were unaware of the yet-to-come Supreme Court clarifications in *Twombly*, and—at the time of their drafting of the Amended Complaint—were not aware of the yet-to-come Supreme Court's clarifications in *Iqbal*, is of no import, since Plaintiffs were obligated to inventory the facts underlying their pleadings under the *Conley v. Gibson* regime, where they could just plead these facts with lesser specificity. And, if Plaintiffs had duly developed their facts, they should have had little trouble stating them with precision. *Accord Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577, 588–89 (2005) ("[The Court recognizes] that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. But it should not prove burdensome for a plaintiff ... to provide a defendant with some indication of the [facts] that the plaintiff has in mind.... [A]llowing a plaintiff to forego giving any indication of the [facts] that the plaintiff has in mind would ... permit a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence") (citations omitted). In sum, the pleading requirements of Rule 8, as articulated in *Twombly* and *Iqbal*, should not have caught Plaintiffs by surprise.

The same, however, cannot be said about this Court's decision to subject Plaintiffs' subject matter jurisdictional position to factual review under *Turicentro*: it can reasonably be assumed that Plaintiffs did not know about this development until the Clerk's entry of the December Opinion and accompanying order three months prior to Plaintiffs' filing of the Amended Complaint. Therefore, it is not unfathomable that the requirement to produce actual proof of their position—rather than to merely state their facts—caught Plaintiffs by surprise and found them unprepared and unable to rally their evidence within three months. With that in mind, the Court assesses Plaintiffs' ability to cure the deficiencies of their factual

proof in the event another leave to amend is granted.

## B. *Limited Leave to Amend Is in the Interests of Justice*

The factual proof submitted by Plaintiffs with regard to the position that Defendants are exporters falling within the reach of the Sherman Act under subsection (1)(A) (requiring that the defendants' conduct had a direct, substantial, and reasonably foreseeable effect on United States domestic trade) could be tallied up as follows: (a) six paragraphs in the Amended Complaint reiterated in the Opposition and making entirely factless assertions and inviting the Court to construe Plaintiffs' conclusory self-serving statements as "factual proof"; and (b) six paragraphs in the Amended Complaint, reiterated or paraphrased in the Opposition, which refer to irrelevant or unverifiable documents, the content of which—even if deemed true—fails to provide any relevant factual proof establishing (or even strongly suggesting) that Defendants' alleged collusive activities resulted in export that caused direct, substantial and reasonably foreseeable effect on United States domestic commerce within the meaning of clarifications provided in *Alcoa/Hartford Fire*.[62] Thus, the statements made and documents submitted by Plaintiffs indicate that the jurisdictional requirement of subsection (1)(A) is neither met nor likely to be met, since Plaintiffs—even if granted leave to

---

**62.** A policy point made by Plaintiffs warrants a comment. *See* Opp. at 11 (asserting that the Court's focus on the *Alcoa/Hartford Fire* requirement to show that Defendants meant to increase prices in the United States, "prevents U.S. courts from adjudicating claims [based on any defendant's] global price-fixing [affecting exportation] without regard to the harm caused to U.S. consumers. This is plainly contrary to the language and intent of the FTAIA and controlling precedent. To dismiss this case on subject matter jurisdiction grounds would jeopardize numerous ongoing prosecutions and investigations of the Department of Justice, as well as private damages actions, against [foreign] cartels exporting products [that enter] into U.S. commerce"). The Court disagrees. Historically, federal courts and Congress have been careful in crafting their language, cautious to not unduly superimpose United States law outside United States borders. This was the reason for the *Alcoa* court's creation of the "intended" effect test, *see* 148 F.2d at 444, for Judge Hand's rejection of the idea that Congress meant "to punish all whom [United States] courts can catch," *id.* at 443, and for the Supreme Court's adoption of the same in *Hartford Fire*. Moreover, a similar concern prompted Congress to limit Section (1)(A) exception to the export conduct that causes "direct" and "substantial" and "foreseeable" effect in the United States, *see LSL Biotechnologies*, 379 F.3d at 679, rather than to expand Section (1)(A) to all export conduct that "harms" United States consumers: had Congress wished to so state, it would have done so. Upon analyzing "the language and intent of the FTAIA and controlling precedent," this Court concludes that foreign exporters' global price-fixing is wholly indifferent to whether their goods might be imported into any particular state, the United States included, falls within the FTAIA jurisdictional bar, *accord supra* note 19 (discussing the anomaly of punishing indiscriminating exporters on the grounds of the choices made by United States importers); any conclusion otherwise is likely to yield an overreaching mandate directing "special competition" catering to American consumers with full ignorance of consumers in all other nations and even in the exporters' own state. *Accord* S/Reply at 7 ("Congress specifically adopted the effects test in the FTAIA to balance the concern for over-extending the antitrust laws to foreign trade in precisely the sort of situation present here, H.R. Rep. 97–686, at 9—12, 97th Cong., (2nd Sess.1982), *reprinted in* U.S.C.C.A.N. 2487, at 2492–97 (1982), a principle similarly recognized by the Department of Justice Antitrust Enforcement Guidelines for International Operations, § 3.121, Illus. C, Var.(1) at 13 [clarifying that] wholly foreign sales activities not subject to U.S. antitrust laws absent express agreement directed to the U.S.").

amend—are unlikely to improve on their already-almost-five-year-long efforts and, hence, would produce just another mix of self-serving conclusions, irrelevant tables and exponential layers of heavily technical language disguising the stark absence of facts and factual proof.

Hence, leave allowing Plaintiffs to amend their claims based on subsection (1)(A) appears futile. *See Career Educ. II,* 2007 WL 1029092, at *10, 2007 U.S. Dist. LEXIS 23635, at *36 (leave to amend is not warranted where "plaintiffs have had ample opportunities to research and plead their claims," but failed to produce sufficient pleadings). This conclusion seems to be particularly warranted in light of Plaintiffs' statements that: (a) "[t]his action seeks no damages or relief with respect to non-import foreign commerce," Am. Compl. ¶ 1; and (b) "[t]he Amended Complaint alleges [only] import commerce, which [falls] outside the scope of the [FTAIA]" under the statute's introductory language. Opp. at 10–11. Since these statements—regardless of Plaintiffs' occasional use of the "direct, substantial and reasonably foreseeable" language of subsection (1)(A)—strongly indicate Plaintiffs' lack of interest in pursuing claims under this subsection, the combination of such lack of interest and lack of factual support after almost five years of litigation signifies to this Court that another leave to amend would not be in the interests of justice. Therefore, Plaintiffs' claims based on subsection (1)(A), that is, if such claims were actually intended to be raised, will be dismissed with prejudice.

However, the opposite conclusion appears warranted with regard to Plaintiffs' claims based on the assertion that the FTAIA is wholly inapplicable to this matter because Defendants were importers that actually brought their price-fixed magnesium oxide into the United States.[63] True, virtually all documents and statements provided by Plaintiffs after almost five years of litigation strongly suggest that Defendants were nothing but worldwide exporters of magnesium oxide wholly indifferent to where their goods would be imported. However, the Court cannot ignore: (a) the potentially ambiguous printout that refers to "Order of Shipper"; and, especially (b) the highly suspicious agreement replicated in Plaintiffs' Contract/Exhibit 3. In light of the content of the Contract/Exhibit 3, the Court finds that it would not be in the interests of justice to dismiss, with prejudice, Plaintiffs' claims based on the exclusionary language of the FTAIA introductory clause. Consequently, leave to amend will be granted with regard to these claims, and—in recognition of the perhaps somewhat stricter standard Plaintiffs might have been facing since the issuance of the December Opinion informing them of the Court's intentions to conduct factual rather than facial review—Plaintiffs will be allowed another ample opportunity to produce detailed and, hopefully, more abundant factual proof than the sole exhibit fortuitously provided to them by Defendants.[64]

---

**63.** While the Court notes its deep concern with what appears to be Plaintiffs' position that neither the specific composition of the alleged "cartel" nor the relation between such cartel and the collusive agreement or the collusive agreement and the actual imports into the United States could matter for the purposes of stating a claim, *see* Opp. at 35 (seemingly so suggesting), these issues fall within the scope of the Sherman Act, rather than the FTAIA. The Court, therefore, need not reach these issues at the instant juncture.

**64.** Plaintiffs maintain that they should not be "required to provide [any] sales agreements, purchase orders, shipping confirmations, . . . bills of lading" or other similar documentary proof verifying Defendants' activities as importers of goods into the United States because all "[t]hese documents are, of course, in Defendants' possession." Opp. at 30. Plaintiffs' assertion appears half-hearted at best, since any typical international sale of goods leaves voluminous paper trail in the hands of the seller, the buyer and all intermediaries,

### C. *Prudential Considerations*

The Court's conclusion that limited leave to amend and a grant of ample time to Plaintiffs to comply with that leave are warranted invites considerations related to the speed of administering justice. Specifically, in light of: (a) the fact that Defendants challenge the Court's subject matter jurisdiction over this matter under the FSIA and, in addition, argue that a host of comity-sourced doctrines warrants abstention; and (b) the Court's recognition that postponement of its decision as to these arguments until after Plaintiffs' filing of their next amended complaint might result in undue waste of the parties' and the Court's time and resources since—if the matter is dismissed on the grounds of the FSIA or a comity-sourced doctrine—Plaintiffs' efforts associated with re-pleading, the parties' motion practice based on such re-pleading and the Court's resolution of the same, would be rendered wholly academic and, hence, wasteful for all practical purposes.

The Court, indeed, is mindful of the general rule that abstention factors should be deemed relevant only if the court determines that subject matter jurisdiction exists in the first place, *see, Hartford Fire,* 509 U.S. at 797 n. 24, 113 S.Ct. 2891 (citing *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir.1979)), and, thus, a decision as to abstention grounds prior to resolution of the subject matter jurisdiction issue might yield a wasteful, if not facially premature, ruling. However, here, an exception to the general rule appears warranted since Defendants' abstention grounds are closely intertwined with Defendants' subject matter jurisdiction challenges under the FSIA, which means that the Court's resolution of Defendants' FSIA challenges: (a) has to come first; and (b) is likely to dispose of at least a substantial number of aspects associated with Defendants' abstention grounds. Therefore, it appears prudentially unwise to address the FSIA challenges without addressing abstention. Rather, it appears in the interests of justice to not shelve either Defendants' FSIA-based and/or their abstention challenges until after a ruling is entered as to the applicability of the FTAIA's introductory language to Plaintiffs' claims. *Cf. Pittsburgh Press Co. v. Preate,* 797 F.Supp. 436, 440 (W.D.Pa.1992) (relying, *inter alia,* on *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), in order to first conduct abstention analysis and then follow it with a determination as to the court's subject matter jurisdiction).

Consequently, the remainder of this Opinion will examine Defendants' abstention challenges, as well as those raised by Defendants under the FSIA with respect to the Court's subject matter jurisdiction.

### VII. *THE FSIA AND ABSTENTION ASPECTS*

As noted *supra,* Defendants raise a cluster of affirmative defenses based on the FSIA [65] and interrelated abstention-caus-

---

plus the United States Department of Customs. Therefore, the Court is not clear as to how there could be no documentary or, at the very least, detailed first-hand testimonial evidence if, as the Amended Complaint maintains, Defendants have been in fact bringing hundreds of thousands of tons of magnesium oxide into the United States, year after year, for almost a decade. *Cf. Paul Morelli Design, Inc. v. Tiffany & Co.,* 200 F.Supp.2d 482, 488 (E.D.Pa.2002) ("We do not leave our common sense at the courthouse door"). *See also infra* note 149 of this Opinion.

**65.** While, from the point of its legislative history, the FSIA is an affirmative defense, *see* H.R.Rep. No. 1487, 94th Cong., 2d Sess. at 17, *reprinted in,* U.S.C.C.A.N. 6604, 6616 (1976), the Supreme Court noted that the congressional position to that effect was not entirely accurate since a district court lacks jurisdiction over a suit against a foreign state until it is determined that the defendant does

ing tenets referred to by the courts as the "act of state doctrine," "international comity" and "government compulsion" (which is also known as "sovereign" or "foreign" compulsion). *See* S/Mot. at 45–54 (listing and discussing these tenets as related but nonetheless wholly independent defenses); S/Reply at 7, 18, 20, 24 (same); M/Mot. at 23–36 (same); M/Reply at 11–17 (same); *accord* Opp. at 34–65.

### A. *Standard of Review*

It has been argued that, for the purposes of the FSIA, the defendant has to establish a *prima facie* case of immunity, and only if the defendant succeeds at that, does the burden shift to the plaintiff to rebut the presumption. *See Alberti v. Empresa Nicaraguense De La Carne*, 705 F.2d 250, 256 (7th Cir.1983) (relying on H.R.Rep. No. 1487, 94th Cong., 2d Sess. 17, *reprinted in*, U.S.C.C.A.N. 6604, 6616). Since the standard of review applied to the defendant's *prima facie* showing has been typically construed as imposing the burden of producing factual proof rather than merely making factual allegations, *accord Matter of Sedco, Inc.*, 543 F.Supp. 561 (S.D.Tex.1982); *de Sanchez v. Banco Central de Nicaragua*, 515 F.Supp. 900 (E.D.La.1981); *Jet Line Services, Inc. v. M/V Marsa El Hariga*, 462 F.Supp. 1165 (D.Md.1978), the Court concludes that Defendants are obligated to make a showing under the standard comparable to the factual review process, as it was defined by the Third Circuit in *Turicentro*.

Moreover, a substantively identical standard of review appears to be applicable to Defendants' position advocating abstention, since the prevalent practice of federal courts facing abstention issues has been to

focus on the factual proof presented by the abstention-advocating litigant rather than on conclusions and assertions of the litigant unsupported by evidentiary proof. *Accord Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (addressing the concept of abstention in domestic setting and cautioning that federal courts should exercise abstention only in "exceptional" circumstances, as the litigant proves the reason to forego the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them"); *Grammar, Inc. v. Custom Foam Sys., Ltd.*, 482 F.Supp.2d 853, 855 (E.D.Mich. 2007) (applying *Colorado River* to an international setting); *cf. Turner Entertainment Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir.1994) (noting two similar standards, one based on *Colorado River* and another based on *Landis v. North American Co.*, 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936)); *I.J.A., Inc. v. Marine Holdings, Ltd.*, 524 F.Supp. 197, 199 (E.D.Pa.1981) (applying the standard analogous to *Colorado River*).

The Court, therefore, will examine Defendants' position with regard to the FSIA and their abstention-prompting grounds under the standard substantively identical to the Court's factual review applied to Plaintiffs' FTAIA-related contentions, *i.e.*, the Court will "accord no presumption of truth" to Defendants' statements unless such statements are supported by evidential proof actually presented in this matter or amenable to judicial notice. *Accord Turicentro*, 303 F.3d at 299, n. 4.

### B. *Applicable Legal Tests*
#### 1. The FSIA[66]

not have immunity, which means that the absence of sovereign immunity must be determined regardless of whether it was raised by the defendant or even defendant's entry of appearance. *See Verlinden B.V. v. Central*

*Bank of Nigeria*, 461 U.S. 480, 493 n. 20, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).

**66.** In light of the breadth and complexity of the FSIA, a multitude of aspects of the statute,

Nearly two hundred years ago, in *The Schooner Exchange v. M'Faddon*, Chief Justice Marshall, speaking for the Supreme Court, held that the United States had impliedly waived jurisdiction over certain conduct of foreign sovereigns, *see* 11 U.S. (7 Cranch) 116, 145–147, 3 L.Ed. 287 (1812), hence creating what is known as "absolute immunity" for foreign sovereigns, *see Verlinden*, 461 U.S. at 486, 103 S.Ct. 1962 (citing *Berizzi Bros. Co. v. S.S. Pesaro*, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926)), *i.e.*, the policy is based on the principles that all sovereigns possess equal rights and equal independence under international law, and that a sovereign enters the territory of a friendly foreign nation confident that immunities conferred on it by reason of its sovereignty will be preserved. *See Arango v. Guzman Travel Advisors*, 761 F.2d 1527, 1534 (11th Cir.1985). However, in 1952, the State Department abandoned the absolute immunity policy in favor of the "restrictive" foreign sovereign immunity, *see Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); letter from Jack B. Tate, Acting Legal Adviser, Dept. of State, to Acting Attorney General Philip B. Perlman, *reprinted in*, 26 Dept. of State Bull. 984–985 (1952), which confined immunity to suits involving only the foreign sovereign's public acts. *See Verlinden*, 461 U.S. at 487, 103 S.Ct. 1962 (1983). However, since application of this restrictive theory was inconsistent at best, *see id.*, Congress effectively codified the restrictive theory in 1976, when it enacted the FSIA, which bestowed limited immunity upon so-called "foreign states."[67] *See* 28 U.S.C. § 1330.

The statute defined the term "foreign state" broadly, including in the definition political subdivisions of a foreign state, as well as the state's "agencies and instrumentalities."[68] *See* 28 U.S.C. § 1603(a); *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1460 (9th Cir.1995). The latter means an entity that is a separate juridical person (corporate or otherwise) and, in addition, is an organ of a foreign state, or a majority of whose shares or other ownership interest is owned by a foreign state or its political subdivision.[69] *See, e.g. Abrams v.*

its case law interpretations and its legislative history are omitted from this discussion—not for lack of significance but for having little relevance to the factual circumstances at hand.

**67.** The primary purpose of the FSIA was to depoliticize sovereign immunity decisions by transferring them from the executive branch to the judiciary, hence assuring litigants that the decisions would be made on legal rather than political grounds. *See Dames & Moore v. Regan*, 453 U.S. 654, 685, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *Nat'l Airmotive Corp. v. Iran*, 499 F.Supp. 401, 406 (D.D.C.1980).

**68.** For the purposes of the FSIA, an "agency or instrumentality of a foreign state" is not the same legal entity as the foreign state itself. *See Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 847–848 (D.C.Cir.2000); *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1462 (9th Cir.1995).

**69.** The statute's legislative history suggests that the term "agency or instrumentality" should be interpreted broadly, *see EIE Guam*, 322 F.3d at 639–649; *cf. Refco, Inc. v. Galadari*, 755 F.Supp. 79, 82 (S.D.N.Y.1991) (statements of foreign officials to be accorded great weight in determining whether entity is foreign state within meaning of FSIA). An entity may qualify for immunity even if it has some autonomy and independence from its government, *see Venus Lines*, 210 F.3d at 1311–1313, and without regard to its line of business, e.g., trading, mining, shipping, banking, procurement, etc. *See* H.R.Rep. No. 1487, 94th Cong.2d Sess., at 15–16, *reprinted in*, U.S.C.C.A.N. 6604, 6614 (1976). The Court of Appeals for the Third Circuit explained that the "agency or instrumentality" nature is determined under the seven-factor test: (1) the circumstances surrounding the entity's creation; (2) the purposes of the entity's activities; (3) the degree of supervision by the government; (4) the level of governmental financial support; (5) the entity's employment policies, particularly regarding whether the foreign state requires the hiring of public em-

*Societe Nationale des Chemins de Fer Francais,* 332 F.3d 173, 178–180 (2d Cir. 2003) (French national railroad company is agency or instrumentality of foreign state because it is a separate legal entity wholly-owned by French government); *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.,* 322 F.3d 635, 639–649 (9th Cir.2003) (Japanese government funded corporation, expressly created by the government to perform exclusive task of revitalizing financial system is a state organ); *Venus Lines Agency v. CVG Industria Venezolana De Aluminio,* 210 F.3d 1309, 1311–1313 (11th Cir.2000) (defendant corporation is considered a foreign state because it is majority-owned by agency or instrumentality of Venezuelan government); *Mangattu v. M/V IBN Hayyan,* 35 F.3d 205, 207 (5th Cir.1994) (entity 100% owned by several foreign states, created by agreement of all participating states, is a foreign state for the purposes of the FSIA). However, the Supreme Court held that a subsidiary of an "instrumentality" (or an entity otherwise owned by "instrumentality") is not itself an "instrumentality" for the purposes of the FSIA, since the exponential-level connection between such subsidiary and the state renders the entity too removed to qualify. *See Dole Food Co. v. Patrickson,* 538 U.S. 468, 477–479, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003).

 Once the defendant's status as a "foreign state" is established, the FSIA presumes the defendant's immunity to be the rule, not an exception, *see Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct.

1471, 123 L.Ed.2d 47 (1993); *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 438, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989); *Corzo v. Banco Central de Reserva del Peru,* 243 F.3d 519, 522 (9th Cir.2001); *Kelly v. Syria Shell Petroleum Dev't B.V.,* 213 F.3d 841, 847 (5th Cir.2000); *Export Group v. Reef Indus., Inc.,* 54 F.3d 1466, 1470 (9th Cir.1995); *General Elec. Capital Corp. v. Grossman,* 991 F.2d 1376, 1380 (8th Cir.1993), even though the FSIA includes a number of exceptions, one of which is based on the defendant's commercial activity carried on in the United States. *See* 28 U.S.C. § 1605(a)(2). For purposes of the exception, the commercial character of the activity is determined by examination of the nature of defendant's conduct rather than of its purpose, *see* 28 U.S.C. § 1603(d); *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 615–616, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); *Behring Int'l, Inc. v. Imperial Iranian Air Force,* 475 F.Supp. 383, 390 (D.N.J.1979), *aff'd,* 699 F.2d 657 (3d Cir.1983) (*en banc* ), with recognition that: (a) the term "commercial activity" was legislatively intended to include a broad spectrum of endeavors, such as extraction of minerals, commute of passengers, trade, etc.; and (b) if an activity is customarily carried on for profit, then its commercial nature can readily be assumed.[70] *See* H.R.Rep. No. 1487, 94th Cong., 2d Sess., at 16, *reprinted in,* U.S.C.C.A.N. 6604, 6614–6615 (1976). In sum, the gist of the commercial exception inquiry is whether the particular actions,

ployees and pays their salaries; (6) the entity's obligations and privileges under the foreign state's laws; (7) the ownership structure of the entity. *See USX Corp. v. Adriatic Ins. Co.,* 345 F.3d 190, 206–208 (3d Cir.2003) (holding that an Irish insurer was an organ of the Irish government in light of Ireland's indirect ownership and control over the insurer's shares, and the government's decision-making role).

70. In enacting the commercial-activity exception, Congress sought to make it difficult for foreign defendants engaged in commercial activity to invoke sovereign immunity with regard to commercial wrongs. *See Alberti v. Empresa Nicaraguense De La Carne,* 705 F.2d 250, 256 (7th Cir.1983).

regardless of the motive behind them, were of the type in which a private party would engage for the purposes of commerce. *See, e.g., Morel de Letelier v. Republic of Chile,* 748 F.2d 790, 797 (2d Cir.1984). For instance, the Supreme Court clarified that when a foreign government acts not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" for the purposes of the FSIA. *See Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614–615, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (issuance of bonds by Argentina as part of currency stabilization plan was commercial activity because bonds were "in almost all respects garden-variety debt instruments").

## 2. Act of State Doctrine

 While the act of state doctrine, being judicially created, is more flexible than the FSIA—and, hence, might perhaps warrant abstention even where the FSIA does not strip the court of jurisdiction over a certain case, *see Republic of Austria v. Altmann,* 541 U.S. 677, 700–701, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (leaving this question open)—the key features of the act of state doctrine and the FSIA are somewhat similar, since the doctrine prompts United States courts to refrain from judging the validity of a foreign state's governmental acts as to matters within that state's borders, *see Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), building on the premise that the most fundamental aspect of foreign relations is the recognition of foreign governments. *Cf. Corzo v. Banco Central de Reserva del Peru,* 243 F.3d 519, 524 (9th Cir.2001) (observing that the purpose of the FSIA is to promote harmonious international relations). However, while being more flexible than the statute, the doctrine has evolved from a generic expression of international law into an relatively narrow inquiry into "a consequence

of domestic separation of powers." *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l,* 493 U.S. 400, 404, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990); *Sabbatino,* 376 U.S. 398, 84 S.Ct. 923. Thus, the doctrine could be summarized as a merely strong belief of the judiciary that engaging in the task of passing on the validity of foreign acts of state could hinder rather than further the conduct of foreign relations. *See Sabbatino,* 376 U.S. at 421–423, 84 S.Ct. 923; *accord Kirkpatrick,* 493 U.S. at 409, 110 S.Ct. 701; *see also Gross v. German Found. Indus. Initiative,* 456 F.3d 363 (3d Cir.2006) (the court must dismiss the suit if its resolution would require the court to declare invalid an official act of a foreign sovereign). Consequently, the doctrine knows numerous exceptions which include, *inter alia,* non-abstention in matters challenging: (a) the acts performed outside the sovereign territory of a foreign government, *see Drexel Burnham Lambert v. Galadari,* 777 F.2d 877, 881 (2d Cir.1985) (the act of state doctrine does not apply to claims based on ownership of shares securing note of Dubai national because situs of debt was outside Dubai); *Allied Bank Int'l v. Banco Credito Agricola de Cartago,* 757 F.2d 516, 520–523 (2d Cir.1985) (claims based on notes payable by Costa Rican banks fell outside the protection of the doctrine because situs of debt was outside Costa Rica); or (b) the acts qualified as "commercial activity." *See Alfred Dunhill,* 425 U.S. at 703–706, 96 S.Ct. 1854 (declining to extend act of state doctrine to acts committed by foreign sovereigns in course of purely commercial operations); *Williams v. Curtiss–Wright Corp.,* 694 F.2d 300, 302–305 and n. 2 (3d Cir.1982); *compare Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1114–1115 (5th Cir.1985) (claim that Mexican bank breached contract by repayment of debt in devalued pesos did not qualify for commercial activity exception to act of

state doctrine because promulgation of exchange control regulations was sovereign and not commercial in nature); *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 408 (9th Cir.1983) (claim that bribe to obtain offshore oil concession violated antitrust laws did not qualify for commercial activity exception to act of state doctrine because granting of concessions involved exercise of powers peculiar to sovereigns). Therefore, the defendant successfully establishes the act-of-state defense if the "commercial activity" exception does not remove the reasons for abstention. *See id.*

### 3. The Concept of Comity

The main point of the parties' confusion appears to relate to the concept of comity, that is, considering the multitude of tests offered in their briefs. While the tests stated therein are all correct, theoretically, such theoretical correctness does not, in and by itself, render these tests applicable to the case at bar. The Court surmises that the parties' confusion as to the proper test might be rooted in the federal courts' frequent wholesale utilization of the phrase "doctrine of comity," even though such utilization blends the distinctions between various tests and corresponding circumstances.

> The use of the term "comity" to describe a theory for accommodating conflicting legal policies of territorial sovereigns was developed by scholars in 17th-century Holland to resolve conflicts between the laws of the various Dutch provinces. *See* Davies, *The Influence of Huber's de Conflictu Legum on English Private International Law*, 18 Brit. Y.B. Int'l L. 49, 52 (1937). The Dutch scholar, Ulrich Huber, set out to reconcile the fact and theory of national territorial authority with the needs of a developing international system in which persons and commerce moved across state lines. Huber summarized his analysis in three now

well-known axioms: (1) the laws of every sovereign authority have force within the boundaries of its state, and bind all subject to it, but not beyond; (2) those are held to be subject to a sovereign authority who are found within its boundaries, whether they be there permanently or temporarily; (3) those who exercise sovereign authority so act from comity, that the laws of every nation having been applied within its own boundaries should retain their effect everywhere so far as they do not prejudice the powers or rights of another state and another state's courts. *See [id.* at] 26 (1937).

*Windt v. Qwest Communs., Int'l, Inc.*, 544 F.Supp.2d 409, 434 n. 34 (D.N.J.), *aff'd* 529 F.3d 183 (3d Cir.2008).

Huber's theory and his choice of word "comity" derived, in turn, from the principle of "comity of nations." *See Morguard Investments, Ltd. v. De Savoye* [1990] 3 S.C.R. 1077 (where the Supreme Court of Canada, quoting *The Schooner Exchange*, 11 U.S. (7 Cranch) 116, traced this development, relating the fact that "states cannot live in splendid isolation" to the "common interest [which] impels sovereigns to mutual intercourse" on the legal plane). Since "comity of nations" was not a natural state of affairs but born of necessity, *see Connaught Labs. v. Medeva Pharma.*, 1999 F.T.R. LEXIS 1817, at *25 (Fed. Ct. Canada 1999) ("'Comity' is the name given to the general principle that encourages the recognition in one country of the judicial acts of another. Its basis is not simply respect for other nations, but convenience and necessity, recognizing the need to facilitate inter-jurisdictional transactions"), the principle was necessarily fluid, conceptually. *See id.* (noting that "the content of comity must be adjusted in light of a changing world order" and citing *Morguard*). This fluid principle, in turn, provided a basis for an equally fluid legal concept of the same name. *See Hilton v.*

*Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895) ("The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call 'the comity of nations.' Although the phrase has been often criticized, no satisfactory substitute has been suggested. 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other"). The fluid concept, in turn: (a) indirectly provided theoretical support to areas of law related to international interactions, e.g., by supplying jurisprudential solutions for conflict of law problems, or bases for enforcement of foreign judgments or for resolutions of *forum non conveniens* challenges; and, in addition, (b) mushroomed into a panoply of legal doctrines, all bearing the name "the doctrine of comity," even though each of these doctrines eventually developed its own distinct set of considerations ensuring application of the umbrella concept of comity to the particular issue tackled by the doctrine.[71] *See, e.g.,* David J. Bederman,

---

71.

In the United States[,] the foundation of private international law is the [concept] of international comity. Roughly speaking, courts, according to this [concept], should apply foreign law or limit domestic jurisdiction out of respect for foreign sovereignty. [*See* ] Mark Janis, *An Introduction to International Law* 327 (2003). [Since] international comity requires courts to balance competing public and private interests in a manner that takes into account any conflict between the public policies of the domestic and foreign sovereigns[,] scholars and courts have characterized international comity inconsistently as a choice-of-law principle, *see, e.g.,* Ian F. Baxter, *Essays on Private Law* 22 (1966), a synonym for private international law, *see, e.g.,* Joseph H. Beale, *A Treatise on the Conflicts of Law,* vol. 1 § 6.1 (1935); L. Oppenheim, *International Law* 34 n. 1 (H. Lauterpacht ed., 8th ed. 1955), a rule of public international law [or an element of international legal order], *see, e.g.,* 288 *Domestic Letters of the Department of State, cited in,* 4 Green H. Hackworth, *Digest of International Law* 460 (1942); ... Harold Maier, *Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law,* 76 Am. J. Int'l. l. 280, 281 (1982), a moral obligation, *see, e.g.,* Ian Brownlie, *Principles of Public International Law* 31 (3d ed. 1979); Joseph Story, *Commentaries on the Conflict of Laws* § 33 (1834), expediency, *see, e.g.,* Somportex, Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir.1971), courtesy, *see, e.g.,* Francis Wharton, *A Treatise on the Conflict of Laws*
5 (2d ed. 1881), reciprocity, *see, e.g., Hilton,* 159 U.S. [at] 163–64 [16 S.Ct. 139]; Hans Smit, *International Res Judicata and Collateral Estoppel,* 9 UCLA L.Rev. 44, 53 (1962), utility, *see, e.g.,* Beale, *id.,* § 71; Henry Wheaton, *Elements of International Law* § 79 (Richard Henry Dana, Jr. ed., 8th ed. 1866) or diplomacy. *See, e.g.,* Harold Maier, *Interest Balancing and Extraterritorial Jurisdiction,* 31 Am. J. Comp. L. 579, 589 (1983).... For all these reasons, international comity [might have been perceived as] too vague, incoherent, illusory, and ephemeral to serve as a foundation for U.S. private international law. Yet, it is precisely these qualities that have allowed the [concept] of comity to mutate over time in ways that [allowed for creation of various "doctrines of comity" that] responded to different geopolitical circumstances. [In its direct manifestations, the concept of] international comity [yielded] comity [ ]as a discretionary doctrine that empowered courts to decide when to defer to foreign cases [and to the] broader concept of comity as a rule and a justification for deference encompasses a wider constellation of ... [inter]related doctrines—like the foreign-act-of-state doctrine—which, though analytically distinct ..., nonetheless share[ ] certain methods, values, and justificatory rhetoric. Joel R. Paul, *Transformation of International Comity,* 71 L. & Cont. Probs. 19 (2008) (citations restored to the main text, parenthetical explanations and citations to the author's prior publication, *i.e., Comity in International Law,* 32 Harv. Int'l L.J. 1 (1991), omitted). Hence, the panoply of "doctrines of comity,"

*International Law Frameworks* 182 (Foundation Press 2006) ("Comity has been construed by the Supreme Court to mean a number of different things"); N. Jansen Calamita, *Rethinking Comity: Towards a Coherent Treatment of International Parallel Proceedings*, 27 Pa. J. Int'l Econ. L. 601, 614 (2006) (same); *see also Windt*, 544 F.Supp.2d at 434 n. 35 (pointing out different doctrinal incarnations of the concept of comity and citing M. Wolfe, *Private International Law* 19–20 (2d ed. 1950); Yntema, *The Comity Doctrine*, 65 Mich. L.Rev. 9 (1966); and Lorenzen, *Huber's de Conflictu Legum*, 13 Ill. L.Rev. 375, 375–77 (1918)).

### 4. Government Compulsion

While just a handful of courts addressed the doctrine of government compulsion and its being moored to the broad concept of comity, a string of judicial decisions forming the doctrine can clearly be detected. The seminal decision appears to be *Hartford Fire*, the case where the Supreme Court read comity as a jurisdictional rule of reason applied to potential impossibility of compliance with conflicting regimes (rather than to the scenarios where simultaneous but potentially conflicting or *forum non conveniens*-like adjudications might be conducted). *Cf. Hartford Fire*, 509 U.S. at 817, 113 S.Ct. 2891 (Scalia, J., dissenting) (clarifying that "[t]he 'comity' [the Court] refer[s] to is not the comity of courts, whereby judges decline to exercise jurisdiction over matters more appropriately adjudged elsewhere,

distinctly named doctrines (e.g., "the act of state") and even the statutory language of the FSIA, are different legal faces expressing an overall position of United States legislators and the judiciary as to the modern "comity of nations." *See Republic of Aus. v. Altmann*, 541 U.S. at 689–691, 124 S.Ct. 2240 (the doctrine of foreign sovereign immunity had always been viewed as a matter of grace and comity); *Verlinden*, 461 U.S. at 486, 103 S.Ct. 1962 (same); *Ex parte Republic of Peru*, 318

but rather what might be termed 'prescriptive comity': the respect sovereign nations afford each other by limiting the reach of their laws"). Applying the principles of prescriptive comity to the challenges presented in that particular matter, the Court in *Hartford Fire* held that such form of comity did not prevent the extraterritorial application of the Sherman Act to British reinsurers because the requirements of the Sherman Act did not directly conflict with British regulations covering the defendants, *see id.*, 509 U.S. at 799, 113 S.Ct. 2891, *i.e.*, because conforming with United States law did not require the foreign defendants to violate British law. *See id.* It is, however, an error to construe the holding of *Hartford Fire* as a decision stating that the absence of a "true conflict between domestic and foreign law" automatically precludes abstention on the basis of preclusive comity. As one court noted,

> *Hartford Fire*'s holding is not necessarily that expansive. [*See* ] *In re Maxwell Commc'n Corp. plc*, 93 F.3d 1036, 1050 (2d Cir.1996) ("As we have previously noted, *Hartford Fire* recognized that 'other concerns' might be implicated if the context were different") (citing *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 747 (2d Cir.1994)). [Hence, courts] decline[ ] to construe *Hartford Fire*'s conflict analysis as a prerequisite to the application of comity principles ... because of numerous countervailing considerations that counsel in favor of abstention.... The limited scope of the Supreme Court's comity holding is dem-

U.S. 578, 586–590, 63 S.Ct. 793, 87 L.Ed. 1014 (1943) (same); *accord Aquamar S.A. v. Del Monte Fresh Produce N.A.*, 179 F.3d 1279, 1294–1298 (11th Cir.1999) (same); *Aquamar S.A. v. Del Monte Fresh Produce N.A.*, 179 F.3d 1279, 1294–1298 (11th Cir.1999) (since Congress intended international law to inform the courts in their interpretation of the FSIA, courts may look to the concepts of international law as a guide to the meaning of the FSIA).

onstrated by its statement that the presence of a conflict between domestic and foreign law was "[t]he only substantial question" before the Court with respect to the comity issue. *Id.* at 798, 113 S.Ct. 2891. Moreover, the main authority cited in *Hartford Fire* for the "true conflict" proposition—the Third Restatement Foreign of Relations Law § 403 and comment j—requires conflict analysis only if the exercise of jurisdiction is first found to be reasonable. *See id.* at 821, 113 S.Ct. 2891 (Scalia, J., dissenting in part). The *Hartford Fire* Court appears to have assumed that exercising jurisdiction over the foreign defendants was reasonable in that case. *See id.* at 799, 113 S.Ct. 2891 ("We have no need in this litigation to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity"); *see also id.* at 799 n. 25, 113 S.Ct. 2891. Therefore, *Hartford Fire* did not forbid [rule of reason] abstention on comity grounds in the absence of [expressly] conflicting laws; it merely assumed that no other considerations existed in the [*Hartford Fire*] case that justified abstention.

*Freund v. Republic of France,* 592 F.Supp.2d 540, 573–74 (S.D.N.Y.2008).

In sum, it appears that the holding of *Hartford Fire* is best read as: (a) articulating a broad rule-of-reason approach to prescriptive comity; (b) specifying that the defendant's inability to comply simultaneously with the laws of the defendant's nation and United States laws would necessarily warrant abstention, *accord* Report of the Attorney General's Committee to Study the Antitrust Laws 83 (1955), *quoted*

*in,* Wilbur L. Fugate, *Foreign Commerce and the Antitrust Laws* 148 (1958) ("should the laws of another country require uniform non-competitive prices by companies doing business there, then compliance with that law should constitute a defense in this country to an antitrust charge of price fixing solely in that country"); and (c) guiding that abstention based on prescriptive comity might also be appropriate in other scenarios, e.g., where a foreign government's manifestation of its sovereign power (through the means other than issuance of a legal provision directly contradicting United States law) compels defendants' conduct which, if assessed under United States law, would be deemed illegal. *See, e.g., Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir.1976), and *Mannington Mills,* 595 F.2d 1287 (the leading cases that declined to read the jurisdictional rule of reason narrowly).

It seems the Court of Appeals in *Mannington Mills* and the Ninth Circuit in *Timberlane Lumber* were the pilot tribunals that bridged the prescriptive comity of *Hartford Fire* into what has developed as its sprout: the doctrine of government compulsion. Addressing the considerations that might be pertinent to the application of the doctrine, both courts came up with similar lists of factors setting forth a "tidy framework, easily workable in practice." *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 494 F.Supp. 1161, 1188 n. 63 (E.D.Pa.1980), *vacated sub nom., In re Japanese Elec. Prods. Antitrust Litig.,* 631 F.2d 1069 (3d Cir.1980), *rev'd sub nom., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[72] However—being

---

**72.** The *Timberlane* factors are: (a) the degree of conflict with foreign law or policy; (b) the nationality or allegiance of the parties and their place of business; (c) the likelihood of compliance with judicial orders; (d) the effects on the countries involved; (e) whether there was an explicit intention to harm United States commerce or the foreseeability of such effect; and (f) where the conduct occurred. *See Timberlane,* 549 F.2d at 614. The Court of Appeals refined the *Timberlane* list by offer-

merely framework-building guideposts—these compilations of factors were not offered by both courts as either exhaustive lists of pertinent considerations or as sets of mandatory elements, each of which must be present to trigger an application of the doctrine. *Cf. Trugman–Nash, Inc. v. New Zealand Dairy Board*, 954 F.Supp. 733, 737 (S.D.N.Y.1997) (observing that, "[i]n *Hartford* [*Fire* ], the Supreme Court granted certiorari to consider the Ninth Circuit's decision in *In re Insurance Antitrust Litigation*, 938 F.2d 919 (9th Cir. 1991), [where t]he Ninth Circuit referred to the factors [it already] articulated in its prior *Timberlane* decision[. The Ninth Circuit in *Insurance Antitrust Litigation* ] concluded [that all these factors, short of one] militated in favor of [non-abstention], but [the remaining] factor ... requir[ed] abstention .... The Supreme Court reversed, finding [that this remaining factor was not present in light of the evidence in the record]. In doing so, the Court did not have before it, and accordingly expressed no view upon, the validity of [the analysis had it been performed only under] other *Timberlane* factors"); *see also Laker Airways, Ltd. v. Pan American World Airways, Inc.*, 604 F.Supp. 280, 292 (D.D.C.1984) (employing a selective application of the *Mannington Mills* factors).

Since *Mannington Mills* and *Timberlane Lumber*, a handful of courts reflected, either in holding or in *dicta*, upon the gist and/or the sketchy parameters of the government compulsion doctrine. *See, e.g., Williams v. Curtiss–Wright Corp.*, 694 F.2d 300, 303 (3d Cir.1982) (stating that abstention pursuant to the doctrine of "governmental compulsion ... is available [where] the [allegedly illegal] action was mandated by a foreign sovereign," relying on *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F.Supp. 1291, 1293 (D.Del.1970), the case observing that it "should be self-evident [that a]nticompetitive practices compelled by foreign nations are not restraints of commerce, as ... understood in the Sherman Act, because refusal to comply would put an end to commerce [since c]ommerce may exist [only] at the will of the government, and to impose liability for obedience to that will would eliminate for many companies the ability to transact business in foreign lands[, including the United States" and citing Kingman Brewster, *Antitrust and American Business Abroad* 94 (1976)); *accord In re Vitamin C Antitrust Litig.* ("*Vitamin C* "), 584 F.Supp.2d 546, 559 (E.D.N.Y.2008) (outlining the perimeter of the government compulsion doctrine as ensuing from the circumstances where the alleged wrongdoers-defendants were "acting as private citizens pursuant to governmental directives "); *Linseman v. World Hockey*, 439 F.Supp. 1315, 1324 (D.Conn. 1977) (quoting *Timberlane Lumber*, 549 F.2d at 606, for a somewhat-doctrines-conflating observation that "corporate conduct which is compelled by a foreign sovereign is also protected from antitrust liability, as if it were an act of the state itself").

■ All these statements seemingly build on the Court of Appeals' broad ob-

___

ing the following list of considerations: (a) the degree of conflict with foreign law or policy; (b) nationality of the parties; (c) relative importance of the alleged violation of conduct here compared to that abroad; (d) availability of a remedy abroad or pendency of litigation there; (e) existence of intent to harm or affect United States commerce; (f) possible effect upon foreign relations if the court grants relief; (g) whether the defendant will be under conflicting requirements by both countries if the requested relief is granted; (h) whether the court's order could be made effective in practice; (i) whether the same type of order would be acceptable in the United States if made by a foreign nation under similar circumstances; and (j) whether a treaty with the affected nations has already addressed the issue at bar. *See Mannington Mills*, 595 F.2d at 1297.

servation that the government compulsion doctrine "shields from ... liability the acts of [the defendant that were] carried out in obedience to the mandate of a foreign government" and so, in order to successfully invoke the doctrine, the defendants must show that the defendants' act challenged as a violation of United States law was compelled by the foreign government through a compulsion that was "basic and fundamental" to the defendants' acts (rather than served as a mere peripheral aspect which landed certain supporting considerations to the defendants' decision to engage in the challenged conduct). *Mannington Mills*, 595 F.2d at 1293-94. This Court, therefore, distills from the aforesaid observation that the defendant invoking government compulsion must show that: (a) a certain entity in the defendant's nation qualifies as an arm of the state by enjoying governmental or quasi-governmental powers that are either uniquely peculiar to sovereigns or of essentially sovereign nature; (b) there is a direct link between the entity's powers and the defendant, which enables the entity to compel the defendant to act in accordance with the entity's prescripts as a result of the entity's ability to subject the defendant to a significant negative repercussion for failure to comply with the entity's prescripts; and (c) the entity, in fact, compels the defendant to act in accordance with a certain prescript, and such compulsion is the fundamental force causing the defendant's act challenged as a violation of United States law. *See id.*; *see also Interamerican Refining*, 307 F.Supp. at 1298 (observing that actual compulsion need not be based on a validly promulgated foreign mandate or a duly published binding order); *accord Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (compliance with a state regulatory program shields individuals from liability).

## C. *Parties' Relevant Exhibits and Factual Assertions*

### 1. Defendants' Moving Papers

The Minmetals Defendants open the relevant part of their assertions with an observation that, since "China is still in the process of transitioning from a completely state-controlled economy to a market-based system [like] the United States[, t]he Chinese government still practices extensive intervention in its economy and, in particular, in the export of commodities." M/Mot. at 9 (citing Docket Entry No. 99-3 (U.S. Trade Representative ["USTR"], 2008 Report to Congress on China's WTO Compliance (Dec.2008)), which, in turn, states that "[d]espite its [WTO] commitments, ... China has continued to impose restrictions on exports of raw materials, including[, *inter alia,*] minimum export prices ... as China's economic planners have continued to guide the development of downstream industries. These export restrictions are widespread. For example, China maintains some or all of these types of export restrictions on [such goods as] magnesium [oxide and] magnesium carbonate [*i.e.*, crude magnesite]"). Switching then to the pertinent aspect of Chinese governmental administration, Minmetals Defendants state:

The Chinese ... government relies ... on two actors to carry out its export control policies[: (a) ] the Ministry of Commerce ("MOFCOM"), [which, being] an executive agency of the State Council [ ("State Council") ] of the People's Republic of China, is responsible for formulating, promulgating, supervising and enforcing policies and regulations pertaining to the exportation of products and commodities from China[; and (b) ] numerous "chambers of commerce" [that] were created and organized by commodity type [to assist MOFCOM in its goals]. The [particu-

lar] chamber responsible for assisting MOFCOM in [regard] to the export of magnesite is the Chamber of Commerce of Metals, Minerals & Chemicals Importers & Exporters ("CCCMC"), which was established in 1988.... [With regard to, *inter alia*,] magnesite[-based goods], China has instituted [an] export quota and license system ... in April 1994 [in order] to enable stricter control of export volumes and prices, reduce smuggling and minimize allegations of dumping.... [Such] control over the [export practices with regard to] magnesite ... is achieved through two mechanisms. First, MOFCOM directly controls [these practices] by setting an aggregate export quota that caps the total amount of magnesite that may be exported from China in a single year ... MOFCOM also controls each exporter's individual [exportation] of magnesite ... by requiring prospective exporters to "bid" on an allotment from the aggregate quota. [Thus, t]wice a year [all] exporters bid [on licenses] to export a portion of the aggregate export quota. The "bidding" [process] is administered by the CCCMC on behalf of the government, and t]he allocations to individual exporters ... are made by a Bidding Committee ... consist[ing] of individuals employed by MOFCOM and the CCCMC. It is only through participating in this process that exporters may receive a license to export, and the [Chinese] government requires that every magnesite export be licensed[ since the Chinese] Customs Bureau will not allow exports of commodities subject to licensing without an export license.... [Each] exporter must export its quota allotment during the calendar year for which it received the allotment ([with a very] limited extension ...) [and n]o exporter may stockpile magnesite to manipulate [its business strategy] because [a] fail[ure] to [export its allotted

share would cause the exporter to] lose [this unexported] portion of [its] allotment [for the purposes of] the following year. Like-wise, an exporter cannot export in excess of its lawful allotment [in order to manipulate its business strategy] without risking termination of its right to export and potential criminal liability.... In addition to restricting the [amount] of magnesite [allotted] for export, MOFCOM also mandates that exporters follow a uniform minimum export price .... [Specifically,] the minimum export price ... is arrived at through a meeting of exporters convened by the CCCMC. MOFCOM regulations explicitly prohibit entities from exporting at prices below those established within the CCCMC and prohibit the issuance of export licenses [to exporters that sell at] prices ... lower than the coordinated prices fixed by the [CCCMC. Consequently], pricing below the minimum export price in violation of MOFCOM regulations can subject [the so-selling] exporter[ ] to the loss of [its export] quota allotment[, to] imposition of fines and [even full] revocation of [its] export license[ ]. In addition to mandating a minimum export price for magnesite, the Chinese government manipulates the price of magnesite exports through other means[, e.g., reduction of export-geared tax "rebate," levy of customs duty and export tax, and imposition of "resource protection" fees by the local governments of relevant Chinese provinces].... The U.S. Executive Branch has repeatedly raised its concerns about China's ... export restrictions [with regard to magnesite-based products] both bilaterally and at the [WTO,] has pressured China to eliminate [these] restrictions ... and has expressed its intention to continue to do so in 2009.

M/Mot. at 10–16 (quotation marks omitted, original brackets removed) (citing Docket

Entry 99–17; Docket Entry No. 99–9 (Defendants' exhibits to Li Declaration ("Li Exhibits"); [73] and Docket Entries Nos. 99–11 to 99–14 (Defendants' exhibits to Chen Declaration ("Chen Exhibits")). [74]

The statements made in the moving papers of the Sinosteel Defendants are substantively identical with regard to their discussion of the nature and operations of the MOFCOM and CCCMC, both generally and specifically as to the exporters of magnesite-based products. See S/Mot. at 38–40 (providing a brief overview analogous to the statements made by the Minmetals Defendants and relying on selected Li Exhibits, as well as citing Li Exhibits for an additional clarification that: (a) after the MOFCOM requires exporters to

---

**73.** Docket Entry No. 99–9 includes the following documents (replicated in their original Chinese sinographs and in English translation): (a) MOFCOM's Notice on the Working Rules on the Issuance of an Export License of Sep. 7, 2007; (b) Circulation of Ministry of Financial People's Republic of China and State Administration of Taxation on Adjustment of Export Rebate Rate for Part of Products of Apr. 29, 2005; (c) MOFCOM's Measures for the Administration of License for the Export of Goods of Jan. 1, 2005; (d) MOFCOM's Working Rules on the Application for an Export License of Dec. 2003; (e) Announcement of the MOFCOM, the General Administration of Customs and the General Administration of Quality Supervision, Inspection and Quarantine of Nov. 10, 2004; (f) Notice of the Ministry of Finance and the State Administration of Taxation on Adjusting the Export Rebate Rates of Jan. 1, 2004; (g) Regulation of the People's Republic of China on the Administration of the Import and Export of Goods of Jan. 1, 2002; (h) MOFCOM's Measures for the Administration of Export Commodities Quotas of Jan. 1, 2002; (i) MOFCOM's Measures for the Invitation of Bid for Export Commodity Quotas of Jan. 1, 2002; (j) MOFCOM's Provisions on the Export License Administration of Dec. 20, 2001; (k) Circulation of Office of The People's Government of Liaoning Province on Change of Collecting Standard for Resource Protection Fees of Exported Processing Products of Magnesite of Dec. 7, 2001; (*l*) MOFCOM's Circular on Working Rules on the Application for and Release of an Export License of Dec. 14, 1999; (m) MOFCOM's Measures for Administration of Foreign Economic Relations and Trade Social Organizations of Feb. 26, 1999; (n) MOFCOM's Circular on the Strengthening the Job in the Coordination of Export Commodities of Feb. 12, 1998; (o) MOFCOM's Implementation of the Methods on Export Quota Bidding with Compensation of May 6, 1996; (p) MOFCOM's Interim Regulations on Punishment For Conduct Of Exporting at Lower–Than–Normal Price of Mar. 20, 1996; (q) Notice of the MOFCOM, the General Administration of Customs and the State Administration for Import and Export Commodity Inspection on Strengthening the Export Administration of Magnesium Oxide of Mar. 27, 1996; (r) MOFCOM's Notice on the Working Rules for Import and Export License Issuing Departments to Issue Licenses of Mar. 14, 1996 MOFCOM's Regulations on Export License Control of Jan. 2, 1996; (s) Circular of the State Administration of Foreign Exchange, MOFCOM, State Administration of Taxation, and China Customs of July 1, 1995; (t) MOFCOM's Notice on Several Provisions on the Personnel Management of Chambers of Imports and Exports of Sep. 23, 1994; (u) MOFCOM's Notice on Several Provisions on Export License Administration and Application of Apr. 1, 1994; (v) MOFCOM's Detailed Rules for the Implementation of Calling for Bids for Magnesium Oxide Export Quotas for Trial Implementation of Mar. 1, 1994; (w) MOFCOM's Notice on Program on the Reform of the Administration of Licenses for Quotas of Commodities for Export of Feb. 8, 1994 (later repealed); (x) MOFCOM's Interim Procedures for Export Commodities Control of Dec. 29, 1992; and (y) MOFCOM's Circular on Strengthening The Administration Of Magnesium Product Export of April 6, 1992.

**74.** Docket Entries Nos. 99–11 to 99–14 include the following documents (replicated in their original Chinese sinographs and in English translation): (a) CCCMC charter; (b) CCCMC's bylaws; (c) Assistant Minister of Commerce Liu Xiangdong's Speech to the Third Congress of the CCCMC; and (d) CCCMC's Bidding Committee's Announcement Regarding the First Public Bidding for the Export Quota of Magnesium Oxide in 2005 and Announcement Regarding the Second Public Bidding for the Export Quota of Magnesium Oxide in 2005.

coordinate production volume and set certain minimum prices at which magnesite-based products would be sold for export, these minimum prices are registered with the MOFCOM; so (b) when Chinese entities seek to obtain export licenses for magnesite-based goods, they must submit documentation, including their magnesite sales contracts, to the Office of the Special Commissioner ("Special Commissioner") at the MOFCOM, which physically issues such export licenses; but (c) the Special Commissioner reviews the submissions and issues export licenses only upon establishing that the price stated in the sales contracts meets the minimal price registered with the MOFCOM).

## 2. Plaintiffs' Opposition

In response to the above-described Defendants' assertions as to the nature of the MOFCOM and the CCCMC, and the MOFCOM/CCCMC's operation of Chinese export of magnesite-based products, Plaintiffs state their position, which is as follows:

China began the shift from a [planned] economy [75] to a market economy in the 1970s. Starting in the 1980s, the pace of change increased ... as China negotiated its accession to the ... WTO. During negotiations prior to its accession, China's trade representative explained to the WTO ... that "[t]here were [ ] three types of prices [in China]: government price, government guidance price and market regulated price." ... "[M]arket-regulated prices" were prices that companies were free to set in accordance with traditional market factors (i.e., supply and demand). China represented in 2001 that 94.7% of products from China were subject to market-regulated pricing. [Since m]agnesite [was] not on the ... list[ ] of ... products ... subject to government guidance pricing or government pricing submitted by the Chinese government [to the WTO] in 2001[, and] China ... agreed that it would not add any products or services to [that] list, ... China functionally repealed any ... law [existing as of 2001] that controlled the price of magnesite for export. The WTO accession is an international agreement of law, and the legislative approach for China is to incorporate international agreements and law as its own. [Since] China explicitly abolished or amended more than 3,000 laws and regulations to bring its policies in line with WTO requirements, ...[t]he government of China has stated in official comments to the U.S. Department of Commerce that these changes have resulted in industries exporting to the United States becoming independent and market-oriented[, and, i]n 2006, China declared that since its accession to the WTO, it had avoided any government intervention in the economic activities of state trading enterprises and that [even its] state[-owned] trading enterprises [have become] fully independent, responsible for their own gains and losses, and make their export decisions based on factors such as sup-

75. "Planned economy" is an economic regime where the central government makes all decisions on the production and sale of goods and services. *See* Alec Nove, *The New Palgrave: A Dictionary of Economics* vol. 3, at 879–80 (1987). Although a planned economy may consist of state-owned enterprises, private enterprises directed by the state, or a combination of both, the term is most often associated with the economy of the Soviet Union prior to its "perestroika" period, of China before 1978 and of India before 1991. *See, e.g.,* Andrew C. Wilson, *Politics and Market Forces in China's Planned Economy; the Case of Grain Self-sufficiency Versus Cash Crop Benefits* (1986); T. Mathew, *Fiscal Policy in the Planned Economy of India* (1960); V. Ossinsky et al., *Socialist Planned Economy in the Soviet Union* (1932).

ply/demand and price in the domestic and international markets[, there is no reason to presume that the export of magnesite-based products is regulated by Chinese government. True,] MOFCOM includes magnesite [in its] list of products subject to export quota bidding and licensing requirements[, but t]he rules and regulations cited by ... Defendants [in regard to] the export quota and licensing system do not mandate a minimum price and do not compel industry members to agree on export prices .... [Specifically, Exhibit 27 among Li Exhibits states the rules that] do not [expressly] mention a minimum price or compulsory price-fixing. [Similarly, Exhibit 24 among Li Exhibits] does not [expressly] refer to any minimum export price or mandatory price-fixing. [Analogously, Exhibit 4 among Chen Exhibits consists of a]nnouncements [that] do not [expressly] mention a minimum price or compulsory price fixing. [In the same vein, Exhibit 25 among Li Exhibits replicates the regulation that] do[es] not [expressly] mention a minimum price or compulsory price-fixing[, plus, this regulation was] repealed in 2008. [Similarly, Exhibit 23 among Li Exhibits uses the word "when" in the statement] "when the export prices are recommended by the chambers of commerce, the export price shall be in compliance with the relevant price limit regulations" [so the use of the word "when" should be read as a statement that t]he rules do not compel price-fixing for any product. [Likewise, Exhibit 21 among Li Exhibits] do[es] not mention a minimum price or compulsory price-fixing. [Also, Exhibit 20 among Li Exhibits] do[es] not [expressly] mention a minimum price or compulsory price-fixing. [And Exhibit 19 among Li Exhibits is a regulation] specifically repealed on December 10, 2004. Further, [it] only refers to rec-

ommended export prices fixed by the relevant chamber of commerce [but] it does not [expressly] require the fixing of any price for any specific product. [Similarly, Exhibit 18 among Li Exhibits] describe[s] the export quota licensing system but do[es] not [expressly] require—and do[es] not [expressly] authorize any ministry to require—minimum prices or the coordination of prices among competitors. [Rather, it] require[s] the promulgation of new rules governing export quota licensing that conform to the State Council Regulations[, which should be interpreted to mean that] the State Council Regulation effectively repealed any existing export quota licensing rule issued by MOFCOM including minimum pricing requirements. [Analogously, Exhibit 16 among Li Exhibits reproduced] rules [that] were officially abolished on September 7, 2007. Moreover, these rules were based on the export license regulations effective in 1999, which were revised in 2001 and again in 2004[to] state only that a price cannot be lower than the coordinat[ed] price regulated by the relevant import and export commerce commission[, but this language did not expressly] compel price-fixing for any particular product[, and so it might have not included magnesite-based products. In the same fashion, Exhibit 13 among Li Exhibits] does not [expressly] refer to any minimum export price or mandatory price-fixing and [this regulation] was abolished in 2005. [In sum, t]he only document cited by Defendants that specifically refers to a coordinated price for magnesite is [the regulation] promulgated in 1994[, but it should be presumed repealed because, i]n 1998 and 1999, [the] MOFCOM promulgated new rules and regulations governing the export bidding process[, especially since] the 2001 export quota bidding rules do not men-

tion minimum prices or mandatory price fixing. [Consequently, the fact that t]he export quota licensing system ... was effective during the [Class P]eriod ... does not [mean that it was] requiring price-fixing of magnesite by members of the [CCCMC] or any other group of [Chinese] exporters. [Moreover, Defendants' assertions that non-compliance with minimal price requirement could result in reduction of the non-complying exporter's export allotment should not be deemed credible in light of the fact that t]he volume of export quotas for magnesite changes from year to year[, and, i]n 2001, the export quotas awarded by the government far exceeded the [overall] actual volume of magnesite exports by more than 300,000 tons[, and the e]xport quotas were also left unused in 2004[, same as i]n 2009, [when Chinese] export quotas have again exceeded the total volume of [the nation's magnesite] export[. Finally, the governmental nature of the CCCMC is not true, since] Defendants are members of the CCCMC, [and it] is a non-governmental trade organization.

The CCCMC was established in 1988, prior to the establishment of a market economy in China and prior to the vast reform of China's export laws and regulations. The Magnesite Product Branch of the CCCMC was formed in 1994. The CCCMC currently describes itself as a self-disciplined organization that [merely] provides service to enterprises, including the provision of information and offering of coordination and guidance to its members.[The] CCCMC also describes itself as a non-government organization under the current market economy system in China[; it] is a corporate body[ ] funded through the receipt of membership fees from its member entities[, and s]ome of [its] employees [are also employed by CCCMC's members and] continue to be paid by the[se] member[s.] ... With respect to export activities of its members, the CCCMC has stated that Chinese enterprises are all independent in decision making . . . .

Opp. at 18–25 (quotation marks omitted, original brackets and ellipses removed).[76]

**76.** Plaintiffs' Opposition cites, in addition to the specified-in-the-above-quotation Li and Chen Exhibits, other Li and Chen Exhibits, as well as Docket Entries Nos. 35–29; 77–1; 105–4; 105–14 to 105–22; and 105–25 to 105–31 (replicating: (a) undated CCCCMC's Comments; (b) a 2003 Congressional Hearing on China (although the Court presumes that Plaintiffs wished to refer not to the Hearing but rather to 2005 Report by the United States Representative to Congress); (c) CCCMC's Comments to David Spooner, Assistant Secretary for Import Administration, United States Department of Commerce, of Apr. 19, 2007; (d) article *China Advancing to Full Market Economy* at <<http://www. chinaembassy.org/ene/xw/t141877.htm>> (Feb. 7, 2004); (e) *China Summary, Global Trade Negotiations Home Page* by the Center for International Development at Harvard University, at <<http://www.cid.harvard.edu/ cirtrade/goy/chinagov.html>>; (e) the WTO's Report of the Working Party on the Accession of China of Oct. 1, 2001; (f) the WTO's Protocol on the Accession of the People's Republic of China of Nov. 10, 2001; (g) article *Legal System of China* from <<http://www. lawinfochina.com/Legal/index.asp>> (Feb. 7, 2004); (h) Comments of the Bureau of Fair Trade of the MOFCOM on Determination and Treatment of Market–Oriented Enterprises, of June 25, 2007; (i) *WTO Dispute Settlement Proceeding Regarding China–Measures Related to the Exportation of Various Raw Materials*, 74 Fed.Reg. 32218 (July 7, 2009); (j) Ch. 18, Supplement 1 to the Harmonized Tariff Schedule of the United States (2009); (k) *Administrative Measures for Goods Export Licenses* (June 7, 2008), at 2008 China Law LEXIS 2247; (*l*) *Legislation Law of the People's Republic of China* (Mar. 15, 2000), at 2000 China Law LEXIS 1492; (m) United States Geological Survey 2005 ("Magnesium Compounds"); (n) copy of the CCCMC's web-

In light of the foregoing, Plaintiffs conclude that, "[even r]egardless of [the] CCCMC's legal status, no document submitted by Defendants demonstrates that the price collusion ... was initiated at the direction of the CCCMC or was required by the CCCMC." *Id.* at 52.

### 3. Defendants' Reply

Disagreeing with Plaintiffs' position, the Sinosteel Defendants point out that

Plaintiffs admit that [the MOFCOM] includes magnesite among the products subject to government-mandated export bidding and licensing requirements [but] then ... cite various regulations [not expressly referring to the minimum price] in an attempt to show that lack of [such] requirement. [Yet,] Plaintiffs do not challenge that the ... [r]ules requiring coordinated pricing were in place from December 4, 1999, through September 7, 2007, and thus were in effect at all times during [the Class] period [including] when the original Complaint was filed in 2005. [Since these] 1999 ... [r]ules provided that a price cannot be lower than the coordinating price regulated by ... the CCCMC[,] ... [t]he fact that [the] regulations adopted in the interim may not [expressly] mention price coordination is no more relevant than the fact that not all securities regulations promulgated since the Securities Exchange Act of 1934 mention insider trading, nor does every antitrust regulation adopted since the Sherman Act mention horizontal price fixing. Plaintiffs also ... omit mention[ing] other Chinese regulations adopted in the interim that confirm the requirement of

export price coordination[, e.g.: (a) the January 1, 2000, regulation *stating that,* w]hen examining an application for an export license, the [Office of the Special Commissioner] shall ... [e]xamine export contract [and] especially examine [the] price [because the p]rice of goods [subject to] export ... shall be ... not lower than the coordinating price regulated by [the] CCCMC[; (b) the January 1, 2002, regulation providing that Chinese] license issuing [administrative body] shall stress ... verification of the prices of export commodities when examining the export contracts, [and if] the prices in the export contracts are lower than the recommended export price fixed by the ... CCCMC, the license issuing [administrative body] shall refuse to issue the export licenses[; (c) the December 2003 rule stating that, w]hen the export prices are recommended by the [CCCMC, the actual] export price shall be in compliance with [those] price limit regulations.

S/Reply at 18–19 (citing Docket Entries Nos. 35–54, 35–57 and 35–61). The response of the Minmetals Defendants largely corresponds to the position of the Sinosteel Defendants, since the Minmetals Defendants state:

Plaintiffs ... characterize China as[, effectively,] a market economy wherein its industrial enterprises act independently and are not subject to price controls [but none of Plaintiffs'] sources pertains [specifically to export of] magnesite[-based products from] China [which turns on Chinese] export licensing system...

site, at <<http://wwww.cccmc.org.cn/English Web/Company/CmcMember.aspx>>; (n) the WTO's Report of the Council For Trade In Goods On China's Transitional Review of Dec. 7, 2007; and (*o*) article *China Magnesia Export Quotas Turn to Be a "Chicken Rub"* from magazine Refractories Window, of May 2009. In addition to these citations, Plain-

tiffs' above-quoted excerpt is accompanied by footnotes informing the Court, *inter alia,* that "[t]he United Trade Representative recently filed a request for consultation with the WTO relating to commodities subject to export quota licensing systems ... [but] did not include magnesite in its request." Opp. at 20, n. 3 (citations omitted).

[While] Plaintiffs ... argue that many of the regulations [relied upon by] Defendants [were] repealed [and, thus, do not pertain to the issue of minimum price, this] is ... incorrect [because a]ll of the regulations cited by Defendants were in effect and applicable to magnesite at some time from September 2001 to the present, which is the [Class Period. Magnesite has been listed as a commodity subject to export quota and licensing system in each] Catalogue of Goods [issued by Chinese government during the] 2000–2009 [period. Thus, w]hile some of the export price regulations have been repealed and replaced, at all times during the [Class Period, Chinese] exporters were in fact subject to uniform, minimum export price requirements. [For instance, such chain of changing but never disappearing minimum price requirements can be established in Li Exhibits that include a regulation] effective through Jan[uary] 1, 2002; [a regulation effective] through Jan[uary] 1, 2005; [and a regulation effective] through Sept[ember] 7, 2007. Furthermore, many ... other regulations [that did not epressly refer to minimum price] provide[d, nonetheless,] the context in which both the quota and minimum pricing [we]re implemented ... through [the type of] bidding process [employed in China with regard to magnesite-based products].

M/Reply at 11–12 and n.7 (incorporated in the quoted main text) (citing exhibits replicated in Docket Entries Nos. 109–3 to 109–5; as well as in 35–47; 35–51; 35–53; 35–56; and 35–60).

## D. *Relevant Legal Proceedings and Evidence Submitted Therein*

In addition to stating their legal positions and directing the Court's attention to the exhibits which they read as supporting their assertions, the parties also make reference to a certain legal proceeding conducted in the European Union and to another legal action still pending before the United States District Court for the Eastern District of New York. The Court's own research of the issues presented by this matter revealed two additional proceedings that appear just as relevant as the legal matters brought to the Court's attention by the parties. Therefore, a detailed discussion of these four proceedings appears warranted. However, in light of the parties' apparent confusion as to the precedential value of the legal decisions reached by the tribunals presiding over those matters and the value of evidence submitted in those matters, the Court finds it proper to precede its discussion of these four legal proceedings with a clarification as to the distinction between a legal precedent and material subject to judicial notice.

## 1. Judicial Notice and the Concept of *Stare Decisis*

At common law and under the Federal Rules, most proof is presented by means of testimonial evidence or by the offering of documentary evidence. One an exception to the requirement that a party who relies on a certain proposition must prove it is judicial notice. Rule 201 of the Federal Rules of Evidence governs judicial notice, providing that facts noticed cannot be subject to reasonable dispute and specifying certain procedural requirements that must be followed.

Rule 201(b) ... permits a district court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either[:] (1) generally known within the territorial jurisdiction of the trial court[;] or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Rule 201(b). *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir.2002) (finding that judicial notice could be properly taken with

respect to three different categories of documents which include: (1) documents relied upon in the complaint; (2) documents filed with a United States law enforcement agency; and (3) undisputable data, e.g., purely informational opinion-free data compiled by a very widely quoted and, thus, deemed reliable, news service); *accord Jackson v. Broad. Music, Inc.*, 2006 WL 250524, at \*7, 2006 U.S. Dist. LEXIS 3960, at \*18 (S.D.N.Y. Jan. 31, 2006) ("the court may take judicial notice of public records and of 'admissions in pleadings and other documents in the public record filed by a party [to the instant matter] in other judicial proceedings that contradict the party's factual assertions in [the instant] action,' [and the court may do so even] without converting the motion [to dismiss] into one for summary judgment") (quoting *Harris v. New York State Dep't of Health*, 202 F.Supp.2d 143, 173 (S.D.N.Y. 2002), and citing *Munno v. Town of Orangetown*, 391 F.Supp.2d 263, 268 (S.D.N.Y.2005)). In addition, since the court may take judicial notice of a fact "capable of accurate and ready determination by resort to sources [which] accuracy cannot reasonably be questioned," Rule 201(b), the court " 'may take judicial notice of records and reports of administrative bodies,' such as notices and opinion letters." *Wible v. Aetna Life Ins. Co.*, 375 F.Supp.2d 956, 965 (C.D.Cal.2005) (taking judicial notice of a notice and opinion letter issued by the Department of Justice and citing, *inter alia, Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 385 (9th Cir.1953)); *see also Toth v. Automobile Club of California Long Term Disability Plan*, 2005 WL 1877150, 2005 U.S. Dist. LEXIS 40746 (C.D.Cal. 2005) (same).

Conversely, judicial notice is improper if a question exists as to the legitimacy of the source of the information. *See Hinton v. Dep't of Justice*, 844 F.2d 126 (3d Cir.1988); *see also Oneida Indian Nation of New York v. State of N.Y.*, 691 F.2d 1070 (2d Cir.1982). Therefore, contentions made by the parties are not subject to judicial notice, *see e.g., Taylor v. Charter Medical Corp.*, 162 F.3d 827 (5th Cir.1998) (the court cannot take judicial notice of defendant's status as a state actor); *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir.1997) (trial court erred in taking judicial notice of a finding that a settlement in a prior proceeding was fair, reasonable and adequate), since "judicial notice applies [only] to self-evident truths that no reasonable person could question, truisms that approach platitudes or banalities." *Hardy v. Johns–Manville Sales Corp.*, 681 F.2d 334, 347 (5th Cir.1982).

The tool of judicial notice is qualitatively different from the concept of legal precedent, since a legal conclusion reached by another tribunal (or a particular court during its prior ruling) is assessed not under the requirements of Rule 201(b) but under the common law doctrine of *stare decisis.*

> [J]udicial precedent attaches a specific legal consequence to a detailed set of facts in an adjudged case or judicial decision, which is then considered as furnishing the rule for the determination of a subsequent case involving identical or similar material facts and arising in the same court or a lower court in the judicial hierarchy.

*Allegheny General Hospital v. NLRB*, 608 F.2d 965, 969–970 (3rd Cir.1979) (footnote omitted). *Stare decisis* is the policy of the court to stand by precedent; the term is but an abbreviation of *stare decisis et non quieta movere*—"to stand by and adhere to decisions and not disturb what is settled." *United States IRS v. Osborne*, 76 F.3d 306, 309 (9th Cir.1996); *see also Planned Parenthood of Southeastern Pennsylvania v.*

*Casey,* 947 F.2d 682, 691–92 (3d Cir.1991), *aff'd in part and rev'd in part on other grounds,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

▮▮▮▮▮ It has become axiomatic that the doctrine has two applications, vertical and horizontal. Vertical *stare decisis* could be summarized as a principle that a controlling precedent by a superior court is binding upon the lower courts.[77] *See, e.g., Briley v. City of Trenton,* 164 F.R.D. 26, 29 (D.N.J.1995) ("[where] the Supreme Court declined to rule with respect to [a certain issue], the doctrine of *stare decisis* compels this Court to apply the Third Circuit's ... standard to [that issue]"); *compare Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 486, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (observing that a circuit court "engage[s] in an indefensible brand of judicial activism" when it "refuse[s] to follow" a "controlling precedent" of the Supreme Court). In contrast, horizontal *stare decisis* merely implies a court's discretional consideration of non-binding decisions, which that court can—and, perhaps, is even obligated to— ignore if it finds that the rationale of these decisions is insufficiently persuasive or outright unsound, or that the legal issues and/or the facts addressed in these decisions are too removed from the legal issues and facts at hand to have a meaningful impact on the court's judicial analysis. *Accord Planned Parenthood,* 947 F.2d at 691–92 ("As Justice Kennedy has stated, courts are bound to adhere not only to results of cases, but also 'to their explica-

tions of the governing rules of law.' Our system of precedent or *stare decisis* is thus based on adherence to both the reasoning and result of a case, and not simply to the result alone. This distinguishes the American system of precedent, sometimes called 'rule *stare decisis,*' from the English system, which historically has been limited to following the results or disposition based on the facts of a case and thus referred to as 'result *stare decisis* '") (citations and later procedural treatment of the case omitted).

With these rules and principles in mind, the Court now turns to the four proceedings the Court finds relevant to the case at bar.

### 2. Antidumping and Countervailing Proceedings

Two of these four proceedings involve antidumping or countervailing issues. Since, in the United States, the legal matters raising such challenges fall within the exclusive jurisdiction of the United States Court of International Trade, *see* 28 U.S.C. § 1581(i); <<http://www.cit.uscourts.gov/informational/about.htm# FOREWORD>> and, hence, these issues are rarely considered by federal district courts, a brief explanation as to the economic underpinnings and legal rationale of these regimes appears warranted.

In general terms of economics, the practice of "dumping" means sale at "predatory pricing," *i.e.,* sale of the product so cheaply that the seller's competitors are eventually forced out of business. *See* Bri-

---

**77.** Moreover, the following factors must be present before a prior decision has *stare decisis* effect: (a) the decision must be from the same court or from a court which the court applying *stare decisis owes obedience;* (b) an issue was actually determined by the decision; (c) the decision must constitute a holding of the majority of the court and, if a particular result is adopted by a clear majority of the court, it has absolute precedential effect; (d)

the decision must involve an issue of law; and (e) the decision was rendered in substantially identical legal and factual circumstances. *See* 3–30 *Moore's Manual–Federal Practice and Procedure* § 30.11, (2007) (citing, *inter alia, City of Erie v. Pap's A.M.,* 529 U.S. 277, 285, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), and *Rappa v. New Castle County,* 18 F.3d 1043, 1061 (3d Cir.1994)).

an Hindley, *The Economics of Dumping and Anti–Dumping Action: Is There a Baby in the Bathwater?, in Policy Implications* 27 (Workshop on Policy Implications of Antidumping Measures of the European Institute for Advanced Studies in Management, Brussels, Belgium (Oct. 1989)). In the more specific terms of international trade, "dumping" means that a seller from one country is exporting its product to another country at a predatory price, e.g., at the price which is below the price the seller charges for its goods in its home market (such low price is referred to as "less than fair value" price or "LTFV"): since the seller's predatory practices might endanger the well-being and even the very existence of the industry producing the seller's types of goods in the importing country, the law of the importing country might be crafted to alleviate some of the harsher consequences of this controversial reality of free trade;[78] such remedy is usually a penalty (*i.e.*, an import duty) aiming to either economically force the seller to raise its export price or to dissuade the seller from a future LTFV export practice. *See* Lucius B. Lau, *Agency Interpretation of the Statute After Mead with a Special Emphasis on the Antidumping and Countervailing Duty Laws* 4–11 (Comm. Litig. Branch, Civ. Div., U.S. Dep't of Justice, Apr. 8, 2002). Correspondingly, both United States law and the WTO condemn dumping if the practice causes (or threatens to cause) material injury to the domestic industry of the importing country. *See* 19 U.S.C. § 1673; *see also* Marrakesh Agreement Establishing the World Trade Organization, Annex 1A (presenting the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade) (Apr. 15, 1994).

The concept of countervailing is analogous, in its gist, to that of antidumping, although it introduces a third player into the equation, *i.e.*, the state of the exporting seller. Similar to antidumping duties, countervailing duties ("CVDs") are imposed to neutralize the negative effects of predatory pricing if it has been determined that the seller's state subsidized the seller's exports through certain governmental measures, and these subsidies enabled the seller to charge predatory prices causing or threatening to cause an injury to the producers of the seller's types of goods in the importing state. *See* <<http://www.ustr.gov/tradeagreements/wto-multilateral-affairs/wto-issues/trade-remedies/counter vailing-duties>>. In the United States, investigations of countervailing activities and determinations as to the propriety and magnitude of CVDs imposed, is performed

---

**78.** Therefore, it can be argued that LTFV sales arise from "profit-discrimination" rather than "price-discrimination." *See* Tara Gingerich, *Why the WTO Should Require the Application of the Evidentiary Threshold Requirement in Antidumping,* 48 Am. U.L.Rev. 135 (1998). Consequently, while the allegations of antitrust and antidumping are often raised jointly, these legal regimes often put the sellers between the proverbial rock and hard place, since sellers' heavy-handed tilt from one direction to another could place the sellers seeking to avoid dumping accusations in the position where these very same sellers get accused of antitrust practices. This is so largely because the policies driving these two legal regimes could get occasionally at odds in terms of their economic goals, since the goal of antitrust law is to create the maximum market competition between the sellers of the same goods and, hence, to drive the price on these goods as much down as possible, while the goal of antidumping law is to limit this very same market competition by forcing the sellers striving to charge their lowest prices into selling their goods at higher prices that are comparable to those charged by their competitors. *See, e.g.,* Christopher M. Barbuto, *Toward Convergence of Antitrust and Trade Law: An International Trade Analogue to Robinson–Patman,* 62 Fordham L.Rev.2047 (1994) (discussing this incongruity of policies).

by the International Trade Administration ("ITA"). *See* <<http://www.trade.gov/ ITAoverview.asp>>. Here: (a) Plaintiffs bring to the Court's attention an anti-dumping legal matter resolved by the Court of First Instance of the European Communities in *Zhejiang Xinan Chemical Industrial Group Co. Ltd. v. Council* ("*Zhejiang Xinan*"), 2009 ECJ EUR–Lex LEXIS 529 (Gen. Ct., June 17, 2009);[79] and (b) the Court, on its own, notes a relevant countervailing investigation that has been recently conducted by the ITA in *Certain Magnesia Carbon Bricks from the People's Republic of China ("Magnesite from China")*.

#### a. *European Union Proceedings*

The parties' statements made in this matter are not exactly reflective of what was asserted and concluded in *Zhejiang Xinan*. Specifically, Plaintiffs maintain that, in light of *Zhejiang Xinan*,

> [any argument that] the CCCMC is a *de facto* instrument of the Chinese government [is unwarranted]. The European Court of Justice squarely rejected this argument [in *Zhejiang Xinan*], holding, based on the urging of a CCCMC member, that the CCCMC is a non-governmental body that is not directed or controlled by the government of China. The [*Zhejiang Xinan* court] concluded that price agreements among members of the CCCMC ([involved in

production and export of glyphosate rather than magnesite-based products]) were voluntary agreements initiated by the members themselves, not imposed by [Chinese government]. Finally, the [*Zhejiang Xinan* court] concluded that the [plaintiff in *Zhejiang Xinan*, a business entity and] a member of the CCCMC ... agreed with other members [involved in glyphosate production and export] to fix export prices ... under market conditions and was free to decide export prices without significant [Chinese government] interference.

Opp. at 50–51 (citations omitted). In response, the Minmetals Defendants assert that

> [the CCCMC] is a unique organization with no parallel in the United States, and thus is a *de facto* instrument of the Chinese government. This is not contradicted by the [*Zhejiang Xinan* court's] ruling [since that] court had before it the unrelated issue of whether the European Commission applied the proper [formula while] computing an anti-dumping duty [with respect to export by] a single Chinese producer of glyphosate [rather than multiple producers/exporters of magnesite-based goods. Moreover, the *Zhejiang Xinan*] court based its finding about the nature of the CCCMC on only a CCCMC brochure[, a]nd the court's finding regarding gly-

---

**79.** The General Court ("Trial Court") was previously known as the "Court of First Instance." The Trial Court procedural rules envision a written phase and an oral phase; at the oral hearing, the parties' lawyers state their legal positions, and the judicial panel poses questions (While the General Court has on its staff at least one judge from each European Union state, 80% of the cases are presided by a panel of three judges, although it might be five judges, thirteen judges, or even an *en banc* tribunal if the matter is deemed truly complex or important). One of the panelists, "Judge–Rapporteur" (a position which, duties-wise, encompasses the tasks

performed in the United States by magistrate judges), prepares a report and a recommended decision ("R & R"). This R & R is then deliberated by the presiding panel that delivers the judgment which is subject to appeal to the European Court of Justice, the highest court in the EU on the matters of European Union law. *See* <<http://curia. europa.eu/jcms/Jo2_7033/presentation>>. An appeal as to the Trial Court's decision in *Zhejiang Xinan* was filed on June 17, 2009, by the Council of the European Union. *See Vitamin C*, Civil Action No. 06–md–1738 (DGT) (E.D.N.Y.), Docket Entry No. 399–5 (the application detailing appellate grounds).

phosate pricing decisions was based on submissions from the [*Zhejiang Xinan* plaintiff that were left] unchallenged by [the EU Council].

M/Reply at 13, n. 9. Since the Plaintiffs' and the Minmetals Defendants' statements read *Zhejiang Xinan* as if they reflected on two completely different proceedings, a clarification as to what was—and was not—asserted and determined in that proceeding appears necessary.

Pursuant to Article 230 (previously, Article 173) of the European Community Treaty,[80] a juridical or natural individual applicant may seek annulment of a measure adopted against that individual by an institution of the EU; this is exactly what occurred in *Zhejiang Xinan*, where the Trial Court set aside a prior EU determination refusing market economy treatment ("MET") to Zhejiang Xinan Chemical Industrial Group Co. Ltd. ("Zhejiang"), a Chinese agrochemical producer and exporter specializing in glyphosate.[81] The Trial Court summarized the factual and procedural background as follows:

> In February 1998, the [EU] adopted . . . anti-dumping [regulation] applicable to [Zhejiang, and this regulation remained active until late 2002, subjecting Zhejiang to the non-MET level of duty. In] 2002, . . . an interim review [was initiated. In] April 2004, . . . decision refusing [Zhejiang] grant [of the MET status was re-entered. In] September 2004, [another determination was made as to Zhejiang, also] imposing . . . anti-dumping duty [of the non-MET level; this is] the contested regulation[.[82] This] regulation [explained that, even though the majority of Zhejiang shares] were owned by private persons, . . . [Zhejiang was] under State control [since] the majority of the directors of the board [was] either State officials or officials of State-owned enterprises [plus, the Chinese government] had entrusted the . . . CCCMC with the right [to approve export] contract[s upon] verifying export prices. . ., [and t]his system include[d] setting of a minimum price for glyphosate exports and . . . allowed the CCCMC to veto exports that did not respect these prices. [In light of these facts,] it was decided not to grant [the MET status] to [Zhejiang.[83]] . . . Since

---

**80.** Treaty Establishing the European Community, 298 U.N.T.S. 11 (Mar. 25, 1957), *amended by*, Treaty of Amsterdam, 1997 O.J. 1 (Oct. 2, 1997), *amended by*, Treaty of Nice, *consolidated version reprinted in*, 2002 O.J. 33 (Feb. 26, 2001).

**81.** To be granted the MET status, a business must demonstrate that it meets five criteria so composed that this status is typically refused to businesses unable to show that their decisions as to prices, costs, etc., have been taken free of significant interference of their government (in other words, the end result of the inquiry turns not on whether the government could or did interfere, but on whether the government actually succeeded in interfering with that particular businesses' operations). Since the MET status directly affects one of the elements plugged into the applicable calculative formula for anti-dumping duties, lack of the status means that the exporter is charged higher duties. Therefore, there is a direct financial incentive for exporters to obtain the MET status through asserting that they, in particular, operate free of significant interference of their government. *See* Van Bael & Bellis, *Brussels Monitor* 3–4 (July 10, 2009).

**82.** EU legal decisions, including the decisions of the Trial Court, are drafted in a style different from that common to modern United States jurisprudence, especially in terms of their structure, limited citations to legal and factual sources and their terminology.

**83.** Hence, in September 2004, that is, halfway into the Class Period asserted in the instant matter, the EU held that the CCCMC was setting minimum export price on behalf of the Chinese government and that Zhejian's personal export practices were subject to this price requirement.

[Zhejiang's] request for [the MET status] was refused, [it continued paying higher anti-dumping duties but] brought the [*Zhejiang Xinan*] action [in] December 2004 [asserting that] the contested regulation [shall be annulled as to Zhejiang personally. In response, the EU] Council contend[ed] that [Zhejiang's application had to be] dismiss[ed, and the EU] Commission contend[ed the same].

*Zhejiang Xinan*, 2009 ECJ EUR–Lex LEXIS 529, ¶¶ 4–28 (original brackets and quotation marks removed). A typical panel of three judges presided over *Zhejiang Xinan* and detailed Zhejiang' position as follows:

[Zhejiang] claims that it [made] its business decisions [on the basis of] supply and demand without significant State interference[, and] that it negotiated prices at arm's length .... [Zhejiang] disputes the relevance of the ... composition of its board of directors .... [Zhejiang also] observes that [the] 1998 amend[ment of a certain EU provision allowed for the possibility that a certain business entity in transitional economy such as China might operate under market conditions, and this provision was expressly enacted] to enable qualified Chinese exporters, however few they may be, to show ... that they [operate in accordance with] market economy forces ....

*Id.* ¶¶ 45–78 (original brackets and quotation marks removed). Finding that Zhejiang sufficiently established that its own export of glyphosate was free from a substantial interference of the Chinese government, the Trial Court explained its conclusion as follows:

[The issue here is solely] whether the ... actions by the State ... render [Zhejiang's] decisions incompatible with market economy conditions .... [Consequently], State control, as established in this case, [may be not] incompatible with the taking of commercial decisions by [Zhejiang. Here, Zhejiang] claims ... that it showed that its export prices were freely set on the sole basis of commercial considerations [because] the Chinese glyphosate [exporters] agreed among themselves on the need for guided export pricing in order to minimi[z]e the risks of anti-dumping [actions] in foreign markets[; and t]he CCCMC's role in that regard was to facilitate such coordination and provide the services of a secretariat.... [Zhejiang] claims that ... all [Zhejiang's] export contracts[, since at least September of 2004, were approved] by the CCCMC[ ] regardless of price, and, therefore, that the alleged minimum export price was not binding ... so far as [Zhejiang] was concerned.... Finally, [Zhejiang] claims that [even if it were possible that] the CCCMC could refuse to [approve] an export contract because of the price, that possibility could not, in view of [Zhejiang's own export] practice ... justify the refusal of [Zhejiang's] request for [the MET status, because a] right of veto without any use of that right cannot constitute [a] significant State interference [with respect to Zhejiang]. In response, t]he Council contends ... that there was a very efficient control system in place, that it was run by [China] through the CCCMC and customs authorities and [the very existence of that system] constituted interference by [China] in the setting of [Zhejiang's] export prices.... [T]he fact that the CCCMC [approved Zhejiang's] contracts in which the price was lower than the [minimum] price is irrelevant [since Zhejiang concedes that] all export contracts had to be submitted to the CCCMC, which checked the selling prices and [approved] the contract if the selling price exceeded the [minimum] price[, plus]

China directed the Chinese customs authorities not to permit exports ... unless the contract bore the CCCMC's [approval. In sum, the fact] that ... the CCCMC was ... entitled to refuse [approval of] a contract wh[ich] price was lower than the [minimum] price [in and of itself indicated the power of the CCCMC] to ensure ... the pricing of Chinese glyphosate exports[, including Zhejiang's. Zhejiang] does not dispute that [this CCCMC's approval and veto] mechanism ... exists [but it] maintains, however, ... that such mechanism [is] not inconsistent with the criterion [applied by the EU grant to the grant of the MET status. Zhejiang stresses that the] CCCMC [should be deemed] a non-governmental body [in light of the statement to that effect in] the CCCMC's brochure [and because compliance with the CCCMC's guide] price ... was not enforced either by the government, or by the CCCMC [against Zhejiang. Therefore, in Zhejiang's practice,] the CCCMC's role [was] only [to note] the contract price, enter[ ] it in a database for statistical purposes and [approve] the contract [after that ministerial task. The lack of enforcement of minimum price by the CCCMC was verified by the fact that, in] 200 sales ... investigat[ed by the EU for *Zhejiang Xinan* ], the average price was below the [minimum] price [set by the CCCMC. In light of the fact that the Council] never challenged [Zhejiang's] statements that the CCCMC was a non-governmental body and [the Council also] did not take issue with [Zhejiang's] statements that ... the glyphosate [exporters] themselves ... took the initiative in establishing the system [of the minimum price, the Trial Court concluded that Zhejiang should qualify for the MET status, finding, *inter alia*,] the CCCMC's role [in Zhejiang's price control was] not sufficient [to conclude otherwise].

*Id.* ¶¶ 79–136 (original brackets and quotation marks removed).

■ The goal of the parties' debate over *Zhejiang Xinan* is not entirely clear to this Court. Since the Trial Court is not a tribunal whose decisions could be binding on this Court, the value of *Zhejiang Xinan* for the purposes of the principle of *stare decisis* cannot be more than persuasive. However, since the case deals with a different area of law, different legal standard and even the focus of that standard, plus a different factual inquiry, any ruling "by analogy" would be unwarranted. Moreover, the Court cannot take judicial notice of anything related to *Zhejiang Xinan,* that is, short of the fact that such decision was actually entered: *none* of the *Zhejiang Xinan* litigants is a party to *this* action (*i.e.,* the statements in the CCCMC's brochure, even if true, cannot be deemed as an admission by the CCCMC, which was neither a party to *Zhejiang Xinan* nor is a party here), the evidence relied upon by the Trial Court is not before this Court, and—to top it all off—no detailed description of the factual matters considered by the Trial Court are given in the *Zhejiang Xinan,* that is, short of the statement that the CCCMC described itself as a non-governmental body in "a" brochure, and that the Council representing the EU failed to challenge the truthfulness of that statement. *See Hinton v. Dep't of Justice,* 844 F.2d 126 (3d Cir.1988) (judicial notice is improper if a legitimate question exists as to the underlying source of the information); *Oneida Indian Nation of New York v. State of N.Y.,* 691 F.2d 1070 (2d Cir.1982) (same); *accord Dashiell v. Meeks,* 396 Md. 149, 174–75, 913 A.2d 10 (2006) (matters of which judicial notice may be taken must include facts capable of verification by resort to sources); *State v. Green,* 890 So.2d 1283 (Fla.Dist.Ct.App.2d Dist.2005) (sources of a judicially-noticed fact must

necessarily exist and be known to the court to enable even the very consideration of whether the fact is amenable to judicial notice).

### b. *Proceedings Before the International Trade Administration*

Unlike in *Zhejiang Xinan,* some statements made in the countervailing proceedings in *Magnesite from China,* ITA Matter No. C–570–955 (*Preliminary Negative Countervailing Duty Determination,* 74 Fed.Reg. 68,241 (Dec. 23, 2009)), appear to be amenable to judicial notice.

According to the ITA, the procedural history of *Magnesite from China* was as follows:

> On July 29, 2009 (*i.e.,* three weeks prior to Plaintiffs' filing of their Opposition), the [ITA] received a countervailing duty ... petition concerning [magnesite] from ... China filed by Resco Products, Inc. (*[i.e.,* by one of the two named Plaintiffs in the instant matter]*). [Consequently, an] investigation was initiated on August 18, 2009. *See* ..., 74 F[ed.] R[eg.] 42858 (Aug[.] 25, 2009) .... On September 15, 2009, the [ITA] selected Liaoning Mayerton Refractories Co., Ltd. ("LMR") and RHI Refractories Liaoning Co., Ltd. ("RHIL") as mandatory respondents in this investigation. *See* Memorandum [of] Sept[.] 15, 2009. On September 15, 2009, [the ITA also] issued the initial ... questionnaire to the Government ... of China ( ["China"] ), LMR, and RHIL.... On November 5, 2009, [China] submitted a response to the initial ... questionnaire .... Also on November 5, 2009, LMR submitted a response for itself and for its affiliate Dalian Mayerton Refractories Co. Ltd., ... and RHIL submitted a response for itself and for its affiliates RHI Refractories (Dalian) Co., Ltd. (RHI Dalian) and Liaoning RHI Jinding Magnesia Co., Ltd. (RHI Jinding) ....

> On December 8, 2009, [the ITA] issued supplemental questionnaires to [China] and the respondent[s] .... On December 14, 2009, counsel for [Resco] met with [ITA] officials.... Also on December 14, 2009, [Resco] submitted further information regarding the provision of preferential loans [by China to magnesite-products] industry.... [In its petition to the ITA and/or during its December 14, 2009, meeting with ITA officials, *Resco* ] *alleged that [China* ] *has established export quotas and a minimum acceptable export sales price (i.e., export restraints) for a number of raw materials, including three types of magnesi* [te ] *used in the production of [the products at issue. According to Resco, a* ]*ll* [*Chinese* ] *exporters of magnesi* [te ] *are subject to these export restraints, including the affiliated and unaffiliated magnesi* [te ] *suppliers of the [respondents named by the ITA* ]. *Under this system, [Resco asserts, China* ] *appears to rank "bids" received from exporters by price and quantity and then awards exporting rights to the companies that can command the highest export prices.* In its response, [China did not deny the existence of governmental control over export price and export quotas alleged by Resco, rather China] stated that there [was] no basis under WTO rules to treat [such] export restraints as a countervailable [subsidy]. Moreover, [China] reported that the purpose of setting export quotas for magnesi[te was] to help regulate an exhaustible natural resource and protect the environment, as processing magnesi[te into, e.g., magnesium oxide] is an energy-intensive, high-polluting activity.... The [ITA] has issued a supplemental questionnaire requesting that [China] fully describe and document the process [of setting] that export quota and minimum acceptable export price. In addition, [the ITA sent] supplemental

questions to the respond[ents] request[ing] that each provide complete volume and value information . . . relevant to [that] analysis. . . . [Upon receipt of this supplemental information, the ITA determined that] the countervailable subsidy rates for all . . . exporters [were] *de minimis* [regardless of the existence of the above-defined export restraints].

74 Fed.Reg. 68,241–49 (emphasis supplied).

▓▓▓▓▓ Since Resco is a Plaintiff in this matter, and the ITA expressly clarified that Resco, either in its petition filed with the ITA or in its supplemental statements made for the record to the ITA officials, expressly asserted that Resco was basing its ITA claims on the facts that: (a) Chinese exporters of magnesite were subject to price export restraints, and these restraints applied to all Chinese entities dealing in magnesite-based products; and (b) the Chinese government system of export quota was directly tied to export prices, the Court finds it proper to take judicial notice of Resco's admissions made in *Magnesite from China.*[84] *See Jackson,* 2006 WL 250524, at *7, 2006 U.S. Dist.

LEXIS 3960, at *18 ("the court may take judicial notice of . . . admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in [the instant] action") (quoting *Harris,* 202 F.Supp.2d at 173), and citing *Munno,* 391 F.Supp.2d at 268) (internal quotation marks omitted).

### 3. Antitrust Proceedings

#### a. *Proceedings in the Western District of Pennsylvania*

Resco is no stranger to litigation. The magazine *Industrial Minerals,* seemingly identified as Plaintiffs' data source through their reliance on Lamb's Report (which, in turn, relied on Industrial Minerals data, *see supra* note 34 of this Opinion), provides the following headlines (and accompanying articles) as to Resco's recent litigation endeavors: (a) "US Probes Refractory Dumping—Resco Alerts USITC to Alleged Refractory [Product] Dumping by China and Mexico" (Jul. 30, 2009) (referring to the ITA proceedings other than *Magnesite from China* [85]); (b) "Resco revives magnesite case" (Apr. 1, 2009) (referring to the

---

**84.** Although this matter cannot be conclusively resolved on the basis of Resco's statements made in *Magnesite from China,* the fact that, with only three weeks difference, Resco asserted in its Opposition that no government-mandated system of price restraint exists with regard to magnesite-based goods exported from China (or that none was enforced, or that the prices were not tied to export quotas and the export bidding process), and yet asserted an opposite position in its petition filed with the ITA, brings Resco's objective good faith belief in question. "The first prong of the test to determine if Rule 11 sanctions should be imposed is met if the complaint is frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith. The pleader . . . must have an objective good faith belief in the merit of [the pleader's] legal argument." *Mitford v. Marsh,* 1992 WL

205696, at *3, 1992 U.S.App. LEXIS 30070, at *9–10 (9th Cir. Aug. 25, 1992) (internal quotation marks and citation omitted).

**85.** *See Certain Magnesia Carbon Bricks From China and Mexico,* 74 Fed.Reg. 49,889 (notice of investigation of Sep. 29, 2009); *see also Dumping, CVD Petition Targets Magnesia Carbon Bricks—China, Mexico* <<http://www.npwtradelaw.com/hot/08062009.pdf>> (a client bulletin issued by Neville Peterson LLP, a law firm concentrating in international and domestic trade regulation matters, which summarizes Resco's petition to the ITA in the *China and Mexico* matter, provides a detailed discussion of countervailing duty calculation and points out that—with respect to China—the ITA calculates such duty, if any, through utilization of "surrogate value" figure, *i.e., the figure applicable only to non-market economies* ).

instant matter); and (c) "Resco Bites Bauxite Dragon—The U.S. Refractory Producer Has Submitted an Amended Complaint Against Chinese Bauxite Suppliers" (Aug.2009); etc. *See* <<http://www.mineralnet.co.uk/SearchResults.aspx?Keywords=magnesia+resco&PageMove=1>>. This last entry seems to refer to a putative class action currently pending in the United States District Court for the Western District of Pennsylvania before Judge Joy Flowers Conti. *See Resco v. Bosai Minerals Group, et al.* ("*Resco WDPa*"), Civil Action No. 06–235(JFC) (W.D.Pa.).[86]

The procedural records of the instant matter and *Resco WDPa* are strikingly similar. Initiated five-and-a-half month after the case at bar, *see Resco WDPa,* Docket Entry No. 1, *Resco WDPa* was: (a) triggered by a complaint virtually identical, in its substantive respects, to the Original Complaint in this matter; and (b) then lingered in extensions of time until Resco's filing of a motion for default judgement, *see id.* Docket Entry No. 42, which raised the service of process issues and Judge Conti's denial of default. *See, generally, id.* Docket Entries Nos. 1–88. On July 13, 2009, Judge Conti granted Resco leave to file amended complaint. *See id.* Docket Entry No. 90. The amended complaint followed, mimicking in all substantive respects the Amended Complaint currently before this Court. *See id.* Docket Entry No. 92. On October 7, 2009, defendants in *Resco WDPa* filed motions: (a) seeking dismissal of Resco's amended complaint on the grounds of the act of state and government compulsion doctrines; (b) raising an argument as to lack of jurisdiction grounded on the defendants' lack of minimum contacts with the United States (since the *Resco WDPa* defendants were exporters rather than importers),[87] *see id.* Docket Entries Nos. 98–101; *see also* Docket Entries Nos. 102–109 (supporting exhibits); and (c) requesting stay of discovery. *See id.* Docket Entry No. 121. Stay of discovery has been granted, *see id.* Docket Entry No. 125, and the dismissal motions are pending decision.

Perhaps the most remarkable aspect of Resco's opposition to the dismissal motions filed in *Resco WDPa* and Plaintiffs' Opposition in the instant matter is the striking, nearly cut-and-paste, similarity of plaintiffs' arguments in both matters. *Compare Resco WDPa,* Docket Entry No. 117 to Instant Matter, Docket Entry No. 105. While the arguments with respect to the FTAIA and the "minimum contacts"-based subject matter jurisdiction differ due to the distinction in the underlying law (although both oppositions sought to establish a relaxed "involving importation" test and "directness" through sales to alleged American intermediaries and/or American buyers), the arguments presented here and in *Resco WDPa* with regard to abstention repeat each other almost verbatim. *Compare Resco WDPa,* Docket Entry No. 117 to Instant Matter, Docket Entry No. 105. Effectively, the sole distinction between the instant matter and *Resco WDPa* is that, in *Resco WDPa,* the challenge lies against Chinese exporters of bauxite-based products (that are members of the bauxite section of the CCCMC), while here the

---

**86.** In its *Resco WDPa* action, Resco is represented by four attorneys (the United States Department of Justice, being seemingly invited by Resco's counsel to make an appearance in the *Resco WDPa* declined that invitation two months after the *Resco WDPa* was initiated, without making even an appearance and without filing any document). Two of Resco's counsel in *Resco WDPa* are also among Resco's counsel in the instant matter.

**87.** In other words, the *Resco WDPa* asserted a point substantively analogous to that addressed by this Court under the FTAIA exporter exception.

challenge lies against Chinese exporters of magnesite-based products (that are members of the magnesite section of the CCCMC).

All other aspects are effectively the same, *i.e.,* Resco asserted that the bauxite section of the CCCMC was a democratic and voluntary association of Chinese exporters of bauxite-based products that joined the CCCMC as a voluntary trade association and were free not to comply with any minimum price their section of CCCMC was setting but, nonetheless, somehow elected to enter into collusive agreements producing their own "cartel(s)," which were operating in a succession largely similar of the chain of "Cartels" alleged in this matter. *See Resco WDPa,* Docket Entry No. 92; Docket Entry No. 117, at 24–25. Peculiarly enough, the *Resco WDPa* defendants asserted—in response to Resco's *Resco WDPa* claims— a governmental regulatory scheme of the MOFCOM and CCCMC substantively identical to the scheme asserted by Defendants in this matter. Basing their position on the compulsive force of such governmental regulatory scheme, the *Resco WDPa* defendants, too, asserted abstention stating:

> [T]o combat the perceived competitive evils of "low price selling," the Chinese government adopted, among others, regulations prohibiting exporters from selling commodities at "lower than normal" prices. [That regulation was the MOFCOM's] 1996 Interim Regulations on Punishment for the Conduct of Exporting at Lower Than Normal Price.... [Resco] concedes that [this] 1996 [MOFCOM's] regulation is currently valid [88]

... [T]he U.S. government has no doubt that the Chinese government continues to impose both quantity and price controls on bauxite exports, in violation of China's WTO obligations, as part of "pursuit of industrial policies that rely on excessive ... government intervention intended to promote or protect China's domestic industries."[ ] These measures led the USTR last June to request consultations with China.... [Moreover, o]n November 9, 2009, dissatisfied with the Chinese government's responses in the consultations, the U.S. requested the WTO to convene a panel to hear and decide whether China's bauxite export measures violate China's treaty commitments as a WTO member. The U.S. specifically charges that these measures are administered, in part, through chambers of commerce:

> China administers the export quotas imposed on bauxite, ... through its ministries and other organizations under the State Council as well as chambers of commerce and industry associations, in a manner that restricts exports and is not uniform, impartial and reasonable. In connection with the administration of the quotas for these materials, China imposes restrictions on the right of Chinese enterprises as well as foreign enterprises and individuals to export .... China allocates the export quotas ... through a bidding system. China administers the requirements and procedures for this bidding system through its ministries and other organizations under the State Council as well as chambers of commerce and

---

**88.** The *Resco WDPa* defendants cite to their exhibit docketed as Docket Entry No. 103–5. Resco's *Resco WDPa* opposition concedes the current validity of this 1996 regulation but maintains that the regulation's reference to "lower-than-normal price [did] not require

collusive pricing" reached under the auspices of the CCCMC. *Resco WDPa,* Docket Entry No. 117, at 16. The Court disagrees. *See infra,* note 121 of this Opinion, for discussion of this aspect.

industry associations, in a manner that restricts exports and is not uniform, impartial and reasonable .... China also imposes quantitative restrictions on the exportation of the materials by *requiring that prices for the materials meet or exceed a minimum price before they may be exported.* Further, *through its ministries and other organizations under the State Council as well as chambers of commerce and industry associations, China administers the price requirements in a manner that restricts exports and is not uniform, impartial, and reasonable.*

In support of these charges, ... the U.S. cites the CCCMC charter [that is, the very document upon which Plaintiffs in this matter and Resco in *Resco WDPa* rely for their position that the CCCMC is a voluntary trade organization not being an arm of Chinese government] and [various Chinese] governmental measures [implemented through corresponding letters, notices and regulations.]

*Id.* Docket Entry No. 123, at 3–6 (emphasis removed in part) (citing: (a) documents filed as the defendants' exhibits in *Resco WDPa* and as exhibits of Defendants in this matter; and (b) *Resco WDPa* Docket Entries Nos. 123–2 and 123–4 (replicating the USTR Report and its Panel Request)). Since Plaintiffs seem to draw the Court's attention to *Zhejiang Xinan* in order to suggest the CCCMC's general *modi operandi* on the basis of the CCCMC's treatment of *one member* of the glyphosate section of the CCCMC, it appears logical to similarly consider the CCCMC's treat-ment of its *entire bauxite section* as an indication of the CCCMC's general *modi operandi* with regard to all members of the CCCMC, including Defendants.

### b. Vitamin C Proceedings

If the Court were to look for a matter informative as to the general *modi operandi* of the MOFCOM and its "chambers of commerce," one of which is the CCCMC, the Court would be hard pressed to find proceedings more enlightening than *Vitamin C*, Civil Action No. 06–md–1738 (DGT) (E.D.N.Y.). Much like *Resco WDPa*, the gist of the *Vitamin C* controversy is strikingly similar to the matter at hand.[89] On November 6, 2008, Judge David G. Trager, presiding over *Vitamin C*, issued an opinion summarizing the claims, defenses and the then-docketed documentary evidence, as well as Judge Trager's concerns and conclusions, as follows:

> [The p]laintiffs in [the *Vitamin C*] case allege that defendants, Chinese corporations that manufacture and sell vitamin C, formed an illegal cartel to fix prices ... for exports of vitamin C ... to the United States.... Defendants ... move to dismiss[ ] on the grounds that their price-fixing activities were compelled by the Chinese government.... [The plaintiffs maintain that,] beginning in December 2001, defendants and their co-conspirators formed a cartel to control prices ... of exports for vitamin C [under the auspices of their respective "chamber of commerce" dedicated to] Medicines and Health Products of China

---

89. Two of Plaintiffs' counsel in this matter also represent the plaintiffs in the *Vitamin C* litigation, and one of these attorneys is also Resco's counsel in *Resco WDPa*. Moreover, one of Resco's counsel in *Resco WDPa* is also among counsel for Animal Science (the other of the two named Plaintiffs in the instant matter) in another action, *Animal Science v. Hebei Welcome Pharm.*, Civil Action No. 05–453(DGT) (E.D.N.Y.), which was joined by the Eastern District of New York with the *Vitamin C*, Civil Action No. 06–md–1738 (DGT) (E.D.N.Y.), proceedings.

[ ("CCMHPC") and to] restrict quantity [of exported Vitamin C, and] to safeguard [their export] prices ... [The p]laintiffs allege that ... defendants' sales constitute ... "virtually 100 percent of the manufacturers who can produce vitamin C for a cost below $ 4.50 to $ 5 per kilogram" [*i.e.,* that the defendants' prices are the cheapest in the world].... The complaints allege that [as a result of the alleged] collusive price increases ..., prices remained substantially above [those that they should have been had Chinese vitamin C producers actually competed with each other. The d]efendants move to dismiss on grounds of act of state, foreign sovereign compulsion and international comity. [In other words, the d]efendants do not deny the allegations in the complaints [as to their collusion for the purposes of price fixing]. Rather, they argue that their actions were compelled by the [MOFCOM, through the CCMHPC. The] defendants insist that this case may be properly dismissed at the pleadings stage because the [MOFCOM] has submitted an *amicus* brief detailing the [MOFCOM's] role in orchestrating and maintaining the vitamin C cartel. The Chinese government's appearance as *amicus curiae* is unprecedented. It has never ... come before the United States as *amicus* to present its views. This fact alone demonstrates the importance the Chinese government places on this case. [The MOFCOM's brief states that the MOFCOM] is the highest administrative authority in China authorized to regulate foreign trade, and is the equivalent in the Chinese governmental system of a cabinet level department in the U.S. governmental system. The [MOFCOM states] that [the CCMHPC] is an entity under the [MOFCOM's] direct and active supervision that plays a central role in regulating China's vitamin C industry. [The MOFCOM also points out that, i]n contrast to the voluntary, non-governmental chambers of commerce that exist in the United States, chambers of commerce in China have played a central role in China's shift from a command economy to a market economy. In particular, the [MOFCOM] asserts that the [CCMHPC] stepped into the shoes of stated-owned national exporting entities when those entities stopped regulating exports of pharmaceutical products, including vitamin C [prior to China entering the endeavor of transitioning away from pure command economy. The CCMHPC] had its origins in 1991, when the [MOFCOM] promulgated Measures for Administration over Foreign Trade and Economic Social Organizations[ ("Measures"); these] Measures dictate that ["s]ocial organization[s"] established with coordination and industry regulation functions as authorized by [the MOFCOM] must implement the administrative rules and regulations relating to foreign trade and economy. The [MOFCOM] represents that the [CCMHPC] was one of those ["]social organizations["] authorized to implement rules and regulations, thus imbuing it with governmental regulatory authority. Indeed, the [MOFCOM] asserts that the [CCMHPC] act[s] in the name, with the authority, and under active supervision of the [MOFCOM], thus performing a governmental function so authorized under Chinese law. The ... Measures further provide ... that the [MOFCOM] shall be directly responsible for the daily management of social organizations established with coordination and industry regulation functions. In 1997, the [MOFCOM] and State Drug Administration ... issued a notice ... requiring ... the [CCMHPC]

to ... coordinate ... export market [and] price ... [and] explain[ing] that [t]he specific method for coordination shall be formulated by the [CCMHPC], and filed [with the MOFCOM] for [the] record. In 1998, the [MOFCOM approved the CCMHPC's request to establish a vitamin C section and] declared that the major responsibilities of [that section would be]: to be responsible for coordinating the Vitamin C export ... price .... [This section's] charter ... provides that [it had to] coordinate and administrate market [and] price ... of [v]itamin C export [and] requires [its] members to strictly execute export coordinated price set by the [CCMHPC] and keep it confidential. [In addition, t]he charter provides for sanctions for failure to perform any member's obligation, [such sanctions included various measures, up to] revocation of ... membership. In describing the ultimate penalty for non-compliance, the charter notes that the [section would] suggest to the competent governmental department, through the [CCMHPC], to suspend and even cancel the ... export right of such violating member. In 2002, the [MOFCOM] changed the method of price review in order to accommodate the new situations since China's entry into WTO. The new regulation subjected 30 categories of export products (including vitamin C) to [p]rice [v]erification ... by their respective chambers ... The [verification] procedure ... [required] exporters to send the[ir] export contracts to the relevant chambers for verification before [completing their c]ustoms declaration. [The department of c]ustoms [was obliged to] only allow for export those shipments that [were] accompanied by export contracts with the required [verification. In light of the foregoing, the MOFCOM argue[s] that [the] defendants were compelled

under Chinese law to collectively set a price for vitamin C exports. Although [the MOFCOM is] careful to note that [the MOFCOM] itself did not decide what specific prices should be, [it] assert[s] that [the] defendants could not have exported vitamin C that did not conform to the agreed-upon price.... [The p]laintiffs attack the exhibits attached to the [MOFCOM's] brief as mere notices [rather that "laws"] and charter documents of [the CCMHPC, which, they claim is a] nongovernmental organization.... They note, furthermore, that the price collusion [asserted] began in December 2001, long after the [CCMHPC and the vitamin C section] were established and purportedly compelled to set prices. [The plaintiffs assert] that [the] defendants' price agreements were voluntary [because the defendants] were able to reach a self-regulated agreement [which should mean that the defendants had control over the] export prices. [In other words, the plaintiffs assert that, if defendants reached the price requirement by a] self-restraint[, it must mean that they did it] without any government intervention.... The [MOFCOM] argues that [a reference to a self-restraint] should not be taken at face value [because such terms as self-regulation and self-restraint, etc. are] many of the terms [that] have meanings in the context of China's government and economic policy that are quite different from their literal translations [and American perceptions as to the meaning of these concepts]. Among the controversial terms are [such terms as] social organization, voluntary self-restraint, coordination, industry self-discipline, and verification. [The p]laintiffs [however,] rely on [the opinion of their] expert in Chinese law, Professor ... Feinerman [ ("Feiner-

man")], who [opined] that defendants' conduct was not compelled by Chinese law [because] many of the [MOF-COM's] exhibits [did] not contain a [certain stamp, and because these documents, in his opinion, should be qualified not as "real"] laws or regulations, [or as "real" laws and regulations but only if they were] not specific to vitamin C . . . . Feinerman note[d] that the document [addressing the creation of the vitamin C section] merely authorize[d but did not require] the creation of th[is] entity [and] point[ed] out that this reflected [his understanding of Chinese law, where anything] not expressly allowed would be prohibited, in contrast to the long-standing Western norm that anything not expressly prohibited is allowed. [Judge Trager found Feinerman's point questionably helpful to the plaintiffs' cause, observing that, a]ccepting . . . Feinerman's characterization leads to the conclusion that a cartel in China could only exist with governmental sanction[, and that makes it] difficult to differentiate between a cartel that was [allegedly] voluntarily formed . . . and a cartel that was mandated by governmental fiat. *Vitamin C,* 584 F.Supp.2d at 547–55 (original brackets and quotation marks removed, citation to exhibits verifying Judge Trager's factual observations and case law citations omitted). Judge Trager, however, denied the defendants' motion to dismiss finding that "[i]t [was] not clear from the record [accumulated] at th[at] stage . . . whether defendants [themselves, that is, the exporters of vitamin C] were performing a government function, [or] whether they were acting as private citizens pursuant to governmental directives or whether they were acting as unrestrained private citizens. . . . [Simply put,] the record[,] as it st[ood, was] simply too ambiguous to foreclose further inquiry into the voluntariness of defendants' actions." [90] *Id.* at 559.

Since Judge Trager's issuance of the above-quoted decision, the MOFCOM filed another *amicus* statement, dated August 31, 2009, reading as follows: [91]

[The MOFCOM] authorizes its Department of Treaty and Law to respectfully submit this [s]tatement ([reproduced

---

[90.] Plaintiffs assert that Judge Trager reached his decision to deny the defendants' motion because the act-of-state and government compulsion "defenses rest on facts that are not found within the complaints—namely, [that] the Chinese government required defendants to fix prices in violation of the Sherman Act," and such inquiry "could not be resolved at the motion to dismiss stage even after limited discovery." Opp. at 64 (quoting *Vitamin C,* 584 F.Supp.2d at 555–56). Plaintiffs misread Judge Trager's decision. Had Judge Trager found the inquiry into the evidentiary material submitted by the *Vitamin C* defendants and *amicus* not a viable ground for dismissal, he would have ended his decision at page 11 and footnote 6, skipping the remaining 25 pages of his opinion. *See Vitamin C,* Civil Action No. 06–md–1738 (E.D.N.Y.), Docket Entry No. 338. In light of the content of Judge Trager's footnote 6 and the context in which it was entered, it appears that Judge Trager merely observed the general rule that a Rule 12(b) motion is a motion on pleadings, *i.e.,* a motion on what is alleged in the plaintiff's complaint. However, Judge Trager did not directly address the issue of subject matter jurisdiction (since the defendants in *Vitamin C* did not raise a FSIA-based challenge) or the prudential considerations of judicial economy associated with resolution of claims substantively intertwined with the FSIA. Moreover, Judge Trager's discussion did not involve the issue of judicial notice which allows the court consider evidence not made part of the plaintiff's submission at the motion to dismiss stage. *See, e.g., Jackson,* 2006 WL 250524, at *7, 2006 U.S. Dist. LEXIS 3960, at *18.

[91.] The documents filed in the *Vitamin C* proceedings which the Court finds worthy of mentioning but not amenable to judicial notice are accompanied by appropriate clarifications.

herein in Chinese sinographs and submitted] together with an authorized English translation). [The MOFCOM] has attached great importance to the antitrust litigation in the United States .... [The MOFCOM] would like to ... reiterate here that the alleged conduct by the defendant[s who are] Chinese ... exporters is the result of the defendants' performing their obligations to comply with Chinese laws, rather than conduct on their own initiative. In order to prevent self-destructive competition through distorted pricing by Chinese exporters caught unprepared for the drastic change of China's export policies, and to mitigate potential exposures to antidumping investigations in other countries against Chinese exporters, the [MOFCOM] took active measures by exerting export regulation over certain commodities that might encounter or have encountered such problems. Although different regulatory measures may have been implemented in line with changes of circumstances at different times, enterprises in regulated industries were nevertheless compelled to comply with relevant rules and regulations, or they would otherwise be subject to penalties. The actual specific measures taken by China to effect its regulatory policies include what is referred to as a "system of self-discipline." This system has a long history in China and has been well known to, and complied with by, Chinese companies. Self-discipline does not mean complete voluntariness or self-conduct. In effect, self-discipline refers to a system of regulation under the supervision of a designated agency acting on behalf of the Chinese government. Under this regulatory system, the parties involved consult with each other to reach consensus on coordinated activities for the purpose of reaching the objectives and serving the interest as set forth under Chinese

laws and policies. Persons engaged in such required self-discipline are well aware that they are subject to penalties for failure to participate in such coordination, or for non-compliance with self-discipline, including forfeiting their export right.... The [MOFCOM] authorized and instructed the [CCMHPC] and its Vitamin C [section] to implement relevant policies related to the export of vitamin C products. Embodied in the [MOFCOM's] delegation of authority to the [CCMHPC] were industry regulatory functions and powers as well as necessary enforcement measures. [The] exporters were thus subject to the regulation by the [CCMHPC], including compliance with the [CCMHPC's] requirements of self-discipline, the very purpose of which was to coordinate each exporter's behavior. No ... exporter could ignore these policies, nor could they abstain from such coordination with regard to export price and production volume when asked to by the [CCMHPC]. The self-disciplinary system of export coordination also includes meetings and discussions between and among the parties subject to the [CCMHPC's] direction and supervision, and reaching agreements among themselves on taking appropriate actions in the interest of the country as a whole. Participation in such discussions, taking a vote and conducting other similar activities to reach their final consensus constitutes an integral part of the self-discipline process. [The] exporters must comply with the above procedures and the agreements reached in compliance with such procedures; otherwise, the [CCMHPC] would be required to exercise its power to penalize those who were in violation of such procedures and agreements. The [MOFCOM] has read the report issued by plaintiffs' expert, [and] believes that statements of representatives of the [MOFCOM] and other

government agencies, with regard to China's market economy status, and remarks regarding Chinese companies setting price and production volume according to the principle of market demand, quoted by [the plaintiff's expert] were made in a different context—one that had nothing to do with export price regulations—and were general descriptions of the current status of China's market economy presented in a special context. These general descriptions are irrelevant to the present case and should not be deemed as explicit or implicit statements of China's abandonment of its ... regulatory policies over certain designated industries ..., or of China's waiver of its power to continue to regulate according to Chinese ... law. The [MOFCOM] believes that maintaining its regulation in a limited manner (such as its regulation over ... export [of certain goods]) is consistent with China's national goal of establishing a socialist market economy.

*Id.*, Docket Entry 400–1, at 1–3.

### E. *The FSIA Appears Relevant as to Some Defendants*

Here, Plaintiffs concede that Defendant Minmetals and Defendant Sinosteel are fully owned by the Chinese government and, hence, are instrumentalities of China. *See* Opp. at 43. Plaintiffs simultaneously assert—and Defendants seem to concede—that Defendants China National Minerals, Sinosteel Trading and Liaoning Jiayi Metals & Minerals are not directly owned by the state; rather, they are either subsidiaries of Minmetals and Sinosteel or privately owned. Thus, there seems to be no dispute among the parties that the FSIA-based presumption of immunity applies to Defendants Sinosteel and Minme-

tals. Rather, the disagreement between the parties focuses on the reach of the "commercial activity" exception which, as both sides seem to concede, is interpreted broadly and includes such activities as trade/extraction of minerals, *i.e.*, the *business* activities of the Defendants. *See, e.g., Behring,* 475 F.Supp. at 390.

As the Court noted *supra,* the most commonly invoked form of the "commercial activity" exception is based on the claim that the activities at issue were carried on in the United States. *See* 28 U.S.C. § 1605(a)(2). However, subsection (a)(2) (*i.e.*, the subsection dealing with various forms of "commercial activity" restoring federal jurisdiction by invalidating the presumption of immunity) sets also two other forms of "commercial activity" removing immunity. Specifically, under these two additional options, the grant of immunity is also unwarranted if "the action is based upon[: (a)] an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [(b)] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.*

Plaintiffs maintain that the Court has jurisdiction under the option "(a)" because Defendant "Minmetals has directly sold and continues to sell magnesite products to U.S. companies and in U.S. commerce. And [Defendant] Sinosteel conspired with [other] Defendants to fix the export price to the United States and, in fact, is on the Standing Committee of the CCCMC.[92] The commercial activity of [Defendants] Minmetals and Sinosteel[,] thus[,] had a direct effect on U.S. commerce[,] and the FSIA[-based immunity] is inapplicable."[93] Opp. at 42–43.

---

**92.** Sinosteel points out that Plaintiffs' exhibit allegedly showing that Sinosteel is on the

*Standing Committee of the CCCMC* actually lacks such information. *See* S/Reply at 18.

**93.** Given Plaintiffs' stretch of logic, the Court

This assertion is both legally and logically flawed. As the Court already explained in its discussion of the FTAIA, the Court's jurisdiction over an exporter cannot depend on whether an American purchaser (be it an intermediary or a purported end-consumer) elects to actually bring the exporter's goods into the United States or "diverts" these goods to another country: the reach of the United States jurisdiction cannot depend on the whim of the purchaser who is free to create his own injury by first deciding whether the purchased goods cross—or get consumed after crossing—a particular meridian, and then filing a suit against the exporter who has no meaningful control over the purchaser's business elections (or over the purchaser's choice not to act in accordance with its contractually non-binding representations that might have been made to the exporter at the time of the exporter's sale of goods). And, indeed, one's entry into a "conspiracy" or one's "sitting on a committee" cannot qualify as one's "commercial activity" of the type in which a private party engages for the purposes of "trade and traffic or commerce," see *Weltover*, 504 U.S. at 614, 112 S.Ct. 2160, this is so regardless of how broadly the term "commercial activity" is defined by the FSIA legislative history and case law.[94]

However, regardless of incongruence of Plaintiffs' argument, the Court cannot ignore that the language of the FSIA does envision jurisdiction based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere [if] that act causes a *direct effect* in the United States," 28 U.S.C. § 1605(a)(2). Hence, the Court, mindful of Defendants' obligation to meet the burden of establishing inapplicability of the "commercial activity" exception, cannot cease its inquiry upon Defendants' mere assertion that they were instrumentalities of China.

As noted *supra*, the meaning of "directness" under Subsection 1605(a)(2) was clarified in *Weltover*, 504 U.S. 607, 112 S.Ct. 2160, and this "directness" is, seemingly, of the same nature (although, perhaps, of different magnitude) as that referred to in 15 U.S.C. § 6a(1)(A). *See LSL Biotechnologies*, 379 F.3d at 679.[95]

The Supreme Court in *Weltover* guideposted the "directness" test by finding "lit-

---

is not entirely clear as to Plaintiffs' preference of the option "(a)" over the option "(b)". If Plaintiffs assert that the FSIA-based immunity is inapplicable because Defendants' goods were sold in China but, allegedly, used in the United States, or because Defendants' conspiracy allegedly affected the prices of goods used in the United States, then *any* usage/consumption of Defendants' goods in the United States could just as well be qualified as "an act performed in the United States in connection with [Defendants' export sales in China, which could be just as well qualified as] a commercial activity of the foreign state elsewhere," thus yielding an option "(b)" scenario. In sum, Plaintiffs' position, taken to its logical conclusion, removes the FSIA-based immunity from *any* foreign state's activity, provided there is an American usage/consumption of that foreign state's goods.

**94.** The nature of Defendants' *business* activities, *i.e.*, production/sale of magnesite-based goods, squarely qualifies as "commercial activities" under the FSIA, but Defendants' alleged "conspiratorial" meetings, partaking in administrative duties at the CCCMC, reports to and deliberations at the CCCMC, etc. fall outside of the realm of "commercial activities," even if Plaintiffs allege that the *goal* of such "extracurricular" endeavors was an increase in Defendants' business: the commercial character of the activity is determined by the *nature* of the defendant's conduct, *not* by its purpose. *See* 28 U.S.C. § 1603(d); *Weltover*, 504 U.S. at 615–616, 112 S.Ct. 2160.

**95.** It would be indeed anomalous if the conclusions reached by this Court under the FTAIA and the FSIA on the very same set of facts would, nonetheless, yield different results.

tle difficulty [to] conclud[e] that [the defendant's actions] had a direct effect in the United States" because New York was the contractually-designated "place of [the defendant's] performance." 504 U.S. at 618–19, 112 S.Ct. 2160 (internal quotation marks omitted). This Court is reluctant to read *Weltover* as narrowly stating that the "commercial exception" restores the Court's jurisdiction over Plaintiffs' claims against the presumptively immune Defendants if—and only if—these Defendants' express contractual obligations required performance in the United States. *See Weltover*, 504 U.S. at 618–19, 112 S.Ct. 2160 (stressing that the difficulty of determining "directness" was "little" in a scenario of such express contract and, hence, suggesting that a less obvious connection to the United States than a contract directing the defendant's actual performance on American soil might still suffice to establish the requisite degree of "directness"). Consequently, in the event the focus (or, at least, the end-goal) of Defendants' business endeavors actually was a physical materialization of their goods on the United States soil, and Defendants acted in accordance with such goal, then a substantial contact/nexus between Defendants' business and the United States might be established, triggering the "commercial activity" exception. *See BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 686–687 (8th Cir.2002) (suggesting a "substantial contact" test); *see also Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir.1991) (same); *accord Filetech S.A. v. France Telecom S.A.*, 304 F.3d 180 (2d Cir.2002) (setting forth an analogous "nexus test"); *NYSA–ILA Pension Trust Fund v. Garuda Indonesia*, 7 F.3d 35, 38 (2d Cir.1993) (same).

Consequently, in coherence with the Court's finding reached under the intro-ductory clause of the FTAIA, the Court would requiring Defendants to show that the presumptively immune Defendants were not a "main force" behind the transactions that placed their goods on American soil (as the term "main force" is explained *supra, see* note 54 of this Opinion) in order establish to the Court's satisfaction that the presumptively immune Defendants were not engaged in commercial activities restoring the Court's jurisdiction under 28 U.S.C. § 1605(a)(2).[96]

### F. *The Act of State Doctrine Does Not Warrant Abstention*

The bulk of the parties' abstention-related arguments focus on the act of state doctrine, even though the doctrine is facially inapplicable to the case at bar. As noted *supra*, the doctrine is, effectively, an inquiry into "a consequence of domestic separation of powers," *W.S. Kirkpatrick*, 493 U.S. at 404, 110 S.Ct. 701 (1990); *Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, and it directs the court to "dismiss the suit if its resolution would require the court to declare invalid an official act of a foreign sovereign." *Gross*, 456 F.3d 363. Although the law is unsettled as to whether the doctrine is amenable to the FSIA's expansive definition of the term of "foreign state" (*i.e.,* whether "instrumentalities," such as 100% state-owned entities, might be deemed a "foreign sovereign" for the purposes of the doctrine), it is well settled that the doctrine envisions a "commercial activity" exception, pursuant to which abstention is unwarranted as to the acts committed by foreign sovereigns in course of commercial operations. *See Alfred Dunhill*, 425 U.S. at 703–706, 96 S.Ct. 1854; *Williams*, 694 F.2d at 302–305 and n. 2; *see also Clayco Petroleum*, 712 F.2d 404, 408. Hence, in no ambiguous terms, the

---

**96.** Hence, the FSIA-based burden of the presumptively immune Defendants would be largely a mirror image of Plaintiffs' FTAIA-based burden.

doctrine mandates the defendant to make a direct connection between its sovereign status and the uniquely sovereign qualities of its activity being challenged, and allows no cross-matching. *See, e.g., Callejo,* 764 F.2d at 1114–1115. Here, however, Defendants try to do exactly that: they match themselves with the regulatory activities of the MOFCOM and CCCMC. *See* M/Mot. at 36; S/Mot. at 31–32; S/Reply at 21–22; M/Reply at 11–15. Specifically, Defendants' position can be reduced to the following chain of sentiments: (a) the Chinese government, operating through the MOFCOM and CCCMC, adopts regulations and similar measures with regard to the export of magnesite-based goods; (b) Defendants' business actions comply with such governmental regulations and measures; and (c) since an inquiry into the validity of Chinese regulations shall be abstained from, Defendants' business actions shall similarly be left unexamined. *See id.*

██ Defendants mix apples and oranges. Defendants' business activities were purely commercial and not regulatory,[97] which means that, even if the broad construction of the phrase "foreign state" were borrowed by the act of state doctrine from the FSIA, all Defendants, including 100% state owned enterprises, would still be unable to establish grounds for abstention due to the operation of the doctrine's "commercial activity" exception. Simply put, the name of the principle is "act-of-state doctrine," not "act-*because*-of-state doctrine." Once Defendants add the preposition "because" into their argument, they are asserting the doctrine of government compulsion which, as Judge Trager aptly observed, "recognizes that a defendant trying to do business under conflicting legal regimes may be caught between the pro-

verbial rock and a hard place where compliance with [the requirements posed by] one country . . . results in violation of [laws of] another." *Vitamin C,* 584 F.Supp.2d at 551. Therefore, abstention on the grounds of the act of state doctrine will be: (a) denied as factually inapplicable, if taken at face value; but (b) Defendants' position will be construed as a mislabeled argument seeking abstention on the basis of government compulsion.

### G. Doctrine of Government Compulsion Appears Relevant

#### 1. Preliminary Considerations

##### a. Concept of Compulsion through the Prism of Common Law

While the doctrine of government compulsion enjoyed few clarifications (short of the guidance provided in *Mannington Mills* and *Timberlane Lumber*), the legal principle of compulsion has been known to humanity since the Roman canon law, and became part of the United States jurisprudence since its inception in the British common law: being known as defense of duress, where the defense implied both lack of voluntary conduct by the defendant and the resulting inequity of sanctioning the defendant for compliance with a compulsive force. *See, e.g.,* Rick Bigwood, *Coercion in Contract: The Theoretical Constructs of Duress,* 46 U. Toronto L.J. 201, 206 (1996) ("the emphasis of legally cognizable coercion—duress—appears . . . to do with questions of 'freedom [of will]' or 'voluntariness' [and] with questions of . . . 'unfairness' "); Laurence A. Benner, *Requiem for Miranda: The Rehnquist Court's Voluntariness Doctrine in Historical Perspective,* 67 Wash. U.L.Q. 59, 93 (1988) (tracing the ancient history of defense of duress). The concept of common

---

**97.** The only entity vaguely hinting that Defendants' activities were "regulatory" are Plaintiffs, since their Opposition stresses that De-

fendants partook in administration of the CCCMC and in CCCMC's coining of the minimum price applicable to magnesite export.

law duress has been summarized as follows:

> Duress is constraint of another's will ... Persuasion amounting to a form of constraint can take various forms ... Some forms of "economic duress" such as the threat of infliction of pecuniary loss, as in the case in which the actor threatens to obtain the other's discharge from his employment, may be ground for relief of an equitable origin and character ... The early common law view that duress is restricted to imprisonment or threats sufficient to put a brave man in fear of loss of life or limb or of imprisonment of himself or a member of his immediate family clearly does not apply.... [Rather, d]uress means a threat of [repercussion] that is intended to prevent and does prevent another from exercising free will and judgment in his conduct. [Duress] is commonly committed by an oral or written threat but may be accomplished by acts [conveying an unwritten and even unspoken threat of repercussion]. The test of what act or threat produces the required degree of fear is not entirely objective. The threat need not be one that would put a brave person or even a person of ordinary firmness in fear. [Rather, the personal circumstances of the threatened entity, as well as] the relation of [the threatened entity to the entity seeking to extract consent] and antecedent circumstances must all be considered. It is therefore not essential that a threat be made under such circumstances that a reasonable [entity] would believe that it will be executed, provided the threatened [entity] believes the [entity seeking to extract consent] has the means and intends to carry it out. However, in determining whether the fear that is essential for duress did in fact exist in a particular case, the trier of fact can properly consider whether a reasonable person would be put in fear under the circumstances [present in the particular case at bar].

Restatement 2d, Torts, §§ 871, comment f; 892B, comment j.[98]

 Reflecting on these tenets through the comity-driven prism of government compulsion doctrine, it appears logical to presume that the defendant could successfully invoke the doctrine if (s)he shows that a reasonable entity standing in the defendant's shoes (that is, having a similar-to-defendant's understanding of the local legal, economic, political and cultural peculiarities, as well as being exposed to similar antecedent circumstances and current relation to the entity seeking to extract consent) would feel compelled to consent by the totality of these conditions. Conversely, it appears wholly illogical to factor in this concept: (a) the socio-political and cultural perceptions of a foreigner; or (b) the concerns of an entity which is in notably different circumstances; or (c) the degree of bravery common only to bold risk takers. In other words, it appears unreasonable to obligate the defendant to either ignore the realities of his/her world or to take an excessive risk.

### b. Concept of Compulsion through the Prism of Foreign Regimes

Reflecting on the position taken by Plaintiffs in this matter (which is substantively identical to the position taken by Resco in *Resco WDPa* and the *Vitamin C* plaintiffs), this Court surmises that the three key points of logical deduction

---

**98.** Federal constitutional law provides a somewhat relevant test with regard to First Amendment retaliation: it requires the plaintiff seeking to state such claim to show, *inter alia,* that there is a causal link between the plaintiffs' activity at issue and the adverse action that the supervising official takes against him. *See Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir.2001).

Plaintiffs are aiming to foster are: (a) Defendants cannot be deemed "actually compelled" because Defendants concede that they partook in those aspects of the CCCMC's operations that led to systemic rendition and registration with the MOF-COM of the minimum price figure, *i.e.*, because Defendants were *de facto* creating the numerical figure they claim they were compelled to comply with; (b) Defendants were not "actually compelled" because Defendants do not assert facts showing they actually suffered any negative repercussion for not complying with the minimum price requirements, *i.e.*, Defendants could have just as easily refused compliance, and could have done it with Zhejiang's rate of success; and (c) Defendants were not "actually compelled" because the minimum price requirement was only occasionally referenced in certain "regulations," "circulars," "measures," "notices" and oral statements of Chinese government officials/agencies (instead of being made part of a codified statute or, at the very least, instead of being expressly repeated in each new regulation, circular, measure, notice, etc., that dealt with Defendants' specific area of business operations) and, in addition, Defendants were not "actually compelled" because the broad language of these prescripts utilized such terms as "self-discipline" or "self-restraint," which rendered these prescripts not as mandatory as a "real law" would be.

The Court finds each of these positions logically flawed. The fact that a certain natural or juridical entity fails to comply with the requirements of the legal regime, or that this entity succeeds at avoiding negative repercussions, cannot be read as a sign that the legal regime is not compelling, e.g., it would be wholly anomalous to expect one to keep committing serious crimes as a means to establish the actual might of the penal code. Similarly, the unfortunate reality that a rather substantial number of individuals elects to disregard the prescripts of the penal code and commit crimes, as well as the even more unfortunate reality of some individuals' success at avoiding law enforcement, in no way renders the penal code less compulsory. Moreover, one need not focus on a crime as dire as murder (where the rate of detection and law enforcement is statistically rather high): the same sense of compulsion applies to less-publicized offenses, e.g., to shoplifting, where the rate of actual detection and law enforcement is statistically rather low, *i.e.*, the very realization that an applicable prescript (with criminal penalties attached) exists causes the shoplifter fear of repercussions.[99]

Furthermore, law need not be actually codified in order to be a "real law" that may be enforced: for example, the common law of torts has been "codified" only in the Restatement of Torts, but the legal might of tort principles is present through the power of the injured party to act as a "private attorney general" and to rely on government institutions, *i.e.*, the courts, to civilly penalize the wrongdoer; this is so

---

**99.** In addition, the fact that a certain prescript is rarely enforced or even has not been invoked for many years fails to reclassify the prescript into "not-law." For instance, the United States government relied on an 18th-century law on sedition to investigate the September 11 terror attacks. *See* <<http://www.cbsnews.com/sto ries/2001/11/09/terror/main317461.shtml>>. Similarly, the Intelligence Identities Protection Act of 1982, 50 U.S.C. §§ 421–426, was enacted in 1982 but never invoked until 2003, when Valerie Plame's identity was leaked. *See* <<http://www.washingtontimes.com/news/2003/oct/01/20031001–113800–2356r/>>. In the same vein, in 2001, a Mormon Fundamentalist was sentenced under Utah law that outlawed plural marriages since 1896, which has been barely invoked over the past decades regardless of the state officials' estimate that as many as 30,000 Utahans live in polygamy. *See Valerie Richardson, Mormon Polygamist— and a Lifestyle—Go on Trial Today*, Wash. Times A3 (May 14, 2001).

regardless of the fact that certain victims of tortious conduct might—and in fact do—elect not to enforce their rights.[100] Likewise, it cannot be said that a prescript is not "real law," and its violation would not result in repercussions if the prescript is merely set forth in terms of a broad

caution: not every type of prescript enacted by every legal regime in the world is open to the constitutional challenge of vagueness.[101]

Finally, one's participation in coining a legal/regulatory prescript does not render

**100.** The Court finds Plaintiffs' position that, in order to be "real law," a mandate must be reduced to a recent statute, executive order, agency regulation, etc. (*i.e.,* a written statement issued by a government) unduly condescending toward foreign legal regimes structured differently from the system used in the United States, Europe, or akin. To illustrate, many prescripts of religious law (carrying, on occasion, very severe punishment for non-obedience) were originally orally stated many centuries ago—often, in indefinite and largely aspirational terms selected by authors whose authority and even existence is hard to verify, or in terms attributed directly to the Almighty—but, reduced to non-governmental writings centuries ago, they remain very "real law" till today, even though they have not been "re-enacted," republished or validated by government stamp, and even though they have been coexisting with newer religious or civil prescripts rendered with regard to the same issues without reciting the contents of the older laws. The same applies with even more force to the countries where there is a complex interplay between civil, religious *and local customary* laws, many of which are unwritten but, nonetheless, enjoy the force of "real law" and entail very real sanctions. *See, generally,* Richard Frimpong Oppong, *Private International Law in Africa: The Past, Present, and Future,* 55 Am. J. Comp. L. 677 (2007); Christina Jones–Pauly & Neamat Nojumi, *Legal Steps Toward National Reconciliation and Reconstruction of Afghanistan,* 52 Am. J. Comp. L. 825 (2004); Ruth Lapidoth, *The Fundamental Agreement Between the Holy See and the State of Israel,* 47 Cath. U.L.Rev. 441, 462 (1998). As one judge in this District noted:

The legal system in Saudi Arabia is fundamentally different from that of the United States. Western conceptions of the role that law plays in society, the legal process, and methods of legal interpretation, often mistakenly assumed to be universal in nature, are in many ways poles apart from those concepts in Islamic countries such as Saudi Arabia. . . . . [T]he Saudi Arabia legal

system is governed exclusively by what is known as the "Shari'a," or divine law. In fact, there are no "laws" in Saudi Arabia other than Islamic law, and any supplemental rules promulgated by the Saudi government are actually considered regulations . . . . These regulations, issued under the authority of the King [and] the Council of Ministers, are valid only to the extent that they are consistent with Shari'a. The Shari'a is the product of several interrelated sources of religious authority. The doctrines comprising Shari'a are derived primarily from the Qur'an, the "Book of God." . . . Because the Qur'an commands adherents of Islam to obey the Prophet, the recorded examples of the acts and words of [Prophet] Muhammed, known as the "Sunnah," constitute an additional integral part of the Shari'a. In the centuries since the founding of Islam, Islamic religious-legal scholars . . . have produced opinions known as "fiqh" [that must, too, be factored in as law].
*Nat'l Group for Communs. & Computers Ltd. v. Lucent Techs. Int'l, Inc.,* 331 F.Supp.2d 290, 294–95 (D.N.J.2004); *accord Mannington Mills,* 595 F.2d at 1297 ("The legislation and policy of each nation is not likely to be the same").

**101.** For example, Canon 1 of the Model Code of Judicial Conduct merely states that "[a] judge shall . . . avoid impropriety and the appearance of impropriety," without either specifying the meaning of the phrase "appearance of impropriety" or consequences for a violation of the prescript; this broadly-termed Canon could be viewed as a United States counterpart of a foreign mandate directing exercise of professional self-discipline. *Accord* Brian C. Buescher, *Out with the Code and in with the Rules: The Disastrous Nebraska "Bright Line" Rule for Conflict of Interest; A Direct Consequence of the Shortcomings in the Model Code,* 12 Geo. J. Legal Ethics 717 (1999) (providing a thoughtful discussion of the grounds that might be utilized for ques-

such participant exempt from the compulsion of the law (s)he helped to create. Indeed, had it been otherwise, all the legislators enacting state and federal statutes, agency officials crafting regulations, reporters compiling the Restatements of Law, judges sitting on advisory committees, etc., would be deemed exempt from the reach of laws they helped to create. And, of course, it would be an error to automatically qualify a foreign prescript as non-mandatory on the grounds that a literal translation of a certain term employed in that prescript has non-compulsory connotations to an American ear in light of the socio-political and cultural peculiarities of United States life.[102] Rather, the law of the foreign sovereign has to be examined, with due consideration given to interpretative statements made by that foreign sovereign.

### c. Deference to Statements Made by an Arm of a Foreign Sovereign

██ Federal Rule of Civil Procedure 44.1 governs the judicial determination of foreign law. The Rule states that, in deciding issues of foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law. *See Nat'l Group for Communs. & Computers, Ltd. v. Lucent Techs. Int'l, Inc.*, 331 F.Supp.2d 290, 294 (D.N.J.2004). Moreover, the Rule provides courts with broad authority—and, perhaps, even with an obligation—to conduct their own independent research in order to determine the meaning of foreign law.[103] *See id.*; *see also Bel–Ray Co., Inc.*

tioning of a certain negative repercussion, which ensued from the Supreme Court of Nebraska's interpretation of the "appearance of impropriety" phrase).

**102.** For instance, the phrase "Soviet Union" is composed of two words, the first of which, "soviet," literally means "advice, opinion, consultation." *See* V.K. Müller, *Russian–English Dictionary* 651 (1947). However, it would be wrong to claim that the decisions rendered by the Soviet Union upon its subjects were nothing but non-mandatory invitations to unite for consultations. Analogously, the phrase "Supreme Arbitration Court of Russian Federation" implies the Supreme Court of Russia, Commercial Part, a government body that has nothing to do with the process of arbitration, as it is known in the United States (*i.e.*, the "Arbitration Court" obtains jurisdiction on the grounds of the nature of disputes, not because the parties voluntary agreed to its jurisdiction, and its decisions are enforced as mandatory legal judgments and not open to the test applicable to arbitral awards). *See* <<http://www.arbitr.ru/eng/>>. This is so regardless of a multitude of United States legal articles, which are written by scholars who are well aware of the distinction but, nonetheless, utilize the literal translation "Arbitration Court,"

*i.e.*, the phrase having very different connotations to an American legal ear. *See, e.g.*, Robert Rothenberg, Tatyana V. Melnikova, *Comparative Forms of Doing Business in Russia and New York State*, 40 Am. Bus. L.J. 563 (2003); Hon. Sidney Brooks, *The International Scene; Russia's March to a Market Economy Assisted by New Bankruptcy Law*, Am. Bankr.Institute J. (1998).

**103.** Translations of foreign provisions, be they actually provided by the parties or obtained by the court from other sources, may be used by the court in its determinations of foreign law. *See Grand Entm't Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 489 (3d Cir. 1993); *Overseas Dev. Disc Corp. v. Sangamo Constr. Co.*, 840 F.2d 1319, 1324–1326 (7th Cir.1988) (court relied on translations of Kuwaiti statutes found in a compilation titled "Business Laws of Kuwait"); *Kaho v. Ilchert*, 765 F.2d 877, 881–883 (9th Cir.1985) (in determining the validity of customary adoptions under the law of Tonga, the court considered an interpretation adopted in an earlier case involving same legal prescripts). Although courts may be faced with varying translations of the same foreign statute or unauthenticated copies of foreign law, such discrepancies or lack of authentication does not prevent a Rule 44.1 resolution. *See Pittway Corp. v. United*

*v. Chemrite Ltd.,* 181 F.3d 435, 440 (3d Cir.1999); *Twohy v. First Nat'l Bank,* 758 F.2d 1185, 1194 (7th Cir.1985); *cf. Curley v. AMR Corp.,* 153 F.3d 5, 12–13 (2d Cir. 1998) ("We urge district courts ... to determine issues relating to the law of foreign nations"). Moreover, the courts may extract from foreign legal material, *see Access Telecom, Inc. v. MCI Telcomms. Corp.,* 197 F.3d 694, 713 (5th Cir.1999) and may even consider material that would be inadmissible at trial, *see Sidali v. I.N.S.,* 107 F.3d 191, 198 n. 10 (3d Cir.1997); as the Advisory Committee's Original Committee Note to Rule 44.1 clarified that "the ordinary rules of evidence are often inapposite to the problem of determining foreign law and have in the past prevented examination of material which could have provided a proper basis for the determination," and the 1975 Committee Note to an amendment to Rule 44.1, further stressed that, even if not admissible under the Federal Rules of Evidence, evidence of foreign law is properly considered, "[s]ince the purpose of the provision is to free the judge, in determining foreign law, from any restrictions imposed by evidence rules ...." *See* 9–44.1 Moore's Federal Practice—Civil § 44.1 App.01 and App. 02. Hence, "differences of opinion among experts on the content, applicability, or interpretation of foreign law do not create a genuine issue as to any material fact" for the purposes of the court's review and final ruling. *See Banco de Credito Indus., S.A. v. Tesoreria General,* 990 F.2d 827, 838 (5th Cir.1993) ("even differences of opinion on the content, applicability, or interpretation of the foreign provision may not be

characterized as a 'genuine issue as to any material fact' under Rule 56") (citation omitted); *Access Telecom,* 197 F.3d at 713 (differences of opinion among experts on the content, applicability, or interpretation of foreign law do not create genuine issue as to material fact).

Moreover, a foreign sovereign's admission of legal compulsion of its subjects might warrant a high—often, nearly binding—degree of deference, even if the admitted compulsion was based on what might be deemed, in American jurisprudence, a form of "unwritten law."

[Here, "the Ministry] of Justice of the [Soviet Union] certifies that[,] by virtue of the laws of the organs of the Soviet Government[,] all nationalized funds and property of former private enterprises and companies, in particular by virtue of the decree of November 28, 1918 ..., the funds and property of former insurance companies, constitute the property of the State, irrespective of the nature of the property and irrespective of whether it was situated within the territorial limits of the [Soviet Union] or abroad." ... [T]his official declaration is conclusive so far as the intended extraterritorial effect of the Russian decree is concerned.... [I]t is clear that the [lower] court ha[d] authority to consider [this declaration] even though [it was] rendered subsequently to the trial [and judicial] notice of [this declaration as an interpretation of] the foreign law [can be] taken. We conclude that this official declaration of Russian law [is] not only properly before the court ..., but also that it has embraced ... "written au-

States, 88 F.3d 501, 503, 504, n. 1 (7th Cir. 1996) (determining the meaning of French statutes notwithstanding inconsistent translations); *United States v. First Nat'l Bank,* 699 F.2d 341, 344, n. 2 (7th Cir.1983) (determining Greek law after concluding that variations in translations were not substantive); *Ramirez v. Autobuses Blancos Flecha Roja, S.A.,* 486

F.2d 493, 497, n. 11 (5th Cir.1973) (reliance on unauthenticated copy of Mexican law did not violate Rule 44.1); *Forzley v. AVCO Corp. Elecs. Div.,* 826 F.2d 974, 979, n. 7 (11th Cir.1987) (allowing usage of unofficial translation of Saudi Labor Law because there is no such thing as an "official translation" of that law).

thorities" [even if] it was not "printed"[:] it would seem to be "other written law" of unquestioned authenticity and authority . . . .

*United States v. Pink*, 315 U.S. 203, 220, 62 S.Ct. 552, 86 L.Ed. 796 (1942);[104] *accord Antitrust Enforcement Guidelines for International Operations*, U.S. Dep't of Justice (Apr.1995), < <http://www.justice.gov/atr/public/guidelines/internat.htm> > (*"DOJ Guidelines"*) ("Although U.S. antitrust jurisdiction extends to conduct and parties in foreign countries whose actions have the required effects on U.S. commerce, as discussed above, those parties may find themselves subject to conflicting requirements from the other country (or countries) where they are located. . . . In these circumstances, at least one court has recognized [the] defense [of government compulsion], and the [DOJ] will also recognize it. There are two rationales underlying the defense of foreign sovereign compulsion. First, Congress enacted the U.S. antitrust laws against the background of well recognized principles of international law and comity among nations, pursuant to which U.S. authorities give due deference to the official acts of foreign governments. . . . Second, important considerations of fairness to the defendant require some mechanism that provides a predictable rule of decision for those seeking to conform their behavior to all pertinent laws. Because of the limited scope of the defense, the [DOJ] will refrain from enforcement actions on the ground of [government] compulsion . . . when . . . the foreign government [asserts that the compulsion at issue was made] under circumstances in which a refusal to comply with [its] command would give rise to the imposition of . . . severe sanctions. As a general matter, the [DOJ would] regard the foreign government's formal representation that refusal to comply with its command would have such a result as being sufficient to establish that the conduct in question has been compelled, as long as that representation contains sufficient detail to enable the [DOJ] to see precisely how the compulsion would be accomplished under local law").

■ In the instant matter, the Court takes notice of the MOFCOM's statements

---

**104.** Considerations of "unwritten law" appear particularly pertinent to Chinese regulatory regime, which has a substantial history of so-called "drawer regulations." "['The drawer regulations'] are regulations . . . issued by various ministries [such regulations], even though not labeled secret, have not been publicly disseminated. They are kept in a ministry official's drawer, removed on one occasion, and left in the drawer on another . . . . [These regulations] may be applied with an inconsistency permitted by the lack of public disclosure." Michael W. Gordon, *Of Aspirations and Operations; The Governance of Multinational Enterprises by Third World Nations*, 16 U. Miami Inter–Am. L.Rev. 301, 334 (1984). China seems to be still in the process of eradicating this mode of administering Chinese law. *See Vitamin C*, 584 F.Supp.2d at 559 (observing that "[t]he [MOFCOM] has been forthright in its admission that Chinese law is not as transparent as that of the United States or other constitutional or parliamentary governments" and quoting the transcript reading "the laws of the government of China do not have . . . quite the same transparency as the laws of the United States, in the sense that there are statute books that are available, that there are lengthy Congressional statements of intent, where you can read what the debates were all about. The way the Chinese system operates is that you have the state council and the state council is then composed of a number of key ministries. The [MOFCOM] is not some backwater regulator in a small city in China. The [MOFCOM] is the preeminent regulator of the economy, export economy of [China]"); *see also Resco WDPa*, Docket Entry No. 123–4, at 7 (the USTR's Request for a WTO Panel with regard to China's export regulation of bauxite, reading "China does not publish certain measures relating to these requirements in a manner that enables governments and traders to become acquainted with them").

(made in its capacity of a cabinet level department of the Chinese government) in the *Vitamin C* proceedings. However, in light of the fact that these statements discussed not the operations of the CCCMC but those of its sister "chamber of commerce," the high degree of deference that seems to ensue from the holding of *Pink* and *DOJ Guidelines* appears unwarranted for the purposes of the case at bar.[105] However, it appears equally erroneous to wholly ignore these statements: a foreign sovereign's views regarding its own laws typically merit at least some degree of deference. *Accord Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 313 F.3d 70, 92 (2d Cir.2002) (citing *In re Oil Spill by The Amoco Cadiz,* 954 F.2d 1279 (7th Cir.1992) (*per curiam*) and *Access Telecom,* 197 F.3d at 714), *cert. denied,* 539 U.S. 904, 123 S.Ct. 2256, 156 L.Ed.2d 113 (2003).

Here, the Court finds the facts and conclusions of *Access Telecom,* instrumental as to setting a pertinent "floor" with respect to the issue of the degree of deference. *See* 197 F.3d 694, *reh'g, en banc, denied,* 210 F.3d 365, *cert. denied,* 531 U.S. 917, 121 S.Ct. 275, 292, 148 L.Ed.2d 200 (2000). In *Access Telecom,* the issue was whether the defendants' challenged conduct was compelled by Mexican law. Specifically,

> [t]he defendants focus[ed] on ... the [Mexican] Secretary of Communications and Transportation's [ ("SCT") ] Official Circular Letter [ ("Official Circular"), which] condemn[ed certain] services in addition to "other similar or equivalent procedures with the same purpose" [asserting] that [all] such services are "rendered outside the legal provisions estab-

lished by [Mexican] Federal Law on Telecommunications" [ ("MFLT Provisions) ]." The defendants maintain[ed] that the Official Circular [was] entitled to [absolute] deference by th[e] court as an agency's interpretation of the laws which it administers and enforces, citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) [ (that is, the decision detailing the degree of deference given, under various circumstances, by United States courts to *United States* agencies empowered to interpret *United States* law). The plaintiffs, however, pointed out] that the [O]fficial [C]ircular[ had] no legal effect [because,] in Mexico, only federal courts have the power to issue resolutions determining the legality or illegality of acts[, and a Mexican governmental entity other than the SCT had] the sole power to "establish and systematize" the legal criteria concerning the application of legal and regulatory provisions .... Recognizing the difficulty of interpreting foreign law, [the *Access Telecom* court noted that] courts may defer to foreign government interpretations [and pointed out that t]he Seventh Circuit reached this conclusion in deferring to an administrative agency in France[,] *see Amoco Cadiz,* 954 F.2d [at] 1312[ where the Seventh Circuit concluded that "g]iving the conclusions of a sovereign nation less respect than those of [a U.S.] administrative agency [was] unacceptable" [being presented with the situation where] the Republic of France [itself] was before the court .... [In contrast, in *Access Telecom,* t]he Republic of Mexico [was] not a litigant before th[e]

---

**105.** It is unclear from the holding of *Pink* whether the fact that the MOFCOM's statements were addressed to Judge Trager rather than this Court should diminish the degree of deference since, in *Pink,* the statements by the Soviet Union were addressed not to the Supreme Court, which relied on the statement for its determination, but to a state court. *See Pink,* 315 U.S. 203, 62 S.Ct. 552.

court and neither is the SCT. [Moreover,] while the evidence in [*Access Telecom,*] show[ed] that the SCT was empowered to enforce Mexican law, it d[id] not ... show that the SCT was empowered to interpret Mexican law.... For these reasons, [the *Access Telecom* court did] not feel compelled to credit the SCT's determinations [as to the meaning of MFLT Provisions] without analysis. *Access Telecom,* 197 F.3d at 714.

This Court finds the distinction drawn between an official circular issued by a governmental agency, which is a non-litigant, and a statement made by a litigating foreign sovereign instructive. Similarly, this Court finds the distinction drawn between an agency's power to merely enforce a regulatory provision and a governmental entity's power to promulgate or interpret a regulatory provision both valuable and highly relevant to the case at bar.

Since the two MOFCOM's statements were made part of public record by being filed in the *Vitamin C* proceedings ("MOFCOM's E.D.N.Y. Statements"), but neither China nor the MOFCOM are litigants before this Court, the MOFCOM's E.D.N.Y. Statements appear to have—for the purposes of this action—worth and significance no lower than those of an official circular discussed in *Access Telecom.* Moreover, since the bulk of evidentiary material presented in this matter (as well as in *Resco WDPa* and *Vitamin C* ) consists of actual regulatory directives issued by the MOFCOM (either singularly or jointly with other Chinese governmental agencies) rather than the MOFCOM's interpretations of Chinese law, it appears that the MOFCOM's E.D.N.Y. Statements warrant a higher degree of deference than that given in *Access Telecom* for the purposes of the Fifth Circuit's assessment of the SCT's interpretations of Mexican provisions not enacted or promulgated by the SCT: indeed, it would be unseemly of this

Court to claim that it could determine the scope or the goals of the MOFCOM's directives (or the meaning of the terminology that the MOFCOM elected to use in these directives) better than the MOFCOM itself. Consequently—for the purposes of reading the MOFCOM's E.D.N.Y. Statements—the Court will consider the MOFCOM's interpretations the final authority unless the Court detects a Chinese legal provision or an alternative MOFCOM's statement that clearly and convincingly establishes the incorrectness of these interpretations.

In contrast, for the purposes of construing directives or statements made by other entities, (or for the purposes of assessing the MOFCOM's perhaps supervisory but, nonetheless, still a third party's opinion as to the mode of operations employed by Chinese "chambers of commerce"), this Court will utilize an analysis recommended in *Access Telecom,* 197 F.3d at 714, *i.e.,* the Court will examine other evidence (presented in this matter and also detected by the Court) in order to establish: (a) whether there is an incongruence between such body of evidence and the interpretations offered in the MOFCOM's E.D.N.Y. Statements; and, in the event such incongruence is detected, (b) whether this incongruence is of such nature or magnitude to render MOFCOM's interpretations unreliable.

### 2. The CCCMC Is a Government Entity for the Purposes of the Doctrine

■ Plaintiffs cite *Ungaro–Benages v. Dresdner Bank AG,* 379 F.3d 1227, 1237 (11th Cir.2004), for an inference that this matter is but a garden-variety proceeding because "[f]ederal courts adjudicate claims against foreign corporations every day." Opp. at 61, n. 24. This is not exactly true. The matter at bar falls within the handful of cases where, as Judge Trager observed, defendants do not deny compliance with a

fixed minimum price but rather "move to dismiss[ ] on the grounds that their price-fixing activities were compelled by the . . . government," *Vitamin C*, 584 F.Supp.2d at 547, *i.e.*, Defendants effectively admit to collusion thus making, at least in part, Plaintiffs' Sherman Act claim.[106]

Challenging Defendants' position, Plaintiffs maintain that Defendants were not compelled by the Chinese government because, *inter alia*, "[t]he CCCMC is not the Chinese [g]overnment." Opp. at 50–52. In support of that assertion, Plaintiffs state as follows:

(i) the Trial Court in *Zhejiang Xinan* "squarely rejected [the] argument [that the CCCMC is a government organization by] holding [that the CCCMC was] a non-government body that is not directed or controlled by the government of China"; [107]

(ii) "the CCCMC has given testimony and submissions to the U.S. government stating [that it is not an arm of the state]";

(iii) the CCCMC charter, adopted at the CCCMC's formation in 1988, "[merely] states that the CCCMC follows state policies and guidelines and is subject to supervision by the state[, but this statement in the charter does not] establish

the CCCMC as a *de facto* arm of Chinese government";

(iv) since Chinese "Measures" of 1991 were followed by Chinese "Regulations" of 1998, the former were repealed by the beginning of the Class Period, and overall "Chinese foreign trade regulations have undergone dramatic changes since 1991 and every law or regulation relating to exports has been abolished or amended[, so] the CCCMC now represents itself as a non-government organization"; [108] and

(v) the MOFCOM's Circular of February 12, 1998, "pre-dates the formation of two initial export cartels by two years and pre-dates the formation of the unified export cartel by three years[, as well as] China's accession to the WTO [during which] China explained to the WTO [that,] by 2000[,] there [was] only a limited number of products subject to government price control[. Plaintiffs believe that, if the 1998] Circular applied to all export products and all chambers of commerce [then the Circular would be] mandating price-fixing of all exports by all chambers of commerce[, but s]uch an interpretation [would be] clearly contrary [to the] interpretation [given] by the CCCMC." *Id.* (emphasis removed).[109]

---

**106.** A graph of the relationships between the CCCMC and its various "cartels" and "sub-cartels" of magnesite exporters sketched by the parties depicts a structure uncommon to the law of antitrust (which usually deals with polygon-like agreements typical to international treaties); rather, it resembles a structure frequent to 18 U.S.C. §§ 1961–68, where a hub-and-spoke combination may yield an organizational chart akin to an "exponential tree" (a graph common to computer science, which resembles a tree trunk with multiple levels of branches and twigs).

**107.** This Court is not entirely clear as to Plaintiffs' logic underlying this argument. A claim that the CCCMC "is not directed or controlled by the government of China" can-

not serve as a premise needed to draw the conclusion that the CCCMC is a "non-government body"; this is so because the conclusion is also the premise, since any sovereign can governmentally control/direct only its subjects, but not itself.

**108.** The Court gathers from this argument that Plaintiffs read the 1991 "Measures" as supporting Defendants' position, although the Court is not entirely clear as to whether the Plaintiffs' reading is related to the CCCMC's status or the existence of compulsion, or both.

**109.** The Court gathers from this argument that Plaintiffs read the Circular of February 12, 1998, as a document supporting Defendants' position, although it appears that

The Court disagrees. Plaintiffs' arguments are either without merit or simply inapposite to the issue of whether the CCCMC is an integral part of the Chinese government.

Plaintiff's first argument is erroneous because the Trial Court in *Zhejiang Xinan* did not, actually, rule that the CCCMC is a non-government organization ("NGO"). Rather, the Trial Court found that Zhejiang, the plaintiff, perceived the CCCMC as posing no sufficient threat of punishment for failure to comply with the requirements the CCCMC issues or was empowered to enforce, and that personal perception and Zhejiang's actions in accordance with its perception entitled Zhejiang to the MET status. *See Zhejiang Xinan,* 2009 ECJ EUR–Lex LEXIS 529, ¶¶ 79–136. This is why the Trial Court in *Zhejiang Xinan* outlined the issue in that case as an inquiry into whether "[Zhejiang's business] decisions [were not so] incompatible with market economy conditions" to deny Zhejiang the MET status.[110] *Id.* ¶ 80. Conversely, the Trial Court made no findings as to the *nature* of the CCCMC, either for the purposes of the entire EU antidumping regime or for the purposes of passing a political judgement transferrable into any area of law of any nation in the world.[111] *See generally, Zhejiang Xinan,* 2009 ECJ EUR–Lex LEXIS 529. Therefore, the Court finds that the holding of *Zhejiang Xinan* has no bearing on the CCCMC's actual status, while the background discussion provided in that case vaguely suggests that the CCCMC was, and still is, an integrated appendage of the state.

In support of their second argument, *i.e.,* that "the CCCMC has given testimony

Plaintiffs' reading is unrelated to the CCCMC's status, since it addresses the other issue: compulsion.

110. The Trial Court merely acknowledged that Zhejiang's perceptions of the CCCMC as an NGO were "borne out by the contents of the CCCMC's brochure," and that "the wording [of the brochure was such that it omitted to expressly] contradict [Zhejiang's] statements that the [price-fixing] mechanism was not imposed by the State," *id.* ¶¶ 141. 153, hence allowing the possibility of Zhejiang's qualification for the MET status.

111. Indeed, a number of observations made by the *Zhejiang Xinan* court suggests against deeming the CCCMC an NGO. First, at least as of September 2004, that is, half way through the Class Period in this matter, the EU consistently held that Zhejiang's business activities were under such strict governmental control that they were incompatible with operations under free market conditions and, as part of this strict regime, "[the Chinese government] had entrusted the … CCCMC with the right [to approve export] contract[s upon] verifying export prices." *Zhejiang Xinan,* 2009 ECJ EUR–Lex LEXIS 529, ¶ 14. Second, the Trial Court observed that such governmental powers of the CCCMC were well integrated with governmental powers of other Chinese agencies, *see id.* ¶ 131 ("[Zhejiang concedes that] all export contracts had to be submitted to the CCCMC, which checked the selling prices and [approved] the contract if the selling price exceeded the [minimum] price[, plus] China directed the Chinese customs authorities not to permit exports … unless the contract bore the CCCMC's [approval]"), and these CCCMC's powers were operative at least as of the date of rendition of the *Zhejiang Xinan* decision. Consequently, the statements of the *Zhejiang Xinan* court: (a) reject Plaintiffs' claim that the CCCMC became an NGO by 1998 (or by 2000); and (b) indicate that the CCCMC exercised governmental power through the CCCMC's ability to approve or disapprove an export contract on the grounds of the export price. *See id.* ¶¶ 130, 140 (noting that there was no dispute—as to the *system,* in which the CCCMC was an appendage of the state,—by observing that "[t]he Council contends … that there was a very efficient control system in place, that it was run by [China] through the CCCMC and customs authorities and [the very existence of that system] constituted interference by [China] in the setting of [Zhejiang's] export prices" and that Zhejiang "d[id] not dispute that [this CCCMC's approval and veto] mechanism exist[ed in 2009]").

and submissions to the U.S. government stating [that it was not an arm of the state]," Plaintiffs rely on two exhibits. However, neither one of these exhibits contains any statement by the CCCMC suggesting that it is an NGO. One of these exhibits replicates the CCCMC's undated letter addressed, seemingly, to the United States Department of Commerce ("DOC") with the goal of assisting Chinese exporters in obtaining the MET status for the purposes of their United States antidumping duties. *See* Docket Entry No. 77–1, at 1–3. In that exhibit, the entire discussion of the CCCMC's "status" is limited to the statement "[w]e are [the CCCMC]. With a membership of 4,000 [business entities], we are the largest and most representative association in the field of metals, minerals and chemicals." *Id.* at 1. Plaintiffs' other exhibit, Docket Entry No. 105–4, is another CCCMC's letter to the DOC, dated April 19, 2007; in that letter, the CCCMC was still advocating its MET point. That letter is equally silent as to the issue of the CCCMC's "status" as a government entity or as an NGO: rather, this document merely begins with a paraphrase of the statement already given by the CCCMC in the prior letter. *See* Docket Entry No. 105–4, at 2 ("On behalf of [the CCCMC] and our 4[,]000 companies, we submit the following comments on [the non-MET status applied by the DOC to the Chinese goods imported into the United States]").

Consequently, Plaintiffs' decision to rely on these two exhibits is not entirely clear to this Court, since: (a) these exhibits suggest the DOC's opinion that, at least as of April 19, 2007, the members of the CCCMC have been presumed by the United States government to operate under a Chinese government-compelled trade regime; but (b) these exhibits do not suggest

that the CCCMC was an NGO. The Court, thus, will disregard Plaintiffs' factually unsupported second argument. *See also* note 146, *infra* (discussing, *inter alia,* Plaintiffs' Exhibit 15, which—although not cited in Plaintiffs' Opposition in support of Plaintiffs' second argument—appears relevant to their point).

The logic of Plaintiffs' third argument, *i.e.,* that the CCCMC charter "[merely] states that the CCCMC follows state policies and guidelines and is subject to supervision by the state[, but the charter] does [not] establish the CCCMC as a *de facto* arm of the Chinese government," is, too, not entirely clear to this Court because the CCCMC charter, being a document (that is, a stamped, signed and registered piece of paper) rather than a course of conduct (that is, a number of consistent overt actions manifesting relationships between the parties), cannot possibly establish anything *de facto.*[112] The Court, hence, presumes that Plaintiffs' usage of the phrase "*de facto*" is meant to express Plaintiffs' opinion that the CCCMC's governmental status was not "written between the lines" in the charter. If so, the Court disagrees.

The articles of the CCCMC charter provide as follows:

[The] CCCMC is [an] authorized department to deal with import and export trade of metals, minerals and chemicals. It ... is responsible for coordination within the industry.... The aims of [the] CCCMC include: coordinating import and export trade activities in the industry of metals, minerals and chemicals; maintaining import and export trade orders; protecting the legal rights and interests of the State, industry and member enterprises .... [The] CCCMC ... carries out the state policies and

112. *See* Black's Law Dictionary 416 (6th ed. 1990) (defining the phrase "de facto" as "in fact, in deed, actually").

guidelines in foreign trade and economic relations, and accepts guidance and supervision of the competent authority [e.g., the MOFCOM and other Chinese government agencies involved in export, e.g., the Chinese department of customs].... Functions of CCCMC include ... coordinating commodity prices for import and export; ... [a]ssisting the competent authority in direction and supervision of member enterprises to manage and utilize their import and export quotas and permits legally; ... [b]eing responsible for specific actions including the bidding for import and export quotas under the authorization of the competent authority[;] ... coordinating ... the bargaining and bid for foreign customers[; and p]erforming other functions which are authorized by the competent authority.... Obligations of [the CCCMC's m]embers [are: a]biding by [the] CCCMC [c]harter and carrying out resolutions and regulations made by CCCMC; [t]aking part ... actively [in] the work assigned by [the] CCCMC; [p]roviding relevant information, materials and statistical data for [the] CCCMC; [p]aying membership fees .... The ... CCCMC shall have the right to ... terminate the membership of any member who violates this charter or any regulations .... For anyone who commits serious violations, the competent authority may be advised to suspend or revoke part or all of its right to deal with import and export trade.

Docket Entry No. 99–11, at 2–3.

While it is true that this language does not contain a sentence expressly stating that the CCCMC is an appendage of the Chinese government, the gist of these statements suggests such governmental status by pointing out: (a) the integrated relationship between the CCCMC and the MOFCOM (and between the CCCMC and other bodies of the Chinese Government) typical for a large governmental department and one of its agencies; and (b) the CCCMC's right to enjoy the powers of governmental nature, e.g., the power to allocate (and/or hold bidding for) export quotas with regard to China's natural non-renewable resources,[113] as well as the powers to supervise the use of export licenses, to recommend punitive measures for non-compliance and to partake in enforcement of such measures. Thus, the Court construes the charter as a document suggesting the CCCMC's status as a governmental appendage rather than an NGO.

Plaintiffs' fourth argument consists of two groups of statements: (a) one group is asserting that, since China underwent certain economic changes since 1991, and the MOFCOM's "Regulations" of 1998 were issued after the MOFCOM's "Measures" of 1991, the "Measures" must be deemed inapplicable to the CCCMC as of 1998 (or as of 2000) because "every law or regulation relating to exports [must be deemed] abolished or amended"; and (b) another group is limited to the contention that "the CCCMC now represents itself as a non-government organization." Docket Entry No. 105–1, at 51.

The "(a)" group of Plaintiffs statements appears unwarranted. Had all Chinese laws been abolished, China would, by now, be a lawless state. Similarly, the claim that "all" pre–1998 Chinese laws must be deemed amended by the mere promulgation of later-issued provisions is facially

---

113. Although some natural resources are renewable, the resources falling within the province of the CCCMC appear non-renewable or renewable at great expense. For instance, magnesite is a non-renewable natural resource, and magnesium oxide, while being amenable to production from seawater, *see supra*, note 17, could be so produced only at substantial expense.

overreaching. Typically, a provision is deemed repealed or amended when a statement to that effect is actually made; otherwise, the newer law is deemed supplementing the older and construed with an aim to harmonize the two. Plaintiffs do not direct the Court's attention to any source stating that Chinese law does not follow this, rather basic, approach. *See Sullivan v. Finkelstein,* 496 U.S. 617, 623, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990) ("the expression of a legislator relating to a previously enacted statute may bear upon the meaning of a provision in a bill under consideration ... since statutes in *pari materia* should be interpreted harmoniously"); *State v. Stoll,* 84 U.S. 425, 431, 17 Wall. 425, 21 L.Ed. 650 (1873) ("To justify this court in holding that the act passed in that year repealed or modified the [prior statute], it must appear that the later provision is certainly and clearly in hostility to the former. If, by any reasonable construction, the two statutes can stand together, they must so stand. If harmony is impossible, and only in that event, the former law is repealed in part or wholly"). Thus: (a) the fact that the 1998 "Regulations" were issued after the 1991 "Measures" in no way suggests that the regime set forth in the "Measures" was necessarily repealed, since no language in the 1998 "Regulations" so states; and (b) the content of the "Measures"[114] depict the CCCMC as a governmental agency operating as a limb of the MOFCOM and, hence, an appendage of China.

The "(b)" group is the statement asserting that "the CCCMC now represents itself as a non-government organization."

Opp. at 51. In support, Plaintiffs cite Docket Entry No. 77–1, at 30–39, a United States Government Survey on Magnesium Compounds, issued with regard to the year 2000. *See id.* However, the Court's reading of Docket Entry No. 77–1 failed to locate any mentioning of the CCCMC, moreover an express statement as to how the CCCMC represented itself and to whom;[115] the sole relevant statement, which the Court detected *sua sponte,* reads, "[i]n spite of *export licensing requirements imposed by the Chinese Government,* magnesia exports from China to the United States continued to rise [throughout 2000]." *Id.* at 31–32 (emphasis supplied). Since the CCCMC charter indicates that the CCCMC enjoyed certain powers with regard to export licensing, the Survey's reference to the export licensing in the context of "the Chinese Government" suggests that the CCCMC was an appendage of China. Therefore, Plaintiffs' fourth argument appears without merit.

Finally, Plaintiffs' fifth argument—that the MOFCOM's Circular of February 12, 1998, should be deemed repealed because, during China's accession to the WTO, China stated that it had only a limited number of price-controlled products, and the Circular could not have mandated price-fixing of all exports by all chambers of commerce ("Misplaced Argument")—is wholly inapposite to the issue of the CCCMC being a government body or an NGO; rather, it addresses the issue of compulsion. Thus, the Misplaced Argument will be disregarded for the purposes of the inquiry at hand

**114.** The 1991 "Measures" stated that "[the MOFCOM] shall take charge of vocational administration of all ... trade social organizations such as chamber of commerce, ... which are organized within the territory of ... China ... in accordance with these Measures. [Such MOFCOM's] administration ... will be either ... direct ... or [through MOF-

COM's] authorized departments concerned [with the particular social] organizations." Docket Entry No. 35–39, at 2.

**115.** Plaintiffs' Opposition, unfortunately, did not direct the Court's attention to any particular page of this exhibit and did not quote the language which Plaintiffs read as a support.

and addressed in the "Miscellaneous Considerations" section of this Opinion.

Since Plaintiffs' arguments (and evidence provided by Plaintiffs) neither establish nor even suggest that the CCCMC was/is an NGO, the Court turns to Defendants' evidence and evidence detected by the Court in *Magnesite from China*, *Resco WDPa* and *Vitamin C*.

In *Magnesite from China*, Resco (one of the two named Plaintiffs in this matter) represented to the ITA that the Chinese government established and enforced export quotas for a number of raw materials (including magnesite), and that the Chinese government established a bidding system for such exports. *See Magnesite from China*, 74 Fed.Reg. at 68,248. Since the CCCMC charter unambiguously states that the CCCMC is the entity responsible for allocating export quotas and holding the bidding (including for magnesite), and Plaintiffs' allegations in *Magnesite from China* concede that these activities are performed by the "Chinese government," the content of *Magnesite from China* suggests an express admission that the CCCMC is, indeed, an appendage of the Chinese government [116] for the purposes of the instant matter, where Resco is also a Plaintiff.

The defendants in *Resco WDPa* rely on the USTR's November 9, 2009, Request for a WTO panel with regard to China's export practices; the Request is: (a) asserting that the Chinese government administers export quotas and bidding for export quotas with regard to bauxite (one of the minerals falling within the province of the CCCMC's authority); and (b) clarifying that such measures have been administered by the Chinese government through Chinese "chambers of commerce." *See Resco WDPa* Docket Entry No. 123–4. Moreover, the USTR cited the CCCMC charter in support of its WTO charges against China. *See id.* Since the USTR, the agency responsible, *inter alia*, for recommending United States trade policy to the President and for coordinating trade policy within the United States government, unambiguously states its perception of the CCCMC's status as that of a government entity, the Court reads the USTR's WTO Request as strongly suggesting that the CCCMC is an appendage of China.

The documents provided by Defendants in the instant matter suggest the same. For instance, the MOFCOM's 1994 "Program on the Reform of the Administration of Licenses for Quotas of Commodities for Export" was addressed expressly to the "chambers of commerce," like the CCCMC, *see* Docket Entry No. 35–42, at 2, and designated such "chambers" as entities to hold export bidding and allocate export quotas as to the country's natural resources, which suggests vesting of governmental powers in the CCCMC. *See id.* at 5–6. Similarly, the statement made by Assistant Minister Liu Xiangdong of the MOFCOM to the Third Congress of the CCCMC suggests the same, informing the audience that, being "overseen by Central Committee and State Council, guided by MOFTEC, ... and supported by [other] departments [of Chinese national government and] local government[,] ... [the] CCCMC has ... taken many very effective measures to carry out state guidelines, policies and regulations ... safeguard[ing the] interests of the state." Docket Entry No. 99–13, at 2. Since this statement indi-

---

**116.** Notably, since *Magnesite from China* was a countervailing—rather than anti-dumping—proceeding, the Court cannot factor in the possibility that Resco, being the petitioner in *Magnesite from China*, "accidentally" referred to the Chinese government: this is so because countervailing proceedings are necessarily the proceedings based on a foreign government's (rather than an NGO's) interference with the exporters' trade activities.

cates the CCCMC's power to execute (or partake in) export licensing, allocation of export quotas, holding export quota bidding and punishing for non-compliance with Chinese export regime, the Court reads these powers as strongly suggesting governmental nature of the CCCMC. *See also* Docket Entry No. 77–3, at 12–13 (*Plaintiffs'* exhibit replicating an article in the *Industrial Minerals* magazine, stating that, "[o]f critical importance was the introduction of control on export prices and volumes by China's central government in 1994 . . . Export licenses . . . initiative is unique to China [since] *China's central government, through the . . . CCCMC* [,] *implemented its export license system* ") (emphasis supplied); Docket Entry No. 35–57 (MOFCOM's 2001 "Measures for the Administration of Export Commodities Quotas" detailing the process of obtaining an export license and referring to the entities involved in the process of issuing a license as "bodies authorized by the MOF[COM]"); Docket Entry No. 35–57, at 3 (MOFCOM's 2001 "Measures for the Invitation of Bid for Export Commodity Quotas" directing that the "offices for the invitation for bid for export commodity quotas [shall be set] within the relevant chambers of commerce for import and ex-

port according to the types of commodities subject to the invitation for bid").

And while it is true that, in some statements issued by the CCCMC, the CCCMC utilized the term "self-discipline," which—*to a Western ear*—suggests the entity's complete discretion, *see, e.g.,* Docket Entry No. 99–4, at 6 (replicating the CCCMC's brochure which includes a statement that the "CCCMC guides and oversees members['] . . . conduct [of] self-discipline within the industry"), the Court finds the statement made by the MOFCOM in the *Vitamin C* proceedings enlightening as to the *Chinese* meaning of this term, which suggests a disguised form of strict government compulsion.[117] *See Vitamin C,* Docket Entry 400–1, at 2 ("The actual specific measures taken by China to effect its regulatory policies include what is referred to as a "system of self-discipline." This system has a long history in China and has been well known to, and complied with by, Chinese companies. Self-discipline does not mean [as it would be in the Western world,] complete voluntariness or self-conduct. In effect, self-discipline refers to a system of regulation under the supervision of a designated agency acting on behalf of the Chinese government"); *accord Vitamin C,* 584 F.Supp.2d at 555, n. 7 ("The [MOFCOM] argues that [a ref-

---

117. Both sides seem to agree that the CCCMC was chartered (and its bylaws were adopted) in 1988, and no superceding charter or bylaws were ever registered or even attempted. Since the structure and powers of the CCCMC were settled in the charter and bylaws that were adopted: (a) long before Chinese economic reforms began to affect such industry as export of China's natural resources, *see Animal Sci. Prods. v. China Nat'l Metals & Minerals Imp. & Exp. Corp.,* 596 F.Supp.2d 842, 867 (D.N.J.2008) (setting the time line): (b) three years prior to the issuance of 1991 "Measures" detailing the intertwined relationship between the MOFCOM and its "chambers of commerce," *see supra* note 114; and (c) thirteen years prior to China's accession to the WTO, and no changes in charter/bylaws

were ever entered or attempted, the Court has no reason to presume that the use of the term "self-discipline" in the CCCMC's brochure was a sign that the CCCMC transformed into an NGO, or that the Chinese mandatory version of term "self-discipline" existing at the CCCMC's inception had mutated into a qualitatively different Western type of "self-discipline" simply as a result of China's accession to the WTO or China's decision to start a gradual transition from centrally planned economy to *socialist* market economy. *See* Barry Naughton, *The Chinese Economy: Transitions and Growth* (MIT Press, 2007) (discussing qualitative differences between a pure market economy and China's *socialist* market economy).

erence to a self-restraint] should not be taken at face value [because such terms as self-regulation and self-restraint, etc. are] many of the terms [that] have meanings in the context of China's government and economic policy that are quite different from their literal translations [and American perceptions as to the meaning of these concepts]").

Assessing the evidence presented in this matter and detected *sua sponte*, the Court concludes that the totality of evidence convincingly suggests that the CCCMC was and is a governmental appendage, especially in light of the CCCMC's power to affect its members' ability to practice their licensed vocation (or the extent of that ability): under the United States law, this is the power to legally affect one's constitutional property right—something no NGO can do.[118] *Cf. Town of Castle Rock v. Gonzales,* 545 U.S. 748, 789, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) ("The types of interests protected as 'property' are varied and, as often as not, intangible, relating to the whole domain of social and economic fact") (citation omitted).

**3. Presence of Compulsory Processes**

Here, both sides tend to conflate three distinct aspects of the alleged compulsory processes: (a) the relevant source of compulsion; (b) the maximum severity of theoretically possible repercussions for noncompliance; and (c) the actual existence of punitive compulsion. However, each aspect shall be treated separately in order to ensure the clarity of discussion.

**a. *Source of Compulsion***

The initial confusion appears to be rooted in Plaintiffs' position that the compulsion at issue cannot be deemed governmentally produced because Defendants, effectively, "compelled themselves" by attending the meetings held under the auspices of the CCCMC, disclosing to the CCCMC (and, hence, to each other) their accounting and managerial data, deliberating on the actual figure of the minimum price and submitting the result of their deliberation to the CCCMC for registration with the MOFCOM. *See, generally,* Opp. at 18–25, 45–53.

---

**118.** "[T]he term 'NGO' is generally used to mean what its initials stand for—a 'non-governmental organization'—a group of persons in the private sector working in concert, playing a significant role in the public sphere in order to garner support for influencing government policies." Judith Resnik et al., *Ratifying Kyoto at the Local Level: Sovereigntism, Federalism, and Translocal Organizations of Government Actors (TOGAs )*, 50 Ariz. L.Rev. 709, 784 (2008); *see also* Jude L. Fernando & Alan W. Heston, *The Role of NGOs: Charity and Empowerment: NGOs Between States, Markets and Civil Society,* 554 Annals 8 (1997) (providing a detailed answer to the question "what is an NGO?"). For instance, the New Jersey State Bar Association ("NJBA") is an NGO. Conversely, the New Jersey Office of Attorney Ethics ("OAE") is not an NGO; rather, it is an appendage of the state: an agency at the New Jersey Supreme Court. However, the attorneys employed by the OAE came to their AOE employ after being admitted to practice, and they were and still are subject to the very rules the AOE enforces. Moreover, over 600 volunteer members of NJ Bar (*i.e.,* members of the industry over which the OAE enjoys investigative and prosecutorial powers) work each year on OAE matters initiated against other members of the Bar. Furthermore, the membership fees paid by the members of NJ Bar (that is, the "regulated industry") fund the operations of the OAE, entirely. Finally, the OAE also has the power to recommend new rules, which—upon a notice by the New Jersey Supreme Court—are commented upon by the "regulated industry" and issued after these comments are considered. However, none of these features transforms the OAE into an NGO, and while non-compliance with a decision rendered by the NJBA (or a non-membership in the NJBA) has no effect on the attorney's ability to practice law, a failure to comply with the rules enforced by the OAE (or a failure to pay one's Bar fees that fund the OAE) entails punitive consequences verifying the true governmental nature of the OAE's powers.

There is, however, a qualitative distinction between the inquiries into whether: (a) Defendants *obeyed* these registered with—and enforced by—the government minimum price requirement; and (b) Defendants *partook in coining* of the minimum price figures plugged into the requirement. The distinction is important since, in the former, the focus is on the source of compulsion that forced Defendants to performed the very acts challenged by Plaintiffs (namely, employ the minimum price requirement at the time when Defendants were consummating their export contracts), while—in the latter—the focus is on the compulsion that forced Defendants to partake in a ministerial task entirely different from the challenged conduct.

The latter inquiry, while presenting a perhaps interesting academic exercise, is inapposite to the doctrine of government compulsion, since the process of coining a regulatory regime is distinct from governmental enforcement of the same: as the Court already noted, the fact that the state legislators debate the language of various prescripts (or that the members of regulated industries submit comments to proposed agency regulations, etc.) does not affect the "compulsiveness" of the resulting statutes, regulations or agency rules: each of these prescripts becomes a governmental—and, hence, compulsive—force upon its enactment, adoption, registration, etc., and applies with equal force to the public in general and to those who participated in coining these prescripts.[119]

**119.** It appears that this conflation of the "law-coining" and "law-enforcement" aspects is also present in *Resco WDPa* and *Vitamin C*, since—in response to the *Vitamin C* plaintiffs' similar claim the MOFCOM clarified that,

[u]nder [Chinese] regulatory system, the parties involved [in exportation must] consult with each other to reach consensus on coordinated activities for the purpose of reaching the objectives and serving the interest as set forth under Chinese laws and policies. [Natural and juridical p]ersons engaged .in such required [consultations based on the Chinese version of] self-discipline are well aware that they are subject to penalties for failure to participate in such coordination[,] . . . including forfeiting their export right. . . . [The] exporters were thus subject to the regulation by the [chamber of commerce], including compliance with the [chamber of commerce's] requirements of self-discipline, the very purpose of which was to coordinate each exporter's behavior. No . . . exporter could ignore these policies, nor could they abstain from such coordination with regard to export price and production volume when asked to by the [chamber of commerce]. The self-disciplinary system of export coordination also includes meetings and discussions between and among the parties subject to the [chamber of commerce's] direction and supervision, and reaching agreements among

themselves on taking appropriate actions in the interest of the country as a whole. Participation in such discussions, taking a vote and conducting other similar activities to reach their final consensus constitutes an integral part of the self-discipline process. [The] exporters must comply with the above procedures and the agreements reached in compliance with such procedures; otherwise, the [chamber of commerce] would be required to exercise its power to penalize those who were in violation of such procedures and agreements.

*Vitamin C*, Civil Action No. 06–md–1738 (E.D.N.Y.), Docket Entry No. 400–1, at 2. Hence, even if the question of how the minimum price figures came about were relevant to the doctrine of government compulsion, the statement made by the MOFCOM unambiguously indicates the exporters' mandatory obligation to partake in deliberations held by the exporters' "chamber of commerce," so an attempt to filibuster would cause a substantial punishment. The Court has no reason to presume that such compulsion was limited only to the CCMHPC, since all MOFCOM's regulations, circulars, working rules, etc., invariably referred to "chambers of commerce," *see generally*, exhibits docketed in Docket Entries Nos. 98, 99, 109 and 110, *i.e.*, utilized a generic definition suggesting that the mandatory obligation to partake in deliberations applied to the CCCMC members (like

Consequently, for the purposes of this Court's abstention analysis, the inquiry into the "source" of compulsion should be limited to the existence and enforcement of Chinese governmental prescripts compelling obedience with "*a*" minimum price requirement, regardless of how the actual minimum price figures plugged into that requirement were coined.[120]

### b. *Theoretical Severity*

Another source of confusion appears to be the parties' failure to distinguish the issue of "theoretical severity" of repercussion from that of "practical severity" (which is effectively the issue of enforcement of the theoretically possible punishment).

The degree of the "theoretical severity" of repercussion is not exactly spelled out by the documentary evidence filed in this case and detected by the Court in other matters, *i.e.*, no statement issued by the MOFCOM, CCCMC or other Chinese agencies is accompanied by "sentencing guidelines" correlating a particular form (or a particular frequency) of non-compliance to a specific punishment. Rather, this evidence suggests that the degree of punishment has been left to the discretion of the MOFCOM, CCCMC and other Chinese government bodies. However, those documents that skirt the issue clearly set forth the range of the possible punishment, encompassing such measures as: (a) forfeiture of the enterprise's export license (*i.e.*, loss of the ability to practice one's vocation which, for an exporting enterprise, would be loss of livelihood); (b) reduction of one's export quota (*i.e.*, reduction of the ability to make living); (c) monetary fines imposed upon the enterprise, as well as upon natural persons employed as executives of such enterprises (plus, imposition of legal liability on such persons).[121] Moreover, an

Defendants) as much as it did to the members of the CCMHPC.

120. Moreover, the availability of the doctrine of government compulsion cannot depend on the presence or absence of any collusion: had it been otherwise, the doctrinal abstention would be limited only to antitrust, racketeering and similar matters that require proof of collusion. Consequently, for the purposes of the government compulsion doctrine, it would be a logical error to ask whether Defendants *reached an agreement to comply* with the minimum price requirement. Rather, where the doctrine is applicable, such "agreement" aspect should be automatically supplied by the defendant's obedience of his/her/its sovereign's law: so, if there is an alleged hub-and-spokes agreement, then the foreign sovereign should be viewed as the "hub."

121. *See* Docket Entry No. 35–51, at 15 (the MOFCOM's regulation stating that "[t]he Bidding Committee is entitled to revoke the quotas won in the bidding and rescind the qualification for quota bidding . . . of the enterprises which . . . [e]xported at prices lower than the regulated prices set forth by relevant . . . chambers of commerce"); *see also* Docket Entry No. 35–49, at 2–3 (the MOFCOM's regulation explaining that the MOFCOM "shall mete out the following punishments on enterprises which commit conducts of exporting at lower-than-normal price: enterprises . . . shall be fined, investigations can also be [conducted] to affix the administrative or economic responsibility on the legal representative of the enterprise or any person who is directly responsible for the conduct of exporting at lower-than-normal price," and stating the definition of "lower-than-normal price means [as] the export price [which is] lower than the necessary price for the product[, where the] necessary price [is the sum of] the cost for the production . . . , the expenses for storage, transport, insurance and management [plus a] reasonable profit"). Defendants' perception that the term "lower-than-normal price" used in Docket Entry No. 35–49 has the meaning identical to the phrase used in Docket Entry No. 35–51 ("price[ ] lower than the regulated prices set forth by relevant . . . chambers of commerce") appears warranted since: (a) the phrase "reasonable profit" used in Docket Entry No. 35–49 is not defined anywhere else; (b) only 37 days passed between the MOFCOM's issuance of Docket Entries No. 35–49 and No. 35–51; and (c) the very goal of the CCCMC's price coordination was a determination of what is "normal profit" in light of the interest of China, as a sovereign under which rule Defendants had to

analogously severe theoretical punishment applies to prospective non-compliance, *i.e.*, to a mere attempt to export goods priced below the required minimum price; such punishment is denial of export licence to consummate sale, *i.e.*, the exporter's inability to make living.[122]

The Court, of course, recognizes that the phrase "severity of punishment" necessarily entails cultural perceptions, and what might be a severe deprivation in one country could easily be a way of life in another. However, being mindful of the Court of Appeals' guidance in *Mannington Mills*, 595 F.2d at 1297 (teaching that this Court's determination would be best reached upon considering whether an analogous determination rendered by a foreign court against a United States defendant would be acceptable in the United States), the Court finds that the theoretical "severity of punishment" would be best addressed by assessing the punishment as an "injury" under the United States law. Since the maximum punishment envisioned under the prescripts issued by the MOFCOM, CCCMC and other Chinese govern-

---

operate and were mandated to prospect in accordance with China's vision of how prosperity is to be achieved. *See* Docket Entry No. 99–11, at 2 (the CCCMC charter, providing that the "CCCMC is authorized . . . to deal with . . . export trade, . . . [t]he aims of [the] CCCMC include. . . protecting the legal rights and interests of the State[, with] . . . guidance and supervision of [the MOFCOM, by] . . . coordinating commodity prices [as to its members'] export"); *see also Vitamin C*, Civil Action No. 06–md–1738 (E.D.N.Y.), Docket Entry No. 400, at 2 (the MOFCOM's statement that "[n]o . . . exporter could ignore [minimum price] policies" imposed by its chamber of commerce); *accord* the instant matter, (statement made by MOFCOM Assistant Minister Liu Xiangdong, noting that, "guided by [the MOFCOM], . . . [the] CCCMC has . . . taken many very effective measures to carry out state guidelines, policies and regulations [in order to] safeguarded interests of the state and the industry as well as [export] companies, and made outstanding achievements in pushing forward the development of [China's] export trade"); Docket Entry No. 35–60, at 2 (the MOFCOM's working rules explaining that, "[w]hen the export prices are recommend by the chambers of commerce, the export price shall be in compliance with the *relevant* price limit regulations," suggesting that the phrases "relevant price," "normal price" and "minimum price" had identical meaning in the MOFCOM's parlance).

**122.** *See* Docket Entry No. 35–47, at 6 (the MOFCOM's regulation directing that, "[w]hen applying for export licences, every export enterprise should submit to the licence-issuing body the export permits and contract[, and an] application form . . . for the export license. . . . When examining the export contracts, the license-issuing body concerned should pay major attention to the prices of the export commodities. . . . When the prices in the export contracts are lower than the coordinated prices by the related import and export chamber of commerce, . . . the license-issuing body should refuse to issue the export license"); Docket Entry No. 35–51, at 14 (the MOFCOM's regulation clarifying that "[e]vidence [needed for] issuance of export license [include a proof of e]xport contract price[, which should be] not less than the prices set forth by the chambers of commerce for . . . exporters"); Docket Entry No. 35–53, at 5 (the MOFCOM's circular stating that, "[w]hen examining an application for an export license, the releasing authority shall inspect the contents [of] export contract[,] especially examine [the] price. [The p]rice of goods on export license shall the same as that in the export contract [and] not lower than the coordinating price regulated by relevant import and export commerce commission"); Docket Entry No. 35–56, at 6 (the MOFCOM's provision directing that "[p]rices of export commodities shall be in accord with the export prices recommended by the chambers of commerce. The license issuing agencies shall stress on the examination and verification of the prices of export commodities when examining the export contracts, the commodity prices on the export licenses issued shall be the same as the prices in the export contracts; but when the prices in the export contracts are lower than the recommended export prices fixed by the relevant chambers of commerce, the license issuing agencies shall refuse to issue the export licenses").

ment bodies was akin to what the United States jurisprudence qualifies as loss of livelihood as a result of suspension/loss of one's licence to practice one's vocation, the Court assesses such punishment accordingly.[123]

■■■ The Supreme Court of the United States invariably recognized that a license to practice a certain trade should be treated similarly to a property right and an injury to this right invokes protections of the Due Process Clause. *See Barry v. Barchi*, 443 U.S. 55, 63–64, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (finding a horse trainer's license similar to property right); *Goldsmith v. United States Bd. of Tax Appeals*, 270 U.S. 117, 123, 46 S.Ct. 215, 70 L.Ed. 494 (1926) (same, as to an accounting license); *Dent v. West Virginia*, 129 U.S. 114, 121–22, 9 S.Ct. 231, 32 L.Ed. 623 (1889) (same, as to a physician's license); *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 512–13, 22 L.Ed. 205 (1873) (same, as to an attorney's license). Given that the United States law considers one's loss of license to practice one's vocation an injury of constitutional magnitude, *see, e.g.,* Jeffrey M. Gamso, *Cleveland Board of Education v. Loudermill*, 17 Tex. Tech. L.Rev. 255, 256–57 (1986) (explaining the reasons why the inclusion of the Due Process Clause and its source in law of England suggests that protection of intangible property rights is among those of constitutional magnitude), the Court concludes that the direct ties drawn by the Chinese regulations, circulars, working rules, etc., between the prohibition on exportation at a price lower than the minimum price and the exporter's ability to obtain an export

licenses (or to fully exercise it, or to keep exercising it in the future) establish a sufficiently severe theoretical punishment, *i.e.,* the punishment sufficient to compel compliance and, thus, trigger the doctrinal abstention. *Cf. Negusie v. Holder*, — U.S. ——, 129 S.Ct. 1159, 1170, 173 L.Ed.2d 20 (2009) (Scalia, J., Alito, J., concurring) ("The rationale for the duress defense . . . is conventionally 'not that the defendant . . . somehow loses his mental capacity to commit the [conduct] in question,' but rather that 'even though he has done the [physical] act [he is charged with,] . . . and[had] the mental state which the [conduct] requires, his conduct . . . is excused' ") (quoting 2 W. LaFave, *Substantive Criminal Law* § 9.7(a), at 73 (2d ed. 2003)).

### c. *Actual Existence of Prescripts*

■■■ Plaintiffs' position that Defendants' actions were not governmentally compelled "in reality" appears two-fold. First, Plaintiffs assert that the danger of punishment for non-compliance was not "real" because the relevant prescripts were: (a) paraphrased in terms of "self-discipline" or used analogous language that allowed Defendants' discretion; and/or (b) not "actually enforced." *See, generally,* Opp. at 18–25, 45–53. Second, Plaintiffs maintain that the regime of mandatory minimum price requirement did not exist throughout the entire Class Period because: (a) some prescripts were expressly repealed; (b) other prescripts were amended; (c) the topics addressed by yet other prescripts were tackled in later-

---

**123.** Since the range of monetary fines envisioned by the MOFCOM's regulation Docket Entry No. 35–49 is unknown to this Court, it appears unwarranted to conclude that such fines must necessarily be a "severe" punishment, since these fines might, just as well, be of nominal value, even within the meaning of Chinese average income. Moreover, since

Docket Entry No. 35–49, at 2–3, merely refers to "legal liability" of the person responsible for exportation at a "lower-than-normal" price, the court concludes that it would be an undue generalization to equate this unspecified "legal liability" to "penal liability" (which is a severe punishment *per se* ).

issued provisions that omitted to mention the minimum price requirement; and (d) the remaining prescripts—left unaffected by all of the above—must have developed a "new meaning" as a result of China's efforts to transition from a centrally planned economy to socialist market economy, as well as a result of China's accession to the WTO. *See id.* For the reasons detailed below, the Court disagrees.

Specifically:

(i) Plaintiffs begin by claiming irrelevance of the "Working Rules on the Issuance of an Export License, [issued by the] MOFCOM [on] September 7, 2007 [ ("Working Rules II"), because their Working Rules II did] not mention a minimum price." Opp. at 20. However, the "Working Rules II" provide that "[the MOFCOM] shall authorize its Quota & License Administrative Bureau to conduct the uniform . . . inspection . . . of . . . the issuance of an export license. . . . A business applying for an export license shall submit . . . [t]he approval documents on export issued by the competent authorities[, the] . . . contract o[f sale for] export[, and o]ther materials that [are] required by the [MOFCOM]." Docket Entry No. 35–64, at 2–3. Since the regulatory regime established by the pre-"Working Rules II" prescripts required a proof that the export sale was conducted at above minimum price in order to obtain an export licence, and the bidding/customs authorities could deny export quota/actual exportation in the even of non-compliance with the minimum price, the Court has

no reason to presume that all prior prescripts were "repealed" or "amended" by the "Working Rules II"; rather, the "Working Rules II"-based obligation to present the export contract and unspecified other "approval documents" to the "competent authority" could be a paraphrased version of the previously spelled-out duty to show proof of sale at or above the minimum price. Moreover, even if the "approval documents" language referred to other matters, the Court detects no reason for finding that the minimum price requirement was abolished on or prior to September 7, 2007, since not a single statement in the "Working Rules II" expressly states or even suggests so.[124] *Accord infra* subsection (x) (discussing the "Working Rules I").

(ii) Plaintiffs also maintain that the "Notice of the Strengthening of the Export Administration of Caustic–Calcine (Dead–Burned) Magnesite, [issued by the] MOFCOM and the State Administration of Quality, Supervision, Inspection, and Quarantine, [on] November 10, 2004 ("Notice II"), indicated that the minimum price requirement was abolished because the Notice did] not refer to any minimum export price." Opp. at 20. However, the "Notice II" explains why it was issued, stating that, "[i]n order to strengthen [Chinese] export" of magnesium oxide, the government designated certain exclusive ports as points of exit and initiated the mode of inspections to eradicate the practice of "smuggling" magnesium oxide by declaring the

---

**124.** Even if a certain prescript had abolished the minimum price requirement on September 7, 2007, Defendants' conduct would still be subject to abstention from the inception of the Class Period (in mid–2000) to September 7, 2007. That might effectively dispose of Plaintiffs' claims altogether, since the Amended Complaint ends its account of Defendants' alleged collusive activities with the statement

that, "[i]n February 2007, [that is, seven months prior to the issuance of the "Rules," unspecified] members of [the ever-changing] Cartel met to discuss a possible agreement to increase the export price," Docket Entry No. 77, ¶ 64, with no allegations as to any other manifestations of Defendants' alleged post-February 2007 collusion.

goods to be "kaolin clay, calcined brucite, dead-burned ironstone, dolomite, wollastonite, fireclay, dinas earth" (products having physical appearance similar to that of magnesium oxide). Docket Entry No. 35–61, at 2. No statement made in the "Notice II" suggests that the minimum price requirement was abolished on or prior to November 10, 2004:[125] on the contrary, the "Notice II" strongly suggests a concern of numerous Chinese governmental bodies with the fact of exportation of magnesium oxide at prices cheaper than those required by the prescripts addressing the issue of the minimum price. *Accord infra* subsection (xi) (discussing the "Notice I").

(iii) Plaintiffs also assert that the "Announcements Regarding the First and Second Public Bidding for Export Quota of Light–Burnt and Dead–Burnt Magnesite, [issued by the] MOFCOM [on] December 3, 2004[,] and May 25, 2005[, indicated that the minimum price requirement was abolished because t]hese Announcements d[id] not mention a minimum price." Opp. at 20. However, both "Announcements" contain the following language: "Minimum price for the bid[:] A minimum bid price is set up [by the government] for this invitation for bidding. A bidding enterprise may directly adopt the minimum price for the bid as determined by the [government] in its own electronic bidding document. Electronic bidding documents with prices lower than those determined by the [government] shall be regarded as invalid." Docket Entry No. 4, 6–7. Thus, while no statement made in the "Announcements" suggests that the minimum price requirement was abolished by December 3, 2004, or even by May 25, 2005,[126] the language of both "Announcements" indicates that the Chinese government took extra precautions to ensure impossibility of exporting at a price lower than those selected by the government, *i.e.*, the minimum price.

(iv) Analogously, Plaintiffs contend that the "Measures for the Administration of Licenses for the Export of Goods, [issued by the] MOFCOM [on] December 10, 2004[, indicated that the minimum price requirement was abolished because t]hese Measures d[id] not mention a minimum price [and, as a prescript,] were repealed in 2008." Opp. at 21. However, the "Measures" did not contain any statement suggesting that the minimum price requirement was abolished: rather, the "Measures" reiterated that, "[w]hen applying for an export license, an operator shall submit the relevant quota of export goods or *other relevant documents of approval to the license issuing agency*," Docket Entry No. 35–62, at 3 (emphasis supplied), hence allowing for a reasonable deducement that the mandate of all prior prescripts tying export licenses with the minimum price requirement remained intact and incorporated by the "Measures" reference to "other relevant documents [that have to be submitted for] approval to the license issuing agency." Consequently, the Court has no reason to read the "Measures" as stating that the minimum price requirement was

125. Even if a certain prescript had abolished the minimum price requirement on November 10, 2004, Defendants' conduct would still be subject to abstention from the inception of the Class Period (in mid–2000) to November 10, 2004: for almost half of the Class Period.

126. Even if a certain prescript had abolished the minimum price requirement on May 25, 2005, Defendants' conduct would still be subject to the government compulsion-based abstention from the inception of the Class Period (in mid–2000) and until May 25, 2005, that is, for more than half of the proposed Class Period.

abolished on or prior to December 10, 2004.[127]

(v) Plaintiffs continue by asserting that the "Working Rules on the Application for an Export License, [issued by the] Dailan [Division of the MOFCOM in] December 2003 [still cannot be read as imposing the minimum price requirement, even though these R]ules state that, '[w]hen the export prices are recommended by the chambers of commerce, the export price shall be in compliance with the relevant price limit regulations,' [because these R]ules do not compel price-fixing for any [particular] product." Opp. at 21. Plaintiffs' argument is, at best, half-hearted, since the CCCMC is a chamber of commerce subject to the MOFCOM's rule, and the CCCMC's magnesite section (of which Defendants are members) are, too, subject to this rule. Therefore, it would be anomalous to deem the "Rules" inapplicable to any particular section simply because the MOFCOM did not bother to expressly list each and every product falling within the authority of each and every section of each and every chamber of commerce the MOFCOM controlled. Moreover, and paramountly here, as the Court already explained, the process of price-fixing, *i.e.*, how the actual figure of the minimum price

comes about, is irrelevant to the inquiry posed by the government compulsion doctrine, which concerns itself not with the legislative niceties of a foreign sovereign's enactment process but with whether this foreign sovereign's prescripts compel the defendant's behavior. Consequently, all that the "Rules" unambiguously establish is that, as of December 2003 (that is, at least more than one quarter into the proposed Class Period), the threat of repercussion for non-compliance with the minimum price requirement was actually existing.

(vi) In the same fashion, Plaintiffs maintain that the "Measures for the Invitation to Bid for Export Commodity Quotas, [issued by the] MOFCOM [on] December 20, 2001[, indicated that the minimum price requirement was abolished simply because t]hese [M]easures do not mention a minimum price." Opp. at 21. The Court disagrees. There is no statement in the "Measures" indicating that the minimum price requirement was abolished, since the "Measures"—while detailing certain new ministerial aspects of the bidding process—did not include any language suggesting that the minimum price requirement was repealed.[128] Docket Entry No. 35–58, at 3–5. Therefore, the Court can not read

---

**127.** Even if a certain prescript had abolished the minimum price requirement on December 10, 2004, Defendants' conduct would still be subject to the government compulsion-based abstention from the inception of the Class Period (in mid–2000) and until December 10, 2004, that is, for almost half of the Class Period. *A foriori,* if the "Measures" were a statement reinforcing the minimum price requirement, this fact could effectively dispose of Plaintiffs' claims altogether, since the Amended Complaint ends its account of Defendants' alleged collusive meetings with the statement that, "[i]n February 2007, [that is, more than a year prior to the repeal of the "Measures," unspecified] members of [the ever-changing] Cartel met to discuss a possi-

ble agreement to increase the export price," Docket Entry No. 77, ¶ 64, and provides no facts as to any other manifestations of Defendants' alleged post-February 2007 collusion.

**128.** Moreover, a MOFCOM's regulation issued prior to the "Measures" already clarified, while addressing the very same issue of the bidding process, that "[t]he Bidding Committee is entitled to revoke the quotas won in the bidding and rescind the qualification for quota bidding ... of the enterprises which ... [e]xported at prices lower than the regulated prices set forth by relevant ... chambers of commerce." Docket Entry No. 35–51, at 15; and (b)

the "Measures" as stating that the requirement was abolished on or prior to December 20, 2001.[129]

(vii) Identically, Plaintiffs assert that the "Measures for the Administration of Export Commodities Quotas, [issued by the] MOFCOM [on] December 20, 2001[, indicated that the minimum price requirement was abolished simply because t]hese [M]easures do not mention a minimum price." For the reasons reiterated time and again in subsections (i) to (vi), the Court finds this argument invalid. As the Sinosteel Defendants correctly observed, a government's decision not to reiterate each and every previously established aspect of the regulatory regime in each newly adopted provision cannot be construed as an abolition of all previously adopted aspects. *See* S/Reply at 19 ("The fact that [the] regulations adopted in the interim may not [expressly] mention price coordination is no more relevant than the fact that not all securities regulations promulgated since the Securities Exchange Act of 1934 mention insider trading"). Plaintiffs invite the Court to reach an odd conclusion that, by the end of 2001, Chinese law lost all its continuity and started so much "from scratch" that every provision, rule and legal policy not expressly re-enacted was necessarily deemed abolished. However, neither China's decision to initiate a gradual transition from centrally planned to socialist market economy nor China's accession to the WTO transformed China into a "new" nation, with a legal regime wholly divorced from all Chinese pre-WTO/pre-transition law. *Accord United States v. Grainger,* 346 U.S. 235, 248, 73 S.Ct. 1069, 97 L.Ed. 1575 (1953) ("Codification contemplates, implies and produces continuity of existing law in clarified form rather than its interruption"); Halsbury's Laws of Hong Kong, *Commentary, Continuity of Hong Kong's Judicial System After Reunification of Hong Kong with the People's Republic of China* (Oct. 3, 2008), at HLHK Courts and Judicial System 2, LEXIS.[130]

(viii) Plaintiffs also assert that the "Provisions on the Export License Administration, [issued by the] MOFCOM [on] December 20, 2001," should be construed as indicating that the minimum price requirement was repealed because these "Provisions" were operable only until December 10, 2004, and—while operable—"only refer[red] to 'recommended export prices fixed by the rele-

---

129. Even if a certain prescript had abolished the minimum price requirement in December 2001, Defendants' conduct would still be subject to the government compulsion-based abstention from the inception of the Class Period (in mid–2000) and until December 2001, that is, for about a year and a half of the proposed Class Period.

130. *See also* Ian Dobinson, *the Criminal Law of the People's Republic of China (1997): Real Change or Rhetoric?,* 11 Pac. Rim L. & Pol'y 1, at 22, 55 (Jan.2002) (where—just one month after the issuance of the MOFCOM's "Measures" discussed in this subsection—the author, a professor of law at the University of Hong Kong, observed that "[c]ontinuity ... was applicable to the [bulk of the] Standing Committee Decisions and Supplementary Provisions. This principle also related to the numerous Interpretations that were issued by the Supreme Court and the Supreme Procuratorate." The author concluded, upon conducting a scrupulous study of Chinese legal regime, that "[t]here is no denying that there has been significant change in the law [in China].... Chinese rhetoric concerning [these] reforms has lead to the claim that there has been an adoption of [a new] rule of law in China. These changes and the rhetoric are extremely important, but ... while the [language of the provisions have] changed, the underlying principles and policies on which Chinese ... law is based have not. On the contrary, [the legal] policy, in particular, has shown a remarkable continuity and resistance to change").

vant chamber of commerce' [but the "Provisions" did] not require the fixing of any price for any specific product." For the reasons already articulated by the Court in the subsection (v), *supra,* Plaintiffs' position is without merit.[131]

(ix) Plaintiffs then point at the "Regulations" issued on December 10, 2001, by the State Council (*i.e.,* by the highest governmental body in China) with regard to the "Administration of the Import and Export of Goods." *See* Opp. at 21. Plaintiffs maintain that the "Regulations" verify that no mandatory minimum price requirement existed by December 10, 2001, because the "[Regulations] describe the export quota licensing system but ... do not authorize any ministry to require ... minimum prices .... [According to Plaintiffs, repeal of the minimum price requirement is particularly evident because these] Regulations further require[d] promulgation of new rules governing export quota licensing that conform to [these] Regulations." *Id.* This statement presents a compilation of legal and logical errors. First, the fact that the "Regulations" did not *authorize* the MOFCOM (or the CCCMC, or any other Chinese governmental agency) to issue prescripts requiring compliance with the minimum price has no bearing on whether such prescripts (if actually issued) resulted in government compulsion, *see Interamerican Refining,* 307 F.Supp. at 1298 (explaining that the issue of whether the compulsion-causing provision was

issued with or without authority is irrelevant to the doctrine).[132] Second, the fact that the "Regulations" were silent as to the minimum price requirement in no way indicates that they repealed that requirement. *See supra,* subsection (vii) and note 130 of this Opinion (explaining why issuance of a provision silent as to certain aspect cannot be deemed as a breach of legal continuum). Moreover, contrary to Plaintiffs' position, the relevant language of the "Regulations" seems to the suggest a conclusion opposite to that prompted by Plaintiffs. Specifically, the "Regulations" include a section titled "The Goods Limited in Exportation," which provides, *inter alia,* that "[t]he term 'export license' [means] the various kinds of certificates and documents that [relate to] export ... as provided in laws and *administrative regulations,*" hence suggesting an incorporation of the minimum price requirement that was adopted in previous administrative regulations. *See* Docket Entry No. 35–55, at 9; *accord* Docket Entry No. 35–47, at 6 (a pre-"Regulations" MOFCOM's mandate directing that, "[w]hen applying for export licences, every export enterprise should submit to the licence-issuing body the export permits and contract[, and an] application form ... for the export license.... When examining the export contracts, the license-issuing body concerned should pay major attention to the prices of the export commodities.... When the

---

131. Even if a certain prescript had abolished the minimum price requirement on December 10, 2004, Defendants' conduct would be subject to abstention from the inception of the Class Period (in mid–2000) to December 10, 2004, that is, for almost half of the Class Period.

132. As the Court already explained, many provisions are treated as "law" regardless of the fact that the delegated authority of the authors is not—or cannot—be established. *See supra,* note 100 of this Opinion (discussing the sources of religious law and customary law that are enforceable regulatory mandates regardless of coming about without any "delegated authority").

prices in the export contracts are lower than the coordinated prices by the related import and export chamber of commerce, ... the license-issuing body should refuse to issue the export license"); Docket Entry No. 35–51, at 14 (another pre-"Regulations" MOFCOM's mandate clarifying that "[e]vidence [needed for] issuance of export license [include a proof of e]xport contract price[, which should be] not less than the prices set forth by the chambers of commerce for ... exporters"); Docket Entry No. 35–53, at 5 (a pre-"Regulations" MOFCOM's circular stating that, "[w]hen examining an application for an export license, the releasing authority shall inspect the contents [of] export contract[,] especially examine [the] price. [The p]rice of goods on export license shall be the same as that in the export contract [and] not lower than the coordinating price regulated by relevant import and export commerce commission").[133]

(x) Next, Plaintiffs' claim that the "Working Rules on the Application for and Release of an Export License, [issued by the] MOFCOM [on] December 14, 1999 [ ("Working Rules I") indicate that the minimum price requirement was abolished on or prior to September 7, 2007, because t]hese [R]ules were officially abolished on September 7, 2007 ..., [and because] these [R]ules were based on the export license regulations effective in 1999, which were revised in 2001 and again in 2004. *Like the other regulations*, these ... [R]ules state[d] only that a price [could not] be lower

'than the coordinating price regulated by the relevant import and export commerce commission' [but the Rules did] not compel price-fixing for any particular product." Opp. at 21–22 (emphasis supplied). The net result of Plaintiffs' statement appears to be the sum of: (a) a concession that the original 1999 version of the Rules expressly directed exportation at minimum price or above; (b) another concession that this minimum price requirement was present, expressly or implicitly, in 2001 and 2004 related provisions; and (c) yet another concession that this minimum price requirement was made part of many other Chinese regulations. *See id.* Since the issue of how the actual minimum price came about is inapposite to the government compulsion doctrine, *see supra*, subsection (v), Plaintiffs' statement does nothing but concede that numerous governmental prescripts consistently compelled the exporters to obey the minimum price requirement, and did so throughout the period stretching from the pre-Class Period time to, at the very least, September 7, 2007 (that is, until seven months after the last alleged meeting of "Cartel," *see* Docket Entry No. 77, ¶ 64). Moreover, the post-Working-Rules-I period appears, too, marked by the minimum price requirement since: (a) the September 7, 2007, "abolition" of the Working Rules I occurred as a result of the enactment of the later Working Rules ("Working Rules II"), issued by the MOFCOM on the same date, that is, on September 7, 2007; and (b) these Working Rules II cannot be

---

**133.** Finally, even if the Court were to adopt Plaintiffs' reading of the "Regulations" as repealing the actually existing minimum price requirement, the logical conclusion of such presumption would be that, until December 10, 2001, Defendants were, in fact, subject to the minimum price requirement imposed by the highest governmental body of China

which, in turn, calls into question Plaintiffs' good faith with respect to their argument that, since the inception of the proposed Class Period, that is, since in mid–2000, Defendants could not have been subject to any government compulsion as to the minimum price requirement.

**448**

read as abolishing the minimum price requirement. *See supra*, subsection (i) (discussing the "Working Rules II").

(xi) Finally, much in line with their statements detailed in subsections (i) to (x), *supra*, Plaintiffs maintain that the "Notice of the Strengthening of the Export Administration of [Magnesium Oxide, issued by the] MOFCOM and the State Administration for Import and Export Commodity Inspection [on] March 27, 1996 [ ("Notice I") indicates that, as early as 1996, the minimum price requirement stopped existing simply because t]his Notice [I] does not refer to any minimum export price ... and was abolished in 2005." Opp. at 22. For the reasons numerously reiterated in the preceding subsections, this argument is without merit. Moreover, the post-"Notice-I" period cannot be deemed as the period during which the minimum price requirement was abolished. *See supra*, subsection (ii) (discussing the "Notice II").

In sum, the evidence challenged by Plaintiffs invariably indicates, although with a different degree of forte, that—throughout the Class Period—a stream of prescripts was issued; these prescripts either expressly stated the minimum price requirement or employed a language strongly suggesting that the requirement was remaining in force, or made directives reading as entirely compatible with the minimum price requirement, or were simply silent as to the issue.. [134]

### d. *Composite Effect*

As stated above, each piece of documentary evidence referred to by Plaintiffs either evinces the minimum price requirement or strongly suggests the same, or is entirely compatible with the requirement. The same conclusion applies to: (a) the multitude of Defendants' exhibits not challenged in Plaintiffs' Opposition, *see supra* notes 73–74 of this Opinion (listing Defendants' exhibits); and even to (b) Plaintiffs' own exhibits. *See supra* note 76 of this Opinion (listing Plaintiffs' exhibits). In sum, not a single document before the Court states—or otherwise indicates—that the minimum price requirement was abol-

**134.** In addition, Plaintiffs dedicate substantial effort to asserting that: (a) the "Detailed Rules for the Implementation of Calling for Bids for Light (Dead) Burned Magnesia Export Commodity Quotas (for Trial Implementation)," which were promulgated by the MOFCOM in 1994 and expressly directed both collusive agreement on a particular minimum price as to export of magnesite-based products and compliance with that minimum price, had to be deemed repealed by the MOFCOM's issuance of 1998 and 1999 rules that addressed the subject of export bidding, and that these 1998 and 1999 rules were, too, repealed by the MOFCOM's 2001 "Measures for Administration of Export Commodities Quotas and the 2001 Measures for the Invitation of Bid for Export Commodity Quotas"; and (b) this chain of enactments necessarily discarded the minimum price requirements because, "[u]nder Chinese law, [the later enacted rules] prevail over any conflicting provisions in prior rules governing the same subject matter." Opp. at 22–23 (citing to Docket Entries Nos. 35–44 (the 1994 "Rules"); 35–57 (one 2001 "Measure"); and 35–58 (another 2001 "Measure")). The Court studied Docket Entries Nos. 35–44, 35–57 and 35–58 but failed to locate any language in Docket Entries Nos. 35–57 and 35–58 *conflicting* with the minimum price-related language in Docket Entry No. 35–44. Conversely, the MOFCOM's statements that "[t]he export enterprises shall file the [export] quota applications [together with] the relevant documents [that are] according to the requirements" (included in the language of Docket Entry No. 35–57, at 4) and that "[an export bid that is] lower than the minimum limit shall be deemed as an invalid one" (included in Docket Entry No. 35–58, at 5) appear fully in coherence—or, at the very least, easily harmonizable and certainly not in conflict with the MOFCOM's 1994 requirement that "[the bidding] price for export shall not be lower than the ... price determined by [the CCCMC]." *See* Docket Entry No. 35–44, at 4.

ished for any period of time, let alone permanently. However, Plaintiffs appear to be correct in their observation that there has been no particular single prescript issued by the MOFCOM that expressly mandated Defendants' compliance with the minimum price requirement while remaining operable, without any amendment or re-issuance, throughout the entire Class Period which started sometime in mid–2000 and is, allegedly, still running as the Court writes this Opinion.

Rather, the evidence before the Court is an amalgamation of mutually corroborating prescripts.[135] This particular aspect makes the factual scenario at hand more complex than that addressed in *Trugman–Nash*, 954 F.Supp. 733, and even that examined in *Interamerican Refining*, 307 F.Supp. 1291, *i.e.*, the cases dealing with more straight-forward examples of government compulsion.

As Judge Trager observed in *Vitamin C*, the *Trugman–Nash* scenario "involved [a] much clearer example[ ] of government compulsion [since] the court in *Trugman–Nash*, ... consider[ed the effect of only] the New Zealand Dairy Board Act of 1961, a formally codified New Zealand law[, expressly] 'mandat[ing] ... disapproval of sales price competition among New Zealand dairy producers in respect of exports to nations ... that restrict import quantities.'" 584 F.Supp.2d at 558. And while the circumstances in *Interamerican Refining* were less clear-cut, *see* 307 F.Supp. at 1295–98 (explaining that the Venezuelan government directed boycott of the plaintiff not through a codified provision but through two phone calls from Venezuelan Coordinating Commissioner to the defendants directing them to cease sale to the plaintiff and through a soon-thereafter-issued order of the Minister of Mines and Hydrocarbons who made a public promise that "an end will be put to it" in the wake of a national media upheaval scorning sales to the plaintiff), the time-span during which the foreign prescripts examined in *Interamerican Refining* was rather short, and the content of these prescripts was not affected by amendments, re-issuance, etc.

Here, in contrast, the alleged governmental compulsion has stretched for more than a decade and was achieved not through a simple issuance of a single legal mandate that remained continuously operative; rather, it was created by a legal "regime" that employed various regulatory mechanisms producing a composite effect of a never-ceasing correlation between the minimum price requirement and punitive measures for non-compliance with it. Both the gist and the continuum of such regime was, seemingly, left unaffected by China's decision to embark on the path of gradual reforms toward socialist market economy or by China's accession to the WTO: the MOFCOM's statement filed in the *Vitamin C* expressly stressed the MOFCOM's opinion that Chinese economic reforms had neither automatic nor direct effect on Chinese export regulations falling within the MOFCOM's rein. *See Vitamin C*, Civil Action No. 06–md–1738 (E.D.N.Y.), Docket Entry No. 400–1, at 3 (explaining that the "statements of repre-

---

**135.** Inductive logic is the mode of reasoning by detecting a general conclusion from a set of specific facts. *See United States v. McGlory*, 968 F.2d 309, 334 (3d Cir.1992) (illustrating the process of inductive reasoning by quoting the Supreme Court's observation in *Bourjaily v. United States*, 483 U.S. 171, 179–80, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), which explained that "[i]ndividual pieces of evidence, insufficient in themselves to prove a point, may [—] in cumulation [—] prove it. The sum of an evidentiary presentation may well be greater than its constituent parts. Taken together, these two propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence").

sentatives of the [MOFCOM] and other government agencies, with regard to China's market economy status, and remarks regarding Chinese companies setting price and production volume according to the principle of market demand ... were made in a different context—one that had nothing to do with export price regulations—and were general descriptions of the current status of China's market economy presented in a special context .... [These statements] should not be deemed as explicit or implicit statements of China's abandonment of its ... regulatory policies over certain designated industries"). Given that the MOFCOM has had such perceptions throughout the entire Class Period and, hence, promulgated all its prescripts with the intention to convey its views to the "chambers of commerce" and the industries regulated by these "chambers," Defendants' reading of the relevant regulations in the way identical to the intentions the Chinese government wished to convey appears reasonable.

Moreover, here, Defendants established the actual danger of enforcement through showing constant governmental monitoring: the existence of such monitoring follows from the language of the CCCMC charter, *i.e.*, the document that remained operable and unchanged from 1988 and throughout the entire Class Period. In its relevant parts, the charter reads as follows:

The aims of [the] CCCMC include[ ] coordinating ... export trade activities in the industry of ... minerals[, like magnesite-based products. The] CCCMC conforms to the laws and regulations of the State, carries out the state policies and guidelines in foreign trade .... Functions of [the] CCCMC include ... coordinating commodity prices for ... export ... according to ... the [MOFCOM and a]ssisting the [MOF-COM] in ... supervision of [the] member enterprises [so they would] utilize

their ... export quotas and permits legally.... Obligations of [the CCCMC m]embers [include] carrying out resolutions and regulations made by [the] CCCMC .... For anyone who commits serious violations, the [MOFCOM] may ... suspend or revoke part or all of [the violator's] right to deal with ... export trade. The general meeting for [the CCCMC] members ... is the supreme body of CCCMC, [it is] held every three years [but, in the interim, the] powers and authorities of the general meeting [are] exercised by the Council [which] duties include[ s]upervising ... the work of its branches [like the branch of magnesite-based products. In the interim] of any meeting of the Council, [the] powers and authorities of the Council [are] exercised by its Standing Committee[, which has a] meeting ... every six months .... [In the interim,] several functional departments [are] set up [which are] responsible for the daily work of [the] CCCMC.... Branches ... carry out their activities in accordance with CCCMC [c]harter and [under the] supervision of [the] CCCMC.... [B]ranches ... hold their meetings [during which they] examin[e] the implementation of regulations in regard to coordinated prices for ... exports and ... deal with problems occurring due to enterprises that violate the regulations .... [In between such branch meetings,] the branch council [has the] powers and authorities to [act] in accordance with CCCMC [c]harter ....

Docket Entry No. 99–11, at 2–5.

The language of the charter unambiguously establishes that each member of the CCCMC, including Defendants, could reasonably expect to have: (a) its affairs monitored by the CCCMC on regular basis; and (b) the regulatory regime, including its minimum price requirement, punitively enforced through invocation of those particular prescripts which the CCCMC and/or

the MOFCOM could construe as operable at the time of each particular violation of the minimum price requirement.[136] *Accord Minister Wu Yi Discusses the Reform of Import and Export Chambers of Commerce,* ("*Minister Wu*") *Vitamin C,* Civil Action No. 06–md–1738 (E.D.N.Y.), Docket Entry No. 394–2, at 84, 87 (a publication in which Xu Guo Ming, a "specially invited correspondent," related Minister Wu's explanation that: (a) "[b]usinesses having the right to conduct foreign trade . . . all shall obey the coordination of the [CCCMC]"; (b) "[c]oordination means that all [c]hambers of [c]ommerce must . . . coordinate the . . . export transactions of [their] members from the perspective of safeguarding . . . the normal order of China's foreign trade"; (c) "[China's] socialist market economy is still in a nascent stage [where s]ome enterprises[,] after their operational discretion has expanded[,] have not formed their own mechanism enabling [the Chinese versions of] self-determination . . ., self-discipline and self-development [corresponding to the government policies, and caused t]he phenomemnon of blind competition among domestic companies and disruption of market order"; (d) "[w]ith respect to any individual business found to be in violation of the government regulations and the industry-wide agreement [e.g., as to the minimum price, the CCCMC] shall punish these businesses [and] may propose to the [MOFCOM] to impose sanctions upon such business"; and (e) "[t]o facilitate the coordination of the [CCCMC, the MOFCOM plans to] set up several examples by seriously punishing businesses that do not follow the coordination process").

A person applying the United States standard of reasonableness would read the language of the CCCMC charter and Minister Wu's statement as evidence of the CCCMC's: (a) actual enforcement powers; and (b) intent to use these powers punitively. *Accord Resco WDPa,* Civil Action No. 06–235(JFC) (W.D.Pa.), Docket Entry No. 123–4, at 7 and 9 (the November 4, 2009, Request for a WTO Panel by the USTR, asserting that "China . . . imposes . . . restrictions on the exportation of the [minerals falling within the scope of the

---

136. Plaintiffs erroneously assert that the CCCMC could not be a true enforcement arm of the Chinese government simply because the CCCMC's website describes it as a "self-disciplined organization." *See* Opp. at 24. However, the MOFCOM clearly indicated that it intended to use the term "self-discipline" in its Chinese meaning, *i.e.,* as a mandate conveying the members' obligation to obey and be ruled by their "chambers of commerce," *see Vitamin C,* Civil Action No. 06–md–1738 (E.D.N.Y.), Docket Entry No. 400–1, at 3, and the Court has no reason to presume that the CCCMC, being directly controlled by the MOFCOM, defined itself by using the American rather than the Chinese meaning of the phrase "self-discipline." *See, e.g.,* Wang Xiaoye, *The Prospect of Antimonopoly Legislation in China,* 2002 Wash. U. Glob. Studies 2001, 208–09, *available at* <<http://law.wustl.edu/wugslr/issues/volume1/p201Wang.pdf>> (where the author, a professor of law at the Chinese Academy of Social Studies, being un-affiliated with any litigation, observed that "[o]ne always should view 'industrial self-discipline prices' as a synonym for government intervention in price competition among enterprises. In August 1998, the State Economic and Trade Commission [of China] issued its 'Opinions On Self–Discipline Pricing For Certain Industrial Products,' which, on the grounds that it was necessary to end price wars and disorderly competition, demanded that the producers of certain industrial products observe the minimum price limits set by their respective trade associations. . . . 'Industrial self-discipline prices' operate as a type of compulsory price cartel because they force enterprises to sell their products according to 'coordinated prices' . . . which [are] based . . . on the average costs within a particular industry [and, thus, necessarily] exceed[ ] the individual costs of . . . efficient enterprises[; that, in turn,] restrict[s] the scope of price reduction for these enterprises and deprive[s] them of the opportunity to expand their production and operation") (footnote omitted).

CCCMC] by requiring that prices for the[se] materials meet or exceed a minimum price before they may be exported" and relying, *inter alia,* on the language of the charter). *A fortiori,* a reasonable person *standing in Defendants' shoes* could duly conclude that a violation of the minimum price requirement would entail, in actuality, such high risk of punishment that it would warrant compliance.[137] Therefore, Defendants's actions could be viewed as governmentally compelled, even if Defendants never decided to challenge the CCCMC/MOFCOM by non-compliance with the minimum price requirement: the defense of duress does not require the defendant to act self-destructively.

### e. *Miscellaneous Considerations*

Plaintiffs, however, appear to be of opinion that the risk of punishment Defendants faced for non-compliance was insufficiently high to substantiate compulsion. In support of that position:

(i) Plaintiffs assert that a third of Chinese exporters of magnesite products did not comply with the minimum price requirement. This argument seemingly aims at suggesting that a persistent non-compliance with the requirement did not endanger the operations of those exporters ("Market-split Point");

(ii) Fostering, it seems, an analogous point, Plaintiffs rely on the asserted export practices of Zhejiang, the litigant which European Union case was built on its alleged non-compliance with the minimum price requirement applicable to the members of the glyphosate section of the CCCMC ("*Zhejiang Xinan* Point"); and, in addition

(iii) Plaintiffs point out that the respective yearly export quotas allotted by the Chinese government to the magnesite products industry were frequently not fully used. This argument, seemingly, aims to suggest that the punishment of having one's export quota reduced as a result of non-compliance with the minimum price requirement would not be a "real" punishment because the so-punished enterprise would stand to lose an opportunity it cannot use anyway ("Quota-allotment Point"). *See* Opp. at 23, 50–51 and 58.

For the reasons detailed below, the Court is not persuaded.

---

**137.** Charles Sanders Peirce, an American philosopher, logician and scientist, introduced the method of logical inference known as abductive reasoning, where an assessment of a set of facts that appear related is performed with a presumption that these facts are indeed related. *See Collected Papers of Charles Sanders Peirce* 248, 268 (Charles Hartshorne & Paul Weiss editors, 1934). "We proceed by guesses, Pierce explain[ed], because 'our knowledge is never absolute." Louis Menand, *American Prodigy,* N.Y. Rev. Books 30, 35 (Dec. 2, 1993). Abductive reasoning permits use of a known rule in order to explain an observation: the statement "if it rains, the grass is wet" is an example, since the technically correct observation should be an Occam razor "if the grass is wet, the most probable explanation is that it recently rained." Piercian philosophy is manifested in human tendency to accept one's word as one knows it, and it has become an indelible part of the United States jurisprudence after the decisions written by Oliver Wendell Holmes, Louis Brandeis, Benjamin Cardozo and Learned Hand, who transformed American legal formalism into contextualism. *See* Richard A. Posner, *The Problems of Jurisprudence* 26–28 & n. 41 (1990); Robert L. Hayman Jr. & Nancy Levit, *Jurisprudence* 453 (1994); *see also* Wilson Huhn, *The Five Types of Legal Arguments* 13–68 (2002); Jeremy Paul, *The Politics of Legal Semiotics,* 69 Tex. L.Rev. 1779 (1991); *accord Warner v. Goltra,* 293 U.S. 155, 156, 55 S.Ct. 46, 79 L.Ed. 254 (1934) (Cardozo, J., utilizing the "policy of liberal construction" to correct a prior line of cases where "verbal niceties were bent to the over-mastering purpose of the [law]"). Thus, Defendants' correlation of the monitoring/enforcement by the CCCMC to the stream of prescripts creating the legal regime and to the possible maximum punishment is a valid exercise in contextual logic.

The gist of Plaintiffs' *Zhejiang Xinan* Point appears to be that, if Zhejiang was not punished for not complying with the minimum price requirement, then the requirement existed only "on paper" and, thus, could not compel Defendants "in actuality." However, Plaintiffs' reading of *Zhejiang Xinan* omits to take into account that Zhejiang was a member of the glyphosate section of the CCCMC, *see Zhejiang Xinan*, 2009 ECJ EUR–Lex LEXIS 529, ¶ 4, which might have had far less stringent supervision/enforcement than the magnesite section, of which Defendants were members. In addition, Plaintiffs ignore the Trial Court's careful clarification that the EU amended its antidumping law hoping to "enable qualified Chinese exporters, *however few they may be*," to achieve the MET status, *see id.* ¶ 62 (emphasis supplied): such acknowledgment suggests the Trial Court's realization that non-compliance with the minimum price requirement was recognized by the European Union to be an exception rather than the rule of the Chinese exportation. Similarly, Plaintiffs omit noticing Zhejiang's own concession of the EU Council's position that MOF-COM/CCCMC's well-developed regulatory, monitoring and enforcement mechanisms remained invariably operable (at least until the date of the issuance of *Zhejiang Xinan*, that is, until June 17, 2009). *See id.* ¶¶ 130, 140 ("[t]he Council contends . . . that there was a very efficient control system in place . . . . [Zhejiang] does not dispute that [this CCCMC's approval and veto] mechanism"). Therefore, the conclusions that can be drawn from Plaintiffs' *Zhejiang Xinan* Point is that Defendants' situation might have been different from Zhejiang's, and Defendants were not as intrepid in their business affairs as Zhejiang was in his. However,

these conclusions are inapposite to the issue of actual risk of punishment faced by Defendants because a duress inquiry turns on the ability to resist pressure of an average person and, in addition, on the "egg-shell" qualities of the defendant. *See* Restatement 2d, Torts, §§ 871, comment f; 892B, comment j.

Advancing their Market-split Point, Plaintiffs' claim that, "if the law had compelled magnesite exporters to fix-prices, all magnesite exporters would have participated in the cartel. Instead, up to 30% of the exporters declined to participate in 2001." Opp. at 58 (citing Am. Compl. ¶ 54). However, the allegations stated in Paragraph Fifty–Four are silent as to anyone's refusal to comply with the minimum price requirement; rather, Paragraph Fifty–Four merely states that "[t]he members of the two Jiyuan and Huaxia Magnesite Groups [*i.e.*, the initial "sub-cartels,"] collectively represented more than 70 percent of the export volume of magnesite in China." Docket Entry No. 77, ¶ 54. Hence, it appears that Plaintiffs simply deduced from the compulsion-unrelated statement in the Amended Complaint that the remaining less-than-thirty percent of Chinese exporters ("Remaining Exporters") did not comply with the minimum price requirement because they did not feel "compelled enough."

Plaintiffs' deducement is logically flawed, being not only a stretch of logic but also inconsistent in light of other statements made in the Amended Complaint. Specifically, in Paragraph Sixty–Nine of the Amended Complaint, Plaintiffs contend that "Defendants have been able to increase [export] prices [for magnesite-based products] without maintaining 100 percent control of the market [because they] have competitive advantage of lower costs than their competitors," that is, the Remaining Exporters. *Id.* ¶ 69 and note 22.[138]

---

**138.** Note 22 of the Amended Complaint refers the Court to CEH, the document seemingly

In other words, Plaintiffs concede that these Remaining Exporters were exporting their magnesite-based goods at the prices equal to or exceeding Defendants' prices which, in turn, were equal to or exceeding the minimum price mandated by the government. Consequently, Plaintiffs effectively concede that these Remaining Exporters were *automatically complying with the minimum price requirement* by exporting at above the minimum price,

central to Lamb's Report. *See supra* note 26 of this Opinion (observing that CEH was not attached to Lamb's Report, and the Court could only locate the "product review" titled "Magnesium Oxide and Other Magnesium Chemicals" online which allows the reader only the table of contents but, otherwise, requires a $3,000 subscription, *see* <<http://www.sriconsulting.com/cgi-bin/listoptions.pl?/CEH/Public/Reports/747.2000/>>).

Same as Lamb's Report, Plaintiffs' Opposition, in footnote 3, referred to this "product review" and advised the Court that certain "excerpts [of this 'product review' were] attached [to Plaintiffs' Opposition] as Exhibit 2." Opp. at 14, n. 3. However, the Declaration of Robert A. Magnanini ("Magnanini Declaration"), also attached to the Opposition, advises the Court that "[a]ttached hereto as Exhibit 2 is a ... copy of the Comments from the [CCCMC] to [the DOC]." Docket Entry No. 105-2, at 2. Giving Plaintiffs the benefit of the doubt, the Court examined the entire Magnanini Declaration and all exhibits attached to the Opposition in order to determine whether the promised excerpts of CEH were attached as an exhibit other than Exhibit 2, but detected no such exhibit. *See, generally,* Docket Entry No. 105-2. Since Plaintiffs' Amended Complaint was also accompanied by certain exhibits, the Court—in order to ensure fairness to Plaintiffs—also examined all those exhibits aiming to locate these excerpts of CEH, but detected none. *See* Docket Entries Nos. 77–1, 77–2 and 77–3. Therefore, the Court has no information as to either the content or reliability of CEH statements on the basis of which Plaintiffs reached their conclusion that Defendants' costs were lower than the costs of the remaining less-than-thirty percent of Chinese exporters. Moreover, it is unclear to the Court how could CEH authors possibly provide such information since: (a) in order to make an accounting determination as to average costs, data was needed as to the actual identities and actual fixed and variable costs (plus marginal costs) of each member of such "sub-cartels," as well as to the identities and the corresponding costs of alleged non-members of these "sub-

cartels," *see Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 909 (9th Cir.2008) (detailing the calculation of per-unit cost); (b) CEH, not being a member of the CCCMC, could not have access to Defendants' (and other CCCMC members') accounting data, which was disclosed only internally; and (c) any public information upon which the authors of CEH could have relied had to be facially insufficient, because the Chinese Accounting Standards ("CAS"), rather than Accounting Standards for Business Enterprises ("ASBE"), governed the disclosure requirement until January 1, 2007 (that is, until six years after CEH was produced), *see, e.g.,* <<http://www.chinaorbit.com/china-economy/chinese-accountingstandards.html>>, and—unlike the ASBE (which still differ from and are perceived as less stringent than the International Accounting Standards ("IAS"), *see, e.g.,* Songlan Peng, *Chinese Accounting Standards* (VDM Verlag Dr. Mueller e.K.2007))—the CAS required only a limited disclosure of the enterprise's accounting and financial data, and, in addition, directed the accounting approaches, which—under the IAS and the Generally Accepted Accounting Principles United States—should be qualified as data distortion. *See* Michael E. Burke IV, *China's Stock Markets and the World Trade Organization,* 30 Law & Pol'y Int'l Bus 321, 363–64 (1999) ("[the CAS] require that fixed assets be stated at cost[,] ... inventories [be] stated at cost [too,] ... [d]epreciation [information be distorted because] residual value [could not be disclosed in excess of] 3% to 5% of original cost[,] ... [p]re-operating expenses [had to be] amortized in equal installments over five years [rather than as they were in reality], [s]hareholder equity [had to be] valued at the official rate [rather than at market rate, and] bad debts [could not be disclosed in excess of] 0.3% to 0.5% of total receivables") (relying on CAS provisions discussed in detail in Matthew Harrison, *Asia–Pacific Securities Markets* (2d ed. 1994), and Deloitte Touche Tohmatsu International, *International Tax and Business Guide: People's Republic of China* (1997)).

which—in turn—means that none of these exporters could have possibly displayed a Zhejiang-like non-compliance with the requirement. In light of the foregoing, this Court cannot conclude that the conduct of these Remaining Exporters somehow indicated that the risk of punishment for non-compliance was absent, granted that these Remaining Exporters invariably complied with the minimum price requirement.[139]

Finally, Plaintiffs' Quota-allotment Point is flawed both statistically and economically. Plaintiffs assert that, "[i]n 2001, the export quota[ ] awarded by the [Chinese] government [to all Chinese exporters, as an industry,] exceeded the actual volume of magnesite exports by more than 300,000 tons. [Unspecified amount of such industry-wide e]xport quota[ was] also left unused in 2004. In 2009, export quota [allotted, too, industry-wide] have again exceeded the total volume of exports." Opp. at 23 (citing Docket Entry No. 99–15, at 3 (addressing 2001); Docket Entry No. 105–28, at 4 (addressing 2004); and Docket Entry No. 105–29 (addressing 2009)). However, the Court has no reason to deduce from such industry-wide statistics that Defendants *personally* did not fully

use their allotted quotas and, hence, that the danger of having their personal quotas reduced was necessarily perceived by Defendants as a punishment too irrelevant to remove the compulsive force of the minimum price requirement. Moreover, even if the Court were to presume that the danger of having the export quota reduced was only a nominal concern to Defendants, such presumption has no effect on Defendants' concerns as to their ability to make a living altogether, *i.e.*, the concern that non-compliance with the minimum price requirement might result in revocation of the exporter's license, thus yielding the "allotted quota" of zero. Since there is a dramatic distinction between: (a) one's lack of concern with being able to conduct hypothetical *extra* business; and (b) one's ability to conduct *any* business, Plaintiffs' Quota-allotment Point cannot change the outcome of the Court's analysis.[140]

The remaining points made by Plaintiffs are, alas, outlined rather faintly. However, recognizing that abstention is a case-dispositive measure that shall not be imposed lightly, see *Mannington Mills,* 595 F.2d at 1293, the Court feels obligated to address every Plaintiffs' argument the

---

**139.** Moreover, it seems that Plaintiffs' position could be reduced to a concession that the entire Chinese magnesite industry complied with the minimum price requirement, but Defendants and their unidentified "co-conspirators" were not "truly compelled" because they embraced the law willingly, while the Remaining Exporters "rebelled responsibly" by complying with the minimum price out of business necessity but being "emotionally opposed" to the legal regime and "hypothetically willing" to not comply with its requirement. The Court cannot accept Plaintiffs' assertion of such hypothetical rebellion by unspecified enterprises as a proof that the risk of punishment was not actually present. Moreover, Plaintiffs' reference to *unspecified* "co-conspirators" of Defendants, see *supra* note 14 of this Opinion, allows for a conclusion that, after 2001, *all* exporters became Defendants' "co-conspirators" by abandoning

their hypothetical rebellion and willingly embracing the minimum price requirement.

**140.** Plaintiffs' Quota-allotment Point appears particularly duplicitous in light of Plaintiff Resco's claim to the ITA that China has *successfully* utilized the process of export quota allotment (jointly with China's minimum price requirement) to achieve compulsive control over the business practices of Chinese exporters dealing in magnesite-based goods. See *Magnesite from China,* 74 Fed.Reg. 68,247–48 ("[China] has established export quotas and a minimum acceptable export sales price (*i.e.,* export restraints) for a number of raw materials, including three types of magnesi[te] used in the production of [the products at issue in the instant matter. All Chinese] exporters of magnesi[te] are subject to these export restraints").

Court can detect. For instance, the Court notes Plaintiffs' statement that, "the most that can be said of the [Chinese legal regime] is that the Chinese government [was] enforc[ing] agreements among members of a chamber of commerce regarding minimum export prices[; however, l]egislation of a foreign country that merely aids defendants' conspiracy does not convert defendants' deliberate acts into acts of the foreign government." Opp. at 48 (citing *United States v. Sisal Sales Corp.*, 274 U.S. 268, 276, 47 S.Ct. 592, 71 L.Ed. 1042 (1927), and *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 705, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)). The Court agrees with Plaintiffs as to the latter aspect (that is, as to the statement of the legal rule), but not with Plaintiffs' application of that rule to the fact in the instant matter, since both cases cited by Plaintiffs expressly turned on lack of direct (or even indirect) government compulsion,[141] which is not the case here.

Another ambiguous argument fostered by Plaintiffs is the Misplaced Argument (raised in support of Plaintiffs' position that the CCCMC was/is not an appendage of the Chinese government). As noted *supra*, the Misplaced Argument asserts, in part, that the MOFCOM's Circular of February 12, 1998, should be deemed repealed by the beginning of the Class Period because the Circular "pre-date[d] the formation of two initial export cartels by two years and pre-date[d] the formation of the unified export cartel by three years[, as well as] China's accession to the WTO [during which] China explained to the WTO [that,] by 2000[,] there [was] only limited number of products subject to government price control." The errors in Plaintiffs' position that the passage of time or China's decision to embark on the path of gradual economic reforms (or China's accession to the WTO) interrupted the legal continuum of Chinese law were already addressed *supra*. What has not been addressed thus far is Plaintiffs' position that Defendants' reading of the 1998 Circular is "clearly contrary to [the] interpretation [given] by the CCCMC." Opp. at 52 (emphasis removed) (relying on Plaintiffs' exhibits filed as Docket Entries Nos. 105–4 and 105–21).

Plaintiffs misread the Circular, the position taken by Defendants, and the content of their own exhibits evincing the position of the Chinese government. The Circular reads as follows:

> ... All chambers ... shall actively do a good job in the coordination of export goods. [The MOFCOM] hereby notif[ies] the chambers as follows: You must be s]trengthening [your] investigation on the export situation of price coordination .... [You must be] adjusting the coordinating prices of export commodities ...; at present, being affected by the Asian Financial Crisis,[142] the condition of some commodities in the international market is not stable, and

---

**141.** Plaintiffs' reading of *Sisal Sales* is virtually identical to the reading of *Sisal Sales* by the plaintiffs in *In re Refined Petroleum Prods. Antitrust Litig.*, 649 F.Supp.2d 572 (S.D.Tex. 2009). The *Refined Petroleum* court provided a detailed discussion of *Sisal Sales* and carefully explained why the holding of *Sisal Sales* does not apply to the scenario where a foreign sovereign creates—and/or directs compliance with—the prescript that lies at the root of the defendants' conduct. *See Refined Petroleum*, 649 F.Supp.2d at 590–91. Hence, for the reasons provided by the *Refined Petroleum* court, Plaintiffs' position is without merit. Similarly, Plaintiffs' reliance on *Continental*

*Ore* is misplaced: in that matter, the Supreme Court dealt with a scenario where "nothing ... indicate[d] that [the foreign sovereign's] law in any way compelled [the defendants' conduct,]" and where "there [was] no indication that ... any ... official within the structure of the [foreign] Government approved or would have approved [the defendants' conduct] or directed that [conduct]." *Continental Ore*, 370 U.S. at 706–07, 82 S.Ct. 1404.

**142.** "The Asian financial crisis was a period of extreme difficulties in the financial and construction sectors of Pacific Rim countries" in 1997–1998. *Comm. for Fair Beam Imps. v.*

China's competitiveness in export has been under threat. Therefore, all chambers ... shall clean up the current export price coordination plans in an all-round way and organize member enterprises to deliberate and adjust the negotiated prices of some export commodities so as to, under the precondition of maintaining the [profitable] economic effects of exports, improve China's competitiveness of export and enhance [the Chinese version of] the normal development of export.

Docket Entry 35–52, at 2–3. Defendants' reliance on the Circular is limited to two statements made in the Minmetals' Motion, reading: "[t]he chamber responsible for assisting [the] MOFCOM in connection with the coordination of numerous issues relating to the export of magnesite is the [CCCMC]," and "[the] MOFCOM ... mandates [*inter alia,*] that exporters follow [the] minimum export price [the actual figures of which are e]stablished through [Defendants'] chambers of commerce." M/Mot. at 10, 14. Hence, Defendants in no way asserted that *all* "chambers of commerce" were engaged in developing minimum price figures or in enforcement of the minimum price requirement: they merely stated that the CCCMC was performing these functions, and that these functions were in accord with the MOFCOM's mandate stated in the Circular.

The content of the exhibits relied upon by Plaintiffs in support of their assertion that the CCCMC's reading of the Circular is contrary to the reading offered in the Minmetals' Motion provides Plaintiffs with no such support. In fact, Plaintiffs' exhibit filed as Docket Entry No. 105–4 was already discussed *supra,* in conjunction with Plaintiffs' position that the CCCMC is not an appendage of the Chinese government. As noted *supra,* this exhibit is the CCCMC's letter to the DOC, dated April 19, 2007, which begins with the statement, "[o]n behalf of [the CCCMC] and our 4[,]000 companies, we submit the following comments on [the non-MET status applied by the DOC to the Chinese goods imported into the United States]." Docket Entry No. 105–4, at 2. The other exhibit upon which Plaintiffs rely, filed as Docket Entry No. 105–21, is the MOFCOM's comments ("Comments") dated June 25, 2007, and addressed to the DOC. Same as the CCCMC's letter of April 19, 2007, the MOFCOM's Comments seek to persuade the DOC that the non-MET status shall apply to Chinese enterprises importing goods into the United States. The Comments state, in relevant part, as follows:

> [T]he United States has persistently refused China's application [for the MET status] on various pretexts and fully ignored the evidence and facts that have

United States, *477 F.Supp.2d 1313, 1324 n. 12 (C.I.T.2007) (citation and quotation marks omitted). The crisis started in Thailand upon financial collapse of baht, the Thai currency, and swiftly spread throughout most of Southeast Asia, affecting predominantly Japan, Indonesia, South Korea and Thailand, but also hurting the economies of Hong Kong, Malaysia, Laos and the Philippines, and causing losses in China, India, Taiwan, Singapore, Brunei and Vietnam, with a prolong ripple effect throughout the entire global community.* See generally, *William C. Hunter et al.,* The Asian Financial Crisis: Origins, Implications and Solutions *(Springer 1999);* see also *Bee Hua Goh,* The Dynamic Effects of the Asian Financial Crisis on Construction Demand and Tender Price Levels in Singapore *<<http://www.sciencedirect.c om/science?_ob=ArticleURL&_udi=B6V23-4D99B9X-3& ser=10&_coverDate=02% 2F01% 2F2005&_rdoc=1&_mt=high&_ %1orig=search&_sort=d&_docanchor=& view=c&_searchStrId=1187540465&%6 DrerunOrigin=google&_acct=C0000 50221&_version=1&_urlVersion=0&_user-id=10&md5=f7976040d268ddaf15fa375f7c 83efe9>> (June 2004) (discussing the ripple effect of the crisis still existing in 2004).*

been provided by China. Because the United States has persisted in designating China as a non-market economy country in its antidumping investigations, the result is that Chinese enterprises cannot [get more favorable MET] treatment in antidumping investigations. Over more than 20 years of accelerating reforms in its economic system, China has established a market economy system [that] has not only been written into the Chinese constitution, but is, in fact, a more developed market economy system than the system of some countries which the U.S. has actually recognized as market economies.... We hope that the U.S. government can also objectively see the achievements that China has achieved in its reforms and in opening-up and becoming a true market economy. There is no basis to deny the status of market orientation to China's exporting industries on the pretext that the prices of ... main raw materials inputs by enterprise are controlled by the government. [China does not see such price control as an intervention qualifying China as a non-market economy because] China does not intervene in these prices any more than do governments in countries that the U.S. considers market oriented. Market economy countries, including the United States, are no exception to selective interventions [employed by China]. Governments in market economies attempt to influence price trends in the same way that China attempts to influence price trends. [Since t]his practice is not unique to China and not unique to non-market economies[, China should be deemed a market economy].

Docket Entry No. 105–21, at 2–7. Since the case at bar is not an antidumping proceeding, this Court need not address the issue of whether the DOC/ITA correctly calculate antidumping duties imposed on Chinese enterprises bringing their goods for sale in the United States. However, the content of Comment appears enlightening as to what seems to be a conflict in the CCCMC/MOFCOM's tendency to simultaneously claim that: (a) the exporting enterprises have been operating under "market economy conditions"; but, nonetheless, (b) the exporting enterprises have been subject to enforcement of the minimum price requirement. This seeming incongruence appears to be rooted in the difference between: (a) the Western world's perception of a market economy as a materialization of the laissez-faire concepts articulated by Adam Smith;[143] and (b) the Chinese unique vision of "socialist market economy." *See also, supra* note

**143.** Adam Smith is perceived as the father of political economics. His "Theory of Moral Sentiments" (1756) and his magnum opus "The Wealth of Nations" (1776) set the framework of what is known as laissez-faire market economy, driven by the invisible hand consisting of such forces as self-interest, competition, and supply and demand. *See Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 592, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (Rehnquist, J. dissenting) (detailing the concept of the invisible hand and discussing Smith's influence on the theories of markets); *Hume v. Moore–McCormack Lines, Inc.,* 121 F.2d 336, 338–45 (2d Cir.1941) (same). The concepts articulated by John Maynard Keynes in "The General Theory of Employment, Interest and Money," published in 1936, altered laissez-faire economics by introducing the concept of a "mixed economy," based predominantly on private sector but, nonetheless, envisioning a large role played by the government. *See Ronconi v. Larkin,* 253 F.3d 423, 427 and n. 3 (9th Cir.2001) (summarizing the rationale of Keynesian economics); *see also United States Dep't of Labor v. Triplett,* 494 U.S. 715, 724, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990) (quoting Keynes' famous justification for governmental intervention, "[i]n the long run, we are all dead"). It appears that the MOFCOM's Comments were referring to the Keynesian model widely employed by many current nations.

117 of this Opinion (discussing the difference between "pure" and "socialist" market economies).

This Court is neither in the position nor has a mandate to pass judgment on the economic route or economic goals chosen by the Chinese government. *Accord Vitamin C*, 584 F.Supp.2d at 559 ("The court does not question th[e] goal or even China's methods of [transition from a command to a market economy]"). The inquiry before the Court is narrow, *i.e.*, whether the Chinese government compelled Defendants' compliance with the minimum price requirement. The MOF-COM's Comments answer this question in the affirmative, explaining that the Chinese government exercised such compulsion while perceiving it wholly compatible with the Chinese version of socialist market economy. Such answer eliminates the conflict in the position taken by the MOF-COM and CCCMC, and—jointly with the MOFCOM's E.D.N.Y. Statements filed in *Vitamin C*, Resco's admissions noted in *Magnesite from China*, the USTR's request for a WTO panel filed in *Resco WDPa*, evidence filed in this matter and those detected by the Court—concludes the Court's inquiry into whether abstention is warranted: this inquiry is limited to the actual presence and enforcement of governmental compulsion, and it does not concern itself with how China harmonized such compulsion with the economic terminology and goals she selected.

That being said, the Court cannot ignore the implications of one more, although rather vaguely articulated, Plaintiffs' argument that reads as follows:

> Plaintiffs allege the formation of two separate [sub-]cartels acting outside the purview of the CCCMC in 2000 and the unification of those cartels [into a single "Cartel"] in 2001. The[ ] acts [of creating these specific "sub-cartels" and "Cartel"] were not contemplated or directed by any CCCMC document[ ] submitted to the Court.

Opp. at 53 (citing Am. Compl. ¶¶ 1, 52–55, 57–65 and 68).

It appears that Plaintiffs' logic is as follows: since (a) there is no CCCMC's document on the record directing, in express writing, creation of the first two alleged "sub-cartels"; and (b) there is also no CCCMC's document on the record directing, in express writing, unification of these alleged "sub-cartels" into the alleged "unified Cartel," such lack of documentary proof as to the government-mandated stages of "cartelization" must also mean lack of government-mandated minimum price requirement, because—had it been a government-mandated minimum price—it would have applied to all exporters of magnesite-based goods at once and long before the two alleged "sub-cartels" came about.

The argument—if correctly distilled by the Court—is flawed with regard to the issue of government compulsion, as a concept, due to Plaintiffs' misreading of the exhibits filed in this matter. Here, the CCCMC charter indicates that the magnesite section of the CCCMC was continuously operating by holding mandatory meetings at various levels. *See* Docket Entry No. 99–11, at 4–5. The fact that the list of attendees of these meetings varied (and, at each meeting, different attendees expressed their ardor in supporting China's export goals or in deliberating the actual minimum price figures) in no way renders a nation-wide governmental enforcement of the minimum price requirement impossible.[144] However, this fact

---

**144.** China covers 9,596,961 square kilometers, being just slightly smaller than the United States, and is the fourth largest country in the world. See, e.g., <<http://www.cia.gov/ library/publications/the-world-factbook/geos/ ch.html>>. Climate conditions, infrastructure, technical advancement, cost of labor, standards of living, etc., differ dramatically

also suggests that—unrelated to the issue of MOFCOM/CCCMC's enforcement of the government-mandated minimum prices—certain members of the Chinese magnesite industry could have entered into a number of their private agreements to

sell their goods at a certain "supra-minimum price" ("SMP"). *See* Opp. at 53 (citing Am. Compl. ¶¶ 1, 52–55, 57–65 and 68, where the relevant Paragraphs[145] rely on Plaintiffs' Exhibits 6–9 and 11–20, filed as Docket Entries Nos. 77–1, 77–2 and 77–3).[146] Specifically:

throughout China, although some of these differences are gradually dissipating. *See, e.g.,* Stephen L. Morgan, *Richer and Taller: Stature and Living Standards in China, 1979–1995,* The China Journal 44 (July 2000) (discussing the differences between regions at the end of the 20th century). Therefore, it would be improper for this Court to presume that the "minimum price" was necessarily a single figure rendered for a country-wide application: indeed, such "one price" approach is typical only to a centrally planned economy, with which China is trying to part. Rather, China's decision to transition to a socialist market economy appears far more compatible with an initial balkanization of the industry and a "schedule of minimum prices" factoring in the peculiarities of different locales, state or private ownership of the enterprises, size of production facilities, length of export license operation, etc., with progressive harmonization of such schedule later on, as the differences in the exporters' operations fade out. The Court, being a United States district court, is not in the position to fancy the political or economic considerations utilized by the CCCMC/MOFCOM throughout a decade of administrative regulations: the federal courts tend to avoid second guessing even the expertise of the agencies operating in the United States, *see, e.g., Browning–Ferris Indus. of South Jersey, Inc. v. Muszynski,* 899 F.2d 151, 160 (2d Cir.1990) ("[c]ourts should be particularly reluctant to second-guess agency choices involving [technical matters] that are in the agency's province of expertise"), and they are certainly not in the position to render on or guess the considerations falling within the expertise of a foreign agency.

145. The Court is not entirely clear as to the rationale underlying Plaintiffs' citations to the paragraphs in the Amended Complaint that state either irrelevant information or factless self-serving conclusions, *i.e.,* Paragraph One (asserting that "[t]his case arises out of a conspiracy among all Defendants and their co-conspirators that has the purpose and effect of fixing prices of magnesite and magnesite products"); Paragraph

Fifty–Five (asserting that, "[a]s a result of [Defendants'] agreements, despite slumping demand, the price of magnesite products imported from China to the United States increased during 2000"); Paragraph Sixty–Five (asserting that, "[d]ue to the efforts to increase prices at the end of 2003, the [unified] Cartel achieved significant price increases in the U.S., stabilized U.S. prices, and avoided major price cutting despite low levels of demand"); and Paragraph Sixty–Eight (asserting that "Defendants' decision to enter into the *per se* unlawful agreements ... was and is wholly voluntary").

146. Exhibits 6–9, 11–14, 16–17, and 19–20 replicate: (a) *China Jiayuan Magnesite Export Group,* Engineering & Mining J. (Aug. 1, 2000); (b) *Magnesite Export Group Set up in China's Dalian,* Asia Pulse (Apr. 11, 2000); (c) *Magnesium Carbonate Producers Form Export Syndicates,* Indus. Minerals (Aug. 18, 2000); (d) *Second Chinese Magnesium Carbonate Export Group Formed,* Indus. Minerals (Aug. 22, 2000); (e) *And Then There Was One: China's Latest Magnesia Export Group,* Indus. Minerals (Apr. 2, 2001); (f) *Chinese Export Association Holds Dbm Prices Steady,* Metal–Pages (Aug. 15, 2001); (g) Brian Coupe, *Magnesite,* The Mining J. (Oct.2001); (h) *New Chinese Magnesia Export Group Formed Prices Rise,* Elsevier Engineering Info. (Apr. 1, 2003); (i) *Magnesite Export Industry Self-regulatory Group—The China Magnesite Forum,* A Statement by the CCCMC of Mar. 24, 2003; and (j) United States Surveys for 2004 and 2006. Exhibit 15 does not address the issue of "cartelization"; rather, it reproduces a statement by Liu Jianwei, the head of Legal Services Department of the CCCMC, stating that the CCCMC "is a non-government organization" but, nonetheless, it acts "as a bridge between the government and its [2600] members," thus suggesting that the CCCMC is an appendage of China within the meaning of Chinese version of socialist market economy. Exhibit 18, Docket Entry 77–2, presents no information as to the issue of "cartel-creation." Exhibit 20, Docket Entry 77–3, at 13–14, advocates against Plaintiffs' position since

(i) Exhibits 6, 7 and 8 seem to describe the creation of the first alleged "sub-cartel," stating: "China Jiayuan Magnesite Export Group has been formed by 13 Chinese magnesite enterprises ... Currently, this group produces more than 70% of total magnesite output and 50% of the export quota in China"; "A magnesite export group has been set up in Dalian, a coastal city in Northeast China's Liaoning Province. The group has 13 member companies"; and "Chinese leading magnesite producers formed an alliance, Jia Yuan Magnesite Export Group, on [April 9,] 2000." Exhibit 9 seems to describe the creation of the second "sub-cartel," stating: "[a] second magnesium carbonate group has been formed in China. Huaxia Magnesium Products Export Group is made up of 25 companies.... The group indicates that it will account for over 55% of Chinese magnesium products. However, the first export group[,] Jia Yuan, has also claimed to have 50–60% of total export licence for magnesite." Hence, if—as Plaintiffs assert—both alleged "sub-cartels" were created at the same time, see Am. Compl. ¶ 53, the Chinese export industry dealing in magnesite-based goods was simultaneously "cartel-ized," *in its entirety:* this scenario seems highly compatible with a nation-wide government compulsion (and government-imposed minimum price requirement), but it appears utterly peculiar in the absence of it.

(ii) Exhibits 11, 12, 13 and 14 seem to describe the creation of the "unified Cartel" (which appears to be the entire magnesite section of the CCCMC) and its initial operations, reporting: "the formation of a new single unified group to take the place of two previous separate groups designed to control China's magnesite prices and exports"; "The Chinese Magnesite Export Association ... so far the group has acted in unity"; "One of the major developments over the past year has been the formation of a powerful magnesite exporters' group—the Chinese Magnesite Export Association." Hence, these exhibits also suggest a government compulsion and a governmentally imposed minimum price requirement.

(iii) Exhibit 16 seems to describe one of the meetings held by the magnesite section, stating: "[o]n March 22, 19 major enterprises from the [m]agnesite export industry held a meeting in Shenyang to thoroughly review and analyze the [m]agnesite export industry and to discuss and forecast the international market demand and price trend for the year 2003. After much discussion and exchange of ideas, the group agreed to the immediate setting up of the Magnesite Export Industry Self-regulating Group.... [The attendees expressed their willingness to] accept arbitration and guidance from the [CCCMC (which the CCCMC charter required anyway)], establish standards for export behaviors [ (same) ], protect the interest of the country [which the CCCMC charter, as well as the MOFCOM's regulations and its Minister Wu required anyway], of the industry [ (same) ], and of legal interests of its members against improper competition [ (same), and also to] encourage

the Exhibit states that, "[o]f critical importance was the introduction of controls on export prices and volumes by China's central government in 1994, which had an immediate and lasting effect on minerals trade from China.... Export licenses [are] unique to China but has transformed the trade in certain minerals from China to the West. China's central government, through the [CCCMC], implemented its export license system [since] 1994 ... to enable stricter control of export volumes and prices [and] reduce smuggling." The Court is not entirely clear as to why Plaintiffs' rely on Exhibit 20.

healthy development of the magnesite products industry [ (same) ]."

(iv) Exhibit 17 seems to describe either another local meeting or, potentially, the creation of an unrelated-to-the-CCCMC's-operations collusive group that entered into its own SMP agreement, stating: "[i]n February [2004, under the name] the China Magnesite Self-disciplined Association[,] ... the fifth version of the group was established .... The new group represents [only] five ... Chinese producers ...." The Exhibit is silent as to the identities of the producers that entered into that agreement.

(v) Same as Exhibit 17, Exhibit 19 seems to describe either another local meeting or, potentially, the creation of an unrelated-to-the-CCCMC's-operations collusive group entering into its own SMP agreement (or a re-creation of the collusive group described in Exhibit 17), stating: "In December [2006], the four principal producers of magnesite in China agreed on a $10–per–metric–ton price increase for their [magnesium oxide]. This followed the $30–per–metric–ton price increases that were [already] announced in November [2006]." Just as Exhibit 17, the Exhibit 19 is silent as to the identities of the producers that entered into that agreement. *See* Docket Entries Nos. 77–1 and 77–3.

### 4. Compulsion Established and Asserted

As the foregoing illustrates, the evidence presented in this matter, jointly with the evidence detected by the Court, establishes to the Court's satisfaction that the Chinese government indeed compelled compliance with "*a*" minimum price, which—in turn—means that Defendants' conduct prompted by *that particular* compulsion warrants this Court's abstention.

This conclusion, however, leaves two aspects unresolved. The first requires establishing the minimum price *figures* that applied to Defendants' export operations during the period at issue: if such actual figures were never coined or coined but left unknown to Defendants and to the Chinese governmental bodies enforcing the minimum price requirement (*i.e.*, the CCCMC, MOFCOM, Chinese customs, etc.), then such actual figures were, for all practical purposes, equal to zero, and every agreement to comply with a minimum price above zero would, in that case, be just a private contract lacking governmentally compelled nature and not warranting abstention.[147]

Moreover, even if it is determined that the minimum price figures were known to Defendants and the Chinese governmental bodies enforcing the minimum price requirement, such determination cannot eliminate the possibility that certain Chinese entities, opportunely taking advantage of Chinese governmentally-imposed minimum export prices, entered into their private SMP agreements.[148] If so, such

---

**147.** As the Court pointed out in its notes 104 and 145 of this Opinion, the Court is mindful of the possibility that the minimum price figures might exist in the form of complex schedules and might even be available for verification only through testimonial rather than documentary evidence in light of the secrecy shrouding the process of Chinese minimum price creation and compliance. *Accord Vitamin C,* 584 F.Supp.2d at 553 (observing that the charter of the CCMHPC required its members to strictly follow the mini-

mum price but simultaneously directed them keep this matter "confidential").

**148.** An SMP scenario is, in its workings, identical to the scenario where the governmental minimum price figures are unknown to Defendants/Chinese government bodies because, there, any agreement privately reached between the parties as to the sale at/above a certain minimum price would automatically be an SMP agreement, with the SMP equal to itself (SMP minus zero). Conversely, if the governmentally-imposed minimum price is

SMP agreements could be illegal for the purposes of the United States antitrust law, regardless of whether or not the CCCMC was standing ready to enforce them. The involvement of the CCCMC would have no relevance to the issue of government compulsion, just as the fact that American courts stand ready to direct performance upon finding a breach of a specific performance contract: no adjudication/enforcement of a contractual obligation transforms the underlying contract into a mandate "compelled" by the government.

Defendants appear to be of the opinion that Plaintiffs' Amended Complaint is wholly void of any statements suggesting allegations based on such SMP agreements. *See* S/Reply at 20 ("here, plaintiffs at best allege price coordination consistent with China's regulatory scheme for magnesite[,] and their Opposition is noticeably silent [as to] exports of magnesite above the set price"). This is not entirely true. Plaintiffs at no point admit Defendants' "price coordination consistent with China's regulatory scheme" (indeed, had Plaintiffs so stated, they would come dangerously close to conceding that Defendants qualify for abstention). *See generally,* Am. Compl. Moreover, Plaintiffs' Opposition asserts that Defendants failed to "demonstrate[ ] that the price collusion alleged [in the Amended Complaint] was initiated at the direction of [—] or was required by

[—] the CCCMC [or any other Chinese government body]" Opp. at 52. This statement suggests Plaintiffs' intent to assert claims based on agreements unrelated to Defendants' compliance with the government-mandated minimum price requirement, and it would be an error for this Court to ignore Plaintiffs' intended assertions, even if they were stated rather nebulously. *See Foman,* 371 U.S. at 182–83, 83 S.Ct. 227 ("[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits").

Consequently, Plaintiffs will be allowed an opportunity to re-amend their pleadings (by factually establishing—in accord with the requirements of *Turicentro*—that those defendants whom Plaintiffs would name in their re-amended pleadings, were importers into the United States within the meaning of the introductory clause of the FTAIA and, in addition, by asserting—in accord with the requirements of *Iqbal* and *Twombly*—the facts of such named defendants' agreement(s) to sell their goods at SMP. Defendants then, will be in a position to provide the Court with evidentiary proof, if such is in existence, showing that the SMP prices alleged by Plaintiffs were, in fact, the actual minimum price figures: (a) mandated by the Chinese

known to Defendants/Chinese government bodies, then the entities that purchased these defendants' goods could have suffered the base injury equal to the market-forces-unrelated share of the SMP (where the SMP is the difference between the price actually charged and the government-compelled minimum price). *Accord* Docket Entry No. 77–1, at 70 (Plaintiffs' Exhibit 17, a United States Survey discussing increases in Chinese magnesium oxide prices "[b]ecause of increasing prices in China for fuel coke and increasing freight costs" and, hence, suggesting, that price increases could be a result of market forces

unrelated to collusion); Docket Entry No. 77–3, at 3 (a United States Survey suggesting the same by noting China's imposition of a new 10% export tax on the export of magnesite-based goods in 2007); *see also* Docket Entry No. 35–59, at 3 (the MOFCOM's 2004 regulation that prompts the same conclusion by informing the reader about China's reduction of its magnesite export stimulus, which existed in the form of "rebate" allowing exporters to keep prices low); Docket Entry No. 35–63, at 2 (the MOFCOM's 2005 regulation informing the industry about complete elimination of this magnesite export stimulus).

government; and (b) known to Defendants and Chinese governmental bodies capable of enforcing—or otherwise punishing Defendants for non-compliance with—the minimum price requirement.[149]

## VIII. *CONCLUSION*

For the foregoing reasons:

(i) Plaintiffs' Amended Complaint will be dismissed. Such dismissal will be with prejudice as to Plaintiffs' claims based on the exporter exception to the FTAIA. However, Plaintiffs' claims in-voking this Court's subject matter jurisdiction under the introductory clause of the FTAIA will be dismissed without prejudice, and Plaintiffs will be allowed an opportunity to amend these claims and submit factual proof in support. Plaintiffs will also be allowed an opportunity to amend their pleadings by stating facts showing that the defendants named in Plaintiffs' re-amended pleadings entered in private collusive agreements: such allegations shall specify the particular defendants that entered in such agreements, the circumstances of

---

**149.** The Court stresses that Plaintiffs and Defendants' facts cannot be "sketched": they must be established in detail. Simply put, the Court will not credit Plaintiffs' assertions that—regardless of a decade of United States importation of thousands of tons of magnesite-based products from China—all (or the bulk of) documentary evidence verifying such transactions disappeared and all witnesses, too, developed a memory failure. *Accord supra* note 64 of this Opinion. State and federal courts consistently refused to accept such "dog ate my homework" defense/evidentiary submission, and the Court will not change this rule. *See Lowe v. McGraw–Hill Cos.*, 361 F.3d 335 (7th Cir.2004) (refusing to accept the claim that *evidence vanished* and noting "[t]his 'the dog ate my homework' defense [is] no defense at all") (citing *In re Riggs*, 240 F.3d 668, 670 (7th Cir.2001)); *Allen v. Dockery*, 2008 WL 926674, at *2, 2008 U.S. Dist. LEXIS 27447, at *4–5 (M.D.Ga. Apr. 4, 2008) ("Such an excuse, which sadly sounds like the proverbial and desperate 'dog ate my homework' defense, is not legally sufficient"); *Alsentzer v. Bulboff*, 2005 WL 3701461, 2006 N.J.Super. LEXIS 816 (N.J.Super.App.Div. Jan. 26, 2006) ("[The trial court correctly] observed that [the litigant's] excuses for the lack of evidence most closely resembled 'the dog ate my homework' [defense]. Yet, in this case, we have no dog, [and even] no x-ray of the dog, to establish ... an appropriate excuse") (internal quotation marks and citation omitted). In the same vein, the Court will not allow Plaintiffs to conduct discovery of to the entire Chinese magnesite industry in search for the entities, which Plaintiffs might deem suitable defendants for purposes of their re-amended pleadings, *i.e.*, the entities that were *importers of goods into the United States.* Similarly, the Court will not accept re-amended pleadings failing to state the identities of the entities that entered into SMP agreements or to detail the facts/circumstances of such SMP agreements, as well as the prices of these SMP agreements. *Accord Iqbal,* 129 S.Ct. at 1954 ("[The plaintiff] is not entitled to discovery [where the complaint asserts some wrongs] "generally," [*i.e.*, as] a conclusory allegation [since] Rule 8 does not [allow] pleading the bare elements of [the] cause of action [and] affix[ing] the label 'general allegation' [in hope of developing actual facts through discovery]"); Am. Compl. at 4 (expressly stating that this matter is not based on any parallel pricing by any Defendant). Simply put, Plaintiffs' belief that they suffered an injury cannot substitute for a valid complaint. *Accord Kumho Tire,* 526 U.S. 137, 119 S.Ct. 1167 (explaining that the law of evidence *eliminates* claims based on "phantom" injuries, *i.e.*, cases involving actual harms, in a literal sense, but unwieldy in a legal sense for the lack of means to trace the injury to a specific action of a specific defendant); *compare* Opp. at 10 (where Plaintiffs, inexplicably, claim that "[t]he only remarkable feature of [the] Amended Complaint is the specificity with which agreements on price are alleged and the accompanying documentary evidence supporting those allegations," even though the Amended Complaint's allegations, e.g., as to the last "conspiratorial" meeting, are limited to a mere statement that, "[on] February 2007, [unspecified] members of the Cartel met [at unspecified location] to discuss a possible agreement to increase the export price [to an unspecified level]").

these agreements and the particular SMP prices agreed upon;

(ii) Defendants' application for abstention on the grounds of the act of state doctrine will be denied, with prejudice, as factually inapplicable;

(iii) Defendants' motions to dismiss, for lack of jurisdiction and pursuant to the FSIA, Plaintiffs' claims against those Defendants that are 100% owned by the Chinese government will be denied, without prejudice to renewal, for insufficiency of evidence currently on the record; and

(iv) The Court's decision as to Defendants' application for abstention on the grounds of the government compulsion doctrine is reserved. In the event Plaintiffs establish this Court's subject matter jurisdiction pursuant to the factual review, as defined in *Turicentro,* and, in addition, duly plead the facts of Defendants' SMP agreements, the Court will re-visit the issue of abstention by directing Defendants to produce a verified schedule of the actual minimum prices:

(a) that existed during every three months of the Class Period;

*and*

(b) that ensued from the Chinese regulatory regime (imposing a minimum price requirement as to Chinese export of magnesite-based goods) composed by the prescripts issued by the State Council of China and/or China's Ministry of Commerce, and/or China's Chamber of Commerce of Metals, Minerals & Chemicals Importers & Exporters, and/or China's Department of Customs and/or similar Chinese government entities, and/or by public letters, addresses or similar statements or pronouncements made by officials of the aforesaid Chinese government entities;

*and*

(c) that were known to Defendants *and* to the Chinese government entities capable of enforcing—or otherwise punishing Defendants for non-compliance with—the aforesaid minimum prices,

in order to determine whether complete abstention is warranted in light of Plaintiffs' SMP prices and Defendants' schedule of the actual minimum prices being identical.

An appropriate Order accompanies this Opinion.